IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIFE UNIFORM HOLDING CORP., *et al.*,[1] | ) | Case No. 13-11391 ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM; (B) MAINTAIN EXISTING BUSINESS FORMS; AND (C) GRANT ADMINISTRATIVE PRIORITY TO INTERCOMPANY CLAIMS AND PERFORM UNDER CERTAIN INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES BETWEEN DEBTORS**

Life Uniform Holding Corp., Healthcare Uniform Company, Inc., and Uniform City National, Inc., the debtors and debtors-in-possession herein (collectively, the "*Debtors*"),[2] respectfully represent:

### Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Robert Frezza (the "*First Day Declaration*"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), which were filed on May 29, 2013 (the "*Petition Date*").

3. The bases for the relief requested herein are sections 363, 364, 503, 507, 1107(a) and 1108 of the Bankruptcy Code, Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rules 2015-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

### Relief Requested

4. The Debtors utilize a cash management system that provides well-established and efficient mechanisms for the collection, concentration, management and disbursement of funds used in their operations (the "*Cash Management System*"). More specifically, the Debtors use the Cash Management System to (a) collect, transfer and disburse funds from operations and (b) facilitate cash monitoring, forecasting and reporting. The Cash Management system, among other things, enables the Debtors to maintain control over their bank accounts (collectively, the "*Bank Accounts*") located at the banks identified on the lists annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "*Banks*").[3]

5. By this motion, the Debtors request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "*Interim Order*" and the "*Final Order*," respectively), authorizing the Debtors to (a) continue to operate the Cash Management System, (b) maintain existing business forms, (c) grant administrative priority to intercompany claims and continue to perform under certain intercompany arrangements consistent with

---

[3] For purposes of confidentiality, the Debtors have only provided the last four digits of the Bank Accounts described in this motion. The Debtors will share a list of the complete account numbers associated with each Bank Account with the United States Trustee for the District of Delaware (the "*U.S. Trustee*"), counsel to the Debtors' prepetition and postpetition secured lender, and any statutory committee of creditors appointed in these chapter 11 cases.

historical practices, junior to the liens of the postpetition lender, and (d) schedule a final hearing (the "*Final Hearing*") to consider entry of the Final Order, to the extent necessary.

6. The Debtors further request that the Court authorize the Banks to (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks or electronic funds transfers drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks before the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

7. Absent authority enabling the Debtors to continue to operate their Cash Management System, the Debtors would be unable to effectively maintain their financial operations, which would cripple the Debtors' business and cause significant harm to the Debtors, their estates, creditors and all parties in interest.

## Basis for Relief

**A.    Description of the Debtors' Cash Management System**

   *(i)    Overview*

8. The Cash Management System consists of approximately 37 Bank Accounts with the following financial institutions:

- Bank of America, N.A. ("*BofA*");
- JP Morgan Chase ("*Chase*");
- Wells Fargo Bank, N.A. ("*Wells*");
- Fifth Third Bank ("*53 Bank*")

3

- First National Bank ("*1st National*");
- Huntington National Bank ("*Huntington*");
- Ameriserv Financial ("*Ameriserv*");
- Regions Financial Bank ("*Regions*");
- Elmira Savings Bank ("*Elmira*");
- First Bank ("*First Bank*");
- BMO Harris ("*BMO Harris*").[4]

9. The Debtors' financial personnel manage the Cash Management System from the Debtors' principal executive office located in St. Louis, Missouri.

10. The Debtors have designed the Cash Management System to meet their operating needs; enable management to control and monitor corporate funds by creating status reports on the location and amount of funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balances.

11. These controls are crucial given the significant volume of cash transactions managed through the Cash Management System on a daily basis. Additionally, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.

---

[4] As of the Petition Date, Ameriserv Financial, Elmira Savings Bank, and First Bank are not designated as authorized depositories (the "*Authorized Depositories*") pursuant to the U.S. Trustee Chapter 11 Guidelines for the District of Delaware ("*U.S. Trustee Guidelines*"). In accordance with the practice in this jurisdiction, the Debtors will make a good faith effort after the Petition Date to cause those Banks that are not Authorized Depositories to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee. To the extent the Debtors need to open a new bank account after the Petition Date, they will only do so either at an Authorized Depository or after consulting with the U.S. Trustee.

12. Funds enter the Cash Management System through various accounts. The retail stores deposit receipts in an account near the location (the "**Collection Accounts**"). The majority of the Collection Accounts are with Chase, Wells Fargo, BofA and 53 Bank. Funds also may be mailed by check or wire to certain lockboxes (the "**Lockboxes**"). The funds in the Collection Accounts and the Lockboxes are wired nightly into a depository account at Wells (the "**Depository Account**"). Credit Card settlements are also deposited into the Depository Account. The balance of the Depository Account is swept daily into a concentration account at Wells (the "**Concentration Account**"). Retail locations that do not use the Collection Accounts deposit their funds nightly in a depository account that is convenient to their location (collectively, the "**Outlier Collection Accounts**"). The Outlier Collection Accounts are swept weekly into the Concentration Account. The Concentration Account is used to fund disbursement accounts at Wells (the "**Disbursement Accounts**"). These Disbursement Accounts are used to pay various operating expenses based on type of expense. For example, there are separate Disbursement Accounts for each of the operating Debtors' accounts payable, there is a separate Disbursement account for each payroll, etc. Finally, the Concentration Account is also utilized to pay down the Debtors' prepetition revolver financing and to receive funds from their Prepetition Lender on such revolver facility. A list of the Debtors' Bank Accounts is attached as **Exhibit 1** to **Exhibit A** hereto. A flow chart outlining the flow of funds through the Bank Accounts is attached hereto as **Exhibit C**.

B.   **The Debtors' Intercompany Transactions**

13. In the ordinary course of business, certain of the Debtor entities and business divisions maintain business relationships with each other, resulting in intercompany receivables and payables (collectively, the "**Intercompany Claims**"). These business relationships result in certain Debtors funding shared service costs, including employee benefits and payroll, shipping

expenses, inventory and supply costs, customer refunds, insurance premiums and professional fees. These costs and revenues are then allocated among the legal entities and business divisions (within the legal entities) resulting in Intercompany Claims. Indeed, as funds are disbursed throughout the Cash Management System (for example, as funds are disbursed from the DIP Facility on a postpetition basis), there may be, at any given time, Intercompany Claims owed by one Debtor to another (the "*Intercompany Transactions*") in connection with the disbursement of funds.[5]

14. The Debtors do not transfer funds from one Debtor entity to another; rather, before the Petition Date, pursuant to the Debtors' ordinary course of business, all Intercompany Claims were netted against each other and then offset against the prepetition credit facility. Postpetition, all Intercompany Claims between Debtors will be netted against each other and then offset against the DIP Facility. The Debtors maintain records of all Intercompany Transactions and, therefore, are able to ascertain, trace and account for the Intercompany Transactions. At the same time, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted.

15. To ensure each individual Debtor will not permanently fund the operations of any affiliated entity, the Debtors respectfully request that, pursuant to sections 364(b), 503(b)(1) and 507(a)(2) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor, arising after the Petition Date as a result of ordinary course Intercompany Transactions, be

---

[5] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such Intercompany Transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in possession.

accorded administrative expense priority. If Intercompany Claims are accorded administrative expense priority, each entity utilizing funds flowing through the Cash Management System should continue to bear the ultimate repayment responsibility for such ordinary course transactions.

### C. The Debtors' Ordinary Course ACH Payments, Bank Fees and Preparation for the Chapter 11 Filing

16. In the ordinary course of business, the Debtors conduct transactions by debit, wire or automatic clearing house ("*ACH*") and other similar methods. In addition, a large percentage of the Debtors' customer credit card payments are received through ACH or wire transfer. In fact, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties.

17. Thus, the Debtors respectfully request that the Court authorize and direct the Banks to continue to maintain service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Debtors request the Banks be authorized and directed to receive, process, honor and pay any and all checks, ACH and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto. Notwithstanding the foregoing, any check, draft or other notification that the Debtors advised the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

18. Furthermore, in the ordinary course, the Banks (as well as certain credit card processors) charge, and the Debtors pay, honor or allow the deduction from the appropriate

account, certain service charges and other fees, costs and expenses (collectively, the "**Bank Fees**"). The Debtors respectfully request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on or subsequent to the Petition Date. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees of the respective Bank at which the Bank Account is located.

**D.     The Debtors' Existing Business Forms and Checks**

19.    In the ordinary course of business, the Debtors use a variety of checks and business forms. To minimize expenses to their estates, the Debtors believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

20.    Nonetheless, as soon as practicable after the Petition Date, the Debtors will include "Debtor-In-Possession" on the checks they print electronically. Further, upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors in possession.

<u>Supporting Authority</u>

**A.     The Court Should Approve the Postpetition Use of the Debtors' Cash Management System**

   *(i)     The Continued Use of the Debtors' Cash Management System is Essential to the Debtors' Operations and Restructuring Efforts*

21.    Absent the relief sought in this motion, the Debtors would be unable to continue to operate their Cash Management System after the Petition Date. For example, the U.S Trustee Guidelines require, among other things, that a debtor: (a) establish one debtor in possession

account for all estate funds required solely for the payment of taxes (including payroll taxes); (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account.

22. As discussed above, however, the Debtors' business and financial affairs are complex, requiring the Debtors to collect, disburse and move funds through numerous Bank Accounts in an expedited manner. Given the Debtors' corporate and financial structure, the Debtors believe that it would be difficult and unduly burdensome to establish an entirely new cash management system for each Debtor entity. To comply with the U.S. Trustee Guidelines, the Debtors would also need to execute new signatory cards and depository agreements, and create a new system for manually issuing checks and paying postpetition obligations.[6] The delays that would result from opening these accounts, revising cash management procedures and instructing customers to redirect payments would significantly disrupt the Debtors' business at this critical time.

23. In addition, requiring the Debtors to maintain separate accounts would decentralize the Cash Management System. Indeed, courts in this and other districts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del.

---

[6] Notwithstanding anything herein to the contrary, the Debtors reserve the right to close their prepetition Bank Accounts and open new accounts as may be necessary in the Debtors' business judgment. The Debtors will give prompt notice of such actions, however, to the U.S. Trustee and any statutory committee appointed in these chapter 11 cases.

1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

### (ii) *Maintaining the Existing Cash Management System Will Not Harm Parties in Interest*

24. The Debtors' continued use of their Cash Management System will greatly facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition obligations. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, and the Bank Accounts because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations.

25. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System will benefit all parties in interest and is in the best interests of the Debtors' estates and creditors.

### (iii) *The Court Should Authorize the Debtors to Continue Using Debit, Wire and Automatic Clearing House Payments*

26. The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate

10

funds must be made by check with a notation representing the reason for the disbursement. As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH and other similar methods. In addition, a certain percentage of the Debtors' customer receipts are received through wire transfer payments. In fact, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties. If the Debtors' ability to conduct transactions by debit, wire, ACH or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted and their estates will incur additional costs.

    *(iv)* *The Court Should Authorize the Banks to Continue to Maintain, Service and Administer the Debtors' Bank Accounts in the Ordinary Course of Business*

  27. The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business. The Debtors strongly believe that replacing the Bank Accounts with new accounts pursuant to the U.S. Trustee Guidelines would needlessly interrupt their operations and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.

  28. Thus, the Debtors respectfully request that the Court authorize and direct the Banks to continue to maintain service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption. In this regard, the Banks should be authorized and directed to receive, process, honor and pay any and all checks, ACH and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto; *provided, however,* that any check, advise, draft or other notification that the Debtors

11

advised the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

29. The Debtors further request that the Court authorize and direct the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires or ACH should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires or ACH are dated before or subsequent to the Petition Date. The Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account that is the subject of the motion either (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a result of an innocent mistake made despite the above-described protective measures, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

30. Moreover, the Debtors request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on or subsequent to the Petition Date, in the ordinary course of business. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees of the respective Bank at which the Bank Account is located.

31. In similar large chapter 11 cases, courts in this district have regularly waived the U.S. Trustee Guidelines on the grounds that they are potentially detrimental to a debtor's

postpetition business operations and restructuring effort. *See, e.g., In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS) (Bankr. D. Del. Jan. 30, 2012) (authorizing the debtors' continued use of existing cash management system and bank accounts); *In re Buffets Restaurants Holdings Inc.*, No. 12-10237 (MFW) (Bankr. D. Del. Jan. 19, 2012) (same); *In re LTAP US, LLLP*, No. 10-14125 (KG) (Bankr. D. Del. Oct. 18, 2011) (same); *In re U.S. Concrete, Inc.*, No. 10-11407 (PJW) (Bankr. D. Del. Apr. 30, 2010) (same); *In re Atrium Corp.*, No. 10-10150 (BLS) (Bankr. D. Del. Feb. 23, 2010) (same).[7]

### B. The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms

32. The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their business forms substantially in the forms existing immediately before the Petition Date. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing business forms is unnecessary and unduly burdensome.

33. In other large chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label. *See, e.g., In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS) (Bankr. D. Del. Jan. 30, 2012) (authorizing continued use of business forms); *In re Buffets Restaurants Holdings Inc.*, No. 12-10237 (MFW) (Bankr. D. Del. Jan. 19, 2012) (same); *In re LTAP US, LLLP*, No. 10-14125 (KG) (Bankr. D. Del. Oct.

---

[7] Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

18, 2011) (same); *In re Friendly's Ice Cream Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Oct. 5, 2011) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. Oct. 5, 2011) (same).[8]

34. The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on account of debts incurred before the Petition Date (other than those authorized by the Court). To prevent the inadvertent, unauthorized payment of prepetition claims, the Debtors will work closely with the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval.

C. **Permitting Continued Intercompany Transactions and Granting Administrative Expenses Status to Intercompany Obligations is Appropriate**

35. The Debtors can ascertain, trace and account for all Intercompany Transactions previously described. Moreover, the Debtors will continue to maintain records of such Intercompany Transactions postpetition. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 364(b), 503(b) and 507(a)(2) of the Bankruptcy Code, all Intercompany Claims against the Debtor by another Debtor arising after the Petition Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative expense priority status, junior to the postpetition liens of any approved postpetition debtor-in-possession financing. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management

---

[8] Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

System will continue to bear ultimate repayments responsibility for such ordinary course transactions.

36.     In addition, as described above, the Debtors enter into certain Intercompany Transactions in the ordinary course of business, including centrally-billed expenses, intercompany sales and other intercompany transactions (*e.g.*, the payment for inventory, supplies, shipping costs and receivable collections on behalf of their Debtor and non-Debtor affiliates). Discontinuing the Intercompany Transactions could impact the Debtors' ability to fund payroll accounts, pay benefits to their employees and make timely payments to vendors. Accordingly, the Debtors believe that continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors, and seek the authority to enter into such Intercompany Transactions in the ordinary course of business.

37.     At any given time, there may be balances due and owing between and among the Debtors. The Debtors maintain records of, and are able to ascertain, trace and account for, the Intercompany Transactions. Moreover, the Debtors will continue to maintain such records, including records of all current intercompany accounts receivables and payables, in the postpetition period.

38.     The Debtors believe in the exercise of their reasonable business judgment that the preservation of the going-concern value of the Debtors, is essential to the success of any restructuring effort for the Debtors. Therefore the relief requested herein is necessary to maintain their continued operations.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

39.     As described above, the Debtors are seeking authority pursuant to the Interim Order to continue to operate the Cash Management System during the first 21 days of these chapter 11 cases. Under Bankruptcy Rule 6003, this Court may authorize the relief requested

herein within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed. R. Bankr. Proc. 6003 (b) and (c). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

40. Because of the complexity of the Debtors' operations, any disruption to the Cash Management System would greatly harm the Debtors and their estates. Without the Cash Management System, the Debtors would be unable to track incoming receipts and make on-time payments, precluding the Debtors from determining their current liquidity. This, along with the possibility that third parties would refuse to provide essential services in the event the Debtors failed to remit payment, could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest. As a result, immediate and irreparable harm would result without the relief requested herein being granted on an interim basis. Accordingly, the Debtors respectively submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b) and (c) and seek authority to continue to operate the Cash Management System.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

41. To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

### The Debtors' Reservation of Rights

42. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim

or an approval or assumption of any agreement, agreement, contract or lease under section 365 of the Bankruptcy Code. Additionally, nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claims regarding escheatment. The Debtors expressly reserve their rights to contest any claim or billing dispute. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

43. The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Debtors' prepetition secured lender and debtor in possession lender; (d) counsel for the Debtors' proposed stalking horse bidder; (e) the Delaware Secretary of State; (f) the Delaware Secretary of Treasury; (g) the Delaware State Attorney General; (h) the Office of the United States Attorney General for the State of Delaware; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) each of the Banks listed on **Exhibit 1 to Exhibit A**. In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

44. No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to (i) continue to operate the Cash Management System, (ii) maintain existing business forms and (iii) grant administrative priority for Intercompany Claims and perform under certain intercompany arrangements and historical practices and (b) granting such other and further relief as may be appropriate.

| | |
|---|---|
| Dated: May 30, 2013<br>Wilmington, Delaware | */s/ Domenic E. Pacitti*<br>Domenic E. Pacitti (DE Bar No. 3989)<br>Michael W. Yurkewicz (DE Bar No. 4165)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 N. Market Street, Suite 1000<br>Wilmington, Delaware 19801<br>Telephone:    (302) 426-1189<br>Facsimile:    (302) 426-9193<br><br>*Proposed Counsel to the Debtors*<br>*and Debtors in Possession* |