## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIFE UNIFORM HOLDING CORP., *et al.*,[1] | Case No. 13-11391 (   ) |
| Debtors. | Joint Administration Requested |

### DEBTORS' MOTION FOR ENTRY OF
### INTERIM AND FINAL ORDERS AUTHORIZING, BUT
### NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION
### EMPLOYEE WAGES, OTHER COMPENSATION AND REIMBURSABLE
### EMPLOYEE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS

Life Uniform Holding Corp., Healthcare Uniform Company, Inc., and Uniform City National, Inc., the debtors and debtors-in-possession herein (collectively, the "***Debtors***"),[2] respectfully represent:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 363 and 507(a)(4)-(5), 1107 and 1108(a) of the Bankruptcy Code, Rules 6003 and 6004(h) of the Federal Rules of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Robert Frezza (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), which were filed on May 29, 2013 (the "***Petition Date***").

Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

### Relief Requested

4.    To minimize the personal hardship that the Debtors' various employees will suffer if certain prepetition amounts are not paid when due or as expected, and to maintain the morale of an essential workforce during this critical time, the Debtors request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "***Interim Order***" and the "***Final Order***," respectively), (a) authorizing, but not directing, the Debtors to pay prepetition wages, salaries, commissions, incentives, and other compensation and reimbursable employee expenses, (b) authorizing, but not directing, the Debtors to continue employee benefits programs, each subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.    (c) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition employee obligations (collectively, and as described herein, the "***Employee Obligations***")[3] and (d) scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order (to the extent a Final Hearing is necessary).

---

[3]    The summary of the Debtors' various Employee Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (as defined herein) (each, an "***Official Policy***"). In the event of any inconsistency or ambiguity between the summary contained in this motion and an Official Policy, the terms of such Official Policy shall govern.  The Official Policies are not contractual commitments of the Debtors.

2

5. Given that the Debtors' employees are integral to the Debtors' ability to operate their businesses during these chapter 11 cases, the Debtors' failure to satisfy certain Employee Obligations within the first 21 days of these chapter 11 cases would jeopardize employee loyalty, morale and trust, possibly causing employees to leave the Debtors' employ and thereby significantly harming the Debtors' operations at this critical juncture. Accordingly, pursuant to the Interim Order, the Debtors seek the authority, but not the direction, to continue to honor, pay, satisfy or remit all claims and prepetition obligations related to Employee Obligations subject to the limitations discussed herein.

## Basis for Relief

### A.    Overview of the Debtors' Workforce

6. As of the Petition Date, the Debtors employ approximately 840 employees (the "*Employees*"). Of these Employees, approximately 350 are employed on a full-time basis and 490 are employed on a part-time basis.

7. The Employees perform a variety of critical functions, including sales, customer service, purchasing as well as administrative, accounting, finance, management, supervisory and other related tasks. Their skills, knowledge and understanding with respect to the Debtors' operations, customer relations and infrastructure are essential to the effective restructuring of the Debtors' businesses.

8. Just as the Debtors depend on the Employees to operate their businesses on a daily basis, these individuals also depend on the Debtors. Indeed, many of these individuals rely exclusively on payments received from the Debtors for their basic living necessities.

3

**B.**     **Wages, Payroll and Other Compensation**

    *(i)*     *Wage Obligations*

    9.     In the ordinary course of business, the Debtors incur payroll obligations for base wages owed to their Employees (collectively, the "***Wage Obligations***"). The Debtors maintain three payrolls, one for the home office employees (the "***HQ Payroll***"); one for the Life Uniform business (the "***Life Payroll***"); and one for the Uniform City portion of the Business (the "***UC Payroll***"). Each of these payrolls is paid bi-weekly on Friday, with the HQ Payroll being paid through the current week and the Life Payroll being paid one week in arrears. On the alternate Friday, the UC Payroll is made and is one week in arrears. The Debtors estimate that Wage Obligations average a total of approximately $165,000 for the HQ Payroll, $455,000 for the Life Payroll, and $65,000 for the UC Payroll.

    10.     The Debtors' payrolls are administered by Automatic Data Processing, Inc. ("***ADP***"), a third-party service provider, which distributes payroll, either directly to the Employees via check or through direct deposits with funds advanced by the Debtors to ADP. The Debtors fund the amounts payable to the employee on Wednesday for Friday's payroll. The Debtors fund the taxes and withholding payments relating to such payroll on Thursday. ADP remits the withholding tax and files all related returns for the Debtors.

    11.     The Debtors have funded the payroll for the upcoming Friday, May 31, 2013 prior to the Petition Date. Nonetheless, certain prepetition payroll amounts may remain unpaid on the Payrolls as of the Petition Date as well as other compensation due to the Employees (the "***Unpaid Compensation***"). The Debtors estimate that as of the Petition Date, they owe approximately $535,000 of Unpaid Compensation.

4

12.     By this motion, the Debtors seek the authority to pay and honor the Unpaid Compensation in an amount not to exceed $12,475 per eligible Employee and continue to honor the Wage Obligations on a postpetition basis in the ordinary course of business.

### (ii)     *Unpaid Payroll Service Fees*

13.     The majority of the Debtors' Wage Obligations are made by direct deposit through the electronic transfer of funds from the Debtors' payroll department to ADP, which then directly transfers funds to each Employee's bank account, with the remaining Employees receiving checks.

14.     Specifically, ADP is responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state and local tax filings.  In addition, for each payroll period, ADP processes direct deposit transfers, and administers payroll checks to Employees from certain disbursement accounts funded by the Debtors with the amounts necessary to satisfy the Debtors' payroll obligations.  ADP is crucial in providing the Debtors with a payroll system that functions seamlessly.

15.     The Debtors incur approximately $80,000 per year in fees for ADP's services.  As of the Petition Date, the Debtors estimate that approximately $6,500 has accrued and remains outstanding on account of fees owed to ADP for services rendered prepetition (the "***Unpaid Payroll Service Fees***").  By this motion, the Debtors seek authority to remit the Unpaid Payroll Service Fees and continue to use ADP in the ordinary course of business on a postpetition basis subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

5

## C.    Deductions and Payroll Taxes

16.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' gross pay, including garnishments, child support and similar deductions (collectively, the *"Deductions"*), which either the Debtors or a third-party service provider then forwards to the appropriate recipients. The Debtors estimate that Deductions total approximately $28,725 weekly. As of the Petition Date, the Debtors estimate that approximately $46,000 in Deductions have been collected but not yet remitted to the appropriate third-party recipients (collectively, the *"Unremitted Deductions"*).

17.    In addition to the Deductions, the Debtors are required by law to withhold amounts from Employees' wages that are related to federal, state and local income taxes, including social security and Medicare taxes and employment insurance, for remittance to the appropriate taxing authorities (collectively, the *"Employee Payroll Taxes"*). On a weekly basis, the Debtors estimate that Employee Payroll Taxes average approximately $50,000, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

18.    The Debtors must match from their own funds social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the *"Employer Payroll Taxes"* and, together with the Employee Payroll Taxes, the *"Payroll Taxes"*). The Payroll Taxes, including portions paid by the Debtors and portions paid by the Employees, average approximately $185,000 per week. The Debtors fund these Payroll Taxes to ADP weekly, who in turn remits them to the proper authorities. As of the Petition Date, the Debtors estimate that that they are current with the

6

remittances to the appropriate third-party recipients. However, out of an abundance of caution, the Debtors seek the authority to remit any de minimis amounts may not yet have been remitted (the "*Unremitted Payroll Taxes*").

19.    The Debtors believe that because the Unremitted Deductions and certain Payroll Taxes are held for payment to third-parties, they are properly deemed to be held in trust, and thus, do not constitute property of the Debtors' estates. Out of an abundance of caution, however, the Debtors seek authority to remit the Unremitted Deductions and Unremitted Payroll Taxes and continue collecting and remitting the Unremitted Deductions and Unremitted Payroll Taxes in the ordinary course of business on a postpetition basis.

**D.    Reimbursable Expenses**

20.    In the ordinary course of business, the Debtors reimburse certain Employees for reasonable, customary and approved expenses incurred on behalf of the Debtors in the scope of their employment and service, including travel expenses and credit cards,[4] in accordance with the Debtors' policies (collectively, the "*Reimbursable Expenses*").

21.    As of the Petition Date, the Debtors estimate that the total prepetition amount with respect to all Reimbursable Expenses is approximately $40,000[5] (collectively, the "*Unpaid Reimbursable Expenses*"). To avoid unnecessary disruption, the Debtors seek the authority, to pay the Unpaid Reimbursable Expenses and continue to honor Reimbursable Expenses in the

---

[4]    The Debtors reimburse approximately 13 Employees each month for business-related expenses purchased with a credit card (collectively, the "*Employee Credit Cards*"). All participating Employees are personally liable for charges incurred on the Employee Credit Cards and are reimbursed by the Debtors for approved expenses. The Debtors also have approximately 11 purchasing or credit cards that are billed directly to the Debtors; all related expenses are approved by management and the individual employees holding these cards are personally liable only for any unapproved expenses.

[5]    No Employee is owed in excess of $12,475 in Reimbursable Expenses.

7

ordinary course of business on a postpetition basis, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

### E.    Sales Incentives Program

22. The Debtors maintain certain sales incentive programs and commission programs both for sales at their normal retail locations (the "*Store Incentive Programs*") and at outside events.    The outside events consist of shopping events at customer locations called Life Scrub Expos ("*LSEs*") and other outside sales events (collectively "*Outside Sales*").    LSEs are trunk shows of select product set up by store personnel as a "temporary" store for one or two days at a customer workplace.    The sales personnel that set up and run such events receive a commission of the total sales for the event which ranges between 3%-10% depending on the circumstances of the sale (the "*Outside Sales Commission*," collectively with the Store Incentive Programs, the "*Sales Incentive Programs*").

23.    As of the Petition Date, the Debtors estimate that approximately $15,000-$20,000 of commissions relating to the Store Incentive Programs are owed to employees and $15,000-$20,000 of commissions relating to the Outside Sales Commissions are owed to employees, with no single employee owed more than $12,475 in total commissions along with other Unpaid Compensation.

24.    The Store Incentive Program is based upon an increase of same store sales over the prior year where store managers receive a 5% commission on the increase in sales and regional managers receive a 1.5% commission on the increase in regional sales, each measured on a monthly basis. In order for the store manager or regional manager to be eligible for such commission, the store or region respectively, must meet its EBITDA plan for the month. The

8

commissions are remitted to the employee in the month following the month on which the commission is based.

25.     To continue incentivizing their sales Employees, which in turn maintains the enterprise value of the Debtors' businesses, the Debtors seek the authority, pursuant to the Interim Order, to continue to offer the Sales Incentive Program in the ordinary course of business on a postpetition basis and to remit any amounts owed to employees relating to prepetition amounts due (the "***Unpaid Sales Incentive Obligations***"), subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

**F.     Employee Benefits Plans**

26.     The Debtors maintain various employee benefit plans and policies, including health care, dental and vision plans and flexible benefits plans (collectively, and as discussed in more detail below, the "***Employee Benefits Plans***").

*(i)     Health Benefits*

27.     All regular, full-time, Employees are eligible to receive medical, prescription drug, dental and vision insurance coverage (collectively, the "***Health Benefits***").

        a.     <u>Medical and Prescription Drug Plans</u>. United Health Care administers the Debtors' medical plan for approximately 225 covered Employees (the "***Medical Plan***"). The Debtors' average monthly cost to administer the Medical Plan is approximately $110,000, net of Employee contributions. As of the Petition Date, the Debtors estimate that they owe $164,000 in prepetition obligations under the Medical Plan.

        b.     <u>Dental Plan</u>. Delta Dental administers the Debtors' dental plans for approximately 232 covered Employees (the "***Dental Plan***"). The Debtors' average monthly cost to administer the Dental Plan is approximately $9,500. As of

9

the Petition Date, the Debtors estimate that they owe $9,500 in prepetition obligations to Delta under the Dental Plan.

c.    Vision Plan. United Health Care administers the Debtors' vision benefits plan for approximately 182 Employees (the "*Vision Plan*"). The Vision Plan is almost completely funded by the participating Employees. The Debtors' average monthly cost to administer the Vision Plan is approximately $1,400. As of the Petition Date, the Debtors estimate that they owe approximately $1,400 of prepetition obligations to United Health Care under the Vision Plan. The Debtors seek authority, out of an abundance of caution, to forward the Employee contributions and to continue the Vision Plan in the ordinary course of business.

d.    Life Insurance. United Health Care administers the Debtors' life insurance plan for approximately 251 covered Employees (the "*Life Insurance Plan*"). The Debtors' average monthly cost to administer the Life Insurance Plan is approximately $400, net of Employee contributions. As of the Petition Date, the Debtors estimate that they owe $1,700 in prepetition obligations under the Life Insurance Plan.

e.    Disability Insurance. Met Life and Unum administer the Debtors long term and short term disability insurance plans respectively for approximately 86 covered Employees (collectively, the "*Disability Insurance Plan*"). The Debtors' average monthly cost to administer the Disability Insurance Plan is approximately $500, net of Employee contributions. As of the Petition Date, the Debtors estimate that they owe $1,500 in prepetition obligations under the Disability Insurance Plan.

28.    In addition to the amounts owed on account of Health Benefits, the Debtors have collected $48,000 pursuant to payroll deductions for Health Benefits, which funds are held in trust and which the Debtors seek to remit to the appropriate third-party health providers on behalf of the Employees (collectively, the "*Unpaid Health Benefits*"). Considering that the Health Benefits are vital to the Debtors' Employees and that the Unpaid Health Benefits are held in trust for the Employees, and therefore, not property of the Debtors' estates, the Debtors seek

the authority to remit the Unpaid Health Benefits.  The Debtors also seek to continue providing the Health Benefits in the ordinary course of business on a postpetition basis, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

### (ii)    Flexible Benefits Plans

29.    The Debtors offer two flexible benefit plans to employees, a flexible spending account (the "*FSA*") and a healthcare reimbursement account (the "*HRA*," together with the FSA, the "*Flexible Benefits Plans*").  The Flexible Benefits Plans are administered by J.W. Terrill ("*J.W. Terrill*").

30.    All of their full-time Employees have the ability to contribute a portion of their pre-tax compensation to FSA to pay for eligible, out-of-pocket health care and dependent care costs and expenses (the "*Flexible Benefits Plan*").  The FSA is fully funded by Employee contributions and is subject to a $2,500 per year limit per employee.  As of the Petition Date, the Debtors estimate that they hold no unremitted contributions to the FSA.  Out of an abundance of caution, the Debtors request the authority to remit any of these funds that are discovered, which are held in trusts for the employees.

31.    The HRA is funded both by employee and by company contributions.  The Debtors fund $3,800 per year for each employee that may be utilized against a $5,000 deductible with respect to each employees Medical Plan.  The Debtors forward those contributions, in addition to certain administrative fees, to J.W. Terrill on behalf of the applicable Employees.  As of the Petition Date, the Debtors hold approximately $12,000 in contributions to the HRA (collectively with any amounts unremitted under the FSA, the "*Flexible Benefits Plan*

11

*Obligations*"). The Debtors request the authority to forward the Flexible Benefits Plan Obligations if and when they become due and continue offering the Flexible Benefits Plan in the ordinary course of business on a postpetition basis, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

**G.      Employee Workers' Compensation, Insurance Plans and Disability Benefits**

      *(i)      Workers' Compensation Programs*

32.      The Debtors maintain workers' compensation insurance for their Employees at the mandated level required by each state in the U.S. in which the Debtors operate (the "***Workers' Compensation Program***"). The Debtors maintain their Workers' Compensation Program with The Hartford ("***Hartford***"). The Debtors pay a approximately $35,000 per month in premiums for the Worker's Compensation Policy.

33.      The Debtors obligations under the Workers Compensation Program are paid in advance, therefore, as of the Petition Date, the Debtors estimate that they do not owe any prepetition Workers' Compensation Policy premium obligations (the "***Unpaid Workers' Compensation Premiums***"). Out of an abundance of caution, the Debtors request the authority to remit any Unpaid Workers Compensation Premiums that may be due and to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis.

**H.      Vacation Time and Paid Holidays**

34.      The Debtors provide all full-time Employees with vacation time as a paid, time-off benefit ("***Vacation Time***"). The amount of available Vacation Time, and the rate at which such Vacation Time accrues, is generally determined by the Employee's length of full-time employment.

12

35.     Upon termination, the Employee's final paycheck will include any available, unused Vacation Time, if the employee is accordance with the Debtors employment policy. An Employee's unused Vacation Time, however, may not be used at the end of an Employee's active period of employment to lengthen their service or allow them to receive other benefits. As of the Petition Date, the Debtors estimate that they are responsible for Vacation Time totaling approximately $260,000. This amount, however, is not a current cash pay obligation as long as the employee is not terminated, as Employees are only entitled to be paid for accrued and unused Vacation Time upon termination. The Debtors expect that they have accrued but not yet paid $5,000 of Unpaid Vacation Time for terminated employees.

36.     The Debtors also maintain a policy whereby Employees receive compensation for certain non-working holidays (the "***Paid Holidays,***" collectively with the unpaid Vacation Time, the "***Unpaid Vacation Time***"). A majority of the Debtors Employees are part-time hourly employees and they are paid for their holidays in relation to the average hours they work per week.

37.     By this motion, the Debtors seek the authority, solely upon entry of the Final Order, to remit the Unpaid Vacation Time (if any) when such obligations become due and owing and continue honoring Vacation Time and Paid Holidays in the ordinary course of business on a postpetition basis, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases. Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

13

## I.    401(K) Retirement Savings Plan

38.    The Debtors maintain a retirement savings plan for the benefit of all eligible Employees that meets the requirements of section 401(k) of the Internal Revenue Code (the "*401(k) Plan*"). Approximately 490 Employees participate in the 401(k) Plan, which is administered by Fidelity ("*Fidelity*"). The Debtors match 15% of each pretax or post tax dollar that is contributed on the first 6% of deferred pay (the "*Matching Contributions*"). The Matching Contributions vest automatically once contributed. As of the Petition Date, the Debtors estimate that they will have accrued but not yet remitted $17,000 of Matching Contributions.

39.    Additionally, the Debtors withhold approximately $36,000 (in the aggregate) each month from participants' paychecks on account of their 401(k) contributions. As of the Petition Date, the Debtors hold in trust approximately $17,000 (together with the unpaid Matching Contributions, the "*Unremitted 401(k) Contributions*") in Employee 401(k) Plan contributions. The Debtors seek the authority to continue the Matching Contributions outstanding as of the Petition Date, release the Unremitted 401(k) Contributions held in trust for their Employees and continue operating the 401(k) Plan in the ordinary course of business on a postpetition basis, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

## J.    Automobile Program

40.    The Debtors provide certain Employees with a leased automobile for use in the ordinary course of their duties (the "*Automobile Program*"). The leases for such vehicles are paid directly for the Debtors. Approximately 10 regional managers are a part of this program

14

and all have job requirements that require them to travel from store to store within their region. The Debtors remit approximately $6,000 per month relating to the Automobile Program. As of the Petition Date, accrued and unpaid amounts under the Automobile Program total approximately $6,000 (the "*Automobile Program Obligations*"). By this motion, the Debtors seek the authority to continue the Automobile Program on a postpetition basis in the ordinary course of their business, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

## K.    Severance Program

41.    The Debtors have historically paid part-time employees two weeks' pay and full-time employees one month's pay in the event that they are terminated (the "*Severance Program*"). As a part of their restructuring, the Debtors commenced closing stores prepetition and terminating employees. The closing of such unprofitable stores is necessary for the success of the restructuring. Although the closing of stores will reduce the administrative rent, which will benefit the estate, the more important impact of the store closings relates to inventory.

42.    The average store of the Debtors is relatively small, approximately 1,700 square feet, and are maintained by one to three employees. In many instances, a store manager will cover multiple stores in the same area. These stores do not have the physical space to take on an extreme amount of excess inventory. Moreover, the proper mix of inventory at each location is necessary to maintain sales at the location. The closing of the stores will reduce the inventory purchases that are necessary by eliminating the need to replenish the closed stores and by replenishing the remaining stores with the inventory from the closed stores. The Debtors have developed a plan to implement this inventory savings, and have commenced this plan

15

prepetition. The plan requires redistributing the closed stores inventory to multiple locations such that (a) no location has such an excess of inventory that it cannot accommodate, (b) the inventory is redistributed to locations that historically sold the product well, (c) the inventory is redistributed to locations that do not already have a need for the size and style of inventory that needs to be redistributed, and (d) each store has a limited number of transfers so that the inventory redistribution does not distract from the core sales responsibility of the remaining stores and the shipping costs are minimized.

43.     The effectiveness of the inventory plan depends on the cooperation and skill of the Debtors' employees that will have received notice that they will very soon be terminated. All of the employees that will be impacted by this request are store level sales employees and none approach the definition of an "insider" as contemplated by the Bankruptcy Code. Also, the remaining employees that are not terminated will know of the treatment of these terminated employees and are informed that additional stores are likely to close prior to the consummation of the Debtors' proposed sale of substantially all of their assets. Accordingly, the remaining employees will look to the treatment of the first round of terminations to extrapolate the potential treatment of themselves. If the terminated employees are not treated well, the remaining employees may seek alternative employment to protect themselves, regardless of whether or not their own store will be closed or not.

44.     As more fully described in the First Day Declaration, the average store carries approximately 2,700 stock keeping units ("**SKUs**"). This large number of SKUs are housed in a small physical space and many would appear to outsiders as being extremely similar to each other. The employees knowledge of the SKUs is essential to this redistribution so that the remaining stores receive the proper inventory and not something that would have appeared close

16

to an outsider.  The Debtors have evaluated the proposed plan and have determined that utilizing personnel other than the existing employees to accomplish the redistribution plan, if achievable at all, would be vastly more expensive, result in significantly more errors requiring further redistribution and resulting in a reduction in sales, and the increased expense would far outweigh the incremental expense of maintaining their historic program of severance to these store level employees.  The Debtors believe that if the Severance Program is not implemented, the current employees that are required to implement this plan may leave immediately upon receiving notice that they will be terminated in a few days to seek other employment rather than spend those few days assisting the Debtors, who have just terminated them, in a packing and shipping exercise.

45.    The Debtors do not owe any current amounts under the Severance Program. Moreover, the Debtors contemplate that all future obligations that arise under the Severance Program will be postpetition transaction that are consistent with the Debtors' historical employment practices and thus do not require Court authorization as they are in the ordinary course of business.  However, out of an abundance of caution, and due to the critical nature of these programs to the first weeks of the Debtors' restructuring, the Debtors seek the authority to maintain and administer the Severance Program in the ordinary course of business, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

17

**Supporting Authority**

**A.    The Court Should Authorize the Debtors to Honor Their Employee Obligations**

     *(i)    Certain of the Employee Obligations are Entitled to Priority Treatment*

    46.    Pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code, certain of the unpaid prepetition Employee Obligations – including Unpaid Wage Obligations – are entitled to administrative expense priority treatment in an amount up to $12,475 for each individual Employee.

    47.    In addition, and as noted above, the Debtors are not seeking authority to pay Unpaid Wage Obligations in amounts that exceed $12,475 per Employee.  Accordingly, granting the relief sought with respect to compensation only affects the timing of payments to Employees, and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Wage Obligations up to $12,475 per individual will enhance value for the benefit of all stakeholders because it will help ensure that the Employees – the lifeblood of the Debtors' business operations – continue to provide vital services to the Debtors at this critical juncture.  The Debtors believe that finding and attracting qualified talent would be extremely difficult and most likely would require higher salaries, guaranteed bonuses and overall higher cost compensation packages than are currently provided to the Debtors' Employees, should the Debtors be unable to honor the Employee Obligations when due and payable.

    *(ii)    Payment of Certain of the Employee Obligations is Required by Law*

    48.    The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that Employees, governments and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain deductions, including contributions to the Employee Benefits programs and child

support and alimony payments, are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b).

49.     Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Unremitted Deductions and Unremitted Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize the Debtors to transmit the Unremitted Deductions and Unremitted Payroll Taxes to the proper parties in the ordinary course of business.

50.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states, and therefore is crucial to the continued operation of the Debtors' businesses.

**B.    Payment of the Employee Obligations is Warranted Under the Doctrine of Necessity**

51.     Courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of

19

the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants). When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code.

52.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries charged with "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Inherent in a debtor in possession's fiduciary duties is the obligation to "protect and preserve the estate, including an operating business's going-concern value," which, in certain instances, can be fulfilled "only . . . by the preplan satisfaction of a prepetition claim." *Id.* Indeed, the *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

53.     Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon

20

section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were

potential lien claimants).[6]

54.     In addition to the authority granted a debtor in possession under sections 1107(a),

1108, 363(b) and 105(a) of the Bankruptcy Code, courts have developed the "doctrine of

necessity" or the "necessity of payment" rule, which originated in the landmark case of

*Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). Since *Miltenberger*, courts

have expanded their application of the doctrine of necessity to cover instances of a debtor's

reorganization, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel

reorganization matter, that the court was not "helpless" to apply the rule to supply creditors

where the alternative was the cessation of operations). The United States Court of Appeals for

the Third Circuit which recognized the doctrine of necessity in *In re Lehigh & New England Ry.*

*Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

55.     In *Lehigh*, the Third Circuit held that a court could authorize the payment of

prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.*

(stating that a court may authorize payment of prepetition claims when there "is the possibility

that the creditor will employ an immediate economic sanction, failing such payment"); *see also*

*In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of

---

[6]     Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section
105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable
powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is
necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a),
courts may permit preplan payments of prepetition obligations when such payments are essential to the
continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation
would trigger a withholding of goods or services essential to the debtors' business reorganization plan.  *See In*
*re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of
suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization);
*Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment
of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

21

payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. at 824-45 (noting that debtors may pay prepetition claims that are essential to continued operation of the business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

56.     Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation . . . ."); Collier on Bankruptcy P 105.02[4][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

57.     Here, the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption.   In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.   Such a development would deplete the Debtors' workforce, hinder the Debtors' ability to meet its customer obligations and likely diminish creditors' confidence in the Debtors.   Moreover, the loss of valuable individuals and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on their restructuring.

58.     The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested herein.   Indeed, courts in this jurisdiction have approved relief similar to the relief requested in this motion.   *See, e.g., In re School Specialty, Inc.*, No. 13-10125 (KJC) (Bankr D. Del. Jan. 30, 2013) (stating that relief requested is in the "best interests of the Debtors"); *In re THQ, Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012) (same); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012) (same); *In re A123 Systems, Inc.*, Case No. 12-12859 (KJC) (Bankr D. Del. Oct. 18, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011) (same).[7]

**C.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

59.     The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves, expected

---

[7]     Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.   Copies of these orders are available upon request to the Debtors' counsel.

cash flows from ongoing business operations and anticipated access to debtor in possession financing. Also, under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made to an Employee. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that all applicable financial institutions should be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Employee Obligations.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

60.    As described above, the Debtors are seeking authority pursuant to the Interim Order to pay certain of the Employee Obligations during the first 21 days of these chapter 11 cases. Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the payment of the Employee Obligations within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed. R. Bankr. Proc. 6003(b). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

61.    The Debtors' Employees are integral to their operations. Failure to satisfy obligations to Employees in the ordinary course of business will jeopardize Employee loyalty and trust, possibly causing Employees to leave the Debtors' employ and thereby disrupting the Debtors' operations to the detriment of all parties in interest. Moreover, the Debtors' Employees rely on the Debtors' timely payment of their compensation and provision of benefits.

24

Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and seek authority to pay the Employee Obligations described herein pursuant to the Interim Order.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

62.    To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

### The Debtors' Reservation of Rights

63.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.    The Debtors expressly reserve their rights to contest any Employee Obligation.   Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

64.    The Debtors have provided notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Debtors' prepetition secured lender and debtor in possession lender; (d) counsel for the Debtors' proposed stalking horse bidder; (e) the Delaware Secretary of State; (f) the Delaware Secretary of Treasury; (g) the Delaware State Attorney General; (h) the Office of the United States Attorney General for the State of Delaware; (i) the Internal Revenue Service;

and (j) the Securities and Exchange Commission.  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## **No Prior Request**

65.    No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and the First Day Declaration, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) authorizing, but not directing, the Debtors to pay prepetition wages, salaries, other compensation and reimbursable employee expenses, (b) authorizing, but not directing, the Debtors to continue employee benefits programs, (c) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition Employee Obligations, (d) scheduling a Final Hearing to consider entry of the Final Order (to the extent a Final Hearing is necessary) and (e) granting such other and further relief as may be appropriate.

Dated: May 30, 2013
      Wilmington, Delaware

*/s/ Domenic E. Pacitti*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:   (302) 426-1189
Facsimile:   (302) 426-9193

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

28