## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIFE UNIFORM HOLDING CORP., *et al.*, [1] | ) | Case No. 13-11391 (  ) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND
### FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING,
### THE DEBTORS TO MAINTAIN AND ADMINISTER CUSTOMER
### PROGRAMS AND HONOR PREPETITION OBLIGATIONS RELATED THERETO

Life Uniform Holding Corp., Healthcare Uniform Company, Inc., and Uniform City National, Inc., the debtors and debtors-in-possession herein (collectively, the "*Debtors*"),[2] respectfully represent:

### Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested herein are sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code, Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rule 9013-1(m) of the Local Rules of Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Robert Frezza (the "*First Day Declaration*"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), which were filed on May 29, 2013 (the "*Petition Date*").

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

**Relief Requested**

4.     By this motion, the Debtors request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "*Interim Order*" and the "*Final Order*,*"* respectively), (a) authorizing, but not directing, the Debtors to (i) maintain and administer the Debtors' customer-related programs, including Group Pricing, Discounts and Promotions, Gift Cards, Customer Satisfaction Obligations, Prepaid Orders, LSE Rebates, and Shipping Programs (each a "*Customer Program*" and collectively, the "*Customer Programs*") and (ii) make payments to customers or otherwise honor accrued prepetition obligations owed under their Customer Programs (collectively, and as identified below, the "*Customer Program Obligations*") and to continue, replace, modify or terminate any Customer Program in the ordinary course of business, each subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases; (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of Customer Program Obligations and (c) scheduling a final hearing (the "*Final Hearing*") to consider entry of the Final Order, to the extent necessary.

5.     Absent honoring Customer Program obligations in the ordinary course of business, the Debtors may lose a number of significant customers who have come to expect and rely on such Customer Programs, thereby resulting in a potential surge of cancellations on orders in process and a precipitous decline of future sales.  Thus, the Customer Programs are necessary

2

for the Debtors to stay competitive and maintain their customer base during this critical juncture as well as during the course of these chapter 11 cases.

## Basis for Relief

6.      The Debtors have created numerous long-standing customer relationships and developed significant customer loyalty and goodwill.  These relationships have, in large part, been sustained by the Customer Programs, which encourage sales, foster brand loyalty, manage pricing and establish (and maintain) customer goodwill.  Failure to continue the Customer Programs and honor the Customer Program Obligations will erode hard-earned customer loyalty and goodwill, substantially reducing sales and jeopardizing the Debtors' ability to effectuate a successful restructuring.  Because the Debtors' industry is highly competitive, these customers will likely purchase from other companies if the Debtors fail to honor Customer Programs, thereby crippling revenue, collection of accounts receivable and the Debtors' opportunity to effectively restructure.  Accordingly, the Debtors seek authorization to continue, modify or terminate the Customer Programs in the ordinary course of business and to honor the Customer Program Obligations, as described below, so that customer relationships are maintained and business operations can continue uninterrupted.

## A.      Overview of the Debtors' Sales Practices

7.      The Debtors have created numerous long-standing customer relationships.  These relationships have, in large part, been sustained by the Customer Programs, which incentivize sales, develop brand loyalty and establish (and maintain) customer goodwill.  Any failure to continue the Customer Programs and honor the Customer Program Obligations could erode hard-earned brand loyalty and customer goodwill, substantially reducing sales and jeopardizing the Debtors' ability to effectuate a successful restructuring.  Accordingly, the Debtors seek

3

authorization to continue the Customer Programs in the ordinary course of business and to honor the Customer Program Obligations, as discussed below, so that customer relationships are maintained and business operations can continue uninterrupted notwithstanding the restructuring process.

**B.    Customer Programs**

      **i.    Group Pricing**

8.     The Debtors make a significant amount of sales to individuals that receive promotional pricing due to their membership in a group ("***Group Pricing***"). The Group Pricing encourages members of organizations or individuals with an association to a particular hospital or health care organization to purchase more items from the Debtors than without the Group Pricing as well as driving individuals new to an organization or affiliation towards a lasting relationship with the Debtors.

9.     Because the Debtors' obligations under the Group Pricing generally do not arise until the time at which a customer takes advantage of an individual Group Pricing Discount at the time of purchase, the Debtors do not have outstanding prepetition obligations to their customers on account of the Group Pricing. Additionally, the Debtors believe that maintaining the Group Pricing on a postpetition basis is consistent with their typical, ordinary course practice. Out of an abundance of caution, and to provide clarity and comfort to all of their customers, the Debtors request authority to continue the Group Pricing, in their discretion, consistent with past practice after the Petition Date, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases. The Debtors believe that discontinuing the Group Pricing at this point may lead to a precipitous decline in sales.

4

### ii.    Discounts and Promotions

10.    As is common practice in the industry and expected by the Debtors' consumers, the Debtors routinely offer the following discounts and promotions:  (a) discounts and coupons through mailings, internet promotions, email offers and other formats; (b) gift programs such as "buy one get one free" or "free gift with purchase" offers, loyalty rewards programs, and general discounts; and (c) shipping offers, such as free or discounted shipping (collectively, and as discussed herein, the "***Discounts and Promotions***").  Each of the Discounts and Promotions is critical to the Debtors' sales efforts and the Debtors firmly believe that they would lose a competitive edge if they are unable to honor prepetition commitments on a postpetition basis and continue the Discounts and Promotions.

11.    The Debtors have a number of different coupon programs including a new member discount as well as other promotional programs from time to time.  The Coupon programs entitle the customer to a discount at the point of sale and thus do not require a cash outlay by the Debtors.  The Debtors also maintain a loyalty program that presents a customer with a coupon good for a future discount based on a present purchase.  Historically, about $300,000 of these coupons are redeemed each year.  However, these coupons only entitle the customer to merchandise and thus do not require a cash outlay.  Moreover, the redemption of these coupons is often accompanied by an additional purchase (or the redemption does not cover the entire purchase) thus the coupons drive additional sales.  The Debtors believe that ongoing maintenance of this program will allow the preservation of the Debtors sales and will facilitate the restructuring process.

5

### iii.    Gift Cards

12.    Before the Petition Date, the Debtors sold gift cards to retail customers for the purchase of merchandise in the Debtors' retail stores and online retail business (the "*Gift Cards*"). The Gift Cards generally carry no expiration date, and as of the Petition Date, certain customers had not yet redeemed certain of the prepetition Gift Cards for merchandise. As the time that the Gift Cards were purchased by customers, customers had every expectation that the Gift Cards would be honored and applied towards purchases. Absent authority to honor the Gift Cards, the Debtors would be unable to accept the Gift Cards for purchases, which would negatively impact their sales and their customer relations. This would inevitably lead to dissatisfied customers and negative publicity, which would potentially jeopardize the Debtors' restructuring efforts and the contemplated sale to their proposed stalking horse bidder (the "*Stalking Horse Bidder*") or to a party presenting a higher and better offer.

13.    As of the Petition Date, the Debtors estimate that approximately $1.1 million in Gift Cards remain outstanding. These obligations are non-cash in nature. Under the asset purchase agreement negotiated with the Stalking Horse Bidder, the purchase price will be adjusted upwards by 50% of the face amount of Gift Cards redeemed after the APA is executed and downwards by 50% of the face amount of Gift Cards sold after the APA is executed. Accordingly, honoring the Gift Cards will not result in any depletion of the estates but will instead preserve the Debtors' enterprise value by preserving their customer goodwill. Therefore, the Debtors request the authority to honor these Gift Card obligations that have accrued prepetition and to maintain the Gift Card program in the ordinary course of business.

6

### iv.    Returns, Refunds and Exchange Programs

14.    If a customer is not satisfied with merchandise purchased from any of the Debtors' brands, the customer generally has the option to return or exchange the goods within 30 days after the purchase date (collectively, the "***Customer Satisfaction Obligations***"). This type of customer program is not uncommon in the Debtors' industry and, therefore, critical to the Debtors' ability to remain competitive and continue to generate and maintain brand loyalty.

15.    As a result of the Debtors' various Customer Satisfaction Obligations, certain customers hold, as of the Petition Date, contingent claims against the Debtors for refunds, returns, exchanges and other credit balances relating to goods sold to customers, both at physical stores and online (collectively, the "***Refund Programs***"). The Debtors' outstanding prepetition obligations on account of the Refund Programs generally fall into two categories: obligations where (a) the Debtors have, as of the Petition Date, mailed checks to their customers on account of a Refund that remain uncashed and (b) certain of the Debtors' customers have paid for their purchase by check in an amount that exceeds the total cost of the goods purchased (including related tax and shipping costs), leaving the Debtors with a balance that the Debtors return on a periodic basis to the customer (the "***Current Refund Obligations***").[3] The Debtors estimate that, as of the Petition Date, they owe approximately $20,000 on account of outstanding Current Refund Obligations, solely on a contingent basis.[4]

---

[3]    The Current Refund Obligations also include potential cash reimbursements to the Debtors' credit card servicers on account of amounts that are refunded to customers by the credit card servicer.

[4]    The Debtors' relief requested pursuant to the Refunds does not account for any escheatment claims that may exist. Moreover, the Debtors reserve the right to dispute any such escheatment claims at the appropriate time. For the avoidance of doubt, the Debtors are not seeking discretionary authority to honor prepetition claims based on escheatment in the ordinary course of business.

16.    In addition to the Current Refund Obligations, the Debtors have various outstanding obligations on account of the Refund Programs that are contingent and unknown as of the Petition Date (the "*Future Refund Obligations*").  The nature and scope of the Future Refund Obligations vary among the Debtors depending on a number of factors, including the type of good sold and the Debtors' ability to resell a given item of merchandise that has been returned.  In some instances a returned item may simply be exchanged for another good (and/or future credit), thereby not requiring the Debtors to make a cash outlay to a customer.  In other circumstances, the Debtors may refund a cash amount to a customer in exchange for receipt of the returned good, with the intention of reselling the returned item.  Although it is difficult to state the Debtors' potential cash obligations on account of Future Refund Obligations with specificity, the Debtors estimate that, based on historical trends and taking into account the Debtors' earnings based on their subsequent ability to resell returned goods, Future Refund Obligations total between approximately $170,000 and approximately $200,000 as of the Petition Date.

17.    The ability to continue to provide the Refund Claims to customers is vital to the Debtors' ongoing relationship with their customers.  The Debtors believe that, without the ability to provide and honor the Refund Claims, many customers would be unwilling to purchase merchandise from the Debtors.  Accordingly, the Debtors request the authority to honor the Refund Claims in their discretion and continue to honor the Refund Claims in the ordinary course of business, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

8

v.    **Prepaid Orders**

18.    Before the Petition Date, the Debtors received payment in the form of checks, credit card transactions, cash and other forms of compensation orders and services that remain outstanding as of the Petition Date (the "***Prepaid Orders***"). These Prepaid Orders typically arise from the purchase of an item one of the Debtors locations that is currently out of stock or the purchase of an item that is typically not stocked in the location and must be special ordered. The Debtors typically are able to fulfill these Prepaid Orders in three to ten days. However, in certain instances the Prepaid Orders take longer to fulfill, typically when the item is shipped to a Debtor location and the customer delays picking up the item. The Debtors' customers fully expect to receive goods that are subject to Prepaid Orders, notwithstanding the commencement of these chapter 11 cases. Any failure by the Debtors to fulfill the Prepaid Orders, including payment of any necessary transaction fees or third-party vendors who may direct-ship to the customer, will result in a loss of customer goodwill and a likely wave of negative public opinion. As of the Petition Date, the Debtors estimate that approximately $210,000 in Prepaid Orders has accrued and remains outstanding. These obligations are generally non-cash in nature. The Debtors request the authority to honor these obligations in their discretion and in the ordinary course of business, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

vi.    **LSE Rebates**

19.    The Debtors regularly conduct shopping events at customer locations called Life Scrub Expos and other outside sales events (collectively, the "***LSEs***"). LSEs are trunk shows of select product set up by store personnel as a "temporary" store for one or two days at a customer

9

workplace. The Debtors use local store managers, an outsourced marketing effort, quarterly email blasts, and dedicated LSE representatives to originate new LSE opportunities. The customers that work with the Debtors to set up the LSEs receive a portion of the sales generated at the event as a rebate (the "***LSE Rebates***"). The LSE Rebates are generally remitted to the customers shortly after a LSE concludes. The Debtors pay approximately $750,000 in LSE Rebates annually. The Debtors estimate that approximately $80,000 of LSE Rebates have accrued prepetition but remain unpaid, all of which will come due within the first 21 days after the Petition Date (the "***LSE Rebate Obligations***"), subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.

20. The Debtors have developed significant and important relationships with their customers relating to LSEs. The Debtors have had success in returning to the same location to conduct an LSE and they generate significant recurring sales from the LSEs. If the Debtors fail to pay the LSE Rebates, the customers may discontinue using the Debtors for such events and potentially utilize one of the Debtors' competitors to hold such events. Accordingly, the failure to pay the LSE Rebates Obligations may result in the Debtors' competitors developing relationships with the Debtors' customers and may result in a permanent revenue reduction and loss of market share. Therefore, the Debtors request the authority to continue the LSE Rebate program and to remit the LSE Rebates in the ordinary course of business.

### vii.   Shipping Programs

21. The Discounts and Promotions also cover the Debtors' various shipping offers, such as free or discounted shipping (collectively, the "***Shipping Programs***"). The Debtors effectively discount their products pursuant to the Shipping Programs to remain competitive in

10

the industry. The inability to honor or continue the Shipping Programs would force the Debtors to lower their product prices across the board to maintain their competitive position. The Debtors believe they are current on their prepetition obligations to third-party shippers as of the Petition Date. However, the Debtors expect to continue any Shipping Programs on a postpetition basis in the ordinary course of business and request authority to satisfy any prepetition obligations relating to the Shipping Programs, if any such obligations are discovered, subject to the requirements imposed on the Debtors under any approved debtor-in-possession financing facility, or budget in connection therewith, or any order regarding the use of cash collateral approved by the Court in these cases.. Failure to maintain these Shipping Programs may result in the Debtors' inability to fulfill orders and any of such obligations that are determined will be more than outweighed by the lost revenue if such Shipping Programs are discontinued.

<u>**Supporting Authority**</u>

A.      **The Court Should Authorize the Debtors to Maintain Their Customer Programs and Honor Customer Program Obligations Under the Doctrine of Necessity**

22.      Courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants). When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 1107(a), 1108, 363(b) and 105(a) of the

11

Bankruptcy Code.

23.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries charged with "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Inherent in a debtor in possession's fiduciary duties is the obligation to "protect and preserve the estate, including an operating business's going-concern value," which, in certain instances, can be fulfilled "only . . . by the preplan satisfaction of a prepetition claim." *Id.* Indeed, the *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

24.     Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).[5]

---

[5]   Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit preplan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation
(Continued...)

12

25.    In addition to the authority granted a debtor in possession under sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code, courts have developed the "doctrine of necessity" or the "necessity of payment" rule, which originated in the landmark case of *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). Since *Miltenberger*, courts have expanded their application of the doctrine of necessity to cover instances of a debtor's reorganization, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization matter, that the court was not "helpless" to apply the rule to supply creditors where the alternative was the cessation of operations), including the United States Court of Appeals for the Third Circuit, which recognized the doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

26.    In *Lehigh*, the Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. at 824-45 (noting that debtors may pay prepetition claims that are essential to continued operation of the business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

---

would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

13

27.     Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (finding that it is appropriate to provide for the "unequal treatment of pre-petition debts when [such treatment is] necessary for rehabilitation . . . .."); Collier on Bankruptcy P 105.02[4][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

28.     The relief requested by the Debtors satisfies this standard.  The necessity of the Customer Programs in a retail industry cannot be overstated.  Most, if not all, of the Customer Programs are standard practice in the Debtors' industry.  If the obligations under the Customer Programs are not honored, the Debtors risk alienating their customers and encouraging them to purchase products from the Debtors' competitors.  The failure to honor the Customer Programs

14

could erode the Debtors' hard-earned reputation and brand loyalty, adversely affecting the Debtors' prospects for a successful restructuring.

29.     Courts in this District have routinely granted relief similar to the relief requested herein. *See, e.g. In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Oct. 31, 2012) (authorizing Debtors to continue Customer Programs and honor their prepetition obligations under the Customer Programs); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011) (authorizing the Debtors to continue the Customer Programs in the ordinary course of business); *In re Appleseed's Intermediate Holdings*, LLC, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing the Debtors to maintain and administer the Customer Programs and satisfy the Customer Program obligations in the ordinary course of business); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Nov. 19, 2010) (authorizing Debtors to honor certain prepetition obligations to customers and continue prepetition customer programs and practices in the ordinary course of business); *In re The Majestic Star Casino, LLC,* No. 09-14136 (KG) (Bankr. D. Del. Nov. 23, 2009) (authorizing the Debtors to honor Customer Programs and related prepetition customer obligations).[6]

## B.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers

30.     The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves, expected cash flows from ongoing business operations and anticipated access to debtor in possession financing.  Also, under the Debtors' existing cash management system, the Debtors represent

---

[6]   Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies of these orders are available upon request to the Debtors' counsel.

that checks or wire transfer requests can be readily identified as relating to an authorized payment of the Customer Program Obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that all applicable financial institutions should be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests with respect to the Customer Program Obligations.

**The Requirements of Bankruptcy Rule 6003 are Satisfied**

31.    As described above, the Debtors are seeking authority pursuant to this motion to pay prepetition Customer Program Obligations during the first 21 days of these chapter 11 cases. Under Bankruptcy Rule 6003, the Court may authorize the Debtors to satisfy the prepetition claims arising from their Customer Programs during the first 21 days of these chapter 11 cases to the extent such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed. R. Bankr. P. 6003(b).    Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

32.    The Debtors firmly believe that continuing the Customer Programs and honoring the Customer Program Obligations uninterrupted in these chapter 11 cases is necessary to prevent immediate and irreparable harm to the Debtors' estates and business operations. As described above, the Customer Programs are integral to the Debtors' continued operations because they are necessary to maintain the confidence and goodwill of the Debtors' customer base. This is especially true in light of the competitive nature of the Debtors' retail businesses,

16

where the Customer Programs are standard practice and demanded by consumers. Indeed, a reputation for excellent customer service and brand integrity is one of the Debtors' most valuable assets and must be preserved. Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and seek authority to honor and, where necessary, pay, the Customer Program Obligations in the ordinary course of business and pursuant to the Interim Order.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

33.    To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

### The Debtors' Reservation of Rights

34.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, agreement, contract or lease under section 365 of the Bankruptcy Code. Additionally, nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claims regarding escheatment. The Debtors expressly reserve their rights to contest any claim or billing dispute. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

17

## Notice

35.     The Debtors have provided notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Debtors' prepetition secured lender and debtor in possession lender; (d) counsel for the Debtors' proposed stalking horse bidder; (e) the Delaware Secretary of State; (f) the Delaware Secretary of Treasury; (g) the Delaware State Attorney General; (h) the Office of the United States Attorney General for the State of Delaware; (i) the Internal Revenue Service; and (j) the Securities and Exchange Commission.  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

36.     No prior motion for the relief requested herein has been made to this or any other court.

18

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing, but not directing, the Debtors to, in the ordinary course of business, (i) continue, maintain, administer or terminate the Customer Programs; (ii) honor the Customer Program Obligations; (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of Customer Program Obligations; and (c) granting such other and further relief as may be appropriate.

Dated:  May 30, 2013
       Wilmington, Delaware

*/s/ Domenic E. Pacitt*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

*Proposed Counsel to the Debtors and Debtors in Possession*

19