## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIFE UNIFORM HOLDING CORP., *et al.*,[1] | ) Case No. 13-11391 (   ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND 364 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (1) AUTHORIZING INCURRENCE BY THE DEBTORS OF POST PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC STAY AND (5) SCHEDULING A FINAL HEARING**

Life Uniform Holding Corp., Healthcare Uniform Company, Inc., and Uniform City National, Inc., the debtors and debtors-in-possession herein (collectively, the *"Debtors"*),[2] respectfully represent:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Robert Frezza (the *"First Day Declaration"*), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the *"Bankruptcy Code"*), on May 29, 2013 (the *"Petition Date"*).

3.     The bases for the relief requested herein are sections 105, 361, 362, 363(c), 363(e), 364 and 507 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.*, as amended (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rules 2002, 4001 and 9014 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

### Introduction

4.     The Debtors and their advisors have worked to ensure that upon the commencement of these chapter 11 cases, the Debtors would have in hand not only an agreement to sell substantially all of their assets, but also obtain a commitment — through debtor in possession financing — to provide necessary capital for operational purposes during the chapter 11 cases.   With this background, the Debtors embarked upon discussions with the Debtors prepetition senior secured lender Capitalsource Finance LLC (the "*Capitalsource*") and other potential third party providers of financing to procure debtor in possession financing to allow the Debtors' to sell their assets as a going concern and to maximize the value of their assets.

5.     Capitalsource has agreed to provide the Debtors with a $15 million senior-secured credit facility (the "*DIP Financing*" or the "*DIP Facility*"), the terms of which the Debtors submit are reasonable following extensive arm's-length negotiations.   Although the Debtors, through their advisors, searched for alternative financing arrangements, the Debtors' were unable to find any alternatives.   In the face of this, as well as timing and execution risk associated with any third party financing, the Debtors believe the DIP Financing is the best <u>and only</u> financing available under the circumstances.

6.     To implement its proposed sale process and continue to retain and inspire confidence in its business partners, access to liquidity is critical.   The DIP Financing will provide

2

approximately 4 million in incremental liquidity that the Debtors believe is necessary to operations and to conclude a sale process on an expedited basis. In short, to ensure the Debtors have access to liquidity and inspire confidence in the marketplace in demonstrating the Debtors have the funding and financial support necessary to conclude a successful sale, the Debtors submit the DIP Financing is necessary and should be approved.

### Relief Requested

7.      By this motion, the Debtors request entry of an interim order (the "*Interim Order*") a copy of which is attached hereto as **Exhibit A** and a final order (the "*Final Order*" and, together with the Interim Order, the "*DIP Orders*"), authorizing the Debtors to enter into the Ratification and Amendment Agreement (substantially in the form annexed as **Exhibit B** attached hereto and incorporated herein by reference, the "*DIP Financing Agreement*")[3] and use cash collateral. In support of this motion, the Debtors rely on the First Day Declaration and submit the Declaration of James Hadfield, a director of Morgan Joseph TriArtisan LLC, the Debtors' proposed investment bankers, filed contemporaneously herewith (the "*Hadfield Declaration*"). More specifically, the Debtors seek authority to:

    a.      permit the Debtors, pursuant to the Interim Order to borrow up to $12.625 million under the DIP Facility and $15 million on a final basis;

    b.      grant first-priority senior priming security interests in and liens upon (collectively, the "*DIP Liens*") all prepetition and postpetition assets of the Debtors (collectively, the "*DIP Collateral*") to the DIP Lender (defined herein), as provided for by section 364(c) and (d) of the Bankruptcy Code (subject to certain exceptions as specified in the DIP Financing Agreement);

---

3   Specifically, the Debtors seek authority to enter into the DIP Financing Agreement and the postpetition financing made available hereby, among Healthcare Uniform Company, Inc. and Uniform City National, Inc. (the "*Borrowers*"); and the other credit parties on the signature pages to the DIP Financing Agreement (collectively, the "*Credit Parties*" and with the Borrower, the "*Borrowers*"); Capitalsource Finance LLC as administrative agent and the Lender (in such capacity, the "*DIP Lender*").

3

c.    grant super-priority administrative claims (the "**_Superpriority Claim_**") to the DIP Lender pursuant to section 364(c) of the Bankruptcy Code, subject to the Carve-Out (defined herein);

d.    use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) of the Secured Lender (the "**_Cash Collateral_**");

e.    vacate the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreement, the Interim Order and the Final Order;

f.    waive any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

g.    pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order by June 24, 2013.

## Concise Statement Pursuant to
## Bankruptcy Rule 4001(c) Summarizing Terms of the Proposed DIP Financing

8.    Pursuant to Bankruptcy Rule 4001(c), the Debtors submit this concise statement of the material terms of the DIP Financing, as specified in the DIP Financing Agreement and the Interim Order, substantially in the form attached hereto as **Exhibit A**.[4]

| Provision | Summary Description |
|---|---|
| **Type and Amount of Borrowing** | A senior secured revolving loan facility in an aggregate principal amount consisting of the amount outstanding under the Pre-Petition Revolving Facility (as defined below) as of the Petition Date plus any revolving advances necessary to fund the Approved Budget (as defined below) (the "Pre-Petition Amount Outstanding", and together with all other obligations under the DIP Facility, the "DIP Obligations") (collectively, the "DIP Facility"); provided however, that in no event shall the DIP Facility exceed $15 million. |
| **Interest Rate and Margins**<br><br>DIP Financing Agreement at § 2.3 and 3(b)(ii). | Advances under the DIP Facility shall bear interest at a rate equal to Prime Rate (as defined in the Pre-Petition Secured Facility) plus 5.25% per annum. Prime Rate shall have a floor of 2.75%. Interest shall be paid monthly in cash or cash |

---

[4]    Capitalized terms used but not otherwise defined in this concise statement shall have the meanings ascribed to such terms in the DIP Financing Agreement. This concise statement is qualified in its entirety by reference to the provisions of the DIP Financing Agreement and the Interim Order, as applicable. To the extent of any inconsistency between this concise statement and the provisions of the DIP Financing Agreement and the Interim Order, the Interim Order shall govern.

PHIL1 2826630v.5

| Provision | Summary Description |
|---|---|
| | equivalents. |
| **Default Interest**<br><br>DIP Financing Agreement at § 5. | The Default Rate shall be 2.0% in excess of the rate then in effect. |
| **Fees**<br><br>Interim Order ¶ 21(b). | All costs and expenses (including reasonable legal fees) required to be paid to the DIP Lender in connection with negotiation, preparation and filing and/or recordation of the DIP Financing |
| **Commitment Fee**<br><br>DIP Financing Agreement at § 3.3. | The Debtor shall pay to the DIP Lender, a fee (the "Commitment Fee") in an amount equal to $100,000.00. The Commitment Fee shall be fully earned and be non-refundable in its entirety upon the DIP Closing Date, and shall be paid in cash or cash equivalents on the DIP Closing Date. |
| **Maturity**<br><br>DIP Financing Agreement at § 3(b)(xii). | The date that is the earlier to occur of: (a) September 1, 2013; (b) the closing of a sale pursuant to Section 363 of the Bankruptcy Code and (c) the occurrence of an Event of Default under the DIP Facility other than certain specified Events of Default existing on the Petition Date (such date, the "Termination Date"). All amounts outstanding under the DIP Facility shall automatically be due and payable in full in cash on the Termination Date. |
| **Events of Default**<br><br>DIP Financing Agreement at § 12. | Events of Default customary for financings of this type and other terms deemed appropriate by the DIP Agent and DIP Lenders as set forth in the DIP Documentation, Interim Order, Final Order or any other similar. |
| **Priority of DIP Facility Liens and Effect on Existing Liens**<br><br>DIP Financing Agreement at § 2(f). | Subject to the Carve-Out, the granting of junior liens on all prepetition assets of the of the Debtors to the extent such assets are subjected to valid, fully perfected and unavoidable liens in favor of third parties as of the Petition Date pursuant to section 364(c)(3) of the Bankruptcy Code; and valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in and liens upon (collectively, the "*DIP Facility Liens*") on all other prepetition and postpetition assets of the Debtors including those assets securing the Senior Secured Notes pursuant to section 364(d) of the Bankruptcy Code (collectively, the "*DIP Collateral*"). |
| **Super-priority Administrative Claims**<br><br>Interim Order at ¶ 2(i) and 4(b). | The claim for repayment of the DIP Obligations under the DIP Financing Agreement, subject only to the Carve-Out have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise and no other superpriority claims shall be granted or allowed in the these chapter 11 cases but for those set forth in the Interim Order. |

| Provision | Summary Description |
|---|---|
| **DIP Budget**[5]<br><br>Interim Order at ¶ Exhibit A. | The 9-week Budget. |
| **Carve-Out**<br><br>Interim Order at ¶ 10. | During the Interim Period and subject to the terms and conditions contained in this Section 10, the DIP Liens, DIP Superpriority Claims, Pre-Petition Liens, Pre-Petition Replacement Liens, Pre-Petition Superpriority Claim, Pre-Petition Second Liens, Pre-Petition Second Lien Replacement Liens and Pre-Petition Second Lien Superpriority Claim are subordinate only to the following items (a), (b) and (c) (items (a), (b) and (c), collectively, the "**Carve-Out**"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 to the extent such interest is awarded by final order of the Court; and (b) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees, disbursements, costs and expenses (collectively, the "**Professional Fees**") incurred by professionals or professional firms (collectively, the "**Case Professionals**") retained by any committee appointed in these Chapter 11 Cases pursuant to Bankruptcy Code 1102 (a "**Committee**"), but only up to an aggregate amount not to exceed $100,000.00 for items (a) and (b), collectively (which $100,000.00 amount shall be in addition to any fees and expenses of Case Professionals of the Debtors which have actually been incurred but are unpaid as of the occurrence of the Commitment Termination Date); and (c) Morgan Joseph TriArtisan LLC's ("**Morgan Joseph**") Fees (as defined in and pursuant to the terms of the Consent and Acknowledgement dated on or about February 1, 2013 between the Pre-Petition Agent and Morgan Joseph (the "**Morgan Joseph Fee Agreement**")), but solely as and to the extent that such Fees (as defined in and pursuant to the terms of the Morgan Joseph Fee Agreement) are actually due and payable under and in accordance with the terms and conditions of the Morgan Joseph Fee Agreement; <u>provided, however,</u> that, in each case (a), (b) and (c), such fees and expenses are approved by this Court, or such lesser amount as so approved. The DIP Lenders shall deposit the Carve-Out and the Wind-Down Amount into the Fee Account (or, with respect to solely the portion of the Carve-Out constituting amounts under the Morgan Joseph Agreement, with Morgan Joseph) upon the Commitment Termination Date (as defined below); <u>provided, however,</u> that prior to subsequent disbursement from the Fee Account (or, with respect to solely the portion of the Carve-Out constituting amounts under the |

---

[5]    A budget with respect to the DIP Financing is attached hereto as **Exhibit 1** to **Exhibit B**.

PHIL1 2826630v.5

| Provision | Summary Description |
|---|---|
| | Morgan Joseph Agreement, prior to payment to Morgan Joseph) such fees and expenses incurred by professionals or professional firms are authorized to be paid by this Court pursuant to procedures approved by this Court; and, provided, however, further that unutilized amounts, if any, will be refunded to the DIP Secured Parties for application to the DIP Obligations as soon as is practicable. Upon the occurrence of the Commitment Termination Date and the full and final funding of the Carve-Out and the Wind-Down Amount, there shall be no further obligations on the part of the DIP Secured Parties or the Pre-Petition Secured Parties regarding the Carve-Out, any Professional Fees, any U.S. Trustee Fees or any other fees and expenses of the Debtors' estate in these Cases or in any successor cases or proceedings. The DIP Secured Parties' obligation to fund or otherwise pay the Carve-Out and Wind-Down Amount, shall be added to and made a part of the DIP Obligations, secured by the DIP Collateral, and the DIP Secured Parties shall be entitled to all of the rights, claims, Liens, priorities, and protections under this Interim Order, the DIP Financing Agreement, the Bankruptcy Code and/or applicable law in connection therewith.  Subject to the subsequent provisions of this Section 10, the Carve-Out and the Wind-Down Amount shall exclude any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the Pre-Petition Debt, (iii) the Pre-Petition Liens in the Pre-Petition Collateral, (iv) the Pre-Petition Second Lien Debt, , (v) the Pre-Petition Second Liens in the Pre-Petition Second Lien Collateral, or (vi) the DIP Secured Parties', the Pre-Petition Secured Parties' and the Pre-Petition Second Lien Secured Parties' Liens in the Collateral, or (B) preventing, hindering or delaying, whether directly or indirectly, the DIP Secured Parties', the Pre-Petition Secured Parties', or the Pre-Petition Second Lien Secured Parties' assertions or enforcement of their Liens, security interests or realization upon any DIP Collateral, provided, however, that with respect to solely the Pre-Petition Second Lien Debt and the Pre-Petition Second Liens in the Pre-Petition Second Lien Collateral, such exclusion does not encompass any investigative work, at an aggregate expense not to exceed $10,000, conducted by the Case Professionals prior to bringing any action relating to the foregoing, (y) incurred in using cash collateral of the DIP Secured Parties, the Pre-Petition Secured Parties and the Pre-Petition Second Lien Secured Parties, selling or otherwise disposing of any other Collateral, or incurring any indebtedness not permitted under the DIP Financing Agreement, without the DIP Agent's express written consent or (z) arising after the conversion of the chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  The DIP |

7

| Provision | Summary Description |
|---|---|
| | Agent may implement Reserves in accordance with the terms and conditions of the DIP Credit Agreement. Except for a Lien Obligation to fund the Carve-Out and an obligation to fund the Wind-Down Amount as set forth in this Interim Order and the DIP Financing Agreement, nothing herein shall be construed to obligate the Pre-Petition Secured Parties, the DIP Secured Parties or the Pre-Petition Second Lien Secured Parties, in any way, to pay the Professional Fees or U.S. Trustee Fees, or to assure that the Debtors have sufficient funds on hand to pay any Professional Fees, U.S. Trustee Fees or other liabilities or obligations of the Debtors. |
| **Milestones**<br><br>DIP Financing Agreement at § 6.17. | The milestone schedule with which the Debtor shall comply with respect to the 363 Sale and the Debtors' plan of reorganization (the "Transaction Benchmarks"), for the purpose of ensuring the timely pursuit and consummation of the 363 Sale, shall be as follows:<br><br>(a)    Motion to Approve Bidding Procedures. No later than the Petition Date, the Credit Parties shall have filed a motion to approve proposed bidding procedures and a timeline to consummate a Transaction (which shall include, without limitation, an auction date, the requirement that the sale be for cash consideration in an amount that will satisfy the sum of the Pre-Petition Debt and the DIP Obligations, including all fees, expenses and costs of the DIP Agent associated therewith, the timing of a proposed sale, and deadlines for completing due diligence and submitting offers/bids) and designating Scrubs & Beyond LLC as a stalking horse bidder pursuant to the Stalking Horse APA providing for a Purchase Price of no less than $22,625,000.00, subject to adjustment as set forth in the Stalking Horse APA, which shall be in form and substance satisfactory to Agent;<br><br>(b)    DIP Order. No later than the Petition Date, the Debtors shall file a motion seeking Bankruptcy Court approval of the DIP Facility described herein in form and substance satisfactory to the Agent. The Bankruptcy Court shall have entered interim approval of the DIP Financing within three (3) business days of the Petition Date and final approval by June 24, 2013.<br><br>(c)    Approval of Bidding Procedures. On or before June 24, 2013, the Bankruptcy Court shall have entered an order approving Debtors' proposed bidding procedures and timeline to consummate a Transaction, which shall be in form and substance satisfactory to Agent;<br><br>(d)    Final Auction. On or before fifty-three (53) days following the Petition Date, the Debtors shall have held a final auction (the "**Final Auction**"), made a determination as to the highest or best bid with respect to a Transaction in consultation with the Agent and Lenders, and accepted such bid (the "**Accepted Bid**"); |

8

| Provision | Summary Description |
|---|---|
| | (e)    <u>Sale Order</u>.  On or before fifty five (55) days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Transaction with respect to the Accepted Bid, which order shall be in form and substance satisfactory to the Agent in its Permitted Discretion; and<br><br>(f)    <u>Closing of Sale; Remittance of Proceeds</u>.  On or before sixty (60) days following the Petition Date, the Credit Parties shall close the Transaction and concurrently with such closing shall deliver the indefeasible payment to the Agent, for the benefit of the Lenders, of any and all proceeds therefrom as a permanent reduction of the DIP Obligations, the Pre-Petition Debt and other Obligations (in that order of priority). |

### Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i)

9.      The DIP Financing Agreement includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i).  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

a.      **Local Rule 4001-2(a)(i)(B) – *Validity, Perfection and Amount of Prepetition Obligations*,** Interim Order at ¶ E (i), (ii), (iii) and (iv).  As part of the Interim Order, the Debtors agree and stipulate that the Pre-Petition Facility is a valid and binding agreement, and the Liens related thereto constitute valid, binding, enforceable and perfected Liens.  Additionally, the Debtors have waived, discharged and released any right they may have to challenge any of the indebtedness pursuant to the Pre-Petition Facility or the security for those obligations.

b.      **Local Rule 4001-2(a)(i)(B) – *Committee Challenge Period*,** Interim Order at ¶8.  All non-debtor parties in interest (including any trustee or Committee appointed or elected in the Cases prior to the Investigation Termination Date (as defined herein)) shall have until the earlier of (i) sixty (60) days from the date of the Interim Order or (ii) forty-five (45) days from the date a Committee is first appointed to investigate the validity, perfection, and enforceability of the Liens of the Secured Lender and the claims of the Pre-Petition Secured Parties (and to assert any claims or causes of action against any of the Pre-Petition Secured Parties as described in paragraph 8 of the Interim Order).

c.      **Local Rule 4001-2(a)(i)(D) – *Waiver of Section 506(c) Claims*,** Interim Order at ¶ 12.  Subject to entry of the Final Order, with the exception of the Carve-Out, neither the DIP Collateral, Cash Collateral or Prepetition

Collateral shall be subject to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the DIP Lenders.

d.    **Local Rule 4001-2(a)(i)(D) – *Liens on Avoidance Actions*,** Interim Order at ¶ H and 2(e). Subject to entry of the Final Order, fully perfected and unavoidable first-priority senior priming security interests in and liens upon avoidance actions under Chapter 5 of the Bankruptcy Code and/or the proceeds thereof pursuant to sections 502(d), 544, 545, 547, 548, 550 and/or 553 of the Bankruptcy Code and the proceeds thereof.

e.    **Local Rule 4001-2(a)(i)(F) – *Treatment of Committee Professionals*,** Interim Order at ¶ 10. The Committee's professional fees are included in the DIP Budget. As discussed above, each of the DIP Liens and Superpriority Claims are subject and subordinate to the Carve-Out.

### The Debtors' Outstanding Prepetition Indebtedness

10.    Life Uniform and Uniform City are the Borrowers and Holdings is the Guarantor under a credit facility with Capitalsource dated October 3, 2006 (as amended pursuant to certain letter agreements dated July 29, 2009, August 7, 2009, and August 28, 2009 and pursuant to the Waiver and First Amendment dated September 30, 2009) (the "*Prepetition Credit Agreement*"). The Prepetition Credit Agreement consists of a $12.5 million revolver (the "*Prepetition Revolver*") and a $26 million term loan (the "*Prepetition Term Loan*," together with the Prepetition Revolver, the "*Prepetition First Lien Debt*"). Capitalsource is both the agent and the lender under the Prepetition Credit Agreement. The Prepetition First Lien Debt is secured by the Debtors' inventory, equipment, goods, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property, general intangibles, deposit accounts and the proceeds and products of each of the foregoing categories of collateral except for certain "Permitted Liens" (as defined in the Prepetition Credit Agreement). The Debtors have fully utilized all of their availability under the Prepetition First Lien Debt.

10

11.    The Borrowers issued to Sun Uniforms Finance, LLC ("*Second Lien Lender*") a Senior Subordinated Secured Promissory Note ("*Second Lien Secured Promissory Note*") dated September 30, 2009 in the original principal amount of $6,108,000 (the "*Second Lien Loan*") as well as a general guaranty. Second Lien Lender was granted a second lien on the collateral held by Capitalsource as a part of this transaction. The use of proceeds from the Second Lien Loan were to provide liquidity to the Company via partial revolver paydown, further reduce the total outstanding debt of the Company via partial term loan paydown, and fees and expenses to effectuate the transaction. Prior to the completion of the Second Lien Loan, the Company was in default of its financial covenants and the maturity date of the loans with Capitalsource were coming due. With the additional liquidity and reduction in leverage, Capitalsource extended its loan for an additional 18 months. The Second Lien Lender also holds two additional notes, each in the original principal amount of $1,088,303.56, which were purchased from Jeffrey N. Linn and Craig Linn on August 19, 2011.

12.    Angelica Corporation holds an unsecured Junior Subordinated Note issued by Life Uniform, originally dated July 7, 2004 and reissued and dated September 30, 2009 in the reissued original principal amount of $5,482,453.95 (the "*Junior Subordinated Note*").

### The Debtors' Liquidity Needs

13.    As discussed more fully in the First Day Declaration, despite the numerous initiatives enacted by the Debtors, the Company's recent performance has declined in terms of revenue and EBITDA. This has been in large part due to the Company's stressed liquidity profile. The liquidity issues prevented the Debtors from furthering certain necessary goals including the completion of a needed e-commerce system upgrade; payment of key vendors on or near terms to encourage better pricing; continuing a highly accretive acquisition strategy; payment of earned bonuses; and maintaining sufficient working capital to fully support organic

11

sales channel growth. The failure to complete the necessary goals as a result of the Debtors lack of liquidity further stressed the Debtors' liquidity and performance, leading to further deterioration and a downward liquidity spiral

14.    Recognizing this trend and need for an influx of capital to grow the Debtors' business and profitability, the Debtors determined that the best method to maximize the value of the enterprise was to pursue a sale of the Company. Accordingly, the Company retained Morgan Joseph TriArtisan LLC ("*Morgan Joseph*") to explore a sale of the Company.

### Proposed Sale of Substantially All Assets

15.    As discussed more fully in the Sale Motion,the Debtors intend to pursue a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code. The Debtors have determined in consultation with their advisors that the value of the Debtors' estates is likely to be worth substantially more as a going concern than in liquidation. The Debtors' proposed sale of substantially all of their assets can, therefore, not only preserve the value of the Debtors' businesses but also maximize such value for the Debtors' creditors and estates.

16.    On May 29 2013, the Debtors entered into an asset purchase agreement (the "*APA*") with Scrubs and Beyond, LLC ("*Scrubs*") that contemplates the sale of substantially all of the Debtors assets to Scrubs in exchange for $22.625 million. Under the APA, Scrubs has agreed to act as a stalking horse bidder and subject the APA to higher or better offers in exchange for certain bidding protections and a breakup fee.

17.    The APA contains a timeline by which the Debtors intend to complete any proposed sale transaction under section 363 of the Bankruptcy Code and requires a closing of the transaction by August 30, 2013. Pursuant to the APA, the sale and bidding procedures motion must be filed concurrently with these First Day Motions on the Petition Date.

18.    In the face of these chapter 11 cases, absent an ability to demonstrate that the Debtors have the means apart from cash-on-hand available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, vendors and suppliers may choose not to ship goods or provide service to the Debtors, resulting in disruption to the Debtors' supply chain. Any disruption in the Debtors' supply chain at this critical juncture would cause a severe reduction in the Debtors' cash on hand.

19.    Immediate access to the DIP Facility and the use of cash collateral will enable the Debtors to allay concerns of the Debtors' suppliers and customers and enable the Debtors to carry on with business as usual. Absent access to liquidity, the Debtors' ability to operate and ultimately sell their assets as a going concern will be jeopardized, all to the detriment of the Debtors' stakeholders. As a result, the Debtors have an immediate need to secure the DIP Financing to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

### The Debtors' Efforts to Obtain Postpetition Financing[6]

20.    The Debtors — through Morgan Joseph attempted to identify and procure potential sources of funding to allow the Debtors to continue operations until emergence of these chapter 11 cases. With increased customer and vendor pressures, Morgan Joseph sought postpetition financing that would be provided quickly and consensually.

21.    Morgan Joseph contacted several parties in addition to Capitalsource, which included banks and funds that specialize in debtor in possession financing. Because Capitalsource, as first lien lender, would not consent to have its liens primed by an additional

---

6    For a more detailed discussion of the Debtors' efforts to obtain postpetition financing, see the Hadfield Declaration, attached hereto as **Exhibit B**.

13

lender, as well as in light of the compressed sale timeline and the level of assets available as collateral, none of the additional financing parties other than Capitalsource approached by Morgan Joseph expressed an interest in providing postpetition financing.

22.    After extended arms-length negotiations, Capitalsource agreed with the Debtors request for $15 million of liquidity as being appropriate and necessary to maintain the Debtors' operations through the expedited sale process proposed in these chapter 11 cases.

### Development of the DIP Budget and the Debtors' Liquidity Needs[7]

23.    To best assess the Debtors' funding needs during these chapter 11 cases, the Debtors, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful sale of their assets. The Debtors developed a 9-week cash flow forecast that considers the savings derived by the filings of these cases, including potential lease rejections and the Debtors' ability to maintain customary payment terms with key suppliers.

24.    Based on the Debtors' financial projections, the Debtors concluded that cash on hand alone would be insufficient to fund operations and the Debtors' business plan throughout the pendency of these chapter 11 cases. Thus, to provide the Debtors with appropriate and necessary financing, obtaining debtor-in-possession financing was critical to ensure that operations would continue uninterrupted during these chapter 11 cases.

25.    Utilizing this cash flow forecast to project their cash needs during these chapter 11 cases, the Debtors believe that access to approximately $2.5 million in incremental liquidity is necessary for operations on an interim basis and access to approximately $4 million

---

[7]    For a more detailed discussion of the Debtors' liquidity needs and development of the DIP Budget, see the Hadfield Declaration, attached hereto as **Exhibit B**.

in incremental liquidity is necessary in total to operate through a closing of a sale transaction on an expedited basis. The Debtors believe vendors may tighten credit terms or stop shipments, which would result in a severe reduction to the Debtors' cash on hand. Therefore, without approval of the relief requested herein, the Debtors believe they may face significant liquidity constraints in the coming weeks.

### Supporting Authority

**A.    Financing Under Section 364 of the Bankruptcy Code**

26.    Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, as an administrative expense priority or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c);[8] *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense).

27.    Additionally, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the

---

[8]    Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1).

28.    Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements.  Generally, courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements, focusing on the transaction as a whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

29.    More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business, (b) is in the best interests of the Debtors' creditors and estates, (c) is an exercise of a debtor's sound and reasonable business judgment, (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008).

30.     The Debtors submit that entry into the DIP Facility is in the best interests of the

Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the

Debtors' sound and reasonable business judgment.

i.      **Entry into the DIP Facility is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets and is an Exercise of the Debtors' Sound and Reasonable Business Judgment**A debtor's decision to

enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed

by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In

re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition

loan and receivables facility because such facility "reflect[ed] sound and prudent business

judgment."); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section

364 of the Bankruptcy Code must reflect a debtor's business judgment); *Barbara K. Enters.*,

2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long

as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of

the reorganization to one party in interest.").

32.     Generally, the business judgment standard requires that, absent evidence to the

contrary, a debtor in possession is afforded discretion to act with regard to business decision-

making. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449  (Bankr. D. Colo. 1985) ("[D]iscretion

to act with regard to business planning activities is at the heart of the debtor's power.") (citations

omitted).

33.     Specifically, to determine whether the business judgment standard is met, a court

is "required to examine whether a reasonable business person would make a similar decision

under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see

also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts

17

should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

34.     The Debtors' decision to enter into the proposed DIP Facility satisfies this standard. This decision is the culmination of an intense process targeted at procuring the best available financing under the circumstances. And while this is the only financing available under the circumstances, the Debtors negotiated the DIP Financing on an arm's-length basis that the Debtors submit is reasonable and appropriate. Moreover, it is critical that the Debtors assure their customers that they will operate in the ordinary course of business and have the resources in place to do so.

35.     Therefore, entry into the DIP Facility and securing the financing available thereunder is critical to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest. Thus, entry into the DIP Facility is an exercise of the Debtors' sound business judgment.

ii.     **The Terms of the DIP Facility are Fair, Reasonable and Appropriate in Light of the Debtors' Needs and the Current Market Environment**

36.     It is well-recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. *See, e.g., In re Snowshoe Co. Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that where there are few lenders likely, able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re*

18

*Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); *Ames*, 115 B.R. at 37-39 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.     Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and 364(b) of the Bankruptcy Code. *See Snowshoe*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

38.     The Debtors' efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis. As discussed above and in the Hadfield Declaration attached hereto as **Exhibit C**, the DIP Financing was the only available financing under these circumstances. Indeed, discussions with other potential lenders were stalled because of diligence requirements and time constraints or because third-parties were simply uninterested in the costs and risk — as were the Debtors — attendant to a priming fight over the first lien lenders' objection. Accordingly, the Debtors submit that the terms of the DIP Financing Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

39.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R.

19

358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization). Here, despite the unavailability of alternative postpetition financing, the Debtors, with the assistance of its advisors, conducted hard-fought negotiations to ensure that the terms of the DIP Financing were appropriate under the circumstances, with the end result being that the terms of the DIP Financing are comparable to financings approved over the past few months.

### a.    The Scope of the Carve-Out is Appropriate

40.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and a committee of unsecured creditors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

### b.    The Payment of Fees to the DIP Lender is Appropriate

41.    The fees and charges to be paid to the DIP Lender, as expressly provided for in the DIP Financing Agreement, are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in

20

section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

**B.      The DIP Facility was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

42.      Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

43.      The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and Capitalsource, and the DIP Obligations will be extended by Capitalsource in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party in connection with the DIP Financing other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and Capitalsource should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed or modified on appeal or otherwise. *See* 11 U.S.C. § 364(e).

**C.      The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral is Appropriate**

44.      As discussed above, the DIP Financing contemplates providing the DIP Lender with priming liens on the liens granted to Capitalsource pursuant to section 364(d) of the Bankruptcy Code.      Accordingly, the Debtors are required to show that the interests of Capitalsource are "adequately protected." 11 U.S.C. § 364(d). Additionally, pursuant to section

21

363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of Capitalsource subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

45.    What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993).

46.    In this case, access to the DIP Financing – which necessitates granting Capitalsource's liens on a priming basis under section 364(d) of the Bankruptcy Code – is critical to the Debtors' ability to continue operations. As a result of such proposed priming, the Debtors intend to provide Capitalsource with adequate protection, which include: (i) liens in all DIP Collateral and Cash Collateral; (ii) for the extent of any diminution in value of their interests in the Prepetition Security Interests, superpriority administrative claims.

47.    The Debtors believe that the proposed Adequate Protection Obligations are necessary and appropriate to ensure that the Debtors can continue to use Cash Collateral and access necessary liquidity under the DIP Financing. Accordingly, the Adequate Protection Obligations proposed herein and in the DIP Orders is fair and reasonable and is sufficient to

22

satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code. *See* 11 U.S.C. §§

363(c), 364(d).

**D.      Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm.**

48.      Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to

obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority
> to obtain credit no earlier than 14 days after service of the motion.
> If the motion so requests, the court may conduct a hearing before
> such 14 day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Proc. 4001(c)(2).

49.      In examining requests for interim relief under the immediate and irreparable harm

standard, courts apply the same business judgment standard applicable to other business

decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449.  After the 14-

day period, the request for financing is not limited to those amounts necessary to prevent the

destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it

believes are prudent to the operation of its business. *Ames Dept. Stores* at 36.

50.      Immediate and irreparable harm would result if the relief requested herein is not

granted on an interim basis.  As described in detail herein, the Debtors have an immediate need

to obtain access to incremental liquidity.  The Debtors' relationships with their employees,

customers and suppliers are paramount to the Debtors' success.  The Debtors must be able to

communicate to their key stakeholders that they will continue to operate in the ordinary course,

satisfy any critical payment obligations and continually satisfy other general working capital and

operational needs, and that necessitates access to capital.

23

51.     Accordingly, the Debtors believe that absent access to liquidity under the DIP Facility, the Debtors' vendors may cease to provide goods and services to the Debtors, which would be crippling to the Debtors' businesses.  Thus, availability of sufficient working capital and liquidity — and the ability to message to key stakeholders that the funding is available — is imperative to preserve and maintain the value of the Debtors' estates.

52.     The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district.  *See, e.g., In re Friendly Ice Cream Corp.*, Case No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011); *In re Nebraska Book Company, Inc.*, Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011); *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (KG) (Bankr. D. Del. Nov. 19, 2010); *In re U.S. Concrete, Inc.*, Case No. 10-11407 (PJW) (Bankr. D. Del. April 30, 2010); *In re Atrium Corporation*, Case No. 10-10150 (BLS) (Bankr. D. Del. Jan. 21, 2010).

**E.     Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.**

53.     The Interim Order proposes that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow Capitalsource to file the Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests and mortgages.  The Interim Order also proposes that, upon two business days written notice to the Debtors, the Debtors' counsel and the Committee's counsel, the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Lender to exercise remedies following a default under the DIP Facility

24

54.    Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Financing Agreement and the proposed DIP Orders.

### Request For Final Hearing

55.    Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors requests that the Court set a date for the final hearing that is as soon as practicable, but in no event later than June 24, 2013, and fix the time and date prior to the final hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

56.    To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

### Notice

57.    The Debtors have provided notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Debtors' prepetition secured lender and debtor in possession lender; (d) counsel to the Debtors' Second Lien Lender; (e) parties appearing on UCC searches performed by the Debtors; (g) the Delaware Secretary of Treasury; (h) the Delaware State Attorney General; (i) the Office of the United States Attorney General for the State of Delaware; (j) the Internal Revenue Service; and (k) the Securities and Exchange Commission. In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

25

**No Prior Request**

58.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the First Day Declaration and in the Hadfield Declaration, the Debtors respectfully request entry of the DIP Orders, (a) authorizing the Debtors to (i) enter into and perform under the DIP Financing Agreement and (ii) use Cash Collateral, (b) granting the Adequate Protection Obligations, (c) setting a date for a hearing to consider entry of the Final Order no later than 24 days following the Petition Date and (d) granting such other and further relief as may be appropriate.

Dated: May 30, 2013
Wilmington, Delaware

/s/ Domenic E. Pacitti
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

PHIL1 2826630v.5