## Exhibit B

### The DIP Financing Agreement

EXECUTION COPY

## RATIFICATION AND AMENDMENT AGREEMENT

**THIS RATIFICATION AND AMENDMENT AGREEMENT** dated as of May 29, 2013 (this "**Amendment**"), by and between, on one hand, HEALTHCARE UNIFORM COMPANY, INC., a Delaware corporation ("**Healthcare Uniform**"), UNIFORM CITY NATIONAL, INC., a Delaware corporation and successor by merger to each of LINN UNIFORMS OF CLEARWATER, INC., a Florida corporation, UNIFORM CITY- SOUTHEAST, INC., a Florida corporation, UNIFORM CITY, U.S.A., INC., a Florida corporation, UNIFORM CITY SEABOARD, INC., a Delaware corporation, LINN UNIFORMS CORPORATION OF P.G. COUNTY, INC., a Maryland corporation, and LINN UNIFORMS OF FLORIDA, INC., a Florida corporation ("**National**" and together with Healthcare Uniform, each a "**Borrower**" and collectively, the "**Borrowers**"), and LIFE UNIFORM HOLDING CORP., a Delaware corporation ("**Guarantor**" and together with the Borrowers, each a "**Credit Party**" and collectively, the "**Credit Parties**"), and, on the other hand, CAPITALSOURCE FINANCE LLC, a Delaware limited liability company (in its capacity as administrative agent, "**Agent**") for itself and the other lenders from time to time party to the Credit Agreement (hereinafter defined) (each a "**Lender**" and collectively, the "**Lenders**").

### RECITALS

**A.**    Agent and Credit Parties are parties to an Amended and Restated Revolving Credit, Term Loan and Security Agreement dated as of October 3, 2006, as amended by that certain Waiver and First Amendment to Amended and Restated Revolving Credit, Term Loan and Security Agreement dated as of September 30, 2009 and that certain Second Amendment to Amended and Restated Revolving Credit, Term Loan and Security Agreement dated as of August 19, 2011, each by and among the Borrowers, the Guarantor, the Lenders and Agent (collectively, and as the same may be further amended, supplemented, modified and/or restated from time to time, the "**Credit Agreement**"). Capitalized terms used in this Ratification and Amendment and not defined herein shall have the meanings given such terms in the Credit Agreement, as amended by this Amendment;

**B.**    On May 29, 2013 (the "**Petition Date**"), the Credit Parties, as debtors and debtors-in-possession, filed a voluntary petition in Case Nos._____ (the "**Case**") for relief under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**C.**    Events of Default, including, without limitation, the Specified Events of Default and the Events of Default arising from the commencement of the Case, have occurred and are continuing under the Credit Agreement as of the date hereof;

**D.**    In order to continue their operations as debtors and debtors-in-possession under the Bankruptcy Code pending the sale of all or substantially all of their assets and properties pursuant to section 363 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Debtors have requested that the Agent and Lenders continue to make secured Advances and other financial accommodations to the Borrowers pursuant to the terms of the Credit Agreement, as amended by this Amendment (the "**DIP Financing**");

**E.**    Borrowers have moved for an Interim Order and Final Order to be entered by the Bankruptcy Court permitting secured post-petition, debtor-in-possession financing of Borrowers, including, without limitation, a roll up of all Obligations outstanding under the Credit Agreement immediately prior to the effectiveness of this Amendment, all pursuant to the terms of the Credit Agreement, as amended by this Amendment; and

F.     The Agent and Lenders are willing to continue to make secured Advances and other financial accommodations to Borrowers, only if, among other things, the Credit Agreement and the other Loan Documents are amended on the terms set forth in this Amendment, and the Bankruptcy Court enters an Interim Order and Final Order, each in form and substance satisfactory to the Agent and Lenders.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby agrees as follows:

## 1.     ACCURACY OF RECITALS; RELATION TO CREDIT AGREEMENT.

1.1.     **Accuracy of Recitals**. Each of Borrowers, Lenders and Agent acknowledges and agrees that the foregoing Recitals are true and accurate and are incorporated herein by reference.

1.2.     **Relation to Credit Agreement**. This Amendment constitutes an integral part of the Credit Agreement and shall be deemed to be a Loan Document for all purposes. Upon the effectiveness of this Amendment, on and after the date hereof each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to "the Credit Agreement," "thereunder," "thereof" or words of like import referring to the Credit Agreement, shall mean and be a reference to the Credit Agreement as amended hereby. The parties hereto agree to be bound by the terms and conditions of the Credit Agreement and other Loan Documents as amended by this Amendment, as though such terms and conditions were set forth herein and therein in full.

## 2.     ACKNOWLEDGMENT OF OBLIGATIONS.

2.1.     **Certain Obligations.** Subject to the rights of non-debtor parties under Section 8(a) of the Interim Order, each Credit Party hereby acknowledges and agrees that, as of the Petition Date, it is unconditionally liable to the Agent and Lenders under the Loan Documents for the full and immediate payment of all Obligations, including, without limitation, those Obligations set forth on Schedule A attached hereto and incorporated herein by reference, plus all charges, fees, costs, and expenses that may arise under the Credit Agreement and other Loan Documents plus all attorneys' fees, disbursements and costs of collection incurred in connection with such Obligations by Agent and Lenders as well as adjustments and credits as provided in the Credit Agreement and other Loan Documents and that the Credit Parties have no defenses, counterclaims or set-offs with respect to the full and immediate payment and performance of any or all Obligations under the Loan Documents; provided, however, that for purposes of this Section 2.1, the term "Obligations" shall have the meaning given to it in the Credit Agreement without giving effect to this Amendment.

2.2.     **Material Defaults**. Each Credit Party acknowledges and agrees that (a) the Specified Events of Default under the Loan Documents constitute material defaults under the Loan Documents, (b) any notices that might be given and any grace periods or cure periods which must expire prior to Agent and/or Lenders exercising any of their respective rights and remedies in connection with the Loan Documents, have been given, complied with and expired and, in any event, are hereby waived and relinquished by such Credit Party, and (iii) as a consequence, Agent and Lenders are now entitled to immediately exercise all of their respective rights and remedies under the Loan Documents, at law or in equity, including, without limitation, their rights to declare all Obligations to be immediately due, payable, and performable, without notice, except to the extent that Agent and Lender agree to forbear from exercising those rights and remedies for

a certain period of time as set forth in this Amendment and/or as provided in the Interim Order and Final Order.

2.3.    **No Commitments.**  Each Credit Party further acknowledges and agrees that Agent and Lenders have no commitments, obligations or agreements to make Loans or other financial accommodations to Borrowers, all such commitments, obligations, and agreements having terminated, except to the extent that Agent and Lenders agree to continue to make Loans or other financial accommodations pursuant to this Amendment and/or as provided in the Interim Order and Final Order.

2.4.    **Lien Acknowledgment.**  Subject to the rights of non-debtor parties under Section 8(a) of the Interim Order, each Credit Party acknowledges, confirms and agrees that the Agent and Lenders have and have had a valid, enforceable and perfected first priority security interest and Lien upon all of the Pre-Petition Collateral granted by the Credit Parties to the Agent and/or Lenders pursuant to the Loan Documents to secure all of the Obligations, subject only to Liens or security interests permitted under the Loan Documents; provided, however, that for purposes of this Section 2.4, the term "Obligations" shall have the meaning given to it in the Credit Agreement without giving effect to this Amendment.

2.5.    **Pre-Petition Collateral Acknowledgment.**  Subject to the rights of non-debtor parties under Section 8(a) of the Interim Order, each Credit Party acknowledges, confirms and agrees that the aggregate value of the Pre-Petition Collateral granted to the Agent and/or Lenders pursuant to the Credit Agreement and the other Loan Documents exceeds the aggregate amount of the Pre-Petition Debt.

3.    **AMENDMENTS TO CREDIT AGREEMENT.**

(a)    **New Definitions.**    Annex A of the Credit Agreement (Definitions) is hereby amended to add the following definitions in the appropriate alphabetical order:

(i)    "**Accepted Bid**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(ii)    "**Agent's Financial Consultant**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(iii)    "**Agreement**" or "**this Agreement**": means the Amended and Restated Revolving Credit, Term Loan and Security Agreement dated as of October 3, 2006, as amended by that certain Waiver and First Amendment to Amended and Restated Revolving Credit, Term Loan and Security Agreement dated as of September 30, 2009, that certain Second Amendment to Amended and Restated Revolving Credit, Term Loan and Security Agreement dated as of August 19, 2011 and that certain Ratification and Amendment Agreement dated as of May 29, 2013, each by and among the Borrowers, the Guarantor, the Lenders and Agent, as the same now exists or as the same may be further amended, supplemented, modified and/or restated from time to time.

(iv)    "**Bankruptcy Court**": shall mean the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Case from time to time.

(v)    "**Budget**": shall mean the budget prepared by the Credit Parties and attached hereto as Schedule B in form and substance satisfactory to the Agent.

3

(vi)     "**Business Consultant**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(vii)    "**Carve-Out**": shall have the meaning given such term in the Interim Order or any successor Financing Order.

(viii)   "**Case**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(ix)     "**Collections**": means all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, proceeds of debt or equity issuances, cash proceeds of dispositions, and tax refunds) of any Credit Party from whatever source and however derived.

(x)      "**Debtors**": shall mean, collectively, Healthcare Uniform Company, Inc., Uniform City National, Inc., and Life Uniform Holding Corp., as debtors and debtors-in-possession, and their successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as their legal representative or with respect to the property of the estate of such corporation whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 case and its successor upon conclusion of the Case of such corporation).

(xi)     "**DIP Collateral**": shall mean, all now existing or hereafter acquired real and personal property (including, without limitation, and by way of general description only, all cash, cash equivalents, bank accounts, accounts, accounts receivable, chattel paper, contract rights, inventory, machinery, instruments, documents, securities (whether or not marketable), the Deposit (as defined in the Stalking Horse APA or any other deposit under any alternative asset purchase or similar agreement), or any right, title and interest that Debtors have in the Deposit or any deposit, equipment, furniture, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, causes of action and all substitutions, accessions, products and cash and non-cash proceeds of the foregoing, wherever located, including, without limitation, insurance proceeds or other proceeds) of the Debtors and the Debtors' estate, wherever located, of any kind or nature, upon which the Agent and/or Lenders are granted a security interest or Lien pursuant to the Loan Documents or any Financing Order (and any other items included within the definition of "DIP Collateral" as set forth in any Financing Order); provided, however, that the "DIP Collateral" shall not include any avoidance actions under chapter 5 of the Bankruptcy Code or the proceeds thereof (other than the proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of Collateral) until the entry of a Final Order.

(xii)    "**DIP Financing Agreements**": shall mean the Loan Documents as in effect immediately following the Petition Date, and shall include, without limitation, the Ratification and Amendment Agreement.

(xiii)   "**DIP Obligations**": shall mean all of the Debtors' liabilities and obligations under the DIP Financing Agreements and any related Financing Order, including, without limitation, all fees and expenses, and their obligation to provide Agent and Lenders with adequate protection of their interests in the Pre-Petition Collateral and other property to

4

be used, sold, leased or otherwise disposed of by the Debtors after the commencement of the Case under the terms of any Financing Order (including, without limitation, coverage as to the account of any loss, damages, depletion, diminution or depreciation resulting from the Debtors' use (or in the case of inventory, sale) of such property (unless otherwise specified, DIP Obligations shall constitute "Obligations" under this Agreement).

(xiv)   "**DIP Overadvance Amount**": shall mean, from the date of the Ratification and Amendment Date to the Termination Date, additional Advances over and above what would otherwise be permitted by straight calculation of the Receivables Borrowing Base and the Inventory Borrowing Base, but only up to amounts set forth in the Budget for the corresponding time or period.

(xv)   "**Disclosure Schedule**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(xvi)   "**Fee Account**": shall have the meaning given such term in the Interim Order or in any successor Financing Order.

(xvii)   "**Final Order**": shall mean a Final Order (acceptable in form and substance to the Agent and Lenders) entered or to be entered by the Bankruptcy Court authorizing the secured financing under the Loan Documents contemplated under the Ratification and Amendment Agreement.

(xviii)   "**Financing Order**": shall mean, collectively, the Interim Order, the Final Order and such other orders relating thereto or authorizing the granting of credit by Agent and/or Lenders to the Debtors on an emergency, interim or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Case.

(xix)   "**Full Roll Up**": shall have the meaning given such term in Section 2.21(b) of this Agreement.

(xx)   "**Interim Order**": shall mean an Interim Order (acceptable in form and substance to Agent and Revolving Lenders) entered by the Bankruptcy Court authorizing the secured financing under the Loan Documents.

(xxi)   "**New Default**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(xxii)   "**Partial Roll Up**": shall have the meaning given such term in Section 2.21(a) of this Agreement.

(xxiii)   "**Petition Date**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(xxiv)   "**Pre-Petition Collateral**": shall mean all of the Collateral, which includes all of the Debtors' property, including, without limitation, and by way of general description only, inventory, accounts receivable, machinery, equipment, furniture and fixtures, general intangibles and the cash and non-cash proceeds thereof; provided, however, that in respect to real property leaseholds, only accounts receivable, payment obligations and/or proceeds arising from a sale, assignment or other disposition thereof shall constitute Pre-

Petition Collateral.

(xxv) "**Pre-Petition Debt**": shall mean all Obligations of the Credit Parties to the Agent or Lenders under the Pre-Petition Financing Agreements and outstanding as of the Petition Date as specified on Schedule A to the Ratification and Amendment Agreement, including, but not limited to all Obligations in respect of Revolving Advances and Term Loans, plus accrued and accruing interest, fees, costs and expenses, including, without limitation, reasonable attorneys' fees and expenses earned or incurred by Agent and/or Lenders under the Pre-Petition Financing Agreements, and all other debts, liabilities and obligations of the Credit Parties thereunder.

(xxvi) "**Pre-Petition Financing Agreements**": shall mean the Loan Documents as in effect immediately prior to the Petition Date.

(xxvii) "**Professional Fee Carve-Out Reserve**": shall mean a reserve instituted by the Agent in an amount equal to the Wind-Down Amount payable by the Agent and Lenders upon the Commitment Termination Date (as defined in the Interim Order or any successor Financing Order).

(xxviii) "**Ratification and Amendment Agreement**": shall mean that certain Ratification and Amendment Agreement dated as of May 29, 2013, by and among Credit Parties, Agent, Lenders and the other parties thereto, including as amended, supplemented, modified and/or restated from time to time.

(xxix) "**Ratification and Amendment Fee**": shall have the meaning given such term Section 3.3 of this Agreement.

(xxx) "**Ratification and Amendment Fee Effective Date**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(xxxi) "**Released Parties**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(xxxii) "**Sales Consultant**": shall have the meaning given such term in the Ratification and Amendment Agreement.

(xxxiii) "**Specified Events of Default**": shall mean all of the following: (a) Borrowers' failure to make the required amortization payments on the Term Loan on December 1, 2012, March 1, 2013 and June 1, 2013 required pursuant to Section 2.8(a) of this Agreement, in violation of Article VIII(a) of this Agreement; (b) Borrowers' failure to deliver the annual audited financial statements that are certified without qualification by an independent public accounting firm as required pursuant to Section 6.1(a) of this Agreement, in violation of Article VIII(c) of this Agreement; (c) Borrowers' and the other Credit Parties' failure to comply with the Senior Leverage Ratio and Fixed Charge Coverage Ratio financial covenants set forth in Section 7.1 of the Credit Agreement as of the Test Dates ended January 31, 2013 and April 30, 2013; and (d) Credit Parties' filing of the Case on the Petition Date in violation of Article VIII(g) of this Agreement.

(xxxiv) "**Stalking Horse APA**": shall mean that certain Asset Purchase Agreement by and among Healthcare Uniform Company, Inc., Uniform City National, Inc., and Scrubs & Beyond, LLC dated as May 29, 2013 in form and substance satisfactory to Agent, as the

same may be amended, restated, supplemented or otherwise modified (provided however, that any amendment, restatement, supplement or other modification, must also be in form and substance satisfactory to the Agent).

(xxxv)  "**Store Closings Plan**": shall mean a summary plan with respect to the stores of the Credit Parties that are not anticipated to be purchased under the Stalking Horse APA and to be attached hereto as Schedule C by June 4, 2013 setting forth anticipated steps for the closing, transfer of inventory and/or other disposition of such stores (and, to the extent available, summary information about persons designated for pursuing such steps), including as the same may be amended from time to time in order to comply with and/or accommodate changes to the list of stores that are being purchased pursuant to the terms of the Stalking Horse APA or otherwise with the consent of the Agent and Lenders.

(xxxvi)  "**Transaction**": shall the meaning given such term in Section 6.17 of this Agreement.

(xxxvii) "**Transaction Benchmarks**": shall have the meaning given such term in Section 6.17 of this Agreement.

(xxxviii)    "**Variance**": shall have the meaning given such term in Section 6.16 of this Agreement.

(xxxix) "**Wind-Down Amount**": shall mean an amount equal to the sum of (a) the Carve-Out, plus (b) the Wind-Down Expenses Amount.

(xl)    "**Wind-Down Expenses Amount**": shall mean an amount equal to $1,483,000.00 in the aggregate to be funded in to the Fee Account in accordance with (a) the terms and conditions of this Agreement, as amended by the Ratification and Amendment Agreement and (b) the Interim Order or any successor Financing Order, for use by the Debtors solely to fund post Termination Date accrued and unpaid liabilities and fees and expenses relating to the Case and/or the wind-down of the Debtors' estate, subject to the allocations set forth on Schedule D attached hereto; provided, however, that any or all of such fees and expenses incurred by professionals or professional firms shall be paid only to the extent authorized by the Bankruptcy Court and otherwise pursuant to procedures approved by the Bankruptcy Court, and, unutilized amounts, if any, shall be returned to the Agent and Lenders for application to the Obligations as soon as is practicable.

(b)    **Replaced Definitions.**  Annex A of the Credit Agreement is hereby amended by replacing the following definitions with the definitions below:

(i)    "**Advances**": shall mean individually or collectively, as the context may require, the Pre-Petition Advances, the DIP Advances, and, upon the Termination Date, also an Advance equal to the Wind-Down Expenses Amount.  Any amounts paid by Agent or any Lender on behalf of any Credit Party under any Loan Document (other than the Term Loan) shall be an Advance for purposes of this Agreement.

(ii)    "**Applicable Margin**": shall mean for all the Loans, the Applicable Margin for each such Loan as set forth below:

|  | Loans Constituting DIP Advances | Loans Constituting Pre-Petition Debt |
|---|---|---|
| Revolving Advances | 5.25% | 5.25% |
| Term Loans | N/A | 7.00% |

(iii) "**Collateral**": shall mean collectively and each individually, all collateral and/or security granted and/or securities pledged to Agent, for the benefit of itself and the Lenders, by Credit Party pursuant to the Loan Documents (including, without limitation, the DIP Financing Agreements), including, without limitation, all Pre-Petition Collateral and all DIP Collateral.

(iv) "**DIP Advances**": shall mean borrowings under the Revolving Facility from and after the Petition Date.

(v) "**Facility Cap**": shall mean, $15,000,000.00; provided, however, that the Wind-Down Amount shall also be funded upon the Termination Date in accordance with the terms of this Agreement, the Interim Order and any successor Financing Order.

(vi) "**Interest Payment Date**": shall mean with respect to all Loans, monthly in arrears on the first (1st) day of each calendar month.

(vii) "**Inventory Advance Rate**": shall mean, from time to time, seventy six percentage (76%) or such other percentage as the Agent shall determine in its sole and absolute discretion.

(viii) "**Loan Documents**": shall mean, collectively and each individually, this Agreement, the Notes, the Security Documents, the Subordination Agreements, the Landlord Waiver and Consents, Collateral Access Agreements, the Borrowing Certificates, the Fee Letter, all Pre-Petition Financing Agreements, all DIP Financing Agreements, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered by a Credit Party to Agent or Lenders in connection with any of the foregoing or the Loans, as the same may be amended, modified or supplemented from time to time.

(ix) "**Pre-Petition Advances**": shall mean borrowings under the Revolving Facility prior to the Petition Date.

(x) "**Revolving Credit**": shall mean all Advances made pursuant to Section 2.1 of this Agreement.

(xi) "**Reserves**": shall mean, without duplication, any Availability Reserves, Inventory Reserves, Professional Fee Carve-Out Reserve and any other reserve created by Agent in its Permitted Discretion hereunder.

(xii) "**Term**": shall mean the period commencing on the Closing Date and ending on the Termination Date.

(xiii) "**Termination Date**": means the earlier to occur of: (a) September 1, 2013; (b) the Commitment Termination Date (as defined under any Financing Order); and (c) the

8

occurrence of an Event of Default (other than the Specified Events of Default) under this Agreement, as amended by the Ratification and Amendment Agreement.

(c)     **Deleted Definitions.**  Annex A of the Credit Agreement (Definitions) is hereby amended to delete the following definitions in their entirety:

> "Eurocurrency Reserve Requirements"
> "Interest Period"
> "Interest Rate Determination Date"
> "LIBOR Election Notice"
> "LIBOR Loan"
> "LIBOR Rate"
> "Prime Rate Portion"

(d)     **Recitals of Credit Agreement.**  The fourth recital of the Credit Agreement is hereby amended by deleting the phrase "up to Twelve Million Five Hundred Thousand Dollars ($12,500,000) (the "**Facility Cap**")" and replacing it with "the Facility Cap (as defined herein)".

(e)     **Revolving Credit Loans.**  The first paragraph of Section 2.1 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"**2.1 The Revolving Facility.**  Subject to the terms and conditions of this Agreement and the Financing Orders: (a) on the Ratification and Amendment Agreement Effective Date, all Revolving Loans and related Obligations outstanding as of the Petition Date shall automatically be deemed to constitute Pre-Petition Debt, and shall be subject to the Partial Roll Up and Full Roll Up described in Section 2.21 of this Agreement; and (b) each Revolving Lender agrees to make available its Pro Rata Share of DIP Advances to Borrowers under the Revolving Facility from time to time before the Termination Date so long as no Event of Default (other than the Specified Events of Default) then exists or would result from the making of such Advance, provided, however, that the aggregate amount of all Advances (including, without limitation, DIP Advances) at any time outstanding under the Revolving Facility shall not exceed the lesser of (x) the Facility Cap and (y) the Availability as then in effect.  All DIP Advances shall be secured by the DIP Collateral and shall be subject to Availability, the Borrowing Base and the Budget, each as determined by Administrative Agent, in its Permitted Discretion, and based on the Borrowing Base Certificates furnished by Borrowers to Administrative Agent pursuant to this Agreement.  The obligations of Revolving Lenders hereunder shall be several, and not joint or joint and several, up to the amount of the Commitments. The Revolving Facility is a revolving credit facility which may be drawn, repaid and redrawn from time to time as permitted under this Agreement.  Subject to the provisions of this Agreement, Borrower Representative may request DIP Advances up to and including the value, in Dollars, of the following calculated amounts (such calculated amounts, collectively, the "**Availability**"): (a) the sum of (i) the Receivables Borrowing Base, plus (ii) the Inventory Borrowing Base, plus (iii) the DIP Overadvance Amount, minus (b) the sum of (i) the Professional Fee Carve-Out Reserve and (ii) any other Reserves instituted from time to time by Agent in its Permitted Discretion pursuant to this Agreement.  For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the parties hereto hereby acknowledge and agree that the aggregate amount of all Advances (including, without limitation, DIP Advances) outstanding under the Revolving Facility at any time or during any period shall not exceed the amount set forth in the Budget for the corresponding time or period.

In addition to and not in lieu of the foregoing, upon the Termination Date and notwithstanding the occurrence thereof, each Revolving Lender agrees to make available to Borrowers its Pro Rata Share of an additional Advance to fund the Wind-Down Amount.  In furtherance thereof, the Wind-Down Amount shall be funded into the Fee Account (as defined in the Interim Order or any successor Financing Order)

promptly upon the occurrence of the Termination Date; provided, however, that any or all of the Wind-Down Amount that constitutes fees and expenses incurred by professionals or professional firms shall be paid only to the extent authorized by the Bankruptcy Court and otherwise pursuant to procedures approved by the Bankruptcy Court, and, unutilized amounts, if any, shall be returned to the Agent and Lenders for application to the Obligations as soon as is practicable."

(f)     **Term Loan.**  Subsection (a) of Section 2.8 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"(a)     Prior to the Petition Date, each Term Lender made the Term Loan, which Term Loan shall on the Ratification and Amendment Effective Date automatically be deemed to constitute part of the Pre-Petition Debt, and subject to the Full Roll Up described in Section 2.1(b) of this Agreement, subject to the Financing Orders.  The Borrower may not request a Term Loan following the Petition Date.  To the extent not previously paid, the Term Loans shall be due and payable in full, together with any accrued and unpaid interest thereon, on the Termination Date."

(g)     **Roll Up of Pre-Petition Debt.**  A new Section 2.21 is hereby added to Article II of the Credit Agreement in the appropriate location as follows:

"**2.21    Roll Up of Pre-Petition Debt.**

(a)     Partial Roll Up of Revolving Facility.  Upon the entry of the Interim Order in the Case, the Lenders shall become entitled to partially roll-up all Advances and amounts outstanding under the Revolving Facility immediately prior to the Petition Date into the DIP Obligations in accordance with the terms of the Interim Order and this Agreement; and (ii) notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, from and after the entry of the Interim Order in the Case, and without further action by any party to this Agreement, the Lenders shall be entitled to and shall apply all Collections received prior to the occurrence of an Event of Default: (i) first, to reduce the outstanding obligations pursuant to the Pre-Petition Revolving Loans (the "**Partial Roll Up**"), and (ii) second, to reduce the DIP Advances and other DIP Obligations.  At all times prior to indefeasible payment in full in cash of all Pre-Petition Revolving Loans in accordance with the Partial Roll Up, such Pre-Petition Revolving Loans shall be administered in the same manner as such Loans were administered prior to the Ratification and Amendment Agreement Effective Date, subject to the terms hereof, and shall continue to be secured by and be entitled to the benefits of all Liens and security interests created and arising under the Loan Documents, which Liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and un-discharged.

(b)     Full Roll Up of Pre-Petition Debt.  Upon the entry of a Final Order in the Case, the Lenders shall become entitled to roll-up all Pre-Petition Debt into the DIP Obligations; and (ii) notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, from and after entry of a Final Order, and without further action by any party to this Agreement, the Lenders shall be entitled to apply all Collections received prior to the occurrence of an Event of Default: (i) first, to reduce the outstanding obligations pursuant to the Pre-Petition Debt in such order and manner as determined by the Lenders in their sole discretion (the "**Full Roll Up**"), and (ii) second, to reduce the DIP Advances and other DIP Obligations.  At all times prior to indefeasible payment in full in cash of all Pre-Petition Debt in accordance with the Full Roll Up, such Pre-Petition Debt shall be administered in the same manner as such Pre-Petition Debt was administered prior to the entry of a Final Order, subject to the terms hereof, and shall continue to be secured by and be entitled to the benefits of all Liens and security interests created and arising under the Loan Documents, which Liens shall remain in full force and effect on a

continuous basis, unimpaired, uninterrupted and un-discharged."

(h)     **Interest on the Revolving Facility**. Section 2.3 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"**2.3    Interest on the Revolving Facility**

Subject to Section 3.7, outstanding Advances under the Revolving Facility shall bear interest at an annual rate equal to the Prime Rate plus the Applicable Margin. Accrued and unpaid interest on (i) the Revolving Loans shall be calculated on the basis of a 360-day year and shall be charged for the actual number of calendar days elapsed in each interest calculation period and (ii) shall be payable on each Interest Payment Date and on the date of any prepayment of the Loans pursuant to Sections 2.8 and 2.9, in accordance with the procedures provided for in Section 2.9, commencing on November 1, 2006 and continuing until the latest of (w) the Termination Date, (x) the expiration of the Term, (y) the Revolver Maturity Date and (z) the full performance and indefeasible payment in full in cash of the Obligations and termination of this Agreement."

(i)     **Interest on Term Loan**. Section 2.7 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"**2.7    Interest on Term Loan**

Subject to Section 3.7, the outstanding principal balance of the Term Loan shall bear interest at an annual rate equal to the Prime Rate plus the Applicable Margin. Accrued and unpaid interest on (i) the Term Loan shall be calculated on the basis of a 360-day year and shall be charged for the actual number of calendar days elapsed in each interest calculation period and (ii) shall be payable on each Interest Payment Date and on the date of any prepayment of the Loans pursuant to Sections 2.8 and 2.9, in accordance with the procedures provided for in Section 2.9, commencing on November 1, 2006, and continuing until the later of the expiration of the (x) the Termination Date, (y) Term and (z) the full performance and indefeasible payment in full in cash of the Term Loan and all Obligations related thereto and termination of this Agreement."

(j)     **Prepayment of LIBOR Loans**. Section 2.8(d) of the Credit Agreement shall be deleted in its entirety and replaced with the following:

"(d)     Intentionally Omitted."

(k)     **LIBOR Loans**. Section 2.19 of the Credit Agreement shall be deleted in its entirety and replaced with the following:

"**2.19   Intentionally Omitted.**"

(l)     **Ratification and Amendment Fee**. Section 3.3 of the Credit Agreement shall be deleted in its entirety and replaced with the following:

"**3.3 Ratification and Amendment Fee.** As partial consideration for the Agent's and Lenders' agreements and commitments under the Ratification and Amendment

Agreement, the Borrower shall pay to Agent, for the benefit of the Revolving Lenders, One Hundred Thousand Dollars ($100,000.00) (the "**Ratification and Amendment Fee**"). Such fee shall be fully earned and non-refundable as of the Ratification and Amendment Agreement Effective Date, and shall be paid in cash on the Ratification and Amendment Agreement Effective Date. The Revolving Lenders may make an Advance under the Revolving Facility to pay the Ratification and Amendment Fee. The Ratification and Amendment Fee shall constitute part of the DIP Obligations and shall be secured by all of the DIP Collateral."

(m)    **Rights and Remedies**. Clause (viii) of Section 9.1(a) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"(viii) reduce or otherwise change the Facility Cap, the Receivables Percentage, the Inventory Advance Rate, the Appraised Inventory Percentage, the Availability and/or any component of the foregoing, and/or"

(n)    **Bankruptcy Related Items**. Sections 6.16 through 6.20 are hereby added to the Credit Agreement in the appropriate location as follows:

"**6.16. Budget.**

(a)    Subject to subsection (b) below, the Credit Parties shall meet and comply, in all material respects, with the Budget attached hereto as Schedule 6.16, including, without limitation, as to disbursements, cash receipts and Inventory levels, subject to the Variance. Notwithstanding anything to the contrary set forth in any provision of this Agreement, the proceeds of the Loans shall be used by Credit Parties solely for the Credit Parties' working capital needs, administrative costs and expenses and other expenses in accordance with and subject in all respects to the expenditure limitations set forth in the Budget that is attached hereto as Schedule 6.16, subject to the Variance.

(b)    No portion of the Carve-Out (as defined in the Interim Order) or any other proceeds of the DIP Financing may be used to litigate, investigate, object, contest or challenge in any manner or raise any defenses or offsets to the debt, liens, security interests, claims or collateral position of the Lenders under the DIP Financing Documents or any other claims against the Agent or Lenders or their affiliates owned or controlled by the Agent or Lenders, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Financing Documents or the validity, perfection or priority of any mortgage, pledge, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of the Lenders, or by seeking to subordinate or recharacterize the DIP Financing or disallow any claim, mortgage, pledge, security interest or lien by asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Agent, Lenders, or any of their officers, directors, agents, attorneys, representatives, or employees. In addition, the Carve-Out (as defined in the Interim Order) and any other proceeds of the DIP Financing shall not be used in connection with (i) preventing, hindering or delaying (directly or indirectly) the Agent or Lenders' enforcement or realization upon the Collateral or DIP Collateral once an Event of Default has occurred, (ii) selling or otherwise disposing of the Collateral or DIP Collateral without the written consent of the Agent and Lenders, provided that the Credit Parties may relocate Collateral or DIP Collateral to other stores of the Credit Parties in a manner not in violation of the Stalking Horse APA, (iii) using or seeking to use any insurance proceeds related to the Collateral or DIP Collateral without the written consent of the Agent and Lenders, or (iv)

incurring indebtedness senior to the DIP Liens other than in accordance with the DIP Financing Documents.

(c)     Credit Parties shall not permit or suffer to exist a variance ("**Variance**") of the Budget which would have an adverse financial effect (in the sole discretion of the Agent) on the Credit Parties, individually or in the aggregate. In addition and not in limitation of the foregoing, the Borrower shall not permit or suffer to exist: (x) actual cash receipts that are less than ninety percent (90%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly and on a cumulative basis commencing with the week ended June 28, 2013; or (y) actual cash disbursements that are greater than one hundred and ten percent (110%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly and on a cumulative basis commencing with the week ended June 28, 2013, provided that savings accrued during any applicable period may be utilized in future periods.

(d)     Beginning with the first week after the Petition Date and for each week thereafter, the Credit Parties shall deliver to the Agent, not later than Wednesday of such week and at such other times as the Agent may request, a compliance certificate of the chief financial officer in form and substance satisfactory to the Agent, in its Permitted Discretion, certifying that the Credit Parties are in compliance with this Section 6.16 and that no Default or Event of Default has occurred and is continuing or, if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof.

6.17.    **Transaction.** The Credit Parties shall use its best efforts to sell its assets and business operations as promptly as possible, pursuant to section 363 of the Bankruptcy Code, pursuant to a transaction or transactions that shall generate liquidity in an amount sufficient to enable the Borrower to satisfy the Obligations to Agent and Lenders in full in cash, and on terms and conditions satisfactory to Agent in its Permitted Discretion (one or more such transactions, collectively, the "**Transaction**"). Any asset purchase agreement(s), arrangements, pleadings or other documents relating to such transaction or transactions which Borrowers or any Credit Party shall enter into shall be acceptable to Agent, in its Permitted Discretion. In furtherance and not in limitation of the foregoing, and unless otherwise agreed to by the Agent, in its absolute and sole discretion, the Credit Parties shall comply with the following milestones (collectively, the "**Transaction Benchmarks**") in all material respects:

(a)     Motion to Approve Bidding Procedures. No later than the Petition Date, the Credit Parties shall have filed a motion to approve proposed bidding procedures and a timeline to consummate a Transaction (which shall include, without limitation, an auction date, the requirement that the sale be for cash consideration in an amount that will satisfy the sum of the Pre-Petition Debt and the DIP Obligations, including all fees, expenses and costs of the DIP Agent associated therewith, the timing of a proposed sale, and deadlines for completing due diligence and submitting offers/bids) and designating Scrubs & Beyond LLC as a stalking horse bidder pursuant to the Stalking Horse APA providing for a Purchase Price of no less than $22,750,000.00, subject to adjustment as set forth in the Stalking Horse APA, which shall be in form and substance satisfactory to Agent;

(b)     DIP Order. No later than the Petition Date, the Debtors shall file a motion seeking Bankruptcy Court approval of the DIP Facility described herein in form and substance satisfactory to the Agent. The Bankruptcy Court shall have entered interim approval of the DIP Financing within three (3) business days of the Petition Date and final approval by June 24, 2013.

13

(c)     Approval of Bidding Procedures.  On or before June 24, 2013, the Bankruptcy Court shall have entered an order approving Debtors' proposed bidding procedures and timeline to consummate a Transaction, which shall be in form and substance satisfactory to Agent;

(d)     Final Auction.  On or before fifty-three (53) days following the Petition Date, the Debtors shall have held a final auction (the "**Final Auction**"), made a determination as to the highest or best bid with respect to a Transaction in consultation with the Agent and Lenders, and accepted such bid (the "**Accepted Bid**");

(e)     Sale Order.  On or before fifty five (55) days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Transaction with respect to the Accepted Bid, which order shall be in form and substance satisfactory to the Agent in its Permitted Discretion; and

(f)     Closing of Sale; Remittance of Proceeds.  On or before sixty (60) days following the Petition Date, the Credit Parties shall close the Transaction and concurrently with such closing shall deliver the indefeasible payment to the Agent, for the benefit of the Lenders, of any and all proceeds therefrom as a permanent reduction of the DIP Obligations, the Pre-Petition Debt and other Obligations (in that order of priority).  Amounts applied to the reduction of the Pre-Petition Debt shall be applied to the Obligations in the Agent's sole and absolute discretion; provided, however, that the Lenders acknowledge that the Bankruptcy Court has reserved the right to unwind, after notice and hearing, any portion thereof (which might include the disgorgement or re-allocation of interest, fees, principal or other incremental consideration paid in respect thereto and not paid on account of the Pre-Petition Debt), solely in the event that there is a timely successful challenge, subject to the limitations contained in Section 8(a) of the Interim Order or any successor provision in any other Financing Order, to the validity, enforceability, extent, perfection or priority of the Pre-Petition Debt, and only to the extent that, the Bankruptcy Court finds that, the Lenders have been unduly advantaged hereby.

### 6.18.  **Bankruptcy Court Reports and Related Items.**

(a)     General Information and Reports.  In addition to the reporting requirements set forth in this Agreement, until the Obligations have been indefeasibly repaid in full in cash, the Credit Parties shall promptly provide the Agent and Lenders with copies of all financial reports, schedules and other materials or information related to the Collateral or DIP Collateral at any time furnished by the Credit Parties, or on behalf of the Credit Parties, to the Bankruptcy Court, the United States Trustee, any other lenders or creditors of the Debtors, any purchaser of the Credit Parties' business operations or assets, any creditors' committee or any of the Credit Parties' shareholders, concurrently with the delivery thereof.  The Credit Parties shall keep the Agent fully informed of the Credit Parties' efforts to consummate a Transaction, and upon the Agent's request, shall promptly provide the Agent and Lenders with copies of all material documents, schedules or materials provided to any purchaser of the Credit Parties' business operations or assets.  In addition to and not in lieu of the foregoing, the Credit Parties shall provide the Agent and the Lenders with copies of any and all notices of default or other material events under any purchase agreement or other similar agreement, simultaneously with the issuance or receipt thereof, as applicable.

(b)     Weekly Reports.  Weekly, not later than Wednesday for the immediately preceding fiscal week: (i) a "Budget Variance Report" (in form and substance satisfactory to Agent in its Permitted Discretion), which sets forth: (a) a detailed reconciliation analysis of actual results compared to projected results of the Budget for the immediately preceding calendar week

and the cumulative period-to-date; and (b) a written explanation of all material variances; and (ii) a "Store Closings Variance Report" (in form and substance satisfactory to Agent in its Permitted Discretion), which sets forth: a detailed reconciliation of actual results compared to anticipated results of the Store Closings Plan for the immediately preceding calendar week and the cumulative period-to-date (including, without limitation, a detailed analysis of inventory transfers between stores of the Credit Parties and a detailed reconciliation analysis thereof).

(c)     May Financials. Notwithstanding any time periods to the contrary in Section 6.1(a) to the contrary, the Credit Parties shall furnish to Agent as soon as available and in any event not later than June 30, 2013 the financial statements for the fiscal month ending May 31, 2013 as required by Section 6.1(a)(iii) of the Credit Agreement.

**6.19.    Assumption or Rejection of Leases.**    Prior to the date upon which the Obligations have been indefeasibly repaid in full in cash, the Credit Parties shall not assume or reject any leases of real property or any executory contract(s): (a) unless such assumption or rejection is contemplated by the terms of the Stalking Horse APA or (b) the Agent consents to such assumption or rejection in writing in advance, provided that any such consent may be granted or withheld by Agent in its Permitted Discretion.

**6.20.    Store Closings Plan.**    The Credit Parties shall deliver the Store Closings Plan to the Agent on or before June 4, 2013. Thereafter, the Credit Parties shall endeavor to pursue the Store Closings Plan; provided, however, that the failure to comply with all or any portion of the Store Closings Plan shall not constitute an Event of Default. Any store closures conducted in the Case in conjunction with a wind-down of the Credit Parties' assets and business operations shall be conducted in a manner reasonably acceptable to Agent and in accordance with the terms and provisions of the Store Closings Plan, or, the Stalking Horse APA, as the case may be. "

(o)     **Financial Covenants.** The financial covenants set forth on Annex I of the Credit Agreement (Financing Covenants), including, without limitation, Senior Leverage Ratio, Fixed Charge Coverage Ratio, and Capital Expenditures covenants, shall not be tested at any time prior to the occurrence of the Termination Date.

(p)     **Commitments**. Schedule A to the Credit Agreement is amended by deleting "$12,500,000" and replacing it with "$15,000,000; provided, however, that the Wind-Down Amount shall also be funded upon the Termination Date in accordance with the terms of this Agreement, the Interim Order and any successor Financing Order", in each instance.

(q)     **Budget**. A new Schedule 6.16 (Budget) is hereby added to the Credit Agreement in the appropriate order in the form of Schedule B attached hereto.

(r)     **LIBOR Election Notice**. Exhibit C (Form of LIBOR Election Notice) to the Credit Agreement is hereby deleted in its entirety.

4.     **APA**.

(a)     **APA Deposit**. The Deposit (as defined in the Stalking Horse APA) of an amount of no less than $4,750,000.00 and any interest thereon (or any other deposit made by any alternative bidder or purchaser) shall constitute DIP Collateral and the Agent shall be entitled to Borrowers' right, title and interest in such Deposit (or any other deposit made by any alternative bidder or purchaser). Upon Borrowers' or any Credit Party's receipt of such Deposit (or any other deposit made by any alternative bidder or purchaser), such Credit Party shall hold the Deposit (or any other deposit made by any

alternative bidder or purchaser) in trust for the benefit of Agent and Lenders and shall immediately remit the Deposit (or any other deposit made by any alternative bidder or purchaser) to Agent.

(b)     **Purchaser Default.** If Borrowers are entitled to take any action under the Stalking Horse APA (or any other agreement providing for the sale of the Credit Parties' assets) as a result of a breach or default by Scrubs (or an alternative purchasers, if applicable) or otherwise seek to amend or terminate such Stalking Horse APA (or any other agreement providing for the sale of the Credit Parties' assets); the Borrowers shall obtain the prior written consent of Agent before taking any such action.

5.      **DEFAULT INTEREST.** Notwithstanding anything in the Credit Agreement to the contrary, the Credit Parties hereby acknowledge and agree that based on the continuance of the Specified Events of Default, the Obligations accrued interest from December 3, 2012 through and the Ratification and Amendment Effective Date at the then applicable Default Rate (determined without giving effect to the amendment to the definition of the "Applicable Margin" made pursuant to this Amendment).  From and after the Ratification and Amendment Effective Date, the Obligations shall cease to accrue interest at the Default Rate and shall accrue interest in accordance with the terms of Sections 2.3 and 2.7 of the Credit Agreement unless and until an Event of Default (other than the Specified Events of Default) has occurred and is continuing in which case the Default Rate may again be instituted in accordance with the terms of the Credit Agreement.

6.      **CASH MANAGEMENT.** Notwithstanding anything in the Credit Agreement to the contrary, on the Petition Date the Credit Parties shall seek Bankruptcy Court Approval to maintain a cash management system substantially similar to such system existing on the Petition Date and otherwise acceptable to Agent in its sole and absolute discretion. Subject to Bankruptcy Court approval, the Credit Parties agree that they shall not alter the existing flow of funds, open accounts or make other material changes to the cash management system that existed on the Petition Date. Additionally, the Credit Parties covenant and agree that all payments received from Account Debtors and other Persons shall be directed daily from depository banks into the account maintained by Healthcare Uniform at Wells Fargo Bank, National Association, account number 2000021126741.

7.      **ELIMINATION OF L/C SUBLINE.** Notwithstanding anything in the Credit Agreement to the contrary, the Credit Parties shall not have any rights to request or receive any L/C or Letters of Credit pursuant to the Credit Agreement and all such rights of Credit Parties are hereby terminated. Agent and Lenders shall have no obligation to provide or arrange for the issuance of L/Cs or Letters of Credit on behalf of or in favor of the Credit Parties. The Credit Parties hereby represent, warrant and covenant that as of the Ratification and Amendment Effective Date there are no L/Cs issued or outstanding.

8.      **UNPAID FEES.** Notwithstanding anything in the Fee Letter (as defined below) or the Second Amendment to the contrary, the Borrowers hereby acknowledge, confirm and agree that as of the date of this Amendment, the Borrowers are indebted: (a) to the Agent in an amount of $197,964.22 in respect of unpaid Collateral Management Fees (as defined in that certain Fee Letter dated as of November 22, 2011 from Agent and accepted and agreed to by the Credit Parties (the "Fee Letter")) (the "Unpaid Collateral Management Fee") and (b) to the Agent, for the ratable benefit of the Lenders, in the amount of $117,500.00 in respect of the Amendment Fee (as defined in the Second Amendment (the "Unpaid Amendment Fee" and together with the Unpaid Collateral Management Fee, the "Unpaid Fees"). On the Ratification and Amendment Effective Date, the Unpaid Fees shall be capitalized and added to the principal balance of the Term Loan and such capitalized amount shall bear interest from the Ratification and Amendment Effective Date at the same rate per annum and be payable in the same manner as in the case of the original principal amount of this Term Loan and shall otherwise be treated as principal of the

Term Loan for all purposes.

9.    **CONSULTANTS.**

(a)    **Business Consultant.**

(i)    The Credit Parties shall continue to employ and maintain in place, at all times prior to the indefeasible payment of the Obligations in full in cash and at its sole expense, Capstone Advisory Group, LLC ("**Capstone**") on terms and conditions consistent with those in effect on the date hereof or such other terms of engagement that are reasonably acceptable to Agent, or in the event that Agent reasonably determines that Capstone is unacceptable, such other consultant acceptable to Agent in its sole discretion ("**Business Consultant**"). Within seven (7) days of the Petition Date, the Credit Parties shall file all appropriate pleadings to obtain authorization of the Bankruptcy Court to employ such Business Consultant. The Credit Parties shall cooperate with the Business Consultant. The Credit Parties agree that the Business Consultant shall continue to provide advice and assistance to Credit Parties' management with respect to all aspects of the business and operations of the Credit Parties, including, without limitation, identifying operational inefficiencies, developing and assisting to implement strategies to eliminate such operational inefficiencies, reviewing the Debtors' Budget(s) and providing suggested changes, if any, and assisting the Credit Parties with respect to marketing and selling the Borrowers' assets and business operations. Credit Parties hereby agree that Agent shall have full and direct access to Business Consultant and that Business Consultant shall be permitted to freely communicate directly with Agent without any Credit Party or any Credit Party's management participating in such communications. Each Credit Party shall direct the Business Consultant to provide Agent directly with copies of any written reports, work product, information, documents or items simultaneously with the delivery or receipt of the same and any other such materials that Agent may request in Agent's sole discretion; provided, that the Credit Parties shall promptly deliver any such materials referred to in this Section 9 upon receipt thereof if Agent has not received such materials from the Business Consultant.

(ii)    The Credit Parties (including key management and any other requested personnel) and Business Consultant shall participate in a weekly telephonic meeting, at which time the Credit Parties and Business Consultant will: (a) review the status of the business operations and cash flows (including cash flow variances, variances from the Budget and variances from the Store Closings Plan); (b) provide detail relating to the status of the Credit Parties' accounts receivables, accounts payable and inventory; (c) provide detail relating to the outstanding and future sale orders, and changes in major sales programs or other material sales or business developments; (d) provide detail regarding any recommendations made by the Business Consultant regarding any Credit Party or the business or financial performance of such Credit Party; (e) provide any updates and details regarding the status of the Case and any other information that the Agent may reasonably request.

(b)    **Sale Consultant.** The Credit Parties hereby acknowledge and agree to continue to employ and maintain in place, at all times prior to the indefeasible payment in full in cash of the Obligations and at its sole expense, Morgan Joseph TriArtisan LLC ("**Morgan Joseph**") on terms and conditions consistent with those in effect on the date hereof or such other terms of engagement that are reasonably acceptable to Agent, or in the event that Agent reasonably determines that Morgan Joseph is unacceptable, such other consultant acceptable to Agent in its sole discretion ("**Sale Consultant**").

Within seven (7) days of the Petition Date, the Borrowers shall file all appropriate pleadings to obtain authorization of the Bankruptcy Court to employ such Sale Consultant. The Credit Parties agree that the Sale Consultant shall assist the Credit Parties with respect to a Transaction on or before the Termination Date and in accordance with the Transaction Benchmarks set forth in Section 6.17 of the Credit Agreement, on terms and conditions satisfactory to Agent and Lenders in their Permitted Discretion. Credit Parties hereby agree that Agent shall have full and direct access to the Sale Consultant and that the Sale Consultant shall be permitted to freely communicate directly with Agent without any Credit Party or any Credit Party's management participating in such communications. Each Credit Party shall direct Sale Consultant to provide Agent directly with (a) no less frequently than weekly via telephone conference or in some other medium satisfactory to Agent, details, updates and information in a form reasonably satisfactory to Agent regarding the sale process and/or Transaction or any other information that the Agent may reasonably request; and (b) copies of any written reports, work product, information, documents or items simultaneously with the delivery or receipt of the same, including, and any other such materials that Agent may request in Agent's sole discretion; provided, that the Credit Parties shall promptly deliver any such materials referred to in this clause (b) upon receipt thereof if Agent has not received such materials from the Sale Consultant. The Credit Parties hereby consent to the Agent contacting the Sale Consultant directly with respect to the status of the prospects and the Credit Parties' marketing and sales efforts with respect to a Transaction, and hereby agrees that such communications shall not be restricted or denied in any way provided that the Agent shall not have the right to direct the actions of the Sales Consultant or to otherwise exercise any control over the Sales Consultant.

(c)   **Agent's Consultant.** The Credit Parties hereby acknowledge and agree that the Agent, or its counsel, has engaged Deloitte Financial Advisory Services LLP and may retain and thereafter continue to employ and retain, at the Credit Parties' expense, a financial consultant satisfactory to Agent in its Permitted Discretion (the "**Agent's Financial Consultant**") to assess the status of the Case, the business operations of the Credit Parties and to analyze the Credit Parties' current and future plans with respect to its business operations and the Credit Parties' fulfillment of its Obligations under the Loan Documents, including, without limitation, reviewing and testing the work product of the Business Consultant and the Sale Consultant. Subject to the terms of the Financing Orders, the Credit Parties shall reimburse the Agent, or its counsel, as the case may be, on the timeline contemplated by the Interim Order or any successor Financing Order, for all reasonable fees and expenses of the Agent's Financial Consultant. The Credit Parties agree to cooperate fully and reasonably with the Agent's Financial Consultant in conducting its review, including, without limitation, access to the Credit Parties' facilities and books and records, and the opportunity to interview officers and key agents and employees of the Credit Parties, including, without limitation, the Business Consultant, outside auditors and the Sale Consultant. The Agent's Financial Consultant shall endeavor to provide prior or concurrent notice to the Credit Parties regarding any such activity, but the failure to provide notice shall not prevent or impair the Agent's Financial Consultant from proceeding with such activity. The Agent's Financial Consultant shall otherwise conduct such activities in a reasonable manner and shall not unreasonably interfere with the Credit Parties' business.

10.   **COOPERATION; OTHER INFORMATION**. Each Credit Party shall cooperate fully and reasonably shall provide such other financial and other information concerning the financial, business and legal affairs of any Credit Party as the Agent and Lenders may from time to time reasonably request.

11.   **CONFIRMATION OF LIENS**. Each Credit Party hereby acknowledges and confirms that all of the Obligations, and each of them, are and shall be secured by valid and perfected, first priority liens and security interests in all of the Collateral (except to the extent of any Permitted Liens) enforceable against each Credit Party, in accordance with their terms.

12.    **EVENTS OF DEFAULT.** In addition to and without in any way limiting or substituting for the Events of Default outlined in the Credit Agreement and the other Loan Documents, the following shall constitute additional Events of Default under the Credit Agreement and other Loan Documents, and shall not be subject to any grace, remedy or cure period, except to the extent specifically set forth in this Amendment (each a "**New Default**"):

(i)    **Breach or Non-Compliance.** Any Credit Party's breach, default, violation or failure to timely and fully comply with any covenant or agreement set forth in this Amendment or any other DIP Financing Agreement (including, without limitation, any of the Transaction Benchmarks set forth in Section 6.17 of the Credit Agreement, as amended by this Amendment) or any other agreement, document or instrument executed in connection herewith;

(ii)   **Breach or Termination of APA.** (a) Any Credit Party's breach, default, violation or failure to comply in any respect with the terms and provisions of the Stalking Horse APA or any other agreement providing for the sale, transfer or disposition of any of the Credit Party's assets or (b) any termination, revocation or cancellation of the Stalking Horse APA or any other agreement providing for the sale, transfer or disposition of any of the Credit Party's assets.

(iii)  **Budget.** Any Credit Party's breach, default, violation or failure to comply in any respect with the Budget, subject to the Variance, including, without limitation, as to disbursements, cash receipts and Inventory levels or a breach, default or violation of Section 6.16(a) or (b) of the Credit Agreement;

(iv)   **Financing Orders.** A breach or failure to comply with any term, covenant, representation, warranty or requirement of any Financing Order or any other material order of the Bankruptcy Court;

(v)    **Liens.** The granting in favor of any Person other than the Agent or Lenders of a security interest or Lien upon any property of any Credit Party or any Credit Party's estate, or a claim against any Credit Party having priority over other security interests, Liens or claims in favor of Agent or Lenders, except: (a) to the extent that such Person had a security interest or Lien upon any property of such Credit Party on the Petition Date which had priority over the security interests, Liens or claims of the Agent and Lenders existing on the Petition Date; or (b) to the extent otherwise required or permitted under any Financing Order or any other order of the Bankruptcy Court;

(vi)   **Conversion of Case.** The entry of an order converting the Case to a case under Chapter 7 of the Bankruptcy Code;

(vii)  **Appointment of Trustee or Examiner.** The entry of an order appointing a trustee or an examiner with expanded powers in the Case;

(viii) **Non- Renewal; Reversal of Financing Orders.** The termination or non-renewal of this Amendment or the Financing Order as a result of the objection of any third party being sustained by the Bankruptcy Court unless such objection is stayed on timely appeal, or if the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the Agent and Lenders;

(ix)     **Claims Against Agent or Revolving Lenders.** Any claim is asserted against Agent or Lenders pursuant to <u>Section 8</u> of the Interim Order or any successor provision in any subsequent Financing Order;

(x)      **Final Order.** The failure of a Final Order approving the financing contemplated by the Credit Agreement, as amended by this Amendment, to enter on or before 4:00 p.m. (Eastern Standard Time) on June 24, 2013;

(xi)     **Termination Date.** The occurrence of any condition or event that permits Agent and/or Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any event which causes the occurrence of the "Commitment Termination Date" as such term is defined in the Financing Order, in each case without any notice, grace and/or cure period of any kind (except to the extent, if any, required or permitted under any Financing Order or any other order of the Bankruptcy Court); and

(xii)    **Material Adverse Effect.** Any act, condition or event occurring after the date of the commencement of the Case that has a Material Adverse Effect upon the assets of the Credit Parties or the Collateral or the rights and remedies of Agent and/or Lenders under the Credit Agreement or other Loan Documents or the Transaction, subject to reasonable allowances for the impact of: (a) the store closings implemented or to be implemented by the Credit Parties as contemplated by the Store Closings Plan and/or the Stalking Horse APA; (b) the Budget and limitations under this Amendment; and (c) the Credit Parties' filing of the Case on the Petition Date, as the same are determined by Agent in its Permitted Discretion.

**13.     REMEDIES.** Notwithstanding anything herein to the contrary, but subject in each case to the provisions of the Financing Orders, the Borrowers' right to request DIP Advances under the Credit Agreement, as amended by this Amendment (and Revolving Lenders' commitments to make DIP Advances and extend any other financial accommodations) to fund the expenditures set forth in the Budget, and the Lenders' consent to the Debtors' use of property of the estate (including cash collateral) in the ordinary course, shall automatically expire and terminate without further notice, demand or request on the Termination Date. Upon the occurrence of the Termination Date, (a) the Pre-Petition Debt and the DIP Obligations shall become immediately due and payable and shall be indefeasibly repaid in full in cash, (b) the Agent and Lenders shall be entitled to exercise any and all rights and remedies granted to them under the Loan Documents, the DIP Financing Agreement or pursuant to the terms of any Financing Order and the Agent and Lenders shall have relief from the automatic stay and may foreclose on all or any portion of the Collateral, and (c) the Agent and Lenders shall be entitled to declare a Termination Date and terminate the DIP Facility and any other DIP Financing Documents as to any future liability or obligation of the Agent and the Lenders, but without affecting any of the DIP Obligations, the DIP Liens or post-petition administrative superpriority claim status.

**14.     REPRESENTATIONS AND WARRANTIES.** Each Credit Party hereby represents and warrants to Agent and Lenders as follows: (a) it is duly incorporated, organized or formed, validly existing and in good standing under the laws of its jurisdiction of organization; (b) the execution, delivery and performance by it of this Amendment and all other Loan Documents executed and/or delivered in connection herewith are within its powers, have been duly authorized, and do not contravene (i) its articles of incorporation or other organizational documents, or (ii) any applicable law, statute, regulation, ordinance, tariff or order; (c) except as provided under any Financing Order, as applicable, no consent, license, permit, approval or authorization of, or registration, filing or declaration with any Governmental Authority or other Person is required in connection with the execution, delivery, performance, validity or enforceability of this Amendment or any other Loan Documents executed and/or delivered in connection

herewith by or against it; (d) this Amendment and all other Loan Documents executed and/or delivered in connection herewith have been duly executed and delivered by it; (e) after giving effect to the Interim Order and any successor Financing Order, this Amendment and all other Loan Documents executed and/or delivered in connection herewith constitute its legal, valid and binding obligation enforceable against it in accordance with its terms; (f) after giving effect to this Amendment, the Interim Order and any successor Financing Order, it is in compliance with all covenants and agreements in the Loan Documents and, except for the Specified Events of Default, no Default or Event of Default exists, has occurred and is continuing or would result by the execution, delivery or performance of this Amendment, and (g) after giving effect to this Amendment, the Interim Order and any successor Financing Order, the representations and warranties contained in the Loan Documents shall be true and correct in all material respects, except to the extent already qualified by materiality, in which case they shall be true and correct in all material respects, subject to reasonable allowances for the impact of: (i) the store closings implemented or to be implemented by the Credit Parties as contemplated by the Store Closings Plan and/or the Stalking Horse APA; (ii) the Budget and limitations under this Amendment; and (iii) the Credit Parties' filing of the Case on the Petition Date, as the same are determined by Agent in its Permitted Discretion.

15.    **RELEASE.** EACH CREDIT PARTY HEREBY ACKNOWLEDGES AND AGREES THAT IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY THE OBLIGATIONS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM THE AGENT OR THE LENDERS. EACH CREDIT PARTY HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES AGENT, THE LENDERS, CS CF EQUITY 2007-2 LLC, CS CF EQUITY I LLC AND EACH OF THEIR RESPECTIVE AFFILIATES, PREDECESSORS, AGENTS, EMPLOYEES, COUNSEL, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, OBLIGATIONS, DEBTS AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL, OR AT LAW OR IN EQUITY, IN ANY CASE ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AMENDMENT IS EXECUTED THAT ANY SUCH CREDIT PARTY MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND THAT ARISE FROM ANY LOANS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE CREDIT AGREEMENT OR OTHER LOAN DOCUMENTS, AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AMENDMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE. EACH CREDIT PARTY WAIVES THE BENEFITS OF ANY LAW, WHICH MAY PROVIDE IN SUBSTANCE: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDIT PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE OTHER PARTY." EACH CREDIT PARTY UNDERSTANDS THAT THE FACTS WHICH IT BELIEVES TO BE TRUE AT THE TIME OF MAKING THE RELEASE PROVIDED FOR HEREIN MAY LATER TURN OUT TO BE DIFFERENT THAN IT NOW BELIEVES, AND THAT INFORMATION WHICH IS NOT KNOW KNOWN OR SUSPECTED MAY LATER BE DISCOVERED. EACH CREDIT PARTY ACCEPTS THIS POSSIBILITY, AND EACH CREDIT PARTY ASSUMES THE RISK OF THE FACTS TURNING OUT TO BE DIFFERENT AND NEW INFORMATION BEING DISCOVERED; AND EACH CREDIT PARTY FURTHER AGREES THAT THE RELEASE PROVIDED FOR HEREIN

SHALL IN ALL RESPECTS CONTINUE TO BE EFFECTIVE AND NOT SUBJECT TO TERMINATION OR RESCISSION BECAUSE OF ANY DIFFERENCE IN SUCH FACTS OR ANY NEW INFORMATION. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASE SHALL BE SUBJECT TO THE RIGHTS OF A COMMITTEE APPOINTED PURSUANT TO SECTION 1102 OF THE BANKRUPTCY CODE OR ANY OTHER PARTY IN INTEREST UNDER SECTION 8(a) OF THE INTERIM ORDER OR ANY SUCCESSOR PROVISION IN ANY OTHER FINANCING ORDER.

16.     **CONDITIONS PRECEDENT.** Agent's and Lenders' obligations to enter into this Amendment and perform their obligations their obligations hereunder are subject to the condition precedent that the Agent shall have received the following documents and other items, satisfactory to Agent, in Agent's sole and absolute discretion, duly executed where appropriate by authorized representatives of each Credit Party (subject to Agent's right to waive any such conditions precedent in Agent's sole discretion) ("**Ratification and Amendment Agreement Effective Date**") and, notwithstanding anything herein to the contrary, upon execution of this Amendment by each Credit Party, then Agent and Lenders immediately shall be entitled to all of the rights, remedies and benefits of this Amendment:

(a)     **Amendment.** Receipt by Agent of this Amendment duly executed by the Credit Parties and Lenders;

(b)     **Budget.** Receipt by the Agent of the Budget (including, without limitation, detailed professional fee information) and all other exhibits and schedules hereto, each in form and substance satisfactory to the Agent;

(c)     **April Financials.** Receipt by the Agent of the unaudited consolidated financial statements of the Borrowers consisting of a balance sheet and statements of income and cash flows as of the end of April 30, 2013, together with any other information required to be delivered therewith in accordance with Section 6.1(a) of the Credit Agreement, which shall be in form and substance satisfactory to Agent;

(d)     **Secretary's Certificate.** Receipt by Agent of a certificate from the Secretary of each Credit Party attesting to the resolutions of each Credit Party's Board of Directors authorizing the filing of the Case and authorizing its execution, delivery, and performance of this Amendment and the other documents related thereto to which such Borrower is a party and authorizing specific officers of Borrower to execute the same;

(e)     **Governing Documents.** Receipt by Agent of the Credit Parties' certificate of incorporation or similar document and bylaws, as amended, modified, or supplemented, certified by the secretary of each Credit Party;

(f)     **Representations.** All representations and warranties contained herein shall be true and correct in all respects;

(g)     **No Defaults.** After giving effect to this Amendment, no Default or Event of Default shall have occurred and be continuing except for the Specified Events of Default;

(h)     **Payment of Fees.** Payment of all outstanding fees and expenses owing to Agent by the Credit Parties pursuant to the Loan Documents and all attorneys' fees, charges and expenses incurred by the Agent and Lenders in connection with the drafting, negotiation and execution of this Amendment, and Borrowers hereby confirm the Agent's authority to make an Advance on the Revolving

Loans in order to satisfy such outstanding fees and expenses;

(i)    **Compliance.** The Debtors shall be in compliance with the notice and other requirements of the Bankruptcy Code and applicable Bankruptcy Rules (as defined in the Interim Order) with respect to any relevant Financing Order in a manner acceptable to Agent and its counsel;

(j)    **Entry of Interim Order.** The Interim Order shall have been entered by the Bankruptcy Court, in form and substance satisfactory to Agent and Lenders and substantially in the form attached hereto as <u>Schedule E</u> and shall not be subject to any other order that impairs its effectiveness;

(k)    **Satisfactory Proceedings.** All proceedings taken in connection with the transactions contemplated by this Amendment and all documentation and other legal matters incident thereto shall be satisfactory to the Agent and Lenders and all motions and orders submitted to the Bankruptcy Court prior to the date hereof shall be in form and substance satisfactory to the Agent and Lenders;

(l)    **Stalking Horse APA**. Receipt by Agent and Lenders of a duly executed Asset Purchase Agreement by and between Scrubs & Beyond, LLC ("**Scrubs**") and Borrowers in form and substance satisfactory to Agent (the "**Stalking Horse APA**");

(m)    **Approvals**. Credit Parties shall have received each consent, license, permit, approval or authorization from any Governmental Authority or other Person that is required in connection with the execution, delivery, performance, validity or enforceability of this Amendment or any other Loan Documents executed and/or delivered in connection herewith by or against it; and

(n)    **Other Documents**. Agent shall have received fully executed and legally binding copies of other assurances, certificates, documents, consents or opinions as the Agent or its counsel may required.

17.    **COSTS AND EXPENSES.** Subject and pursuant to the terms of the Financing Orders, the Credit Parties shall pay to Agent all of Agent's and Lenders' and/or their Affiliates' (a) out-of-pocket reasonable costs and expenses (including, without limitation, the reasonable fees and expenses of their respective professionals and advisors (including, without limitation, the Agent's Financial Consultant and legal counsel (which counsel may include main and any local counsel deemed necessary), search fees, filing and recording fees, documentation fees, appraisal fees, travel expenses and other fees and expenses) arising in connection with the preparation, negotiation, execution, delivery and administration of this Amendment, the other Loan Documents, the Obligations (including, without limitation, the DIP Obligations), the Case and all transactions contemplated by any of the foregoing, including, without limitation, any amendment, modification, supplement, waiver or replacement of any of the foregoing and (b) all out-of-pocket expenses of the Agent and Lenders and/or their Affiliates (including, without limitation, the reasonable fees and expenses their respective professionals and advisors (including, without limitation, the Agent's Financial Consultant and legal counsel (which counsel may include main and any local counsel deemed necessary), search fees, filing and recording fees, documentation fees, appraisal fees, travel expenses and other fees and expenses) in connection with the enforcement of this Amendment, the other Loan Documents, the Obligations (including, without limitation, the DIP Obligations), of any rights or remedies of the Agent, Lenders and/or their Affiliates in connection with the Case (or any successor case or insolvency proceeding) and all transactions contemplated by any of the foregoing, including, without limitation, any amendment, modification, supplement, waiver or replacement of the foregoing. For the avoidance of doubt, the travel expenses and other costs of the Agent, Lenders and/or their Affiliates and their respective professionals and advisors (including, without limitation, the Agent's Financial Consultant and counsel (which counsel may include main and any local

counsel deemed necessary)) in connection with attending or otherwise participating in any hearing or other similar proceeding in the Case (or any successor case or insolvency proceeding) shall be reimbursable by the Credit Parties pursuant to this <u>Section 17</u>. Subject and pursuant to the terms of the Financing Orders, Agent shall be authorized to make an Advance on the Revolving Loans in order to satisfy such fees and expenses. The parties hereto agree that this <u>Section 17</u> is in addition to and not in limitation of <u>Section 13.7</u> of the Credit Agreement.

**18.    INDEMNIFICATION.**

(a)    The Credit Parties, jointly and severally, shall indemnify Agent and each Lender their respective Affiliates and managers, members, shareholders, directors, officers, employees, Affiliates, subsidiaries, agents, representatives, successors, assigns, advisors, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liabilities, obligations, claims, losses, damages, penalties, actions, causes of action, settlement payments, judgments, suits, costs, investigation, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house documentation and diligence fees and legal expenses) which may be imposed on, incurred by, suffered, sustained, required to be paid, or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by, or any matter related to any Loan Document, the DIP Facility, the term sheet related to the DIP Facility, the Cases and the DIP Documentation or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction; provided, however, that this <u>Section 18</u> shall be in addition to and not in limitation of <u>Section 13.4</u> of the Credit Agreement. For the avoidance of doubt, this <u>Section 18</u> shall include indemnification for the Agent exercising discretionary rights granted under the DIP Documentation.

(b)    If any Indemnified Person uses in-house counsel for any purpose for which the Credit Parties are responsible to pay or indemnify, the Credit Parties expressly agree that its indemnification obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by such Indemnified Person in its sole discretion for the work performed. Agent agrees to give the Credit Parties reasonable notice of any event of which Agent becomes aware for which indemnification may be required under this <u>Section 18</u>, and Agent may elect (but is not obligated) to direct the defense thereof; provided, that Borrowers shall be entitled to participate in the defense of any matter for which indemnification may be required under this <u>Section 18</u> and to employ counsel at its own expense to assist in the handling of such matter. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), Agent agrees not to exercise its right to select counsel to defend the event if that would cause Borrowers' insurer to deny coverage; provided, however, that Agent reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that the Credit Parties have paid to Agent or any Lender pursuant to the indemnity set forth in this <u>Section 18</u>, then Agent and/or Lender shall promptly pay to Borrowers the amount of such recovery. Without limiting any of the foregoing, the Credit Parties, jointly and severally, indemnify the Indemnified Parties for all claims for brokerage fees or commissions (other than claims of a broker with whom such Indemnified Party has directly contracted in writing) which may be made in connection with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any

Loan Document, or any agreement, document or transaction contemplated thereby.

      **19.**    **LIMITED EFFECT.** In the event of a conflict between the terms and provisions of this Amendment and the terms and provisions of the Credit Agreement, the terms and provisions of this Amendment shall govern. In all other respects, except as specifically amended hereby, by any Financing Order or by any agreement or document executed by Credit Parties in favor of Agent and/or Lenders in connection herewith or therewith, the Credit Agreement and other Loan Documents shall remain in full force and effect and hereby are ratified and confirmed as so amended. Neither this Amendment nor any agreement or document executed by any Credit Party in favor of Agent and/or Lenders in connection herewith shall constitute a novation, satisfaction and accord, cure, release and/or satisfaction of the Credit Agreement and/or other Loan Documents, but shall constitute amendments and waivers of certain provisions thereof. The parties hereto agree to be bound by the terms and conditions of the Credit Agreement and Loan Documents as amended by this Amendment, as though such terms and conditions were set forth herein and therein in full. Each reference in the Credit Agreement and/or other Loan Documents or any other document or instrument to any Loan Documents or words of similar import shall mean and be a reference to the Loan Documents as amended hereby.

      **20.**    **MISCELLANEOUS.**

      (a)    **No Waiver.** The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, be deemed to be an amendment or modification of, or operate as a waiver of, any provision of the Credit Agreement or any other Loan Document or any right, power or remedy of Agent, nor constitute a waiver of any provision of the Credit Agreement or any other Loan Document, or any other document, instrument and/or Credit Agreement executed or delivered in connection therewith or of any Default or Event of Default under any of the foregoing, in each case whether arising before or after the date hereof or as a result of performance hereunder or thereunder. This Amendment shall not preclude the future exercise of any right, remedy, power or privilege available to Agent whether under the Credit Agreement, other Loan Documents, at law or otherwise.

      (b)    **Counterparts.** This Amendment may be executed in any number of counterparts (including by facsimile or pdf), and by the different parties hereto on the same or separate counterparts, each of which shall be deemed to be an original instrument but all of which together shall constitute one and the same agreement. Each party agrees that it will be bound by its own facsimile or pdf signature and that it accepts the facsimile or pdf signature of each other party. The descriptive headings of the various sections of this Amendment are inserted for convenience of reference only and shall not be deemed to affect the meaning or construction of any of the provisions hereof or thereof. Whenever the context and construction so require, all words herein in the singular number herein shall be deemed to have been used in the plural, and vice versa, and the masculine gender shall include the feminine and neuter and the neuter shall include the masculine and feminine.

      (c)    **Amendments.** This Amendment may not be changed, amended, restated, waived, supplemented, discharged, canceled, terminated or otherwise modified orally or by any course of dealing or in any manner other than as provided in the Credit Agreement or the applicable Loan Document or by an order of the Bankruptcy Court in form and substance satisfactory to Agent and Lenders. This Amendment shall be considered part of the Credit Agreement and shall be a Loan Document for all purposes under the Credit Agreement and other Loan Documents.

      (d)    **Single Agreement.** This Amendment, the Credit Agreement, and the Loan Documents constitute the final, entire Credit Agreement and understanding between the parties with respect to the subject matter hereof and thereof and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements between the parties, and shall be binding upon and inure

to the benefit of the successors and assigns of the parties hereto and thereto. There are no unwritten oral agreements between the parties with respect to the subject matter hereof and thereof. If any provision of this Amendment is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of this Amendment which shall be given effect so far as possible.

(e)     **GOVERNING LAW.** THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE CHOICE OF LAW PROVISIONS SET FORTH IN THE CREDIT AGREEMENT AND SHALL BE SUBJECT TO THE WAIVER OF JURY TRIAL AND NOTICE PROVISIONS OF THE CREDIT AGREEMENT, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN BALTIMORE COUNTY, STATE OF MARYLAND.

(f)     **Assignments.** No Credit Party may assign, delegate or transfer this Amendment or any of its rights or obligations hereunder or thereunder and any delegation, transfer or assignment in violation hereof shall be null and void. No rights are intended to be created under this Amendment for the benefit of any third party donee, creditor or incidental beneficiary of Credit Parties or any other Person other than Agent and each Lender. Nothing contained in this Amendment shall be construed as a delegation to Agent or Lender of each Credit Party's duties of performance, including, without limitation, any duties under any account or contract in which Agent has a security interest or Lien. This Amendment shall be binding upon the Credit Parties and shall inure to the benefit of the Agent and Lenders and their respective successors and permitted assigns. Agent's and Lenders' respective ability to assign, sell or transfer all of any part of this Amendment and shall be governed by the Credit Agreement.

(g)     **Reaffirmation.** Each Credit Party hereby (i) consents to the execution and delivery of this Agreement by the other Credit Parties, (ii) agrees that this Agreement and shall not limit or diminish the obligations of the subject Credit Party under the Loan Documents, (iii) reaffirms its obligations under each of the Loan Documents to which it is a party, and (iv) except as specifically amended hereby, agrees that each of such Loan Documents remain in full force and effect and are hereby ratified and confirmed as so amended. All representations and warranties made in this Agreement shall survive the execution and delivery of this Agreement and no investigation by Agent shall affect such representations or warranties or the right of Agent to rely upon them. This Agreement shall not constitute a novation, satisfaction and accord, cure, release, and/or satisfaction of the Credit Agreement or other Loan Documents, but shall constitute an amendment thereof.

(h)     **Further Assurances.** Credit Parties shall execute and deliver such other documents, certificates and/or instruments and take such other actions as Agent may reasonably request in order more effectively to consummate the transactions contemplated hereby.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

[SIGNATURE PAGE TO RATIFICATION AND AMENDMENT AGREEMENT]

IN WITNESS WHEREOF, the parties have caused this Ratification and Amendment Agreement to be executed under seal by their respective officers thereunder duly authorized, as of the date first above written.

BORROWERS:                          HEALTHCARE UNIFORM COMPANY, INC.

                                    By:_____
                                    Name:_____
                                    Title:_____

                                    UNIFORM CITY NATIONAL, INC.

                                    By:_____
                                    Name:_____
                                    Title:_____

GUARANTOR:                          LIFE UNIFORM HOLDING CORP.

                                    By:_____
                                    Name:_____
                                    Title:_____

AGENT AND LENDER:                   CAPITALSOURCE FINANCE LLC

                                    By:_____
                                    Name:_____
                                    Title:_____

**SCHEDULE A**

(Schedule of Obligations)

(Unpaid principal as of May 29, 2013)*

Revolving Advances:                $10,241,750.67
Term Loan:                         $7,250,000.00

*Plus accrued and accruing interest, cost, fees, attorneys' fees and disbursements and other charges as well as adjustments, credits and charges as provided in the Loan Documents.

## SCHEDULE B

(New <u>Schedule 6.16</u> to the Credit Agreement - Budget)

Attached.

**SCHEDULE C**

(List of Stores Not Being Purchased Pursuant to Stalking Horse APA)

To Be Attached On A Post Closing Basis.

## SCHEDULE D

(Wind-Down Expenses Amount)

| Item | Amount |
|------|--------|
| Employee Payroll - Hourly employees (reduced for closed locations) | $201,000 |
| Vacation Closing Stores | $25,000 |
| Severance/Stay Payments - Closed Stores | $124,000 |
| Sales Taxes Payable | $409,000 |
| Estimated Remaining Professional Fees - Debtor (less Escrow Funding) | $440,000 |
| Estimated Remaining Professional Fees - Committee | $84,000 |
| Estimated Remaining Professional Fees - Secured Lender | - |
| Estimated fees claims/notice agent | $90,000 |
| Assumed US Trustee Fees (Assumed $30,000 per quarter) | $60,000 |
| Assumed cost to wind down benefits plan | $10,000 |
| Assumed costs to finalize tax returns | $40,000 |
| **Total Wind Down Amount:** | **$1,483,000** |

**SCHEDULE E**

(Form of Interim Order)

Attached.

61180123 v9-WorkSiteUS-027938/0024