**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| LIFE UNIFORM HOLDING CORP., *et al.*,[1] | ) | Case No. 13-11391 ( ) |
| Debtors. | ) | Joint Administration Requested |

**DECLARATION OF ROBERT FREZZA IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, ROBERT FREZZA do hereby declare, under penalty of perjury, that:

1. I am the Chief Restructuring Officer of each of Life Uniform Holding Corp. ("***Holding***"), Healthcare Uniform Company, Inc. ("***Life Uniform***") and Uniform City National, Inc. ("***Uniform City***," together with Holding and Life Uniform, the "***Debtors***" or the "***Company***"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2. On May 29, 2013 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

3. I submit this declaration (this "***First Day Declaration***") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "***First Day Motion***," and collectively, the "***First Day Motions***").[2] Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. I have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have also been advised by counsel that venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## A. Overview of the Debtors' Corporate Structure and Business

### a. *Company Background*

5. Life Uniform was founded in 1965 when Angelica Corporation ("***Angelica***") decided to enter the retail uniform industry, with the goal of developing a 50-store chain. At the time, Angelica was principally engaged in the manufacture of uniforms, including healthcare uniforms, and the movement of hospitals away from directly providing uniforms to employees prompted Angelica to form Life Uniform. The first Life Uniform store was opened in 1965 in Clayton, Missouri, followed shortly by stores in Atlanta, Louisville and Memphis. The chain grew quickly and by the end of 1969 Life Uniform operated 34 stores with a focus on urban

[2] All capitalized terms not otherwise described herein shall have the meanings ascribed to them in the relevant First Day Motion.

locations, major commercial centers or near hospitals. The 100th Life Uniform store was opened in 1973 and by 1977 Life Uniform had grown to over 150 stores. Today, the Company's expansive national footprint makes it the nation's largest independently owned medical professional supplier. The Debtors offer a leading selection of popular third party and proprietary brands of scrubs, shoes, jackets, lab coats, stethoscopes and other medical accessories, the Debtors are the largest customer for many of its vendors in a unique and highly fragmented industry.

6. A major driver of growth for the Company throughout its existence has been acquisitions. The vast majority of the stores operated today by Life Uniform were acquired as opposed to new stores opened by the Company. Notable acquisitions included: the 1969 acquisition the Bruck's chain from American Hospital Supply (14 stores); the mid-1980s acquisitions of Robin's in southern Florida (10 stores) and National Uniform Shops (76 stores); the 1994 acquisition of Z & H Uniforms, Inc. (21 stores); and the 2006 acquisition of Uniform City (9 stores).

7. Over time, Life Uniform's store portfolio had become somewhat eclectic because of the numerous acquisitions (many of which had different store types). In fiscal 2000 (fiscal year ending in January 2000) Life Uniform decided to rationalize its store portfolio by relocating and closing selected stores as their leases expired. The Company closed a total of 48 stores during the following three fiscal years.

8. During FYE January 2001, Life Uniform initiated a catalog distribution and an e-commerce platform. The Company also developed a growth strategy focused more on opening new stores as opposed to acquiring existing stores. Subsequently, Angelica opted to refocus

efforts on its core line of business, medical linen service, and as a result sought to divest non-core businesses.

9. In July 2004, Life Uniform was acquired by Sun Uniforms LLC. Sun Uniforms LLC continues to own substantially all of the stock of Holdings, the parent of the other Debtors, Life Uniform and Uniform City. At the time of acquisition, the Company operated 196 locations. As part of the acquisition, the Company retained the President to continue serving in his capacity and hired a new CFO to assist in implementing a new growth strategy, selectively targeting strategic acquisitions of already existing medical supply businesses. During this time, the Company focused its efforts on expanding store operations outside of mall-based locations, and into hospitals and other locations in proximity to larger concentrations of healthcare professionals that would better support a growing outside/direct sales trend.

10. In 2006, Life Uniform acquired the nine-store chain, Uniform City, which was then one of the Company's biggest competitors. As part of the Uniform City acquisition, in addition to the retail locations, the Company acquired an existing catalog and direct fulfillment business that had a broad national circulation base and further expanded the Company's national retail footprint into the mid-Atlantic and south-eastern regions of the United States. Uniform City remained a completely separate entity with a distinct catalog, aimed at a lower priced market.

11. Subsequent to the Uniform City acquisition, in 2008, the Company replaced the management with the current management team with the intent of focusing on operational issues, the current economic environment, and the changing customer presence.

12. The Debtors' average store will stock approximately 2,700 stock keeping units ("***SKUs***") including up to 15 colors in nine sizes (ranging from XS to 5XL) and in petite, regular,

and tall for both men and women across basic and fashion products. The Debtors e-commerce site stocks more than 6,500 total SKU's (including some discontinued in stores). New prints are added monthly and generally new products and styles are introduced four to five times a year.

13. Historically, Life Uniform sold primarily nationally recognized brands such as Cherokee, Barco, Landau, Peaches and Nursemates shoes. In 2001, Life Uniform began a private label program and has subsequently introduced several proprietary brands, including "Life®", "Life Essentials", "Fresh Scrubs", "Scrub Wear", "Sierra Scrubs", "Comfy Cotton", "Scrub Elements" and "Laura Ashley®." In FYE January 2013, approximately 25 percent of all scrubs sold by Life Uniform were proprietary or private label brands.

14. The Company enjoys long-standing relationships with a large number of vendors in the industry, providing the Company with ample ability to fulfill varying product demands across each sales channel. These long-standing relationships have also enabled the Company to receive annual rebates from vendors. Over each of the past few years, the Company received nearly $1 million in both contractual and negotiated vendor rebates.

15. Over the past several years, the Company's top ten vendors have represented 75 to 80 percent of inventory purchases. The strong relationships that have been cultivated have allowed the Company to negotiate payment terms, with vendors becoming accustomed to being paid between 60 and 90 days from invoice. The Debtors average time to pay its top vendors increased to between 90 and 120 days from invoice and beyond.

**b. *Healthcare Apparel Industry***

16. The standard apparel for healthcare professionals is commonly referred to as scrubs. Scrubs are typically sold as two separate pieces of apparel consisting of "tops" and "bottoms" and are separated into two categories, "basic" and "fashion."

17. The industry of supplying uniforms and accessories is highly fragmented, with no competitor representing a significant percentage of the market, and those with meaningful scale (i.e., more than one percent of the market) representing less than 30 percent of the overall industry. The Debtors are approximately three times the size of the next largest independent supplier, serving as the largest customer for many of its vendors.

18. Unlike physician worn scrubs that are typically provided by the hospital and discarded or washed after a procedure, non-physician healthcare providers (nurses, orderlies, medical office personnel, dentists, etc.) own and wear their scrubs as a uniform daily. Depending on the healthcare professional's employer and job function, purchases of scrubs can be either the sole responsibility of the employee or employer, or a shared responsibility. Determination of the scrub color, pattern, style, fit, and personalization can also range from employer mandated to the employee's discretion, but usually lies in between. These unique demands associated with the consistently evolving uniform specifications of the healthcare industry require that suppliers such as the Debtors focus on a multi-channel delivery system.

19. Over time, the industry has evolved with more healthcare providers mandating uniforms for their professionals. Outside and inbound sales have emerged as a larger compliment to traditional walk-in retail. The Debtors' extensive national footprint has been highly strategic in providing the Company with scale and national reach to compete effectively in the direct and inbound channels, as more fully described below. These locations serve as retailer, service center and warehouse – providing stock for on-site and outbound sales as well as providing a knowledgeable environment for sizing and fittings.

c. ***Sales Channels***

20. The Company supplies products through three supply channels direct, inbound, and retail. For FYE January 2013, approximately 36 percent of the Company's sales are derived from direct, 14 percent from inbound, and 50 percent are from retail.

**DIRECT SALES**

21. Life Uniform's direct sales channels include the following sub-channels: (i) outside sales; (ii) direct outbound calling; (iii) hospital based stores; and (iv) group sales (collectively "***Direct Sales***"). Direct Sales channel revenue totaled approximately $36.5 million for FYE January 2013, which represent approximately 36 percent of the Company's total revenue during this period.

i. Outside Sales

22. Outside Sales consists of shopping events at customer locations called Life Scrub Expos ("***LSEs***") and other outside sales events (collectively "***Outside Sales***"). LSEs are trunk shows of select product set up by store personnel as a "temporary" store for one or two days at a customer workplace. The Company uses local store managers, an outsourced marketing effort, quarterly email blasts, and dedicated LSE representatives to originate new Outside Sale opportunities.

ii. Direct Outbound Calling

23. The Company recently implemented a new outsourced direct calling effort aimed at a targeted list of healthcare facilities and physician offices, with a third party marketing and fulfillment operation.

iii. Hospital Based Sales

24. Hospital based stores are captive Company stores located within hospitals or medical centers. The Company currently operates 15 hospital based stores. The Debtors believe that hospital based stores and microsites are an established growing trend in the industry.

iv. Group Sales

25. Group sales are comprised of three different segments: (i) direct "B to B" sales to hospital systems; (ii) group medical facility sales; and (iii) onsite fittings for nursing schools and other healthcare facilities.

26. Direct corporate sales to hospital systems are aimed at capturing sales resulting from uniform change policies, a growing industry trend, instituted by hospital and healthcare systems. This forces employees to purchase specific uniforms, by color and sometimes brand, to comply with the new rules. Pre-negotiated group medical facility sales are typically based upon an agreement between an individual Life Uniform store and a medical facility, most often a hospital. The facility generally provides its employees with uniforms or a uniform stipend and negotiates an agreement with Life Uniform in exchange for a discount. For on-site fittings, the Company (usually a store or regional manager) will travel on-site to a nursing school or other medical facility and perform fittings for employees or students. Once fitted, the products are ordered and then delivered directly to the facility or the employees.

**INBOUND SALES**

27. The Company's inbound sales channel includes e-commerce and offline sales ("***Inbound Sales***"). Offline sales are sales the Company derives predominately from phone-in orders. Offline sales are conducted through both the Life Uniform and Uniform City supply channels; however the vast majority of phone orders are received through the Uniform City supply channel. Similarly, the Company's e-commerce platform can be accessed through both the Life Uniform and Uniform City supply channels.

**RETAIL SALES**

28. Life Uniform's walk-in retail sales channel ("***Retail***") operates through two well recognized brand names, Life Uniform and Uniform City. During FYE January 2013, Retail sales are expected to total $51.0 million and comprise approximately 50 percent of the Company's total sales.

29. The Company's expansive Retail footprint spans across 34 states nationwide. As of December 2012, Life Uniform operated a total of 205 retail stores (under the Life Uniform and Uniform City names and inclusive of hospital based stores). In addition to servicing the walk-in retail customer, the Company's locations have begun serving as micro distribution, pick up and fitting sites for the Company's growing Direct Sales channels. The Debtors have begun reducing the number of stores that are not profitable and which they believe have no marketable value to a potential buyer.

30. The Life Uniform store focuses on providing top brands of the newest and latest styles of high fashion medical products, at an average price point that is generally higher than its Uniform City counterpart. The product offering at Life Uniform includes a wide selection of high fashion and basic medical scrubs, shoes and other apparel and accessories such as lab coats, jackets, pants, shoes, hosiery stethoscopes, bags and badge holders.

31. The Uniform City store focuses on offering great prices on branded scrubs, and offers a large selection of basic scrubs, medical uniforms, nurse uniforms, lab coats, stethoscopes, scrub tops and pants, and discount scrubs, at price points lower than those at Life Uniform.

B. **The Debtors' Capital Structure**[3]

[3] A chart describing the Debtors' Capital Structure is attached hereto as ***Exhibit A***.

32. The voting common stock of Holdings is held by Sun Uniforms, LLC. Holdings holds 100% of the stock of Life Uniform, which in turn owns 100% of stock of Uniform City.

33. Life Uniform and Uniform City are the Borrowers and Holdings is the Guarantor under a credit facility with CapitalSource Finance LLC ("***Capitalsource***") dated October 3, 2006 (as amended pursuant to certain letter agreements dated July 29, 2009, August 7, 2009, and August 28, 2009 and pursuant to the Waiver and First Amendment dated September 30, 2009 and pursuant to the Consent and Second Amendment dated August 19, 2011) (the "***Prepetition Credit Agreement***"). The Prepetition Credit Agreement consists of a $11.5 million revolver (the "***Prepetition Revolver***") and a $26 million term loan (the "***Prepetition Term Loan,***" together with the Prepetition Revolver, the "***Prepetition First Lien Debt***"). Capitalsource is both the agent and the lender under the Prepetition Credit Agreement. The Prepetition First Lien Debt is secured by a lien on all of the Debtors' real and personal property. The Debtors have fully utilized all of their availability under the Prepetition First Lien Debt.

34. The Borrowers issued to Sun Uniforms Finance, LLC ("***Second Lien Lender***") a Senior Subordinated Secured Promissory Note ("***Senior Secured Promissory Note***") dated September 30, 2009 in the original principal amount of $6,108,000 as well as a general guaranty by Holdings. Second Lien Lender was granted a second lien on the collateral held by Capitalsource as a part of this transaction. The use of proceeds from the loan were to provide liquidity to the Company via partial revolver paydown, further reduce the total outstanding debt of the Company via partial term loan paydown, and fees and expenses to effectuate the transaction. Prior to the completion of the loan, the Company was in default of its financial covenants and the maturity date of the loan was coming due. With the additional liquidity and reduction in leverage, Capitalsource extended its loan for an additional 18 months. The Second

Lien Lender also holds two additional notes, each in the original principal amount of $1,088,303.56, which were purchased from Jeffrey N. Linn and Craig Linn on August 19, 2011.

35. Angelica Corporation holds a Junior Subordinated Note issued by Life Uniform, originally dated July 7, 2004 in the original principal amount of $4,074,328 and reissued and dated July 27, 2005 in the reissued principal amount of $4,018,680, and further reissued and dated September 30, 2009 in the reissued principal amount of $5,482,453.95, and further reissued and dated August 19, 2011 in the reissued principal amount of $6,304,556.77 (the "***Junior Subordinated Note***").

C. **Events Leading to the Bankruptcy Filing**

36. Leading up to the Sun acquisition, the Debtors had sagging profitability and overhead issues. The Debtors, under new ownership, quickly drove increases in profitability through a combination of store rationalization and sensible corporate overhead initiatives. The Company also looked to expand its operations and footprint through acquisition, and in 2006, the Company acquired Uniform City, a nine location competitor with larger footprint locations, servicing a unique demographic than that of Life Uniform's traditional customers.

37. Despite the numerous initiatives enacted by the Debtors, the Company's recent performance has been declining in terms of revenue and EBITDA. This has been in large part due to the Company's stressed liquidity profile. The liquidity issues prevented the Debtors from furthering certain necessary goals including the completion of a needed e-commerce system upgrade; payment of key vendors on or near terms to encourage better pricing; continuing a highly accretive acquisition strategy; payment of earned bonuses; and maintaining sufficient working capital to fully support organic sales channel growth. The failure to complete the necessary goals as a result of the Debtors lack of liquidity further stressed the Debtors' liquidity and performance, leading to further deterioration and a downward liquidity spiral.

38. Recognizing this trend and need for an influx of capital to grow the Debtors' business and profitability, the Debtors determined that the best method to maximize the value of the enterprise was to pursue a sale of the Company. Accordingly, the Company has retained Morgan Joseph TriArtisan LLC ("***Morgan Joseph***") to explore a sale of the Company.

**d. Proposed Sale of Substantially All Assets**

39. The Debtors intend to pursue a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code. The Debtors have determined in consultation with their advisors that the value of the Debtors' estates is likely to be worth substantially more as a going concern than in liquidation. The Debtors proposed sale of substantially all of their assets can therefore not only preserve the value of the Debtors' businesses but also maximize such value for the Debtors' creditors and estates.

40. On May 29, 2013, the Debtors entered into an asset purchase agreement (the "***APA***") with Scrubs and Beyond, LLC ("***Scrubs***") that contemplates the sale of substantially all of the Debtors assets to Scrubs in exchange for $22.625 million. Under the APA, Scrubs has agreed to act as a stalking horse bidder and subject the APA to higher and better offers in exchange for certain bidding protections and a breakup fee.

41. The APA contains a timeline by which the Debtors intend to complete any proposed sale transaction under section 363 of the Bankruptcy Code and requires a closing of the transaction by August 30, 2013. Pursuant to the APA, the sale and bidding procedures motion must be filed as soon as practicable after these First Day Motions on the Petition Date.

**D. First Day Motions**

42. I reviewed each of the First Day Motions and participated in the preparation thereof. I believe that, to the best of my knowledge, the facts set forth in the voluntary petitions and the First Day Motions are true and correct. This representation is based upon information

and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would, testify competently to the facts set forth in each of the First Day Motions.

43. The relief sought in the First Day Motions will minimize the adverse impact of these cases on the Debtors and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to maximize recoveries to creditors in these cases.

44. As described more fully below, the Debtors carefully tailored the relief requested in the First Day Motions in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm.

**e. <u>Motion for Joint Administration</u>**

45. The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect all three of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 cases. The Debtors further believe that in order to optimally and economically administer the Debtors' pending Chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Holding. The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the Debtors believe that the relief requested by this motion will

also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee. For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**f. Motion to Employ and Retain Claims, Noticing and Balloting Agent**

46. The Debtors request entry of an order appointing Epiq Bankruptcy Solutions, LLC ("***Epiq***") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' cases. The Debtors' selection of Epiq to act as the claims and noticing agent satisfies the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. The terms of retention are set forth in the Engagement Agreement annexed as Exhibit A to the Epiq Application; provided, however, that Epiq is seeking approval solely of the terms and provisions as set forth in the Epiq Application and the proposed order attached thereto. By separate application, the Debtors intend to seek to retain Epiq as administrative advisor in these chapter 11 cases.

47. Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the

appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

48. I have reviewed the Epiq Application and verify that the facts set forth therein are accurate, and I believe the relief requested in the Epiq Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Epiq Application should be approved.

**g. Cash Management Motion[4]**

49. The Debtors seek entry of an order of the Court authorizing them to: (a) continue to use their Cash Management System, (b) maintain existing business forms, (c) grant administrative priority to intercompany claims and continue to perform under certain intercompany arrangements with historical practices, and (d) schedule a final hearing on the Cash Management Motion.

50. The Debtors further request that the Court authorize and direct the Cash Management Banks to, subject to the Account Control Agreements and the DIP Order: (i) continue to maintain, service and administer such accounts, and (ii) debit the Debtors' accounts in the ordinary course of business on account of: (a) all checks drawn on the Debtors' accounts that are cashed at the Cash Management Banks or exchanged for cashier's checks by the payees, thereof, prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtor was responsible for such items prior to the Petition Date; and (c)

[4] A chart describing the Debtors' cash management system is attached hereto as ***Exhibit B***.

all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Cash Management Banks as service charges for the maintenance of the Cash Management System.

51. The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity. Businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to: (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Granting the Debtors the authority to continue using the Cash Management System will help facilitate a smooth transition into the chapter 11 cases.

52. In the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors in possession, provided however, that upon depletion of the Debtors' check stock, the Debtors will obtain new check stock reflecting their status as debtors in possession. With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

53. Absent authority enabling the Debtors to continue to operate their Cash Management System, I believe the Debtors would be unable to effectively maintain their financial operations, which would cripple the Debtors' business and cause significant harm to the Debtors, their estates, creditors and all parties in interest. Additionally, I believe that if the

Debtors were required to comply with the U.S. Trustee Chapter 11 Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend would disrupt the Debtors' business at this critical time. I further believe that maintaining the existing Cash Management System, including their Bank Accounts, will not harm parties in interest because the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.

54. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**h. Employee Wages/Benefits Motion**

55. To minimize the personal hardship that the Debtors' various employees will suffer if certain prepetition amounts are not paid when due or as expected, and to maintain the morale of an essential workforce during this critical time, the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition wages, salaries, commissions, incentives, and other compensation and reimbursable employee expenses, (b) authorizing, but not directing, the Debtors to continue employee benefits programs, (c) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of prepetition employee obligations (collectively, and

as described herein, the "***Employee Obligations***") and (d) scheduling a final hearing to consider entry of the Final Order.

56. Given that the Debtors' employees are integral to the Debtors' ability to operate their businesses during these chapter 11 cases, the Debtors' failure to satisfy certain Employee Obligations within the first 21 days of these chapter 11 cases would jeopardize employee loyalty, morale and trust, possibly causing employees to leave the Debtors' employ and thereby significantly harming the Debtors' operations at this critical juncture. Accordingly, the Debtors seek the authority, but not the direction, to continue to honor, pay, satisfy or remit all claims and prepetition obligations related to Employee Obligations subject to the limitations in the Employee Wage Motion.

57. The Debtors believe any delay in payment or failure to continue to honor the programs and policies comprising the Employee Obligations would cost the Debtors' estates more than the requested payments due to factors such as the cost of losing an employee's knowhow and the cost of replacement of some employees who would be inclined to accept other jobs. Failure to make these payments is likely to impair irreparably the employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with their employees at a time when the employees' support is critical to the Chapter 11 Cases and sale efforts. Moreover, the loss of employee's knowledge and cooperation relating to the relocation of the Debtors' inventory for closed stores would irreparably impair the Debtors' restructuring efforts. Further, absent the relief requested, the employees may suffer undue hardship and, in many instances, serious financial difficulties, as many employees rely on their wages and benefits to meet their personal financial obligations.

58. I have reviewed the Employee Wage Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Employee Wage Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage Motion should be approved.

**i. Customer Programs Motion.**

59. The Debtors request entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) maintain and administer the Debtors' customer-related programs, including Group Pricing, Discounts and Promotions, Gift Cards (solely for Gift Cards issued prepetition), Customer Satisfaction Obligations, Prepaid Orders, LSE Rebates, and Shipping Programs and (ii) make payments to customers or otherwise honor accrued prepetition obligations owed under their Customer Programs and to continue, replace, modify or terminate any Customer Program in the ordinary course of business, (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of Customer Program Obligations and (c) scheduling a Final Hearing to consider entry of the Final Order, to the extent necessary.

60. Absent honoring Customer Program obligations in the ordinary course of business, the Debtors may lose a number of significant customers who have come to expect and rely on such Customer Programs, thereby resulting in a potential surge of cancellations on orders in process and a precipitous decline of future sales. Thus, the Customer Programs are necessary for the Debtors to stay competitive and maintain their customer base during this critical juncture as well as during the course of these chapter 11 cases.

61. The Debtors have created numerous long-standing customer relationships and developed significant customer loyalty and goodwill. These relationships have, in large part, been sustained by the Customer Programs, which encourage sales, foster brand loyalty, manage pricing and establish (and maintain) customer goodwill. Failure to continue the Customer Programs and honor the Customer Program Obligations will erode hard-earned customer loyalty and goodwill, substantially reducing sales and jeopardizing the Debtors' ability to effectuate a successful restructuring. Because the Debtors' industry is highly competitive, these customers will likely purchase from other companies if the Debtors fail to honor Customer Programs, thereby crippling revenue, collection of accounts receivable and the Debtors' opportunity to effectively restructure. Accordingly, the Debtors seek authorization to continue, modify or terminate the Customer Programs in the ordinary course of business and to honor the Customer Program Obligations, as described below, so that customer relationships are maintained and business operations can continue uninterrupted.

62. The success of these cases, and the value to be generated by a sale, hinges on the Debtors' maintaining their industry relationships and marketplace goodwill. Any delay in honoring the Customer Programs, or discontinuation thereof, would jeopardize the Debtors' ability to maximize value for their estates. By honoring their prepetition obligations under the Customer Programs, the Debtors will preserve customer relationships for the benefit of all stakeholders, at a minimal cost to the estates.

63. I have reviewed the Customer Programs Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will

enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

j. **Utilities Motion**

64. The Debtors request entry of interim and final orders (a) determining that the Debtors' Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order, (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion and the adequate assurance procedures annexed as Exhibit 1 to Exhibit A to the Utilities Motion and (e) scheduling a Final Hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

65. In the ordinary course of business, the Debtors obtain gas, water, sewer, electric, telephone, internet and other similar utility services from various Utility Providers. A list of the Utility Providers that provide services to the Debtors as of the Petition Date is set forth on Exhibit 2 to the proposed Interim Order submitted with the Utilities Motion.

66. The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. Contemporaneously herewith, the Debtors have filed a motion seeking authority to enter into a DIP Facility. The Debtors expect that cash flows from operations and borrowings under the DIP Facility will be sufficient to pay postpetition obligations related to their utility services. To provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit representing an amount equal to the estimated

aggregate cost for two weeks of utility service, calculated as a historical average over the past twelve months – into a segregated, interest-bearing account for the benefit of Utility Providers on or before the date that is 20 days after the Petition Date.

67. If a Utility Provider is not satisfied with the Proposed Adequate Assurance, any such Utility Provider may make Requests for additional or different adequate assurance of future payment pursuant to the Adequate Assurance Procedures. The Adequate Assurance Procedures set forth a streamlined process to enable Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to continue their business operations uninterrupted. More specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving a Request upon the Notice Parties (as defined in the Adequate Assurance Procedures) within a specified period of time. The Debtors may then resolve, in their discretion, subject to the DIP Lender's consent, any Request by mutual agreement with the Utility Provider and without further order by the Court. If the Request cannot be resolved, the Debtors request the right to seek a hearing with the Court to resolve the Request. Furthermore, the Adequate Assurance Procedures set forth notice procedures to Utility Providers subsequently added to the Utility Service List. Subsequently added Utility Providers will also be bound by the Adequate Assurance Procedures. The Debtors request that the relief granted in the Interim Order and the Final Order apply to all Utility Providers rendering utility services to the Debtors and not be limited to those listed on the Utility Service List.

68. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer

relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is critical that utility services continue uninterrupted during the chapter 11 cases.

69. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**k. Pending Tax Payments, Sales Tax/ Use Tax Motion.**

70. The Debtors (a) collect sales taxes from their customers, (b) incur franchise taxes, (c) incur fees necessary to operate their businesses including license fees, annual reporting fees, and other similar assessments, and (d) remit such Taxes and Fees to various taxing, licensing and other governmental authorities throughout the United States (collectively, the "***Authorities***"). A list of the Authorities is attached to the Tax Motion as Exhibit B. The Debtors pay the Taxes and Fees monthly, bi-monthly, quarterly, semi-annually, annually as required by applicable laws and regulations.

71. The relief requested is appropriate because a portion of the Taxes is likely not property of the Debtors' estate under section 541(d) of the Bankruptcy Code. Moreover, non-payment of the prepetition Taxes and Fees will cause immediate and irreparable harm to the Debtors because it (a) would cause the Debtors to incur substantial, irreversible tax penalties from governmental authorities that are likely to be paid in full and in cash as priority claims under the Bankruptcy Code, (b) could result in governmental authorities imposing liens related to non-payment of property taxes under the Bankruptcy Code, (c) could prevent the Debtors from operating their businesses and (d) could expose certain directors and officers of the Debtors to

personal liability. Accordingly, the Debtors must continue to pay such amounts as they become due to ensure that they remain focused on operating the business and implementing a successful restructuring.

72. I have reviewed the Taxes Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**I. Lien Claimants Motion.**

73. the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts owed to possessory lien claimants and statutory lien claimants (collectively, and as described herein, the "***Lien Claimants***"), subject to the limitations in the Interim Order and the Final Order, (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of Lien Claimants, and (c) scheduling a Final Hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

74. The Debtors have identified certain prepetition amounts that have accrued and remain unpaid on account of the claims of Lien Claimants. Because of the substantial harm that may befall the Debtors if the Lien Claimants fail to release the goods in their possession or otherwise move to assert their lien rights, the Debtors seek the authority, but not the direction, pursuant to the Interim Order, to remit payment on account of the Lien Claimants subject to the limitations set forth in the Interim and Final Order.

75. The uninterrupted delivery of goods is essential to maintaining the going concern value of the Debtors. The Debtors' ability to generate sales is highly dependent on their ability to ensure that the proper mix of inventory is available for purchase and delivery to their customers. The Debtors' liquidity constraints have limited the amount of inventory the Debtors are able to maintain in reserve. Additionally, their small footprint locations require that they be able to replenish any delivery at their stores quickly and also be able to transfer inventory from one location to another quickly to meet their sales needs. Without the ability to deliver product, the Debtors are unable to generate revenue. To maintain their operations and efficiently transport products, the Debtors employ a distribution network that uses third-party warehouses and carriers who are in current possession of the Debtors' property as of the Petition Date (collectively, and as discussed below, the "***Possessory Lien Claimants***"). Under the laws of most states, these warehousemen and carriers will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses incurred in connection with the transportation or storage of the goods. If the Possessory Lien Claimants' claims are not satisfied, they may refuse to release the Debtors' property, thereby disrupting the Debtors' product flow and operations. The Possessory Lien Claimants consist of Shippers, Warehousemen, Landlords, and Processors, each as more fully explained in the Lien Claimants Motion. Additionally, the Debtors also rely on, and contract with, a number of third parties to obtain equipment used at their facilities and also have such equipment maintained and repaired. The Debtors may owe money to these third parties as a result of the goods and services they have provided. Under applicable state law, many of these parties have a right to assert and perfect statutory liens, which attach to the Debtors' real and personal property.

76. Paying amounts owed to the Lien Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. The Possessory Lien Claimants may have liens on the goods in their possession; they may be unwilling to release these goods since this may result in their secured claims against the Debtors becoming unsecured. Therefore, unless the Debtors are authorized to pay amounts owed to the Possessory Lien Claimants, it is highly unlikely that the Debtors will continue to obtain goods currently in transit or in storage.

77. Additionally, vendors who are Statutory Lien Claimants hold and may perfect liens on estate property for which goods or services were provided prepetition. If the Statutory Lien Claimants possess lien rights or have the ability to exercise "self-help" remedies to secure payment of their claims, failure to satisfy amounts owed to Statutory Lien Claimants could have a material adverse impact on the Debtors' business operations.

78. Under some circumstances, contractual or other rights may permit the Lien Claimants to assert claims for interest during these chapter 11 cases to the extent that their statutory lien rights render their claims oversecured. Paying such oversecured claims during the course of these chapter 11 cases will benefit the Debtors and their estates by reducing interest expense. Further, payment of amounts owed to these claimants will eliminate the cost and potential inefficiency of responding to multiple requests for adequate protection or relief from the automatic stay with respect to such claims. Finally, payment of amounts owed to the Lien Claimants will not harm unsecured creditors in these chapter 11 cases because the creditors paid will not receive more than they would be entitled to under a plan of reorganization by virtue of their secured status.

79. Payment of the Lien Claimants is integral to the Debtors' operations. The payments will facilitate the use and/or sale of estate property against which liens may otherwise be asserted, helping to preserve the going-concern value of the Debtors' businesses. Conversely, if the lien claims are not satisfied, the Debtors' may experience a disruption of their business that results in an irrecoverable loss of revenue. Therefore, the failure to satisfy such prepetition obligations in the ordinary course of business during the first 21-days of these cases will cause significant disruption to the Debtors' operations.

80. I have reviewed the Lien Claimants Motion and verify that the facts set forth therein are accurate, and I believe the relief requested in the Lien Claimants Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Lien Claimants Motion should be approved.

**m. <u>Insurance Premium Financing Motion.</u>**

81. The Debtors request entry of interim and final orders, (a) authorizing, but not directing, the Debtors to (i) continue the Debtors prepetition insurance policies (collectively, the "***Insurance Policies***") and (ii) maintain financing of insurance premiums under a prepetition financing agreement with AFCO Premium Acceptance, Inc. ("***AFCO***") (the "***Financing Agreement***") and (b) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the related Insurance Policies.

82. The Debtors seek interim authority to pay an aggregate amount of approximately $12,994.40 in connection with the Insurance Policies that will become due and owing during the first 21 days of these chapter 11 cases. Pursuant to the Interim Order, the Debtors request authority to (a) continue their prepetition Insurance Policies and (b) maintain financing of their

insurance premiums under the Financing Agreement, including monthly installment payments due on June 1, 2013 in the total amount of approximately $12,994.40, which represents the only amount that will come due within the first 21 days of these chapter 11 cases.

83. Pursuant to the Final Order, the Debtors seek authority to (a) continue the Insurance Policies, including renewal or modification of the Insurance Policies as necessary in the ordinary course of business, and (b) maintain financing of insurance premiums under the Financing Agreement in the ordinary course of business.

84. In the ordinary course of business, the Debtors maintain a number of Insurance Policies. The Insurance Policies provide coverage for property, directors and officers, employment practices, fiduciary liability, crime, kidnap & ransom, automobile, cargo, general liability, umbrella liability, and workers compensation. The Insurance Policies are essential to the preservation of the value of the Debtors' businesses, properties and assets. In many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities.

85. The Debtors generally are current on amounts owed to maintain the Insurance Policies. As of the Petition Date, the Debtors do not believe there are any amounts owed on the Insurance Policies, with the exception of the Financed Insurance Policies (as defined below).

86. Certain of the Debtors' insurance policies require payment of the entire premium at inception. Because it is not always economically advantageous for the Debtors to pay premiums in full up front, the Debtors have financed the premiums for these policies (collectively, the "***Financed Insurance Policies***") under the Financing Agreement with AFCO. The Financed Insurance Policies benefit the Debtors by spreading out the cost of the Insurance Policies over the applicable coverage period. The Financed Insurance Policies benefit the

Debtors by spreading out the cost of the Insurance Policies over the applicable coverage period. The Financed Insurance Policies include property and boiler and machinery. As of the Petition Date, the Debtors owe a total of approximately $77.966.40 on account of the Financing Agreement. Approximately $12,994.40 will come due on account of the Financed Insured Policies within the first 21 days of these chapter 11 cases.

87. I believe continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**n. Debtor-In-Possession Financing and Use of Cash Collateral Motion**

88. The Debtors and their advisors have worked to ensure that upon the commencement of these chapter 11 cases, the Debtors would have in hand not only an agreement to sell substantially all of their assets, but also obtain a commitment — through debtor in possession financing — to provide necessary capital for operational purposes during the chapter 11 cases. With this background, the Debtors embarked upon discussions with the Debtors' prepetition senior secured lender CapitalSource Finance LLC (the "***Capitalsource***") and other potential third party providers of financing to procure debtor in possession financing to allow the Debtors' to sell their assets as a going concern and to maximize the value of their assets.

89. Capitalsource has agreed to provide the Debtors with a $15 million senior-secured credit facility (the "***DIP Financing***" or the "***DIP Facility***"), the terms of which the Debtors submit are reasonable following extensive arm's-length negotiations. Although the Debtors, through their advisors, searched for alternative financing arrangements, the Debtors' were unable to find any alternatives. In the face of this, as well as timing and execution risk associated with any third party financing, the Debtors believe the DIP Financing is the best and only financing available under the circumstances.

90. To implement its proposed sale process and continue to retain and inspire confidence in its business partners, access to liquidity is critical. The DIP Financing will provide approximately $4 million in incremental liquidity that the Debtors believe is necessary to operations and to conclude a sale process on an expedited basis. In short, to ensure the Debtors have access to liquidity and inspire confidence in the marketplace in demonstrating the Debtors have the funding and financial support necessary to conclude a successful sale, the Debtors submit the DIP Financing is necessary and should be approved.

91. The Debtors request entry of the DIP Orders, authorizing the Debtors to enter into the Ratification and Amendment Agreement (the "***DIP Financing Agreement***")[5] and use cash collateral. Contemporaneously with this declaration, the Debtors are submitting the Declaration of James Hadfield, a director of Morgan Joseph TriArtisan LLC, the Debtors' proposed investment bankers (the "***Hadfield Declaration***"). A detailed description of the DIP Financing Agreement, and the terms thereof, is provided in the motion.

[5] Specifically, the Debtors seek authority to enter into the DIP Financing Agreement and the postpetition financing made available thereby, among Healthcare Uniform Company, Inc. and Uniform City National, Inc. (the "***Borrowers***"); and the other credit parties on the signature pages to the DIP Financing Agreement (collectively, the "***Credit Parties***" and with the Borrower, the "***Borrowers***"); Capitalsource Finance LLC as administrative agent and the Lender (in such capacity, the "***DIP Lender***").

92. In the face of these chapter 11 cases, absent an ability to demonstrate that the Debtors have the means apart from cash-on-hand available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, vendors and suppliers may choose not to ship goods or provide service to the Debtors, resulting in disruption to the Debtors' supply chain. Any disruption in the Debtors' supply chain at this critical juncture would cause a severe reduction in the Debtors' cash on hand.

93. Immediate access to the DIP Facility and the use of cash collateral will enable the Debtors to allay concerns of the Debtors' suppliers and customers and enable the Debtors to carry on with business as usual. Absent access to liquidity, the Debtors' ability to operate and ultimately sell their assets as a going concern will be jeopardized, all to the detriment of the Debtors' stakeholders. As a result, the Debtors have an immediate need to secure the DIP Financing to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

94. The Debtors — through Morgan Joseph attempted to identify and procure potential sources of funding to allow the Debtors to continue operations until emergence of these chapter 11 cases. With increased customer and vendor pressures, Morgan Joseph sought postpetition financing that would be provided quickly and consensually.

95. Morgan Joseph contacted several parties in addition to Capitalsource, which included banks and funds that specialize in debtor in possession financing. To avoid the cost, risk and delay inherent in any potential priming fight with the Debtors' first lien lender, Capitalsource, as well as in light of the compressed sale timeline and the level of assets available as collateral, none of the additional financing parties other than Capitalsource approached by Morgan Joseph expressed an interest in providing postpetition financing.

96. After extended arms-length negotiations, Capitalsource agreed with the Debtors request for $15 million of liquidity as being appropriate and necessary to maintain the Debtors' operations through the expedited sale process proposed in these chapter 11 cases.

97. To best assess the Debtors' funding needs during these chapter 11 cases, the Debtors, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful sale of their assets. The Debtors developed a 9-week cash flow forecast that considers the savings derived by the filings of these cases, including potential lease rejections and the Debtors' ability to maintain customary payment terms with key suppliers.

98. Based on the Debtors' financial projections, the Debtors concluded that cash on hand alone would be insufficient to fund operations and the Debtors' business plan throughout the pendency of these chapter 11 cases. Thus, to provide the Debtors with appropriate and necessary financing, obtaining debtor-in-possession financing was critical to ensure that operations would continue uninterrupted during these chapter 11 cases.

99. Utilizing this cash flow forecast to project their cash needs during these chapter 11 cases, the Debtors believe that access to approximately $2.5 million in incremental liquidity is necessary for operations on an interim basis and access to approximately $4 million in incremental liquidity is necessary in total to operate through a closing of a sale transaction on an expedited basis. The Debtors believe vendors may tighten credit terms or stop shipments, which would result in a severe reduction to the Debtors' cash on hand. Therefore, without approval of the relief requested herein, the Debtors believe they may face significant liquidity constraints in the coming weeks.

100. The Debtors' decision to enter into the proposed DIP Facility is the culmination of an intense process targeted at procuring the best available financing under the circumstances. And while this is the only financing available under the circumstances, the Debtors negotiated the DIP Financing on an arm's-length basis that the Debtors submit is reasonable and appropriate. Moreover, it is critical that the Debtors assure their customers that they will operate in the ordinary course of business and have the resources in place to do so. Therefore, I believe that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

101. The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and Capitalsource, and the DIP Obligations will be extended by Capitalsource in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party in connection with the DIP Financing other than as set forth herein and in the motion. Moreover, the DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and Capitalsource should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed or modified on appeal or otherwise. *See* 11 U.S.C. § 364(e).

102. The Debtors believe that the proposed Adequate Protection Obligations are necessary and appropriate to ensure that the Debtors can continue to use Cash Collateral and access necessary liquidity under the DIP Financing. Accordingly, the Adequate Protection Obligations proposed herein and in the DIP Orders is fair and reasonable.

103. The Debtors' efforts to obtain alternative postpetition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis. The DIP Financing was the only available financing under these circumstances. Indeed, discussions with other potential lenders were stalled because of diligence requirements and time constraints or because third-parties were simply uninterested in the costs and risk. Accordingly, the Debtors submit that the terms of the DIP Financing Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

104. Furthermore, immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail herein, the Debtors have an immediate need to obtain access to incremental liquidity. The Debtors' relationships with their employees, customers and suppliers are paramount to the Debtors' success. The Debtors must be able to communicate to their key stakeholders that they will continue to operate in the ordinary course, satisfy any critical payment obligations and continually satisfy other general working capital and operational needs, and that necessitates access to capital.

105. Accordingly, the Debtors believe that absent access to liquidity under the DIP Facility, the Debtors' vendors may cease to provide goods and services to the Debtors, which would be crippling to the Debtors' businesses. Thus, availability of sufficient working capital and liquidity — and the ability to message to key stakeholders that the funding is available — is imperative to preserve and maintain the value of the Debtors' estates.

In conclusion, for the foregoing reasons and the reasons set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as is appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief as set forth in this Declaration.

*/s/ Robert Frezza*
Chief Restructuring Officer

**Exhibit A**

**Organizational Chart**

**Life Uniform Structure Chart**




The following entities merged with and into Uniform City National, Inc. on January 30, 2010:

- Linn Uniforms of Clearwater, Inc.
- Uniform City – Southeast, Inc.
- Uniform City U.S.A., Inc.
- Linn Uniforms of Florida, Inc.
- Linn Uniforms Corporation of P.G. County, Inc.
- Uniform City Seaboard, Inc.

**Exhibit B**

**Cash Management Chart**

# LIFE UNIFORM
# BANKING STRUCTURE




Deposits and Credit Card Settlements
- Customers that have A/R accounts mail checks to one of our two lockboxes either with Wells (Life Uniform) or Bank of America (Uniform City).
- On the retail level, Life and Uniform City Stores make their cash deposits to a bank in their area in which we have an account.
- Credit card transactions from Direct or from the stores at the Retail level will settle with First Data.

Depository Account
- The amounts from the checks received from the A/R customers into the lockboxes is deposited into the Depository account.
- For the Retail cash deposits, the banks will wire the total amount that was deposited from the previous day into the Depository Account.
- The total from credit card transactions that settled with First Data is deposited into the Depository Account.

Depository to Concentration Account
- The total collected amount in the Depository Account is wired into the concentration account on a daily basis.
- Stores that make their deposits into outlier banks are swept directly into the Concentration Account on a weekly basis.

Funding from Concentration Account
- The amounts from the Depository Account and outlier store deposits in the Concentration account are used to fund A/P, payroll, HRA and FSA accounts, service charges and fees, sales tax wires and any other miscellaneous wires.
- If the total needed to fund these amounts is more than the total in the Concentration Account then a request to borrow funds is sent to Capital Source. Capital Source will wire the requested amount into the Concentration Account.

Updated 4 28 2010