## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIFE UNIFORM HOLDING CORP.,[1] | ) Case No. 13-11391 (   ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DEBTORS' MOTION FOR ORDER (A) AUTHORIZING AND APPROVING AGREEMENT; (B) APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE; (D) AUTHORIZING THE DEBTORS TO CONSUMMATE TRANSACTIONS RELATED TO THE ABOVE; AND (E) GRANTING OTHER RELIEF**

Life Uniform Holding Corp. ("***Holdings***"), Healthcare Uniform Company, Inc. ("***Life Uniform***") and Uniform City National, Inc. ("***Uniform City***"), the debtors and debtors-in-possession herein (collectively, the "***Debtors***"), hereby submit this motion (the "***Sale Motion***") pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "***Bankruptcy Code***"), and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (each a "***Bankruptcy Rule***" and collectively, the "***Bankruptcy Rules***"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), for an order substantially in the form attached hereto as **Exhibit A** (the "***Sale Order***") (a) authorizing and approving the Purchase Agreement (defined herein); (b) approving the sale (the "***Sale***") of certain of their assets (the "***Purchased Assets***" as defined in paragraph 30 below) and (the

---

[1]    The Debtors in these cases, along with the last four digits of the federal tax identification number for each Debtor, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

"*Additional Assets*" as defined in paragraph 31 below), as a whole to one bidder or in parts to more than one bidder, pursuant to section 363 of the Bankruptcy Code; (c) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code; (d) authorizing the Debtors to consummate transactions related to the above; and (e) granting other relief.  In support hereof, the Debtors respectfully represent as follows:

## INTRODUCTION

1.     The Debtors, in consultation with their debtor-in-possession lender ("*DIP Lenders*"), and their pre-petition secured lenders and in the exercise of their considered business judgment, have determined that the best way to maximize value for the benefit of their estates and creditors is to attempt an expeditious sale of their assets through one or more transactions.

2.     In this regard, on May 29, 2013 Debtors executed an Asset Purchase Agreement (the "*Purchase Agreement*") with Scrubs & Beyond, LLC (the "*Purchaser*") providing for the sale of the Purchased Assets to the Purchaser and the Debtors' assumption and assignment to the Purchaser of certain executory contracts and unexpired leases.  A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit B**.  The Debtors also seek to expose the Purchase Assets and the Additional Assets for competitive bidding through an Auction pursuant to Sale Procedures that are subject of a separate motion filed contemporaneously herewith.

## BACKGROUND

### A.     The Chapter 11 Filings

3.     On May 29, 2013 (the "*Petition Date*"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2

4.      No official committee of general unsecured creditors (the "***Committee***") has been appointed in these cases by the Office of the United States Trustee to date.

5.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) (M), (N) and (O). Venue of the Debtors' chapter 11 cases and this Sale Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 6004 and 6006 and Local Rules 2002-1, 6004-1 and 9006-1.

**B.      Overview of the Debtors' Corporate Structure and Business**

*1.      Company Background*

6.      Life Uniform was founded in 1965 when Angelica Corporation ("***Angelica***") decided to enter the retail uniform industry, with the goal of developing a 50-store chain. At the time, Angelica was principally engaged in the manufacture of uniforms, including healthcare uniforms, and the movement of hospitals away from directly providing uniforms to employees prompted Angelica to form Life Uniform. The first Life Uniform store was opened in 1965 in Clayton, Missouri, followed shortly by stores in Atlanta, Louisville and Memphis. The chain grew quickly and by the end of 1969 Life Uniform operated 34 stores with a focus on urban locations, major commercial centers or near hospitals. The 100th Life Uniform store was opened in 1973 and by 1977 Life Uniform had grown to over 150 stores. Today, the Company's expansive national footprint makes it the nation's largest independently owned medical professional supplier. The Debtors offer a leading selection of popular third party and proprietary brands of scrubs, shoes, jackets, lab coats, stethoscopes and other medical accessories, the Debtors are the largest customer for many of its vendors in a unique and highly fragmented industry.

3

7.      A major driver of growth for the company throughout its existence has been acquisitions. The vast majority of the stores operated today by Life Uniform were acquired as opposed to new stores opened by the company. Notable acquisitions included: the 1969 acquisition the Bruck's chain from American Hospital Supply (14 stores); the mid-1980s acquisitions of Robin's in southern Florida (10 stores) and National Uniform Shops (76 stores); the 1994 acquisition of Z & H Uniforms, Inc. (21 stores); and the 2006 acquisition of Uniform City (9 stores).

8.      Over time, Life Uniform's store portfolio had become somewhat eclectic because of the numerous acquisitions (many of which had different store types). In fiscal 2000 (fiscal year ending in January 2000) Life Uniform decided to rationalize its store portfolio by relocating and closing selected stores as their leases expired. The company closed a total of 48 stores during the following three fiscal years.

9.      During FYE January 2001, Life Uniform initiated a catalog distribution and an e-commerce platform, making it the only national medical supplier to offer its customers shopping via four retail channels at that time. The company also developed a growth strategy focused more on opening new stores as opposed to acquiring existing stores. Subsequently, Angelica opted to refocus efforts on its core line of business, medical linen service, and as a result sought to divest non-core businesses.

10.     In July 2004, Life Uniform was acquired by Sun Uniforms LLC. Sun Uniforms LLC continues to own substantially all of the stock of Holdings, the parent of the other Debtors, Life Uniform and Uniform City. At the time of acquisition, the company operated 196 locations. As part of the acquisition, the company retained the President to continue serving in his capacity and hired a new CFO to assist in implementing a new growth strategy, selectively targeting

4

strategic acquisitions of already existing medical supply businesses. During this time, the company focused its efforts on expanding store operations outside of mall-based locations, and into hospitals and other locations in proximity to larger concentrations of healthcare professionals that would better support a growing outside/direct sales trend.

11. In 2006, Life Uniform acquired the nine-store chain, Uniform City, which was then one of the company's biggest competitors. As part of the Uniform City acquisition, in addition to the retail locations, the company acquired an existing catalog and direct fulfillment business that had a broad national circulation base and further expanded the company's national retail footprint into the mid-Atlantic and south-eastern regions of the United States. Uniform City remained a completely separate entity with a distinct catalog, aimed at a lower priced market.

12. Subsequent to the Uniform City acquisition, in 2008, the company replaced the management with the current management team with the intent of focusing on operational issues, the current economic environment, and the changing customer presence.

13. The Debtors' average store will stock approximately 2,900 stock keeping units ("*SKUs*") including up to 15 colors in nine sizes (ranging from XS to 5XL) and in petite, regular, and tall for both men and women across basic and fashion products. The Debtors e-commerce site stocks more than 6,500 total SKU's (including some discontinued in stores). New prints are added monthly and generally new products and styles are introduced four to five times a year.

14. Historically, Life Uniform sold primarily nationally recognized brands such as Cherokee, Barco, Landau, Peaches and Nursemates shoes. In 2001, Life Uniform began a private label program and has subsequently introduced several proprietary brands, including "Life®", "Life Essentials", "Fresh Scrubs", "Scrub Wear", "Sierra Scrubs", "Comfy Cotton",

5

"Scrub Elements" and "Laura Ashley®." In FYE January 2013, approximately 25 percent of all scrubs sold by Life Uniform were proprietary or private label brands.

### 2.    Healthcare Apparel Industry

15.    The standard apparel for healthcare professionals is commonly referred to as scrubs. Scrubs are typically sold as two separate pieces of apparel consisting of "tops" and "bottoms" and are separated into two categories, "basic" and "fashion."

16.    The industry of supplying uniforms and accessories is highly fragmented, with no competitor representing more than ten percent of the market, and those with meaningful scale (i.e. more than one percent of the market) representing less than 30 percent of the overall industry. The Debtors, at nearly ten percent of the market, are approximately three times the size of the next largest independent supplier, serving as the largest customer for many of its vendors.

17.    Unlike physician worn scrubs that are typically provided by the hospital and discarded or washed after a procedure, non-physician healthcare providers (nurses, orderlies, medical office personnel, dentists, etc.) own and wear their scrubs as a uniform daily. Depending on the healthcare professional's employer and job function, purchases of scrubs can be either the sole responsibility of the employee or employer, or a shared responsibility. Determination of the scrub color, pattern, style, fit, and personalization can also range from employer mandated to the employee's discretion, but usually lies in between. These unique demands associated with the consistently evolving uniform specifications of the healthcare industry require that suppliers such as the Debtors focus on a multi-channel delivery system.

18.    Over time, the industry has evolved with more healthcare providers mandating uniforms for their professionals. Outside and inbound sales have emerged as a larger compliment to traditional walk-in retail. The Debtors' extensive national footprint has been

6

highly strategic in providing the Debtors with scale and national reach to compete effectively in the direct and inbound channels. These locations serve as retailer, service center and warehouse – providing stock for on-site and outbound sales as well as providing a knowledgeable environment for sizing and fittings.

*3.    Sales Channels*

19.    The Company supplies products through three supply channels direct, inbound, and retail. For FYE January 2013, approximately 36 percent of the Debtors' sales are derived from direct, 14 percent from inbound, and 50 percent are from retail.

**C.    The Debtors' Capital Structure**

20.    The voting common stock of Holdings is held by Sun Uniforms, LLC. Holdings holds 100% of the stock of Life Uniform, which in turn owns 100% of stock of Uniform City.

21.    Life Uniform and Uniform City are the Borrowers and Holdings is the Guarantor under a credit facility with Capitalsource Finance LLC ("*Capitalsource*") dated October 3, 2006 (as amended pursuant to certain letter agreements dated July 29, 2009, August 7, 2009, and August 28, 2009 and pursuant to the Waiver and First Amendment dated September 30, 2009 and pursuant to the Consent and Second Amendment dated August 19, 2011) (the "*Prepetition Credit Agreement*"). The Prepetition Credit Agreement consists of a $12.5 million revolver (the "*Prepetition Revolver*") and a $26 million term loan (the "*Prepetition Term Loan*," together with the Prepetition Revolver, the "*Prepetition First Lien Debt*"). Capitalsource is both the agent and the lender under the Prepetition Credit Agreement. The Prepetition First Lien Debt is secured by a lien on substantially all of the Debtors' real and personal property. The Debtors have fully utilized all of their availability under the Prepetition First Lien Debt.

22.    The Borrowers issued to Sun Uniforms Finance, LLC ("*Second Lien Lender*") a Senior Subordinated Secured Promissory Note ("*Second Secured Promissory Note*") dated

7

September 30, 2009 in the original principal amount of $6,108,000 as well as a general guaranty by Holdings. Second Lien Lender was granted a second lien on the collateral held by Capitalsource as a part of this transaction. The use of proceeds from the Second Secured Promissory Note were to provide liquidity to the Debtors via partial revolver paydown, further reduce the total outstanding debt of the Debtors via partial term loan paydown, and fees and expenses to effectuate the transaction. Prior to the completion of the loan from the Second Lien Lender, the Debtors were in default of their financial covenants under the Prepetition Credit Agreement and the maturity date under such agreement was approaching. With the additional liquidity and reduction in leverage, Capitalsource extended the Prepetition First Lien Debt for an additional 18 months. The Second Lien Lender also holds two additional notes, each in the original principal amount of $1,088,303.56, which were purchased from Jeffrey N. Linn and Craig Linn on August 19, 2011.

23.    Angelica Corporation holds an unsecured Junior Subordinated Note issued by Life Uniform, originally dated July 7, 2004 in the original principal amount of $4,074,328 and reissued and dated July 27, 2005 in the reissued principal amount of $4,018,680, and further reissued and dated September 30, 2009 in the reissued principal amount of $5,482,453.95, and further reissued and dated August 19, 2011 in the reissued principal amount of $6,304,556.77 (the "*Junior Subordinated Note*").

**D.    Events Leading to the Bankruptcy Filing**

24.    Leading up to the acquisition by Sun Uniform, LLC, the Debtors had sagging profitability and overhead issues. The Debtors, under new ownership, quickly drove increases in profitability through a combination of store rationalization and sensible corporate overhead initiatives. The Debtors also looked to expand its operations and footprint through acquisition,

8

and in 2006, the Debtors acquired Uniform City, a nine location competitor with larger footprint locations, servicing a different demographic than that of Life's traditional customers.

25.    Despite the numerous initiatives enacted by the Debtors, the Debtors' recent performance has been relatively flat in terms of revenue and EBITDA. This has been in large part due to the Debtors' stressed liquidity profile. The liquidity issues prevented the Debtors from furthering certain necessary goals including the completion of a needed e-commerce system upgrade; payment of key vendors on or near terms to encourage better pricing; continuing a highly accretive acquisition strategy; payment of earned bonuses; and maintaining sufficient working capital to fully support organic sales channel growth. The failure to complete the necessary goals as a result of the Debtors lack of liquidity further stressed the Debtors' liquidity and performance, leading to further deterioration and a downward liquidity spiral.

26.    Recognizing this trend and need for an influx of capital to grow the Debtors' business and profitability, the Debtors determined that the best method to maximize the value of the enterprise was to pursue a sale of the Company. Accordingly, the Debtors retained Morgan Joseph TriArtisan LLC ("*Morgan Joseph*") to explore a sale of the Debtors as a going concern.

27.    As of the Petition Date, the Debtors lack the funds necessary to meet projected short-term cash needs due to a lack of availability under the Prepetition Credit Agreement and lower than expected cash flow from operations.

28.    Capitalsource agreed to continue to fund the Debtors on a daily basis while the Debtors attempted to find a potential buyer and/or investor in conjunction with either an out of court restructuring or through a bankruptcy proceeding. The Debtors' continuing liquidity problems forced the Debtors to file for chapter 11 protection.

9

## RELIEF REQUESTED

29. By this Sale Motion, the Debtors respectfully request, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1 and 9006-1, entry of the Sale Order: (a) authorizing and approving Purchase Agreement; (b) approving the Sale of the Purchased Assets as a whole to Purchaser or another higher and better bidder or bidders pursuant to section 363 of the Bankruptcy Code; (c) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code; (d) approving the Sale of the Additional Assets to a successful bidder or bidders at the Auction pursuant to section 363 of the Bankruptcy Code; (e) authorizing the Debtors to consummate transactions related to the above; and (f) granting other relief.

## PROPOSED SALE OF THE ASSETS

### A. Description of the Purchased Assets and Additional Assets

30. The Assets to be sold to Purchaser (the *"Purchased Assets"*)[2] and subject to higher and better bids at Auction include, *inter alia,*

(a) all Accounts Receivable and other rights to payment (excluding Credit Card Receivables) arising from the conduct of the Business;

(b) all security and other deposits related to Assumed Contracts;

(c) all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases that are Assumed Contracts, including merchandise, supplies, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials and consumables relating to or available for sale or use in connection with the Business;

---

[2]     Defined terms used in the paragraph 30 shall have the meaning ascribed to such terms under the Purchase Agreement. In the event of any inconsistency between the description of the Purchased Assets set forth herein and the description of such assets set forth in the Purchase Agreement, the Purchase Agreement shall control.

(d)     all right, title and interest of Sellers under each Real Property Lease on <u>Schedule</u> <u>1.1(a)</u> of the Purchase Agreement, each of which shall be an Assumed Contract, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof; <u>provided that</u> Purchaser may add or remove Real Property Leases listed on <u>Schedule 1.1(a)</u> as set forth in <u>Section 2.5</u> of the Purchase Agreement;

(e)     all right, title and interest of Sellers under each other Contract on <u>Schedule 1.1(b)</u> of the Purchase Agreement, each of which shall be an Assumed Contract; <u>provided that</u> Purchaser may add or remove other Contracts listed on <u>Schedule 1.1(b)</u> as set forth in <u>Section</u> <u>2.5</u>;

(f)     all right, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is an Assumed Contract;

(g)     the Purchased Intellectual Property;

(h)     all of the rights and benefits accruing from and after the Closing under any of the Assumed Contracts, including each Real Property Lease, personal property lease and Intellectual Property License that is an Assumed Contract;

(i)     all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, vendor files, financial and other records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (f) <u>but excluding</u> (i) personnel files for Employees who are not hired by Purchaser, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents that Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) Documents relating to an Excluded Asset or Excluded Liability;

(j)     all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(k)     all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(l)     any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(m)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

11

(n)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(o)    all prepaid expenses of Sellers;

(p)    all other assets, properties, rights and claims of Sellers of any kind or nature that relate to the Business, that are used or useful in or held for use in the Business, or that relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in Section 2.1 to the Purchase Agreement, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with the Real Property Leases that are Assumed Contracts; and

(q)    all inventory of any kind and nature, including raw materials, supplies, work-in-process, packaging materials and other materials in the inventory of the Business ("*Inventory*").

31.    The Assets in addition to the Purchased Assets to be sold at Auction (the

"*Additional Assets*")[3] include, *inter alia*,

(a)    all tangible personal property (other than Inventory) owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases THAT ARE NOT Assumed Contracts under the Purchase Agreement with Buyer, including equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, and spare parts relating to or available for use in connection with the Business;

(b)    all right, title and interest of Sellers under each Real Property Lease THAT IS NOT on Schedule 1.1(a) of the Purchase Agreement, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof.

## B.    The Debtors' Solicitation and Marketing Efforts

32.    On February ___ 2013, the Debtors retained Morgan Joseph as their Investment banker to assist the Debtors in exploring certain strategic alternatives in order to maximize their value, including the potential sale of the Debtors' assets.

33.    Morgan Joseph prepared due diligence materials intended for distribution to prospective buyers of the Debtors' assets. Morgan Joseph worked with the Debtors to develop a

---

[3]    Defined terms used in paragraph 31 shall have the meaning ascribed to such terms under the Purchase Agreement.

list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

34.     Morgan Joseph then contacted approximately __ potential strategic buyers and __ financial buyers, out of which __ executed confidentiality agreements and requested additional information, __ visited the Debtors' headquarters and met with management and conducted due diligence.

35.     The Debtors received various offers for substantially all of their assets, either in whole or in parts.  After consultation with the Capitalsource, and in the exercise of their considered business judgment, the Debtors selected the Purchaser pursuant to the Purchase Agreement as the higher and best purchaser of the Purchased Assets, subject to higher and better offers pursuant to the Sale Procedures.

## C.     The Purchase Agreement

36.     The Debtors propose to sell the Purchased Assets (a) to the Purchaser pursuant to the Purchase Agreement or (b) in whole or part, to the highest and best successful bidder(s) ("*Successful Bidder(s)*") at the Auction, as determined by the Debtors in accordance with the terms of the Sale Procedures Order and the Sale Procedures and in consultation with the debtor-in-possession lenders ("*DIP Lenders*") and Capitalsource and as ultimately approved by the Bankruptcy Court.

37.     As set forth in greater detail in the Purchase Agreement, the Debtors' estates will receive approximately $__ million together with adjustments set forth in the Purchase Agreement (being the cash consideration payable by the Purchaser under the Purchase Agreement) for the Assets (the "*Purchase Price*").  Additionally, the Debtors will assume and assign to Purchaser the Assumed Contracts as set forth in the Agreement.

## D.     Disclosures Required by Local Rule 6004-1

13

38. The Purchase Agreement or the proposed Sale Order include the following provisions:

(a) The Purchase Agreement provides for a closing deadline of the earlier of August 30, 2013, or the termination of funding by the DIP Lenders under the DIP Facility (Purchase Agreement, § 4.4(e));

(b) The Purchase Agreement provides for, and the Purchaser has deposited into escrow, a good faith deposit of $4,525,000, 20% of the Purchase Price. The Purchaser will forfeit the deposit if the Debtors terminate the Purchase Agreement as a result of a breach by Purchaser of any covenant or agreement of Purchaser in the Purchase Agreement, or if any representation or warranty of Purchaser in the Purchase Agreement is untrue in any material respect, subject to certain cure rights set forth in the Purchase Agreement (Purchase Agreement, § § 3.2(a), 4.5(c).

(c) The Purchase Agreement provides for preservation of, and access by the Debtors to, books and records of the Debtors transferred to the Purchaser in connection with the sale (Purchase Agreement, § 8.6).

(d) The proposed form of Sale Order requests a finding and holding that the Purchaser will not be subject to successor liability (other than with respect to the Assumed Liabilities).

(e) The proposed Sale Procedures permit credit bidding on any assets being sold at the Auction that are not Purchased Assets, and on the Purchased Assets at such time, if any, that the Debtors and the Purchaser are no longer pursuing approval of the Purchase Agreement.

(f) The proposed form of Sale Order provides relief from the ten-day stay imposed by Bankruptcy Rule 6004(h) for the reasons set forth herein.

14

39.    In addition to the foregoing, although the Purchase Agreement does not require Purchaser to do so, Purchaser intends to make contingent offers of employment, including signing bonuses, to certain employees of the Debtors in order to induce such employees to remain with the Debtors during the pendency of these proceedings.  Both the Purchaser and the Debtors believe that without such contingent offers of employment, there is a risk that departures by such employees could substantially impact operations and result in a material diminution of the value of the Debtors.  None of such employees who will be made contingent offers of employment have been, are, or will be involved in the determination of the Debtors to enter into the Purchase Agreement, or in any determination of who the Successful Bidder will be

E.    **The Purchaser**

40.    The Buyer is Scrubs and Beyond LLC, which is a is a privately held company based in Brentwood, Missouri that started with three scrubs stores in 2000. Today the company owns and operates 27 retail scrubs stores in 14 states along with a mobile scrubs outlet that brings the retail store to larger customers and smaller markets. Scrubs & Beyond also has a catalog operation that complements its retail stores, and delivers scrubs throughout the country. The Purchaser has no connection with the Debtors, its shareholders, officers or directors.  Upon information and belief, and based on information provided to or obtained by the Debtors, the Purchaser has the financial wherewithal to fulfill its obligations under the Agreement.

F.    **Necessity For Sale**

41.    The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue.  To date, no other options exist for the Debtors.  Given current economic and market conditions, including unfavorable conditions in the retail industry, the Debtors' liquidity situation has not improved.

15

42.     The Debtors presently face the possibility of continued financial deterioration. However, the Debtors have managed to obtain necessary financing to conduct the Sale proposed herein.  Under the terms of the DIP Facility, the Debtors are required to complete the Sale process within sixty (60) days of the Petition Date.  Additionally, the Debtors may not have sufficient liquidity to operate much beyond that point.  Thus, the Debtors have decided to pursue a Sale of all or a portion of the Purchased Assets and Additional Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Sale Procedures.

43.     As indicated above, the Debtors have marketed and solicited offers for the Sale of all or any portion of the Purchased Assets and Additional Assets and have or will continue to do so.  The Debtors believe the sale of the Purchased Assets to Purchaser will maximize the value of the Purchased Assets and exposing the Additional Assets to Auction will maximize the value of the Additional Assets, if possible.

## APPLICABLE AUTHORITY

44.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462 (D. Del. 2004) (*quoting Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore.  *See In re Delaware Hudson Ry. Co.*, 124 B.R. 169 , 179 (D. Del. 1991).

16

45.     The Debtors have sound business justifications for selling the Assets at this time. Continued operations requires significant liquidity. While the Debtors currently have limited access to capital, the continuation of their business and preservation of their customer base will create value. Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of all or a portion of the Purchased Assets and Additional Assets.

A.     **Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

46.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). A debtor's sale or use of assets outside the ordinary course of business should be approved by the Bankruptcy Court if the debtor can demonstrate a sound business justification for the proposed transaction. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbott's Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

47.     The Debtors have a sound business justification for selling the Purchased Assets and Additional Assets at this time. Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all or some of their Purchased Assets and Additional Assets in

17

accordance with the procedures set forth in the Sale Procedures may be the best method to maximize recoveries to the estates. Maximization of asset value is a sound business purpose warranting authorization of any proposed Sale.

48.    The Sale of any of the Debtors' Purchased Assets and Additional Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Purchased Assets and Additional Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

49.    In addition, all creditors and parties in interest will receive adequate notice of the Sale Procedures and Sale Hearing. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Purchased Assets and Additional Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale(s) as soon as possible is in the best interests of the Debtors and their creditors and parties in interest

**B.    The Proposed Sale(s) Satisfy the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

50.    Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet

18

one of the five conditions of section 363(f). The Debtors believe that they will be able to demonstrate that at the Sale Hearing that they have satisfied one or more of these conditions.

51.    The Debtors believe that their secured lenders will consent to the sale free and clear under section 363(f)(2). Where that may not be the case, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the secured lenders' liens will attach to the proceeds of the sale and the Debtors will establish at the Sale Hearing that the secured lenders can be compelled to accept a monetary satisfaction of their claims. Additionally, the secured lenders will have the right to credit bid pursuant to section 363(k) of the Bankruptcy Code.

52.    The Debtors propose that any bona fide and allowed liens, claims, and encumbrances shall attach to the sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale. The Debtors propose to pay the "*DIP Liabilities*" (as defined in the DIP Financing Agreement) and the "**Pre-Petition Debt**" (as defined in the DIP Motion filed in these Chapter 11 Cases) in cash through the first proceeds of the Sale.

**C.    A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

53.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *In re Mark Bell Furniture Warehouse, Inc.,* 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz,* 764 F,2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.,* Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Penn.,* 788 F.2d at 147.

54.    The Purchase Agreement was negotiated at arm's-length, with both parties represented by their own counsel. Although the Debtors engaged in discussions with other parties interested in acquiring certain of their Purchased Assets, the Debtors submit that

19

Purchaser's proposal as contained in the Purchase Agreement represents the highest and best offer for the Purchased Assets. The Debtors also submit that any additional agreements at Auction will only be executed if the Debtors' believe, in an exercise of their business judgment, that such proposal represents the competing bidder's highest and best offer of the Purchased Assets and upon this Court's approval. Additionally, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all or any portion of the Purchased Assets or Additional Assets has negotiated at arm's-length, with all parties represented by their own counsel.

55.    Accordingly, the Sale Order will include a provision that the Purchaser or a third party Successful Bidder for the Purchased Assets or Additional Assets (as applicable), is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**D.    The Assumption and Assignment of Executory Contracts and Unexpired Leases**

56.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del 2003). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F. 2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only

20

that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

57.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Center, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Doge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets) .

58.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract...only if the trustee assumes such contract...and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute

21

assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

59.    Purchaser is large company with sufficient assets to close this Sale.  Upon closing, Purchaser will have financial resources that are more than sufficient to perform under the Assumed Contracts.  Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of Purchaser or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them.  The Sale Hearing therefore will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts.

60.    Furthermore, to the extent that any defaults exist under any Assumed Contract, the Debtors will cure any such default prior to such assumption and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder(s), its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

**E.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

61.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property...is stayed until the expiration of 14 days after entry of the order, *unless the court orders otherwise*." (emphasis added).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease...is

22

stayed until the expiration of 14 days after the entry of the order, *unless the court orders otherwise.*" (emphasis added). The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NO PRIOR REQUEST

62.    No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

63.    Notice of this Motion has been provided to the following parties: (a) the Office of the United States Trustee; (b) counsel to the DIP Lenders; (c) counsel to Capitalsource; (d) counsel to the Second Lien Lender; (e) the Debtors' 30 largest unsecured creditors; (f) all known parties asserting a lien or security interest in the Purchased Assets and Additional ; (g) all parties to the Assumed Contracts; (h) all parties requesting notice under Bankruptcy Rule 2002; (i) the Internal Revenue Service; and (f) the United States Attorney.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Sale Motion and grant the Debtors such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated: May 30, 2013<br>Wilmington, Delaware | */s/ Domenic E. Pacitti* |

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

Facsimile:    (212) 446-4900

*Proposed Counsel to the Debtors
and Debtors in Possession*

23