## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| LIFE UNIFORM HOLDING CORP.,[1] | Case No. 13-11391 (   ) |
| Debtors. | Joint Administration Requested |

### DEBTORS' MOTION FOR ORDER (A) AUTHORIZING AND APPROVING AGREEMENT; (B) APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE; (D) AUTHORIZING THE DEBTORS TO CONSUMMATE TRANSACTIONS RELATED TO THE ABOVE; AND (E) GRANTING OTHER RELIEF

Life Uniform Holding Corp. ("***Holdings***"), Healthcare Uniform Company, Inc. ("***Life Uniform***") and Uniform City National, Inc. ("***Uniform City***"), the debtors and debtors-in-possession herein (collectively, the "***Debtors***"), hereby submit this motion (the "***Sale Motion***") pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*., as amended (the "***Bankruptcy Code***"), and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (each a "***Bankruptcy Rule***" and collectively, the "***Bankruptcy Rules***"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), for an order substantially in the form attached hereto as **Exhibit A** (the "***Sale Order***") (a) authorizing and approving the Purchase Agreement (defined herein); (b) approving the sale (the "***Sale***") of certain of their assets (the "***Purchased Assets***" as defined in paragraph 30 below) and (the

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each Debtor, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

"**Additional Assets**" as defined in paragraph 31 below), as a whole to one bidder or in parts to more than one bidder, pursuant to section 363 of the Bankruptcy Code; (c) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code; (d) authorizing the Debtors to consummate transactions related to the above; and (e) granting other relief.  In support hereof, the Debtors respectfully represent as follows:

## INTRODUCTION

1.      The Debtors, in consultation with their debtor-in-possession lender ("**DIP Lenders**"), and their pre-petition secured lenders and in the exercise of their considered business judgment, have determined that the best way to maximize value for the benefit of their estates and creditors is to attempt an expeditious sale of their assets through one or more transactions.

2.      In this regard, on May 29, 2013 Debtors executed an Asset Purchase Agreement (the "**Purchase Agreement**") with Scrubs & Beyond, LLC (the "**Purchaser**") providing for the sale of the Purchased Assets to the Purchaser and the Debtors' assumption and assignment to the Purchaser of certain executory contracts and unexpired leases.  A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit B**.  The Debtors also seek to expose the Purchase Assets and the Additional Assets for competitive bidding through an Auction pursuant to Sale Procedures that are subject of a separate motion filed contemporaneously herewith.

## BACKGROUND

**A.      The Chapter 11 Filings**

3.      On May 29, 2013 (the "**Petition Date**"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2

4.      No official committee of general unsecured creditors  (the "*Committee*") has been appointed in these cases by the Office of the United States Trustee to date.

5.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) (M), (N) and (O).  Venue of the Debtors' chapter 11 cases and this Sale Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 6004 and 6006 and Local Rules 2002-1, 6004-1 and 9006-1.

**B.      Overview of the Debtors' Corporate Structure and Business**

*1.      Company Background*

6.      Life Uniform was founded in 1965 when Angelica Corporation ("*Angelica*") decided to enter the retail uniform industry, with the goal of developing a 50-store chain.  At the time, Angelica was principally engaged in the manufacture of uniforms, including healthcare uniforms, and the movement of hospitals away from directly providing uniforms to employees prompted Angelica to form Life Uniform.  The first Life Uniform store was opened in 1965 in Clayton, Missouri, followed shortly by stores in Atlanta, Louisville and Memphis.  The chain grew quickly and by the end of 1969 Life Uniform operated 34 stores with a focus on urban locations, major commercial centers or near hospitals.  The 100th Life Uniform store was opened in 1973 and by 1977 Life Uniform had grown to over 150 stores.  Today, the Company's expansive national footprint makes it the nation's largest independently owned medical professional supplier.   The Debtors offer a leading selection of popular third party and proprietary brands of scrubs, shoes, jackets, lab coats, stethoscopes and other medical accessories, the Debtors are the largest customer for many of its vendors in a unique and highly fragmented industry.

3

7.     A major driver of growth for the company throughout its existence has been acquisitions.  The vast majority of the stores operated today by Life Uniform were acquired as opposed to new stores opened by the company.   Notable acquisitions included: the 1969 acquisition the Bruck's chain from American Hospital Supply (14 stores); the mid-1980s acquisitions of Robin's in southern Florida (10 stores) and National Uniform Shops (76 stores); the 1994 acquisition of Z & H Uniforms, Inc. (21 stores); and the 2006 acquisition of Uniform City (9 stores).

8.     Over time, Life Uniform's store portfolio had become somewhat eclectic because of the numerous acquisitions (many of which had different store types).  In fiscal 2000 (fiscal year ending in January 2000) Life Uniform decided to rationalize its store portfolio by relocating and closing selected stores as their leases expired.  The company closed a total of 48 stores during the following three fiscal years.

9.     During FYE January 2001, Life Uniform initiated a catalog distribution and an e-commerce platform, making it the only national medical supplier to offer its customers shopping via four retail channels at that time.  The company also developed a growth strategy focused more on opening new stores as opposed to acquiring existing stores.  Subsequently, Angelica opted to refocus efforts on its core line of business, medical linen service, and as a result sought to divest non-core businesses.

10.     In July 2004, Life Uniform was acquired by Sun Uniforms LLC.  Sun Uniforms LLC continues to own substantially all of the stock of Holdings, the parent of the other Debtors, Life Uniform and Uniform City.  At the time of acquisition, the company operated 196 locations. As part of the acquisition, the company retained the President to continue serving in his capacity and hired a new CFO to assist in implementing a new growth strategy, selectively targeting

4

strategic acquisitions of already existing medical supply businesses.  During this time, the company focused its efforts on expanding store operations outside of mall-based locations, and into hospitals and other locations in proximity to larger concentrations of healthcare professionals that would better support a growing outside/direct sales trend.

11.    In 2006, Life Uniform acquired the nine-store chain, Uniform City, which was then one of the company's biggest competitors.  As part of the Uniform City acquisition, in addition to the retail locations, the company acquired an existing catalog and direct fulfillment business that had a broad national circulation base and further expanded the company's national retail footprint into the mid-Atlantic and south-eastern regions of the United States.  Uniform City remained a completely separate entity with a distinct catalog, aimed at a lower priced market.

12.    Subsequent to the Uniform City acquisition, in 2008, the company replaced the management with the current management team with the intent of focusing on operational issues, the current economic environment, and the changing customer presence.

13.    The Debtors' average store will stock approximately 2,900 stock keeping units ("*SKUs*") including up to 15 colors in nine sizes (ranging from XS to 5XL) and in petite, regular, and tall for both men and women across basic and fashion products.  The Debtors e-commerce site stocks more than 6,500 total SKU's (including some discontinued in stores).  New prints are added monthly and generally new products and styles are introduced four to five times a year.

14.    Historically, Life Uniform sold primarily nationally recognized brands such as Cherokee, Barco, Landau, Peaches and Nursemates shoes.  In 2001, Life Uniform began a private label program and has subsequently introduced several proprietary brands, including "Life®", "Life Essentials", "Fresh Scrubs", "Scrub Wear", "Sierra Scrubs", "Comfy Cotton",

PHIL1 2784352v.6

"Scrub Elements" and "Laura Ashley®."  In FYE January 2013, approximately 25 percent of all scrubs sold by Life Uniform were proprietary or private label brands.

**2.      *Healthcare Apparel  Industry***

15.      The standard apparel for healthcare professionals is commonly referred to as scrubs.  Scrubs are typically sold as two separate pieces of apparel consisting of "tops" and "bottoms" and are separated into two categories, "basic" and "fashion."

16.      The industry of supplying uniforms and accessories is highly fragmented, with no competitor representing more than ten percent of the market, and those with meaningful scale (i.e. more than one percent of the market) representing less than 30 percent of the overall industry.  The Debtors, at nearly ten percent of the market, are approximately three times the size of the next largest independent supplier, serving as the largest customer for many of its vendors.

17.      Unlike physician worn scrubs that are typically provided by the hospital and discarded or washed after a procedure, non-physician healthcare providers (nurses, orderlies, medical office personnel, dentists, etc.) own and wear their scrubs as a uniform daily.  Depending on the healthcare professional's employer and job function, purchases of scrubs can be either the sole responsibility of the employee or employer, or a shared responsibility.  Determination of the scrub color, pattern, style, fit, and personalization can also range from employer mandated to the employee's discretion, but usually lies in between.  These unique demands associated with the consistently evolving uniform specifications of the healthcare industry require that suppliers such as the Debtors focus on a multi-channel delivery system.

18.      Over time, the industry has evolved with more healthcare providers mandating uniforms for their professionals.  Outside and inbound sales have emerged as a larger compliment to traditional walk-in retail.  The Debtors' extensive national footprint has been

6

highly strategic in providing the Debtors with scale and national reach to compete effectively in the direct and inbound channels.  These locations serve as retailer, service center and warehouse – providing stock for on-site and outbound sales as well as providing a knowledgeable environment for sizing and fittings.

*3.*      ***Sales Channels***

19.      The Company supplies products through three supply channels direct, inbound, and retail.  For FYE January 2013, approximately 36 percent of the Debtors' sales are derived from direct, 14 percent from inbound, and 50 percent are from retail.

**C.      The Debtors' Capital Structure**

20.      The voting common stock of Holdings is held by Sun Uniforms, LLC.  Holdings holds 100% of the stock of Life Uniform, which in turn owns 100% of stock of Uniform City.

21.      Life Uniform and Uniform City are the Borrowers and Holdings is the Guarantor under a credit facility with Capitalsource Finance LLC ("***Capitalsource***") dated October 3, 2006 (as amended pursuant to certain letter agreements dated July 29, 2009, August 7, 2009, and August 28, 2009 and pursuant to the Waiver and First Amendment dated September 30, 2009 and pursuant to the Consent and Second Amendment dated August 19, 2011) (the "***Prepetition Credit Agreement***").  The Prepetition Credit Agreement consists of a $12.5 million revolver (the "***Prepetition Revolver***") and a $26 million term loan (the "***Prepetition Term Loan,***" together with the Prepetition Revolver, the "***Prepetition First Lien Debt***").  Capitalsource is both the agent and the lender under the Prepetition Credit Agreement.  The Prepetition First Lien Debt is secured by a lien on substantially all of the Debtors' real and personal property.  The Debtors have fully utilized all of their availability under the Prepetition First Lien Debt.

22.      The Borrowers issued to Sun Uniforms Finance, LLC ("***Second Lien Lender***") a Senior Subordinated Secured Promissory Note ("***Second Secured Promissory Note***") dated

7

September 30, 2009 in the original principal amount of $6,108,000 as well as a general guaranty by Holdings. Second Lien Lender was granted a second lien on the collateral held by Capitalsource as a part of this transaction. The use of proceeds from the Second Secured Promissory Note were to provide liquidity to the Debtors via partial revolver paydown, further reduce the total outstanding debt of the Debtors via partial term loan paydown, and fees and expenses to effectuate the transaction. Prior to the completion of the loan from the Second Lien Lender, the Debtors were in default of their financial covenants under the Prepetition Credit Agreement and the maturity date under such agreement was approaching. With the additional liquidity and reduction in leverage, Capitalsource extended the Prepetition First Lien Debt for an additional 18 months. The Second Lien Lender also holds two additional notes, each in the original principal amount of $1,088,303.56, which were purchased from Jeffrey N. Linn and Craig Linn on August 19, 2011.

23.     Angelica Corporation holds an unsecured Junior Subordinated Note issued by Life Uniform, originally dated July 7, 2004 in the original principal amount of $4,074,328 and reissued and dated July 27, 2005 in the reissued principal amount of $4,018,680, and further reissued and dated September 30, 2009 in the reissued principal amount of $5,482,453.95, and further reissued and dated August 19, 2011 in the reissued principal amount of $6,304,556.77 (the "*Junior Subordinated Note*").

**D.     Events Leading to the Bankruptcy Filing**

24.     Leading up to the acquisition by Sun Uniform, LLC, the Debtors had sagging profitability and overhead issues. The Debtors, under new ownership, quickly drove increases in profitability through a combination of store rationalization and sensible corporate overhead initiatives. The Debtors also looked to expand its operations and footprint through acquisition,

8

and in 2006, the Debtors acquired Uniform City, a nine location competitor with larger footprint locations, servicing a different demographic than that of Life's traditional customers.

25.     Despite the numerous initiatives enacted by the Debtors, the Debtors' recent performance has been relatively flat in terms of revenue and EBITDA.  This has been in large part due to the Debtors' stressed liquidity profile.  The liquidity issues prevented the Debtors from furthering certain necessary goals including the completion of a needed e-commerce system upgrade; payment of key vendors on or near terms to encourage better pricing; continuing a highly accretive acquisition strategy; payment of earned bonuses; and maintaining sufficient working capital to fully support organic sales channel growth.  The failure to complete the necessary goals as a result of the Debtors lack of liquidity further stressed the Debtors' liquidity and performance, leading to further deterioration and a downward liquidity spiral.

26.     Recognizing this trend and need for an influx of capital to grow the Debtors' business and profitability, the Debtors determined that the best method to maximize the value of the enterprise was to pursue a sale of the Company.  Accordingly, the Debtors retained Morgan Joseph TriArtisan LLC ("***Morgan Joseph***") to explore a sale of the Debtors as a going concern.

27.     As of the Petition Date, the Debtors lack the funds necessary to meet projected short-term cash needs due to a lack of availability under the Prepetition Credit Agreement and lower than expected cash flow from operations.

28.     Capitalsource agreed to continue to fund the Debtors on a daily basis while the Debtors attempted to find a potential buyer and/or investor in conjunction with either an out of court restructuring or through a bankruptcy proceeding.  The Debtors' continuing liquidity problems forced the Debtors to file for chapter 11 protection.

9

## RELIEF REQUESTED

29.     By this Sale Motion, the Debtors respectfully request, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1 and 9006-1, entry of the Sale Order: (a) authorizing and approving Purchase Agreement; (b) approving the Sale of the Purchased Assets as a whole to Purchaser or another higher and better bidder or bidders pursuant to section 363 of the Bankruptcy Code; (c) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code; (d) approving the Sale of the Additional Assets to a successful bidder or bidders at the Auction pursuant to section 363 of the Bankruptcy Code; (e) authorizing the Debtors to consummate transactions related to the above; and (f) granting other relief.

## PROPOSED SALE OF THE ASSETS

### A.     Description of the Purchased Assets and Additional Assets

30.     The Assets to be sold to Purchaser (the "***Purchased Assets***")[2] and subject to higher and better bids at Auction include, *inter alia*,

(a)     all Accounts Receivable and other rights to payment (excluding Credit Card Receivables) arising from the conduct of the Business;

(b)     all security and other deposits related to Assumed Contracts;

(c)     all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases that are Assumed Contracts, including merchandise, supplies, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials and consumables relating to or available for sale or use in connection with the Business;

---

[2]     Defined terms used in the paragraph 30 shall have the meaning ascribed to such terms under the Purchase Agreement. In the event of any inconsistency between the description of the Purchased Assets set forth herein and the description of such assets set forth in the Purchase Agreement, the Purchase Agreement shall control.

(d)      all right, title and interest of Sellers under each Real Property Lease on Schedule 1.1(a) of the Purchase Agreement, each of which shall be an Assumed Contract, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof; provided that Purchaser may add or remove Real Property Leases listed on Schedule 1.1(a) as set forth in Section 2.5 of the Purchase Agreement;

(e)      all right, title and interest of Sellers under each other Contract on Schedule 1.1(b) of the Purchase Agreement, each of which shall be an Assumed Contract; provided that Purchaser may add or remove other Contracts listed on Schedule 1.1(b) as set forth in Section 2.5;

(f)      all right, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is an Assumed Contract;

(g)      the Purchased Intellectual Property;

(h)      all of the rights and benefits accruing from and after the Closing under any of the Assumed Contracts, including each Real Property Lease, personal property lease and Intellectual Property License that is an Assumed Contract;

(i)      all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, vendor files, financial and other records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (f) above, but excluding (i) personnel files for Employees who are not hired by Purchaser, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents that Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) Documents relating to an Excluded Asset or Excluded Liability;

(j)      all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(k)      all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(l)      any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(m)      all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

11

(n)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(o)    all prepaid expenses of Sellers;

(p)    all other assets, properties, rights and claims of Sellers of any kind or nature that relate to the Business, that are used or useful in or held for use in the Business, or that relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in Section 2.1 to the Purchase Agreement, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with the Real Property Leases that are Assumed Contracts; and

(q)    all inventory of any kind and nature, including raw materials, supplies, work-in-process, packaging materials and other materials in the inventory of the Business ("***Inventory***").

31.    The Assets in addition to the Purchased Assets to be sold at Auction (the "***Additional Assets***")[3] include, *inter alia*,

(a)    all tangible personal property (other than Inventory) owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases THAT ARE NOT Assumed Contracts under the Purchase Agreement with Buyer, including equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, and spare parts relating to or available for use in connection with the Business;

(b)    all right, title and interest of Sellers under each Real Property Lease THAT IS NOT on Schedule 1.1(a) of the Purchase Agreement, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof.

## B.    The Debtors' Solicitation and Marketing Efforts

32.    On February __ 2013, the Debtors retained Morgan Joseph as their Investment banker to assist the Debtors in exploring certain strategic alternatives in order to maximize their value, including the potential sale of the Debtors' assets.

33.    Morgan Joseph prepared due diligence materials intended for distribution to prospective buyers of the Debtors' assets.  Morgan Joseph worked with the Debtors to develop a

---

[3]    Defined terms used in paragraph 31 shall have the meaning ascribed to such terms under the Purchase Agreement.

list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

34.     Morgan Joseph then contacted approximately __ potential strategic buyers and __ financial buyers, out of which __ executed confidentiality agreements and requested additional information, __ visited the Debtors' headquarters and met with management and conducted due diligence.

35.     The Debtors received various offers for substantially all of their assets, either in whole or in parts.  After consultation with the Capitalsource, and in the exercise of their considered business judgment, the Debtors selected the Purchaser pursuant to the Purchase Agreement as the higher and best purchaser of the Purchased Assets, subject to higher and better offers pursuant to the Sale Procedures.

## C.     The Purchase Agreement

36.     The Debtors propose to sell the Purchased Assets (a) to the Purchaser pursuant to the Purchase Agreement or (b) in whole or part, to the highest and best successful bidder(s) ("***Successful Bidder(s)***") at the Auction, as determined by the Debtors in accordance with the terms of the Sale Procedures Order and the Sale Procedures and in consultation with the debtor-in-possession lenders ("***DIP Lenders***") and Capitalsource and as ultimately approved by the Bankruptcy Court.

37.     As set forth in greater detail in the Purchase Agreement, the Debtors' estates will receive approximately $__ million together with adjustments set forth in the Purchase Agreement (being the cash consideration payable by the Purchaser under the Purchase Agreement) for the Assets (the "***Purchase Price***").  Additionally, the Debtors will assume and assign to Purchaser the Assumed Contracts as set forth in the Agreement.

## D.     Disclosures Required by Local Rule 6004-1

38.     The Purchase Agreement or the proposed Sale Order include the following provisions:

(a)     The Purchase Agreement provides for a closing deadline of the earlier of August 30, 2013, or the termination of funding by the DIP Lenders under the DIP Facility (Purchase Agreement, § 4.4(e));

(b)     The Purchase Agreement provides for, and the Purchaser has deposited into escrow, a good faith deposit of $4,525,000, 20% of the Purchase Price.  The Purchaser will forfeit the deposit if the Debtors terminate the Purchase Agreement as a result of a breach by Purchaser of any covenant or agreement of Purchaser in the Purchase Agreement, or if any representation or warranty of Purchaser in the Purchase Agreement is untrue in any material respect, subject to certain cure rights set forth in the Purchase Agreement (Purchase Agreement, § § 3.2(a), 4.5(c).

(c)     The Purchase Agreement provides for preservation of, and access by the Debtors to, books and records of the Debtors transferred to the Purchaser in connection with the sale (Purchase Agreement, § 8.6).

(d)     The proposed form of Sale Order requests a finding and holding that the Purchaser will not be subject to successor liability (other than with respect to the Assumed Liabilities).

(e)     The proposed Sale Procedures permit credit bidding on any assets being sold at the Auction that are not Purchased Assets, and on the Purchased Assets at such time, if any, that the Debtors and the Purchaser are no longer pursuing approval of the Purchase Agreement.

(f)     The proposed form of Sale Order provides relief from the ten-day stay imposed by Bankruptcy Rule 6004(h) for the reasons set forth herein.

14

39.     In addition to the foregoing, although the Purchase Agreement does not require Purchaser to do so, Purchaser intends to make contingent offers of employment, including signing bonuses, to certain employees of the Debtors in order to induce such employees to remain with the Debtors during the pendency of these proceedings.  Both the Purchaser and the Debtors believe that without such contingent offers of employment, there is a risk that departures by such employees could substantially impact operations and result in a material diminution of the value of the Debtors.  None of such employees who will be made contingent offers of employment have been, are, or will be involved in the determination of the Debtors to enter into the Purchase Agreement, or in any determination of who the Successful Bidder will be

**E.     The Purchaser**

40.     The Buyer is Scrubs and Beyond LLC, which is a is a privately held company based in Brentwood, Missouri that started with three scrubs stores in 2000. Today the company owns and operates 27 retail scrubs stores in 14 states along with a mobile scrubs outlet that brings the retail store to larger customers and smaller markets. Scrubs & Beyond also has a catalog operation that complements its retail stores, and delivers scrubs throughout the country. The Purchaser has no connection with the Debtors, its shareholders, officers or directors.  Upon information and belief, and based on information provided to or obtained by the Debtors, the Purchaser has the financial wherewithal to fulfill its obligations under the Agreement.

**F.     Necessity For Sale**

41.     The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue.  To date, no other options exist for the Debtors.  Given current economic and market conditions, including unfavorable conditions in the retail industry, the Debtors' liquidity situation has not improved.

42.     The Debtors presently face the possibility of continued financial deterioration. However, the Debtors have managed to obtain necessary financing to conduct the Sale proposed herein.   Under the terms of the DIP Facility, the Debtors are required to complete the Sale process within sixty (60) days of the Petition Date.   Additionally, the Debtors may not have sufficient liquidity to operate much beyond that point.   Thus, the Debtors have decided to pursue a Sale of all or a portion of the Purchased Assets and Additional Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Sale Procedures.

43.     As indicated above, the Debtors have marketed and solicited offers for the Sale of all or any portion of the Purchased Assets and Additional Assets and have or will continue to do so.   The Debtors believe the sale of the Purchased Assets to Purchaser will maximize the value of the Purchased Assets and exposing the Additional Assets to Auction will maximize the value of the Additional Assets, if possible.

## APPLICABLE AUTHORITY

44.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462 (D. Del. 2004) (*quoting Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008).   Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore.   *See In re Delaware Hudson Ry. Co.*, 124 B.R. 169 , 179 (D. Del. 1991).

45.    The Debtors have sound business justifications for selling the Assets at this time. Continued operations requires significant liquidity.  While the Debtors currently have limited access to capital, the continuation of their business and preservation of their customer base will create value.  Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of all or a portion of the Purchased Assets and Additional Assets.

A.    **Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

46.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).  A debtor's sale or use of assets outside the ordinary course of business should be approved by the Bankruptcy Court if the debtor can demonstrate a sound business justification for the proposed transaction.  *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbott's Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

47.    The Debtors have a sound business justification for selling the Purchased Assets and Additional Assets at this time.  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all or some of their Purchased Assets and Additional Assets in

17

accordance with the procedures set forth in the Sale Procedures may be the best method to maximize recoveries to the estates.   Maximization of asset value is a sound business purpose warranting authorization of any proposed Sale.

48.      The Sale of any of the Debtors' Purchased Assets and Additional Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Purchased Assets and Additional Assets.   Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

49.      In addition, all creditors and parties in interest will receive adequate notice of the Sale Procedures and Sale Hearing.   Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Purchased Assets and Additional Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale(s) as soon as possible is in the best interests of the Debtors and their creditors and parties in interest

**B.**      **The Proposed Sale(s) Satisfy the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

50.      Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).   As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet

one of the five conditions of section 363(f). The Debtors believe that they will be able to demonstrate that at the Sale Hearing that they have satisfied one or more of these conditions.

51.    The Debtors believe that their secured lenders will consent to the sale free and clear under section 363(f)(2). Where that may not be the case, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the secured lenders' liens will attach to the proceeds of the sale and the Debtors will establish at the Sale Hearing that the secured lenders can be compelled to accept a monetary satisfaction of their claims. Additionally, the secured lenders will have the right to credit bid pursuant to section 363(k) of the Bankruptcy Code.

52.    The Debtors propose that any bona fide and allowed liens, claims, and encumbrances shall attach to the sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale. The Debtors propose to pay the "*DIP Liabilities*" (as defined in the DIP Financing Agreement) and the "**Pre-Petition Debt**" (as defined in the DIP Motion filed in these Chapter 11 Cases) in cash through the first proceeds of the Sale.

**C.    A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

53.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *In re Mark Bell Furniture Warehouse, Inc.,* 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F,2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Penn.,* 788 F.2d at 147.

54.    The Purchase Agreement was negotiated at arm's-length, with both parties represented by their own counsel. Although the Debtors engaged in discussions with other parties interested in acquiring certain of their Purchased Assets, the Debtors submit that

19

Purchaser's proposal as contained in the Purchase Agreement represents the highest and best offer for the Purchased Assets.  The Debtors also submit that any additional agreements at Auction will only be executed if the Debtors' believe, in an exercise of their business judgment, that such proposal represents the competing bidder's highest and best offer of the Purchased Assets and upon this Court's approval.  Additionally, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all or any portion of the Purchased Assets or Additional Assets has negotiated at arm's-length, with all parties represented by their own counsel.

55.    Accordingly, the Sale Order will include a provision that the Purchaser or a third party Successful Bidder for the Purchased Assets or Additional Assets (as applicable), is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**D.    The Assumption and Assignment of Executory Contracts and Unexpired Leases**

56.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del 2003).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F. 2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only

that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

57.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Center, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Doge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets) .

58.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute

assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

59.    Purchaser is large company with sufficient assets to close this Sale.  Upon closing, Purchaser will have financial resources that are more than sufficient to perform under the Assumed Contracts.  Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of Purchaser or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them.  The Sale Hearing therefore will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts.

60.    Furthermore, to the extent that any defaults exist under any Assumed Contract, the Debtors will cure any such default prior to such assumption and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder(s), its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

**E.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

61.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of 14 days after entry of the order, *unless the court orders otherwise.*" (emphasis added).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease…is

stayed until the expiration of 14 days after the entry of the order, *unless the court orders otherwise.*" (emphasis added). The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NO PRIOR REQUEST

62.     No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

63.     Notice of this Motion has been provided to the following parties: (a) the Office of the United States Trustee; (b) counsel to the DIP Lenders; (c) counsel to Capitalsource; (d) counsel to the Second Lien Lender; (e) the Debtors' 30 largest unsecured creditors; (f) all known parties asserting a lien or security interest in the Purchased Assets and Additional ; (g) all parties to the Assumed Contracts; (h) all parties requesting notice under Bankruptcy Rule 2002; (i) the Internal Revenue Service; and (f) the United States Attorney.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Sale Motion and grant the Debtors such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated:  May 30, 2013 | */s/ Domenic E. Pacitti* |
| Wilmington, Delaware | Domenic E. Pacitti (DE Bar No. 3989) |
| | Michael W. Yurkewicz (DE Bar No. 4165) |
| | **KLEHR HARRISON HARVEY** |
| | **BRANZBURG LLP** |
| | 919 N. Market Street, Suite 1000 |
| | Wilmington, Delaware 19801 |
| | Telephone:     (302) 426-1189 |
| | Facsimile:      (302) 426-9193 |
| | |
| | Facsimile:      (212) 446-4900 |
| | |
| | *Proposed Counsel to the Debtors* |
| | *and Debtors in Possession* |

PHIL1 2784352v.6

**EXHIBIT A**

**<u>SALE ORDER</u>**

**EXHIBIT B**

**PURCHASE AGREEMENT**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

HEALTHCARE UNIFORM COMPANY, INC.
and
UNIFORM CITY NATIONAL, INC.

as "Sellers"

and

SCRUBS & BEYOND, LLC,

as "Purchaser"

Dated as of May 29, 2013

# TABLE OF CONTENTS

PAGE

## ARTICLE 1

## DEFINITIONS

| | | |
|---|---|---|
| 1.1. | Definitions | 1 |
| 1.2. | Other Definitional and Interpretative Provisions | 2 |

## ARTICLE 2

## PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1. | Purchase and Sale of Assets | 2 |
| 2.2. | Excluded Assets | 4 |
| 2.3. | Assumption of Liabilities | 6 |
| 2.4. | Excluded Liabilities | 6 |
| 2.5. | Assumed Contracts | 6 |
| 2.6. | Further Conveyances and Assumptions | 7 |
| 2.7. | Payments to Sellers | 8 |
| 2.8. | Title to Purchased Assets Free and Clear of Liens; No Successor Liability | 8 |
| 2.9. | Risk of Loss | 8 |
| 2.10. | Purchased Assets Sold "As Is, Where Is" | 9 |

## ARTICLE 3

## PURCHASE PRICE

| | | |
|---|---|---|
| 3.1. | Purchase Price | 10 |
| 3.2. | Deposit | 10 |
| 3.3. | Payment of Cash Purchase Price | 10 |
| 3.4. | Allocation of Purchase Price | 11 |
| 3.5. | Purchase Price Adjustment | 11 |

## ARTICLE 4

## CLOSING AND TERMINATION

| | | |
|---|---|---|
| 4.1. | Closing Date | 14 |
| 4.2. | Deliveries by Sellers | 14 |
| 4.3. | Deliveries by Purchaser | 15 |
| 4.4. | Termination of Agreement | 16 |
| 4.5. | Effect of Termination | 17 |

DMEAST #16827137

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 5.1. | Organization and Good Standing | 17 |
| 5.2. | Title to Assets | 18 |
| 5.3. | Authorization of Agreement | 18 |
| 5.4. | Real Property | 18 |
| 5.5. | Tangible Personal Property; Capital Leases | 18 |
| 5.6. | Intellectual Property | 19 |
| 5.7. | Material Contracts | 20 |
| 5.8. | Employee Benefits | 20 |
| 5.9. | Labor | 21 |
| 5.10. | Litigation | 21 |
| 5.11. | Financial Advisors | 21 |
| 5.12. | Environmental Laws | 22 |
| 5.13. | [Intentionally deleted] | 22 |
| 5.14. | Investments and Third Party Rights | 22 |
| 5.15. | Recent Activities | 22 |
| 5.16. | Insurance | 22 |
| 5.17. | Permits and Licenses | 22 |
| 5.18. | Employees and Employee Relations | 22 |
| 5.19. | Payments | 23 |
| 5.20. | Compliance with Applicable Law | 23 |
| 5.21. | [Intentionally deleted] | 23 |
| 5.22. | [Intentionally deleted] | 23 |
| 5.23. | No Other Representations or Warranties; Schedules | 23 |

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

| | | |
|---|---|---|
| 6.1. | Organization and Good Standing | 23 |
| 6.2. | Authorization of Agreement | 24 |
| 6.3. | No Violation; Consents | 24 |
| 6.4. | Financial Advisors | 24 |
| 6.5. | Adequate Assurance | 24 |
| 6.6. | Consents and Approvals | 24 |
| 6.7. | Purchaser not a Plan | 25 |
| 6.8. | Financing | 25 |

# ARTICLE 7

## BANKRUPTCY COURT MATTERS

| | | |
|---|---|---|
| 7.1. | Commencement of Bankruptcy Cases | 25 |
| 7.2. | Bankruptcy Court Approval of Bid Procedures | 25 |
| 7.3. | Bankruptcy Court Approval of Sale | 25 |
| 7.4. | Form of Transaction Pleadings; Copies of Filings | 25 |

## ARTICLE 8

### COVENANTS

**8.1.** Access to Information ............................................................................................ 25
**8.2.** Conduct of the Business Pending the Closing ...................................................... 26
**8.3.** Consents ................................................................................................................ 27
**8.4.** Appropriate Action; Filings ................................................................................. 27
**8.5.** Confidentiality ..................................................................................................... 27
**8.6.** Preservation of Records; Cooperation .................................................................. 28
**8.7.** Supplements to Schedules .................................................................................... 28
**8.8.** Gift Cards ............................................................................................................. 29
**8.9.** Name Change ........................................................................................................ 29

## ARTICLE 9

### EMPLOYMENT MATTERS; TAX MATTERS; OTHER AGREEMENTS

**9.1.** Employment Matters .............................................................................................. 29
**9.2.** Service Credits ...................................................................................................... 30
**9.3.** No Third Party Beneficiaries ................................................................................ 30
**9.4.** Tax Matters ........................................................................................................... 30
**9.5.** Obligation of Purchaser to Indemnify ................................................................. 32

## ARTICLE 10

### CONDITIONS TO CLOSING

**10.1.** Conditions Precedent to Obligations of Purchaser ............................................... 32
**10.2.** Conditions Precedent to Obligations of Sellers ................................................... 33
**10.3.** Conditions Precedent to Obligations of Purchaser and Sellers ............................ 33
**10.4.** Frustration of Closing Conditions ........................................................................ 34

## ARTICLE 11

### LIMITATIONS

**11.1.** Purchaser's Review ............................................................................................... 34
**11.2.** No Consequential or Punitive Damages ................................................................ 34

## ARTICLE 12

### MISCELLANEOUS

**12.1.** Survival of Representations, Warranties, Covenants and Agreements ................... 35
**12.2.** Remedies ............................................................................................................... 35
**12.3.** Expenses ............................................................................................................... 35
**12.4.** Non-Recourse ....................................................................................................... 35
**12.5.** Submission to Jurisdiction .................................................................................... 35
**12.6.** Waiver of Jury Trial ............................................................................................. 36
**12.7.** Time of Essence .................................................................................................... 36
**12.8.** Entire Agreement; Amendments and Waivers ...................................................... 36

DMEAST #16827137

| | | |
|---|---|---|
| **12.9.** | Governing Law | 37 |
| **12.10.** | Notices | 37 |
| **12.11.** | Severability | 39 |
| **12.12.** | No Right of Set-Off | 40 |
| **12.13.** | Binding Effect; Assignment | 40 |
| **12.14.** | Moral and Attribution Rights | 40 |
| **12.15.** | Headings | 40 |
| **12.16.** | Counterparts | 40 |

DMEAST #16827137

**Exhibits**

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Procedures Order |
| Exhibit C | Bid Procedures |
| Exhibit D | Escrow Agreement |
| Exhibit E | Assignment and Assumption Agreement |
| Exhibit F | Recordable Trademark Assignment |
| Exhibit G | Recordable Copyright Assignment |
| Exhibit H | Domain Name Assignment |
| Exhibit I | Assignment and Assumption of Leases and Related Agreements |
| Exhibit J | Bill of Sale |
| Exhibit K | Sale Order |

**Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Real Property Leases to be Assumed |
| Schedule 1.1(b) | Other Contracts to be Assumed |
| Schedule 2.2(m) | Excluded Assets |
| Schedule 2.5(c) | May and June Store Closings |
| Schedule 3.4 | Principles of Allocation of Purchase Price |
| Schedule 5.1 | Good Standings |
| Schedule 5.4 | Real Property Leases |
| Schedule 5.5(a) | Personal Property Leases |
| Schedule 5.5(b) | Capital Leases |
| Schedule 5.6(a) | Intellectual Property Registrations |
| Schedule 5.6(b) | Intellectual Property Licenses |
| Schedule 5.6(c) | Intellectual Property Exceptions |
| Schedule 5.7(a) | Material Contracts |
| Schedule 5.8(a) | Employee Benefit Plans |
| Schedule 5.9(b) | Work Stoppages |
| Schedule 5.10(a) | Litigation |
| Schedule 5.10(b) | Insurance Claims |
| Schedule 5.11 | Sellers' Financial Advisors |
| Schedule 5.12 | Environmental |
| Schedule 5.14 | Investments |
| Schedule 5.15 | Recent Activities |
| Schedule 5.16 | Insurance |
| Schedule 5.17 | Permits and Licenses |
| Schedule 5.19 | Payments |
| Schedule 5.20 | Compliance with Applicable Law |
| Schedule 6.4 | Purchaser's Financial Advisors |
| Schedule 8.2(a) | Required Conduct of Business Pending Closing |
| Schedule 8.2(b) | Prohibited Conduct of Business Pending Closing |
| Schedule 10.1(d) | Required Consents |
| Schedule 10.1(n) | Tier 1 Stores and Tier 2 Stores |

DMEAST #16827137

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of May 29, 2013 (the "<u>Execution Date</u>"), is made and entered into by and among **HEALTHCARE UNIFORM COMPANY, INC.**, a Delaware corporation ("<u>Healthcare Uniform</u>"), **UNIFORM CITY NATIONAL, INC.**, a Delaware corporation ("<u>Uniform City</u>"; and together with Healthcare Uniform, collectively, "<u>Sellers</u>" and each individually, a "<u>Seller</u>"), and **SCRUBS & BEYOND, LLC**, a Delaware limited liability company ("<u>Purchaser</u>"). Sellers and Purchaser are sometimes herein referred to collectively as the "<u>Parties</u>" and each individually as a "<u>Party</u>." Capitalized terms shall have the meaning set forth in <u>Article 1</u> unless otherwise defined herein.

### BACKGROUND:

Sellers are independent multi-channel suppliers of medical apparel and accessories to healthcare providers and professionals in the United States (the "<u>Business</u>").

Sellers intend to commence proceedings (collectively, the "<u>Bankruptcy Cases</u>") under Chapter 11 of the Bankruptcy Code (as hereafter defined) in the Bankruptcy Court (as hereinafter defined) and, subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to a Sale Order, the Parties desire to enter into this Agreement pursuant to which, among other things, Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Liabilities.

The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and would be consummated only pursuant to a Sale Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code.

### AGREEMENT:

In consideration of the foregoing and of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

### ARTICLE 1

### DEFINITIONS

**1.1.    Definitions.**  For the purposes of this Agreement, capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the meaning given them in <u>Exhibit A</u> attached hereto.

**1.2.    Other Definitional and Interpretative Provisions.**

(a)    The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(d)    Any reference in this Agreement to "$" means United States dollars.

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(f)    Any agreement, instrument, statute or regulation defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes or regulations) by succession of comparable successor statutes or regulations. References to a Person are also to its successors and permitted assigns.

(g)    All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified.

(h)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(i)    This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2

## PURCHASE AND SALE

**2.1.    Purchase and Sale of Assets.**  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire and accept

from Sellers free and clear of any and all Liens and Claims (as defined in Section 101(5) of the Bankruptcy Code), and interests of any kind or nature whatsoever (collectively, the "Liens and Claims") (in each case, other than the Assumed Liabilities), all right, title and interest in and to any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, which are used or useful in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in Section 2.2 (such assets, properties, rights and claims to be acquired hereunder, collectively, the "Purchased Assets"). For the avoidance of doubt, in the event that Purchaser assigns its rights to purchase, acquire and accept the Purchased Assets to its designee, Purchaser shall continue to remain liable for all of its obligations hereunder. The Purchased Assets shall include the following:

(a)    all Accounts Receivable and other rights to payment arising from the conduct of the Business;

(b)    all security and other deposits related to Assumed Contracts;

(c)    all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business that, other than as provided in paragraph (q) below, are related to, located at or useful in connection with the Real Property Leases that are Assumed Contracts, including merchandise, supplies, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials and consumables relating to or available for sale or use in connection with the Business;

(d)    all right, title and interest of Sellers under each Real Property Lease on Schedule 1.1(a), each of which shall be an Assumed Contract, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof; provided that Purchaser may add or remove Real Property Leases listed on Schedule 1.1(a) as set forth in Section 2.5;

(e)    all right, title and interest of Sellers under each other Contract on Schedule 1.1(b), each of which shall be an Assumed Contract; provided that Purchaser may add or remove other Contracts listed on Schedule 1.1(b) as set forth in Section 2.5;

(f)    all right, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is an Assumed Contract;

(g)    the Purchased Intellectual Property;

(h)    all of the rights and benefits accruing from and after the Closing under any of the Assumed Contracts, including each Real Property Lease, personal property lease and Intellectual Property License that is an Assumed Contract;

(i)    all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and

3

documents (including credit information), supplier lists, vendor files, financial and other records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (f) above, but excluding (i) personnel files for Employees who are not hired by Purchaser, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents that Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) Documents relating to an Excluded Asset or Excluded Liability;

(j)     all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(k)     all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(l)     any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(m)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(n)     all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(o)     all prepaid expenses of Sellers;

(p)     all other assets, properties, rights and claims of Sellers of any kind or nature that relate to the Business, that are used or useful in or held for use in the Business, or that relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in this Section 2.1, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with the Real Property Leases that are Assumed Contracts; and

(q)     all inventory of any kind and nature, including raw materials, supplies, work-in-process, packaging materials and other materials in the inventory of the Business ("Inventory").

   **2.2.   Excluded Assets.** Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" means only the following assets:

4

(a)     Cash & Equivalents as of 11:59 p.m. (Eastern time) on the Closing Date and all rights of Sellers in respect of bank and brokerage accounts and lockboxes in their names or held on their behalf;

(b)     Inventory sold by Sellers in the ordinary course of the Business prior to the Closing Date (but subject to the Purchase Price Adjustment of <u>Section 3.5</u>);

(c)     the Excluded Contracts and any Contract terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business;

(d)     all preference or avoidance claims and actions of Sellers, including any such claims and actions arising under Sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code;

(e)     all rights of Sellers under the Transaction Documents and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions thereof;

(f)     insurance proceeds, claims and causes of action with respect to or arising in connection with (i) any Contract that is not an Assumed Contract, or (ii) any item of tangible or intangible property that is not a Purchased Asset;

(g)     all security deposits (other than security and other deposits related to Assumed Contracts);

(h)     all deposits with respect to legal, accounting, financial advisory, valuation and investment banking fees and expenses incurred by or on behalf of Sellers or their Affiliates in connection with the Bankruptcy Cases or the Transactions;

(i)     any (i) confidential personnel and medical records pertaining to any Employee of Sellers; (ii) books and records that Sellers are required by Law to retain or that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; <u>provided</u>, <u>however</u>, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets or Assumed Liabilities; and (iii) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of Sellers; provided, that Purchaser shall have the right to make copies of any portions of such documents and records;

(j)     any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(k)     all equity interests in Sellers;

(l)   all Employee Benefit Plans (and any trusts, 501(c)(9) organizations, insurance (including fiduciary insurance), administrative or other service contracts relating thereto);

(m)   those items identified on Schedule 2.2(m);

(n)   all tangible personal property (other than Inventory) owned by Sellers located at any store that is subject to a Real Property Lease that is not an Assumed Contract; and

(o)   all rights, claims and causes of action of Sellers that are not related to the Purchased Assets or the Assumed Liabilities.

**2.3.   Assumption of Liabilities.**  Purchaser shall assume no Liability of Sellers except the Liabilities expressly set forth in this Section 2.3 and in Section 2.5(a) (collectively, the "Assumed Liabilities").  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume the Assumed Liabilities and shall agree to pay, discharge, perform and otherwise satisfy such Assumed Liabilities in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such Assumed Liabilities are owed.  The Assumed Liabilities shall consist of only the following Liabilities:

(a)   all Liabilities of Sellers under the Assumed Contracts first arising on or after the Closing;

(b)   all Liabilities assigned to Purchaser as specifically provided in Article 9;

(c)   the Permitted Liens; and

(d)   Liabilities of Sellers under that certain Real Estate Consulting Services Agreement with Healthcare Uniform and A&G Realty Partners, LLC, dated as of February 21, 2013, as the same may be amended, restated, supplemented and/or modified from time to time, relating solely to the Assumed Contracts and solely to the extent such Liabilities arise after the Execution Date.

**2.4.   Excluded Liabilities.**   Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of either Seller or of any predecessor of either Seller existing on the Closing Date or arising thereafter, other than the Assumed Liabilities. All of the Liabilities of each Seller or of any predecessor of each Seller not specifically and expressly assumed by Purchaser pursuant to Section 2.3 shall be referred to herein collectively as the "Excluded Liabilities."

**2.5.   Assumed Contracts**.

(a)   At the Closing and pursuant to Section 365 of the Bankruptcy Code and the Sale Order, Sellers shall assume and assign to Purchaser, and Purchaser shall consent to such assignment from Sellers, the Assumed Contracts. All Cure Costs with respect to the Assumed Contracts shall be paid in full by Sellers no later than the Closing Date and Purchaser shall have

no Liability therefor. Purchaser shall be responsible for providing adequate assurance of future performance under the Assumed Contracts in connection with the assumption and assignment thereof by Sellers.

(b)     From the date hereof through the date established by the Bankruptcy Court for submission of competing bids pursuant to the Procedures Order, substantially in the form of Exhibit B, and the Bid Procedures, substantially in the form of Exhibit C, Purchaser shall have the right, by written notice to Sellers, to either (i) designate any Contract not already so designated to be an Assumed Contract (to the extent that such Contract is still in effect), or (ii) remove any Contract from Schedule 1.1(a) or Schedule 1.1(b). Schedule 1.1(a) and Schedule 1.1(b) shall be amended to include or remove any such Contract as an Assumed Contract. Any Contract not listed on, or initially listed on but subsequently removed by Purchaser from, Schedule 1.1(a) or Schedule 1.1(b) shall not be designated as an Assumed Contract (each, an "Excluded Contract") for all purposes of this Agreement and all liabilities and obligations under such Contract shall be Excluded Liabilities for all purposes of this Agreement. Any such addition or removal does not affect the Purchase Price payable hereunder. Notwithstanding the foregoing or any other provision of this Agreement, no less than one hundred ten (110) Real Property Leases shall be Assumed Contracts and Purchaser shall not be permitted to remove or exclude any Real Property Leases that would reduce the number of Real Property Leases that are Assumed Contracts to less than one hundred ten (110).

(c)     Sellers may in their sole and absolute discretion not less than the fourth (4th) Business Day before the date established by the Bankruptcy Court for submission of competing bids pursuant to the Procedures Order, subject to Applicable Law, assume, assign, or reject any Contract other than an Assumed Contract at any time; provided, however, that in the event Sellers intend to do so prior to the date established by the Bankruptcy Court for submission of competing bids pursuant to the Procedures Order, with respect to any Contract other than the Contracts specified on Schedule 2.5(c) attached hereto (in which case the provisions of Section 2.5(b) and this Section 2.5(c) shall not apply), Sellers shall notify Purchaser of such intent and Purchaser shall have four (4) Business Days to agree to treat said Contract as an Assumed Contract. In the event Purchaser does not agree in writing to treat said Contract as an Assumed Contract within said period, Sellers may assume, assign, or reject such Contract in their sole and absolute discretion at any time thereafter. Sellers (in their sole and absolute discretion) may close or sell stores not listed on Schedule 1.1(a) or otherwise relocate or reallocate Inventory at such stores without any reduction to the Purchase Price (except insofar as a loss of Inventory may effect a Purchase Price Adjustment under Section 3.5; provided, however, that nothing in this Agreement shall prevent Sellers from undertaking store closings (other than any stores listed on Schedule 1.1(a)) or reallocations of inventory without any negative adjustment to the Purchase Price).

## 2.6.    Further Conveyances and Assumptions.

(a)     From time to time following the Closing and except as prohibited by Law, Sellers shall, at Purchaser's expense, make available to Purchaser such non-confidential data in personnel records of Employees hired by Purchaser as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Sellers and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to otherwise make effective the transactions contemplated hereby and thereby.

(c)    Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, that is not capable of being assigned pursuant to Section 365 of the Bankruptcy Code or transferred pursuant to Section 363 of the Bankruptcy Code to Purchaser at the Closing ("Nonassignable Assets") unless and until such assignment or transfer shall be permitted.    Sellers and Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction.

(d)    Upon each request by Purchaser, without additional consideration but at Purchaser's expense, Sellers agree: (i) to promptly execute documents, testify, and take other acts as Purchaser may deem necessary or desirable to procure, maintain, perfect, enforce, and defend the full benefits, enjoyment, right, title and interest of, in and to the Purchased Intellectual Property on a worldwide basis; and (ii) to render all necessary assistance in the preparation and prosecution, in Purchaser's name and for its benefit, of any applications, registrations, continuations, continuations-in-part, divisionals, reissues, reexaminations, renewals, substitutions, and extensions, in the United States or a foreign country, covering the Purchased Intellectual Property.

**2.7.    Payments to Sellers.**    If, following the Closing, either Seller shall receive payment in respect of any Account Receivable or other right to payment that is included in the Purchased Assets, then such Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payment to Purchaser.

**2.8.    Title to Purchased Assets Free and Clear of Liens; No Successor Liability.** The Purchased Assets shall be sold or assumed and assigned, as applicable, pursuant to the Sale Order, free and clear of any and all Liens and Claims, other than the Assumed Liabilities.  Other than holders of Assumed Liabilities, all holders of Liens and Claims shall be barred by the Sale Order from asserting such Liens and Claims against Purchaser, its successors or assigns, and the Purchased Assets, and Purchaser shall have no liability for such Liens and Claims, whether as a successor or otherwise.

**2.9.    Risk of Loss.**    If between the Execution Date and the Closing there is any damage or other loss to any item of property, plant or equipment that is covered by insurance, then at the Closing, Purchaser shall receive the insurance proceeds that Sellers shall have received (or be entitled to receive) to the extent such insurance proceeds relate to the Purchased Assets, or in the event the proceeds have not been received by either Seller at the time of Closing, an assignment by such Seller of all of its rights in, and to adjust and receive, the insurance proceeds, Sellers shall credit to Purchaser the amount of any insurance deductible at Closing, and Sellers shall not

DMEAST #16827137

have the right to participate in any insurance adjustment, settlement or claim or condemnation proceeding, but will, at all times, reasonably cooperate with Purchaser in pursuing any claim settlement, adjustment or prosecution, and any and all insurance proceeds shall be the sole property of Purchaser.  The rights of Purchaser in this <u>Section 2.9</u> are in addition to Purchaser's other rights in this Agreement.

### 2.10.   <u>Purchased Assets Sold "As Is, Where Is".</u>

EXCEPT AS EXPLICITLY SET FORTH IN <u>ARTICLE 5</u>, PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY OR INVENTORY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR CONTRACT TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHICH ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY, THE INVENTORY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>ARTICLE 5</u>, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

PURCHASER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

9

THE PROVISIONS OF THIS <u>SECTION 2.10</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE 3

### PURCHASE PRICE

**3.1.    Purchase Price.**    The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) an amount in immediately available, good funds, in cash equal to $22,625,000, which is subject to adjustment upwards or downwards as set forth in this <u>Article 3</u> (the "<u>Cash Purchase Price</u>"), <u>plus</u> (b) the assumption of the Assumed Liabilities <u>plus</u> (c) the amount of the gift card redemptions pursuant to <u>Section 8.8</u>.

**3.2.    Deposit.**

(a)    Simultaneously with the execution and delivery of this Agreement, Purchaser has deposited into escrow with PNC Bank, N.A., as escrow agent (the "<u>Escrow Agent</u>"), pursuant to that certain Escrow Agreement, to be executed contemporaneously with such deposit, among Sellers, Purchaser and the Escrow Agent (the "<u>Escrow Agreement</u>") in substantially the form attached hereto as <u>Exhibit D</u>, by certified check or wire transfer of immediately available funds, a total amount equal to $4,525,000 as an earnest good-faith money deposit and security for the performance of Purchaser's obligations under this Agreement (the "<u>Deposit</u>").  The Escrow Agreement shall include the provisions set forth in this <u>Section 3.2</u>. Upon receipt of the Deposit, the Escrow Agent shall immediately deposit the Deposit into an interest-bearing account.  Interest shall be treated as set forth in the Escrow Agreement.  The Escrow Agent's escrow fees and charges shall be paid one-half by Sellers and one-half by Purchaser.

(b)    The Parties agree that the Deposit shall (i) be applied as a deposit towards the Cash Purchase Price and (after deduction of the Current Assets Escrow) delivered to Sellers at Closing as provided in <u>Section 3.3(c)</u>, or (ii) be returned to Purchaser or paid to Sellers less (Seller's portion of the Escrow Agent's fees and expenses) as provided in <u>Section 4.5</u>.

**3.3.    Payment of Cash Purchase Price.**

(a)    At the Closing, Purchaser shall deliver, or cause to be delivered, an amount equal to the Cash Purchase Price, <u>minus</u> the Deposit by wire transfer of immediately available, good funds, and <u>minus</u> the amounts described in paragraph (b) below, to the bank account or accounts of Sellers set forth on <u>Schedule 3.3(a)</u>.

(b)    At the Closing, Purchaser will pay the amount described in paragraph (a) above in accordance with the funds flow memorandum ("<u>Funds Flow</u>"), net of amounts payable to Morgan Joseph TriArtisan LLC in accordance with, pursuant to and in satisfaction of the fees due in connection with the Transactions, in each case as set forth in the Bankruptcy Court Order approving the retention of such party as Sellers' investment banker and any related agreements.

(c)    At the Closing, Sellers and Purchaser shall jointly instruct the Escrow Agent to (i) transfer an amount equal to the Deposit, minus an amount equal to $500,000 (the "Current Assets Escrow"), by wire transfer of immediately available funds to the bank account or accounts of Sellers set forth on Schedule 3.3(a) and (ii) retain the Current Assets Escrow.

**3.4.    Allocation of Purchase Price.**

(a)    Within fifteen (15) days after the Final Closing Current Assets Statement has been determined, Purchaser shall, in good faith, prepare (or cause to be prepared) and deliver to Sellers an allocation of the Purchase Price, the Assumed Liabilities and any other items that are treated as an additional purchase price for Tax purposes (the "Taxable Consideration") among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and in a manner consistent with the Principles of Allocation set forth on Schedule 3.4 (the "Proposed Allocation"). Sellers shall have ten (10) days thereafter to object to the Proposed Allocation.

(b)    In the absence of a timely objection under Section 3.4(a), the Parties shall (i) be bound by the Allocation Statement and (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, in the filing of IRS Form 8594 and any corresponding other Tax forms). In the event of a timely objection under Section 3.4(a), the Parties shall refer the matter to the Accounting Referee who shall promptly pick either the position of Sellers or the position of Purchaser, which decision shall be final and binding on the Parties.

(c)    In accordance with such binding allocation, Purchaser shall prepare in good faith and deliver to Sellers copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Sellers (or their designated successors) from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating, consistent with the agreed upon allocation. The Parties shall, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement, for all Tax purposes and to file all Tax Returns in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by applicable Tax Laws or good faith resolution of a Tax contest. Notwithstanding anything to the contrary, no allocation hereunder shall supersede or otherwise usurp the jurisdiction of the Bankruptcy Court to value the assets for purposes of distribution to the respective Sellers' estates under the Bankruptcy Code.

**3.5.    Purchase Price Adjustment.**

(a)    Current Assets.

(i)    Not later than 4:00 p.m. (Eastern time) on the second Business Day immediately prior to the Closing Date, Sellers shall prepare and deliver in good faith to Purchaser (A) a preliminary statement (the "Estimated Current Assets Statement"), setting forth the estimated Current Assets as of the Closing Date (the "Estimated Current Assets") and setting forth in reasonable detail the

calculation thereof and (B) a certificate of the Chief Financial Officer of each Seller that the Estimated Current Assets Statement was prepared in accordance with GAAP as it has been interpreted and applied consistent and in accordance with the past practices of Sellers as reflected in Sellers' audited financial statements for the most recent fiscal year end as if such Estimated Current Assets Statement was being prepared and audited as of a fiscal year end. At Purchaser's expense, prior to the Closing Date, Purchaser and its accountants shall have the right to review the preparation of the Estimated Current Assets Statement and the calculation of the Estimated Current Assets set forth therein. Sellers shall cooperate reasonably with Purchaser and its accountants in such review and in providing reasonably required access to Sellers' books, records, financial statements, personnel and accounting firm. Sellers shall reasonably consider any suggestions made by Purchaser or its accountants with regard to the Estimated Current Assets Statement or the calculation of the Estimated Current Assets set forth therein. If Estimated Current Assets as set forth on the Estimated Current Assets Statement is less than $15,384,000, then the Cash Purchase Price shall be decreased by an amount equal to such deficiency. If the Estimated Current Assets as set forth on the Estimated Current Assets Statement is greater than $15,384,000 then the Cash Purchase Price shall be increased by an amount equal to such excess.

(ii)   As soon as practicable (but in any event not later than thirty (30) days following the Closing Date), Purchaser shall, in good faith, prepare and deliver to Sellers a statement (the "Closing Current Assets Statement"), setting forth Current Assets as of the Closing Date and setting forth in reasonable detail the calculation thereof.

(iii)   As soon as practicable (but in any event not later than ten (10) Business Days following delivery of the Closing Current Assets Statement), Sellers may deliver written notice (the "Current Assets Protest Notice") to Purchaser of any disagreement that Sellers may have as to the Closing Current Assets Statement.   Such Current Assets Protest Notice shall set forth in reasonable detail the basis of such disagreement together with Sellers' calculation of Current Assets as of the Closing.   The failure of Sellers to deliver such Current Assets Protest Notice within the prescribed time period will constitute Sellers' acceptance of the Closing Current Assets Statement as determined by Purchaser.   Sellers and their representatives shall be given reasonable access to Purchaser's books and records relating to the calculation of the Closing Current Assets Statement for the purpose of reviewing the Closing Current Assets Statement and determining Current Assets as of the Closing, such access shall be provided after reasonable notice, during normal business hours and in such a way as to not disrupt the business of Purchaser.

(iv)   If Purchaser and Sellers are unable to resolve any disagreement as to the determination of the Closing Current Assets Statement within ten (10) Business Days following Purchaser's receipt of a Current Assets Protest Notice, then either Purchaser or Sellers may, upon written notice to the other

party, require that Current Assets as of the Closing be submitted to Grant Thornton LLP or another independent firm of certified public accountants that is mutually acceptable to Purchaser, on the one hand, and Sellers on the other (the "Accounting Referee") for arbitration, which arbitration shall be final and binding on Purchaser and Sellers.  The Accounting Referee shall act as an arbitrator to determine, based solely on written submissions and presentations by Purchaser and Sellers, and not by independent review, only those amounts still in dispute.  The Accounting Referee shall accept either the position of Sellers or the position of Purchasers, whichever it determines is most correct.  The Accounting Referee shall render a written report as to the basis of the determination of the dispute as promptly as practicable.  The fees and expenses of the Accounting Referee shall be borne by the Party whose position is not accepted by the Accounting Referee.  The term "Final Closing Current Assets Statement," as used in this Agreement, shall mean the definitive Closing Current Assets Statement accepted by Sellers, agreed to by Sellers and Purchaser or the definitive Closing Current Assets Statement resulting from the determinations made by the Accountants, in each case in accordance with this Section 3.5(a).

(b)      Payment.  The adjustment calculations to the Cash Purchase Price under Section 3.5(a)(i) above shall be recalculated with the Current Assets as set forth on the Final Closing Current Assets Statement (the "Final Current Assets") substituted for the Estimated Current Assets to determine if any additional adjustments to the Cash Purchase Price are required in order to give effect to the intention of the Parties to provide for a Cash Purchase Price adjustment in the event that the amount of the Current Assets is less than or greater than $15,384,000.  Within five (5) Business Days after the final determination of Final Closing Current Assets Statement:

(i)  If the calculation of the Cash Purchase Price using the Final Current Assets instead of the Estimated Current Assets under Section 3.5(a)(i) demonstrates that the Cash Purchase Price at Closing was overpaid, then Sellers and Purchaser shall jointly instruct the Escrow Agent to disburse (A) to Purchaser from the Current Assets Escrow an amount equal to the deficiency and (B) to Sellers the remaining portion of Current Assets Escrow.  In the event that the Current Assets Escrow is less than such overpayment, Sellers shall pay to Purchaser the remaining balance of such overpayment by wire transfer of good and immediately available funds.

(ii)  If the calculation of the Cash Purchase Price using the Final Current Assets instead of the Estimated Current Assets under Section 3.5(a)(i) demonstrates that the Cash Purchase Price at Closing was underpaid, then Purchaser and Sellers shall jointly instruct the Escrow Agent to distribute to Sellers the entire balance of the Current Assets Escrow.  Purchaser shall pay to Sellers the remaining balance of such underpayment by wire transfer of good and immediately available funds.

DMEAST #16827137

(iii)    If the calculation of the Cash Purchase Price using the Final Current Assets instead of the Estimated Current Assets under <u>Section 3.5(a)(i)</u> demonstrates that the Cash Purchase Price payable at Closing was neither overpaid nor underpaid, then Purchaser and Sellers shall jointly instruct the Escrow Agent to distribute to Sellers the entire balance of the Current Assets Escrow.

(c)    Purchaser and Sellers agree that the Current Assets as set forth in the Estimated Current Assets Statement and in the Closing Current Assets Statement and Final Current Assets shall be determined in good faith, in accordance with GAAP as it has been interpreted and applied consistent and in accordance with the past practices of Sellers as reflected in Sellers' historical audited financial statements. For the avoidance of doubt, rent, current taxes, insurance, prepaid advertising and other similar items of expense relating to or attributable to the Real Property Leases that are Assumed Contracts shall be prorated between Sellers and Purchaser as of the Closing Date and the pro-rated portion thereof attributable to Purchaser shall be included as a Current Asset. Notwithstanding the provisions of the preceding sentence, all obligations due in respect of periods on or after the Closing shall be paid in full or otherwise satisfied by Purchaser. Rents shall be prorated on the basis of a thirty (30) day month.

## ARTICLE 4

## CLOSING AND TERMINATION

**4.1.    Closing Date.**    Subject to the satisfaction of the conditions set forth in <u>Section 10.1</u>, <u>Section 10.2</u> and <u>Section 10.3</u> (or the waiver thereof by the Party entitled to waive that condition) (the date of such satisfaction or waiver, the "<u>Closing Date</u>"), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article 2</u> (the "<u>Closing</u>") shall take place at the offices of Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599, at 10:00 a.m. (Eastern time), or at such other place as the Parties may mutually agree upon in writing, or remotely upon the electronic exchange of signatures. Notwithstanding anything to the contrary herein, the Closing will be deemed to have taken place at 11:59 p.m. (Eastern time) on the Closing Date; provided, however, that the Closing Date shall not be later than the Outside Date.

**4.2.    Deliveries by Sellers.**    At the Closing, Sellers shall deliver to Purchaser:

(a)    a duly executed Bill of Sale;

(b)    a certified copy of the Sale Order;

(c)    a duly executed assignment and assumption agreement substantially in the form attached as <u>Exhibit E</u> (the "<u>Assignment and Assumption Agreement</u>");

(d)    a duly executed recordable assignment of Trademarks substantially in the form attached as <u>Exhibit F</u> (the "<u>Recordable Trademark Assignment</u>");

(e)    a duly executed recordable assignment of Copyrights substantially in the form attached as <u>Exhibit G</u> (the "<u>Recordable Copyright Assignment</u>");

14

(f)    a duly executed recordable domain name assignment substantially in the form attached as Exhibit H (the "Domain Name Assignment");

(g)    duly executed assignment and assumption agreements with respect to the Real Property Leases that are Assumed Contracts substantially in the form of Exhibit I hereto (the "Assignment and Assumption of Leases and Related Agreements");

(h)    copies of all consents, waivers and approvals referred to in Section 10.1(d);

(i)    a certificate signed by an authorized officer of each Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to Sections 10.1(a) and (b);

(j)    copies of all necessary corporate resolutions or equivalent instruments duly adopted by each Seller, authorizing and approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified as true and in full force and effect as of the Closing Date by the appropriate officers of each Seller;

(k)    a certificate as to the incumbency of the officers of each Seller executing this Agreement and any other Transaction Document;

(l)    evidence reasonably satisfactory to Purchaser of the payment of any and all Cure Costs; and

(m)    such other instruments, agreements, certificates and documents as Purchaser reasonably deems necessary to effect the Transactions.

**4.3.    Deliveries by Purchaser.**  At the Closing, Purchaser shall deliver to Sellers:

(a)    the Cash Purchase Price minus the Deposit (as delivered through the Escrow Agent) and minus the amounts described in paragraph (b) of Section 3.3, to the bank account or accounts of Sellers set forth on Schedule 3.3(a), in cash, in good and immediately available funds;

(b)    a duly executed copy of the Assignment and Assumption Agreement;

(c)    duly executed Assignments and Assumption of Leases and Related Agreements;

(d)    copies of all necessary company resolutions or equivalent instruments duly adopted by Purchaser, authorizing and approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified as true and in full force and effect as of the Closing Date by the appropriate officers or members of Purchaser;

(e)    a certificate as to the incumbency of officers of Purchaser executing this Agreement and any other Transaction Document; and

DMEAST #16827137

(f)    a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers) pursuant to Sections 10.2(a) and (b).

**4.4.    Termination of Agreement.**  Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, only as provided in this Section 4.4 upon notice by the terminating Party to the other Parties and the Secured Party:

(a)    At any time prior to the Closing Date by the mutual written consent of Sellers and Purchaser and Secured Party;

(b)    By Purchaser upon a material breach of any covenant or agreement of Sellers set forth in this Agreement, or if any material representation or warranty of Sellers shall have been or becomes untrue in any material respect, in each case such that the conditions set forth in Section 10.1(a) or Section 10.1(b), as the case may be, shall become impossible of fulfillment on or before the earlier of the Outside Date or five (5) Business Days after delivery of written notice thereof by Purchaser, unless such impossibility shall be due to the failure of Purchaser to perform or comply with any of the covenants or agreements herein to be performed or complied with by it prior to the Closing;

(c)    By Sellers upon a material breach of any covenant or agreement of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser shall have been or becomes untrue in any material respect, in each case such that the conditions set forth in Section 10.2(a) or Section 10.2(b), as the case may be, shall become impossible of fulfillment on or before the earlier of the Outside Date or within five (5) Business Days after delivery of written notice thereof by Sellers, unless such impossibility shall be due to the failure of either Seller to perform or comply with any of the covenants or agreements herein to be performed or complied with by it prior to the Closing;

(d)    Automatically upon the Bankruptcy Court's entry of an order approving an Alternative Transaction; provided, that if in connection with such Alternative Transaction, the Purchaser is the Back-Up Bidder, then Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 4.4(d) until after the earlier of (A) the closing of such Alternative Transaction, or (B) the Outside Date;

(e)    By Sellers or Purchaser if the Closing has not occurred on or before the earlier of (1) the date on which the funding under the DIP Financing Facility is terminated or (2) August 30, 2013 (as may be extended by written agreement of the Parties and Secured Party, the "Outside Date"); provided, however, that a Party may not terminate this Agreement pursuant to this Section 4.4(e) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date;

(f)    By Purchaser, if either of the Bankruptcy Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, an examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code or a trustee is appointed pursuant to the Bankruptcy Code, or the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting the automatic stay with respect to any material portion of the Purchased Assets;

(g)    By Purchaser if (1) the Bankruptcy Cases have not been filed with the Bankruptcy Court on or before May 31, 2013 (or such later date as may be agreed to by the Parties and the Secured Party pursuant to Section 7.1) or (2) (x) the Procedures Order has not been entered by the Bankruptcy Court by June 30, 2013, or (y) the Procedures Order is thereafter reversed, vacated or withdrawn by the date the Auction is scheduled to commence;

(h)    By Purchaser, if the Procedures Order or the Sale Order is modified in any respect materially adverse to Purchaser without the prior written consent of Purchaser; or

(i)    By Sellers or Purchaser, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date.

## 4.5.    Effect of Termination.

(a)    No termination of this Agreement pursuant to Section 4.4 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made and such party shall endeavor to give notice to the Secured Party.   In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Sellers, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Purchaser or Sellers except as otherwise provided herein; provided, however, that the obligations of the Parties under the Escrow Agreement and Sections 3.2(b), 4.5, 8.5 and Article 12 of this Agreement shall survive any such termination and shall be enforceable hereunder.

(b)    If the Agreement is terminated by the Purchaser pursuant to paragraphs (a), (b), (d), (e), (f), (g), (h) or (i) of Section 4.4, then the Escrow Agent shall pay the Deposit (together with all interest earned thereon) to Purchaser, and in the event that such termination is pursuant to paragraphs (b) or (d) of Section 4.4, Sellers shall pay to the Purchaser the Break-Up Fee as liquidated damages and as Purchaser's sole and exclusive remedy for breach of this Agreement by Sellers.   In the case of a termination under Section 4.4(d), Sellers shall pay Purchaser the Break-Up Fee at the Closing of the Alternative Transaction.

(c)    If the Agreement is terminated pursuant to paragraph (c) of Section 4.4, then the Escrow Agent shall pay the Deposit to Sellers as liquidated damages and as Sellers' sole and exclusive remedy for breach of this Agreement by Purchaser.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Purchaser as follows as of the Execution Date:

**5.1.    Organization and Good Standing.**   Each Seller is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the

DMEAST #16827137

jurisdiction of its formation, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except as described on <u>Schedule 5.1</u> or where the failure to be so qualified would not reasonably be expected to have, in the aggregate, a Seller Material Adverse Effect, and, subject to the limitations imposed on Sellers as a result of having filed petitions for relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, each Seller has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

    **5.2.**   **Title to Assets.** Sellers have good valid title to and interest in (as applicable) all of the Purchased Assets. Upon entry of the Sale Order, Sellers will have all requisite authority to transfer good and valid title to the Purchased Assets to Purchaser, free and clear of all Liens and Claims (other than Permitted Liens).

    **5.3.**   **Authorization of Agreement.** Subject to the entry of the Sale Order, Sellers have all requisite power and authority to execute and deliver this Agreement and each other Transaction Document, agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by either Seller in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Seller Documents</u>"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to entry of the Sale Order, the execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action, as applicable, on the part of each Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller that is a party hereto and thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms.

    **5.4.**   **Real Property.**

        (a)     Sellers do not own any real property and is not a landlord under any Real Property Lease. <u>Schedule 5.4</u> sets forth a complete list of all Real Property Lease entered into by Sellers as lessee that relate to the stores listed on <u>Schedule 1.1(a)</u>. Sellers have provided Purchaser with, or access to, true, correct, accurate and complete copies of all leases and other instruments and agreements (together with all amendments, modifications, supplements, and restatements thereto, if any) in Sellers' possession as of the Execution Date pertaining to the Real Property Leases.

        (b)     Except as set forth on <u>Schedule 5.4</u>, to the Knowledge of Sellers, no landlord has asserted in writing any matured right to terminate or to cancel any Real Property Lease that related to the stores listed on <u>Schedule 1.1(a)</u>.

    **5.5.**   **Tangible Personal Property; Capital Leases.**

(a)      Schedule 5.5(a) sets forth all leases of personal property ("Personal Property Leases") that involve annual payments in excess of $17,500 and relate to personal property used by Sellers in connection with the Business or to which either Seller is a party or by which the properties or assets of either Seller are bound.

(b)      Schedule 5.5(b) sets forth all capital leases ("Capital Leases") that involve annual payments in excess of $17,500 and relate to property used by Sellers in connection with the Business or to which either Seller is a party or by which the properties or assets of either Seller are bound.

**5.6.    Intellectual Property.**

(a)      To the Knowledge of Sellers, Schedule 5.6(a) sets forth a true and complete list of all material issuances and registrations and material applications for issuance or registration included in the Purchased Intellectual Property.

(b)      To the Knowledge of Sellers, Schedule 5.6(b) sets forth a true and complete list of (i) all material written Intellectual Property Licenses that are Assumed Contracts and (ii) all material oral Intellectual Property Licenses that are Assumed Contracts, regardless of whether such Intellectual Property Licenses involve annual payments by or to a Seller or an Affiliate of a Seller.

(c)      Except as set forth on Schedule 5.6(c), with respect to all material Purchased Intellectual Property, to the Knowledge of Sellers:

(i)    Sellers own all Intellectual Property listed on Schedule 5.6(a) and have rights in and to all other Purchased Intellectual Property included in the Purchased Assets as such Purchased Intellectual Property is used in the ordinary course of business.

(ii)   The Purchased Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received in writing by Sellers or, any outstanding Order restricting the use by Sellers thereof or adversely affecting any of the rights of Sellers thereto.

(iii)  Neither Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any Intellectual Property License that is an Assumed Contract and to which either Seller is a party or by which it is bound.  No Person is violating any Purchased Intellectual Property exclusively licensed to either Seller under an Intellectual Property License that is an Assumed Contract.

(iv)   (A) Neither Seller is violating any Intellectual Property rights of any other Person and (B) there are no Actions or Legal Proceedings, pending or threatened in writing, concerning any claim that either Seller has infringed, diluted, misappropriated, or otherwise violated any Intellectual Property rights of any other Person.

DMEAST #16827137

**5.7.    Material Contracts.**

(a)    Schedule 5.7(a) sets forth all of the following Contracts to which either Seller is a party or by which either Seller is bound in connection with the Business or by which the Purchased Assets may be bound or affected (collectively with the Personal Property Leases, the Capital Leases and the Intellectual Property Licenses, the "Material Contracts"):

(i)    Contracts with any Affiliate or current or former officer or director of a Seller;

(ii)    Contracts pursuant to which a Seller grants to any Person any rights to represent such Seller with respect to any product or act as agent for such Seller in connection with the marketing, distribution or sale of any Business product;

(iii)    Contracts for the sale of any of the assets of the Business, other than in the ordinary course of business;

(iv)    Contracts relating to the acquisition by a Seller of any operating business or the capital stock of any other Person;

(v)    Contracts containing a covenant that restricts a Seller or any Affiliate of a Seller from engaging in any line of business, conducting the Business in any geographic area (other than standard radius restrictions contained in certain of the Real Property Leases), competing with any Person or hiring any Person;

(vi)    Contracts relating to a joint venture of the Business or any Seller;

(vii)    Contracts for the employment of any individual on a full-time, part-time or consulting or other basis; and

(viii)    Contracts for the sale or purchase of goods pursuant to which a sale or purchase has been made in the past twelve (12) months or is anticipated in the next twelve (12) months.

(b)    To the Knowledge of Sellers, each of the Material Contracts that is an Assumed Contract is in full force and effect and is the legal, valid and binding obligation of a Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**5.8.    Employee Benefits.**

(a)    Schedule 5.8(a) separately lists all Employee Benefit Plans.

DMEAST #16827137

(b)    True, correct and complete copies of each of the Employee Benefit Plans have been made available to Purchaser.

(c)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any Employee of either Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits, in each case, that would be required to be satisfied by Purchaser following the Closing.

(d)    No Employee Benefit Plan provides post-retirement medical, vision, dental, prescription drug, health and/or life insurance benefits (other than as required by Section 601 of ERISA (COBRA coverage)).

(e)    No Employee Benefit Plan is or has been subject to Title IV of ERISA or Section 412 of the Code.  Seller does not currently have, and has never had, any ERISA Affiliates.  No Employee Benefit Plan is maintained in connection with any trust described in Section 501(c)(9) of the Code.

(f)    Seller does not currently have, and has not at any time had, any obligation to contribute to or any Liability in connection with any Multiemployer Plan.

(g)    To Seller's Knowledge, no Liability exists which could reasonably be expected to have a Seller Material Adverse Effect, for any failure to cover or provide benefits under an Employee Benefit Plan to any individual classified as an independent contractor by Seller.

**5.9.    Labor.**

(a)    No Seller is a party to any labor or collective bargaining agreement.

(b)    Except as set forth on Schedule 5.9(b), to the Knowledge of Seller, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or threatened against or involving either Seller, or (ii) unfair labor practice charges, grievances or complaints pending or threatened by or on behalf of any employee or group of employees of a Seller.

**5.10.    Litigation.**  Except (a) as set forth on Schedule 5.10(a), (b) for matters before the Bankruptcy Court involving Sellers or any of their Affiliates, to the Knowledge of Sellers, there are no Legal Proceedings pending or threatened against any Seller or relating to the Business or any of the Purchased Assets or Assumed Liabilities, before any Governmental Authority or (c) matters or Legal Proceedings pending or threatened that would not have a Seller Material Adverse Effect.  Schedule 5.10(b) lists all currently outstanding insurance claims of either Seller.

**5.11.    Financial Advisors.**  Except as set forth on Schedule 5.11, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in connection with the transactions contemplated by this Agreement. No Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

DMEAST #16827137

**5.12.** **Environmental Laws.** Except as set forth in Schedule 5.12, to the Knowledge of Sellers, (a) no Hazardous Materials have been, by either Seller or any of its Affiliates, disposed of, released or discharged on, at or beneath any property subject to any Real Property Lease ("Seller Occupied Property") (including groundwater contamination) in violation of any Environmental Laws; (b) neither Seller has received any written notice, demand, letter, claim or request for information alleging that such Seller or any Seller Occupied Property is in material violation of, or liable under, any Environmental Laws; (c) neither Seller is subject to any order, decree, injunction or other arrangement with any Governmental Entities and is not subject to any indemnity or other agreement with any third party relating to Liability under any Environmental Laws; (d) each Seller has obtained all notices, permits, licenses or similar authorizations, if any, required to be obtained or filed by either Seller under any Environmental Law in connection with all Seller Occupied Properties, including those relating to the treatment, storage, disposal or release of a hazardous substance or solid waste into the environment, and each Seller is in substantial compliance with the terms and conditions of all such notices, Permits, licenses and similar authorizations; and (e) there are no underground storage tanks on any Seller Occupied Property.

**5.13.** **[Intentionally deleted].**

**5.14.** **Investments and Third Party Rights.** Except as set forth on Schedule 5.14, neither Seller holds any Investments (excluding Cash & Equivalents). There are no agreements with, or options, commitments or rights in favor of, any Person to directly or indirectly acquire any of the Purchased Assets or any interest therein.

**5.15.** **Recent Activities.** Except as set forth on Schedule 5.15 and other than with respect to closed stores or Inventory moved among stores, since January 31, 2013:

        (a)    no material damage, destruction or loss (whether or not covered by insurance) has occurred;

        (b)    Sellers have not sold, assigned, transferred, distributed or otherwise disposed of any of the Purchased Assets, except for sales of Inventory in the ordinary course of the Business;

        (c)    Sellers have not canceled or waived any rights in respect of the Purchased Assets, except in the ordinary course of the Business.

**5.16.** **Insurance.** Schedule 5.16 describes all insurance arrangements, including self-insurance, in place for the benefit of the Purchase Assets and the conduct of the Business as of the Execution Date. True and correct copies of all such policies and any endorsements thereto have been made available to Purchaser.

**5.17.** **Permits and Licenses.** Schedule 5.17 contains a complete and accurate list of all material Permits and licenses (including applications therefor) owned or held by Sellers relating to the ownership, development or operations of the Business or the Purchased Assets.

**5.18.** **Employees and Employee Relations.** Sellers have made available to Purchaser a list (as of May 10, 2013) complete in all material respects of the names, positions, current annual

DMEAST #16827137

salaries or wage rates, and bonus and other compensation arrangements of all full-time and part-time Employees (indicating in such list whether each employee is full-time or part-time, whether such employee is employed under written contract, and, if such an employee is not actively at work, the reason thereof).

**5.19.   Payments.**   Except as set forth on Schedule 5.19, Sellers have not, directly or indirectly, paid or delivered or agreed to pay or deliver any fee, commission or other sum of money or item of property, however characterized, to any Person that is in any manner related to the Purchased Assets or the Business in violation of any Applicable Law.  Neither of the Sellers, nor any stockholder, officer, director or employee of either Seller has received or, as a result of the consummation of the Transactions contemplated by this Agreement will receive, any rebate, kickback or other improper or illegal payment from any Person with whom either Seller conducts or has conducted business.

**5.20.   Compliance with Applicable Law.**   Except as set forth on Schedule 5.20, (i) each Seller is in material compliance with all Applicable Law and (ii) there are no claims, actions, suits, litigation, arbitration, mediations, investigations or other proceedings (including qui tarn actions) pending or threatened in writing against either Seller or against the Purchased Assets that would have a Seller Material Adverse Effect.

**5.21.   [Intentionally deleted].**

**5.22.   [Intentionally deleted].**

**5.23.   No Other Representations or Warranties; Schedules.**   Except for the representations and warranties contained in this Article 5 (as modified by the Schedules hereto), neither Seller nor any other Person makes any express or implied representation or warranty with respect to Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective Representatives. Except for the representations and warranties contained in this Article 5 (as modified by the Schedules hereto), Sellers expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose).  Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business and Purchaser expressly assumes such risk.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

**6.1.   Organization and Good Standing.**   Purchaser is a limited liability company duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the State of Delaware and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

DMEAST #16827137

**6.2.    Authorization of Agreement.**  Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary limited liability company action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**6.3.    No Violation; Consents.**  None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (a) the organizational documents of Purchaser, (b) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (c) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (d) any Applicable Law, except in the case of clauses (b), (c) and (d) as would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

**6.4.    Financial Advisors.**  Except as set forth on Schedule 6.4, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Sellers.

**6.5.    Adequate Assurance.**  Purchaser is capable of and shall be responsible for satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and is capable of and shall be responsible for producing or providing any and all information required by the Bankruptcy Code and the Bankruptcy Court in connection therewith.

**6.6.    Consents and Approvals.**  Subject to the entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and each of the Purchaser Documents and the consummation of the Transactions do not require the consent or approval of, or filing with, any Governmental Authority, including, without limitation, under the Hart-Scott-Rodino

24

Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

**6.7.**    **Purchaser not a Plan.**    Purchaser is not an "employee benefit plan" as defined in ERISA, whether or not subject to ERISA, or a "plan" as defined in Section 4975 of the Code and none of Purchaser's assets constitutes (or is deemed to constitute for purposes of ERISA or Section 4975 of the Code, or any substantially similar federal, state or municipal law) "plan assets" for purposes of 29 CFR Section 2510.3-101, as amended by Section 3(42) of ERISA or otherwise for purposes of ERISA or Section 4975 of the Code.

**6.8.**    **Financing.**    Purchaser has sufficient funds available to consummate the Transactions.

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

**7.1.**    **Commencement of Bankruptcy Cases.**    As promptly as practicable, and in no case later than three (3) Business Days after the execution of this Agreement, Sellers shall file the Bankruptcy Cases with the Bankruptcy Court; provided, however, in any event, the Bankruptcy Cases shall be filed no later than May 31, 2013 unless otherwise agreed by the Parties and Secured Party.

**7.2.**    **Bankruptcy Court Approval of Bid Procedures.**    As promptly as practicable after the execution of this Agreement and filing of the Bankruptcy Cases, Sellers will file a motion (the "Sale Procedures Motion") with the Bankruptcy Court requesting the entry of the Procedure Order, and shall thereafter in good faith and with reasonable diligence pursue such entry.

**7.3.**    **Bankruptcy Court Approval of Sale.**    As promptly as practicable after the execution of this Agreement and filing of the Bankruptcy Cases, and contemporaneously with the filing of the Sale Procedures Motion, Sellers shall file a motion with the Bankruptcy Court (the "Sale Motion") requesting entry of the Sale Order, and shall thereafter in good faith and with reasonable diligence pursue such entry.

**7.4.**    **Form of Transaction Pleadings; Copies of Filings.**    The Sale Procedures Motion and the Sale Motion, and any other motion or other pleading filed with respect to the Transactions by Sellers, shall be in form and substance reasonably satisfactory to Purchaser and Secured Party. Sellers shall provide to Purchaser copies, promptly upon the filing thereof, of any other filings made by Sellers in the Bankruptcy Cases.

## ARTICLE 8

## COVENANTS

**8.1.**    **Access to Information.**    Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to (a) make such investigation of the properties, businesses and operations of the Business, and (b) make such examination of the books and

DMEAST #16827137

records of the Business, the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Sellers shall reasonably cooperate therein.  Purchaser and its Representatives shall cooperate with Sellers and their Representatives and shall use their reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which such Seller is bound.

**8.2.    Conduct of the Business Pending the Closing**.

(a)    Subject to Sellers' duties, obligations and requirements under the Bankruptcy Code, and to compliance with, and the availability of funds under, the Budget (as defined in the DIP Financing Facility) associated with the DIP Financing Facility, prior to the Closing, except (1) as set forth on Schedule 8.2(a), (2) as required by Applicable Law or by Order of the Bankruptcy Court, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Sellers shall:

(i)    use commercially reasonable efforts to conduct the Business in the ordinary course of business; provided, however, that this Section 8.2(a)(i) shall not prevent Sellers from closing stores and reallocating inventory in accordance with the terms and provisions hereof;

(ii)    use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with Persons having business dealings with Sellers (including customers and suppliers of the Business); provided Purchaser expressly assumes the risk of any effect that the Bankruptcy Cases may have on the business operations, organization and goodwill of the Business and any relationships that Sellers may have with third Persons; and

(iii) comply, in all material respects, with Applicable Laws, including Environmental Laws.

(b)    Subject to Sellers' duties obligations and requirements under the Bankruptcy Code, except (1) as set forth on Schedule 8.2(b), (2) as required by Applicable Law or Order of the Bankruptcy Court, (3) as otherwise contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)    subject any of the Purchased Assets to any additional Liens and Claims, except for Permitted Liens and Liens granted in connection with the DIP Financing Facility (including any liens granted to any subordinated or

DMEAST #16827137

junior lenders), and except for non-exclusive licenses under any Purchased Intellectual Property granted in the ordinary course of business; or

(ii) make any increase in the compensation or benefits under, or establish any new bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, option (including the granting, modification or acceleration of options or performance awards), or other employee benefit plan, other than compensation increases in the ordinary course of business consistent with past practices; or

(iii) agree to do anything prohibited by this Section 8.2.

**8.3.** **Consents.** Sellers shall use commercially reasonable efforts, and Purchaser shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals listed on Schedule 10.1(d); provided, however, that neither Sellers nor Purchaser shall be obligated to (a) pay any consideration therefor to any third party from whom consent or approval is requested, or (b) agree to any restrictions on its ability to operate the Business or the Purchased Assets or hold or exercise ownership over the Purchased Assets, or initiate any litigation or Legal Proceedings to obtain any such consent or approval (other than the filing and prosecution of the Sale Procedures Motion and the Sale Motion).

**8.4.** **Appropriate Action; Filings.** Through the Closing Date, Sellers and Purchaser shall cooperate with each other and use commercially reasonable efforts: (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, Applicable Law or otherwise to consummate and make effective the Transactions; (b) to obtain promptly from any Governmental Authority any Orders or Permits required to be obtained by Sellers or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions; (c) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under any Applicable Law; (d) to defend any and all lawsuits and other proceedings by or before any Governmental Authority challenging this Agreement or the consummation of the Transactions; (e) to cause to be lifted or rescinded any injunction, decree, ruling, order or other action of any Governmental Authority adversely affecting the ability of any of the Parties to consummate the Transactions; (f) to cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions; (g) to provide prompt notification to the other Party and Secured Party of any actions pursuant to clauses (a)-(f) of this Section 8.4.

**8.5.** **Confidentiality.** Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 8.1, and is subject to the terms of that certain letter agreement dated as of February 20, 2013, by and among Purchaser and Sellers (as amended, restated, supplemented or otherwise modified from time to time, the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement shall be an exhibit to the Sale Procedures Motion and the

Sale Motion, may be otherwise made available by Sellers to prospective bidders, and such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Effective upon, and only upon, the Closing, Purchaser's obligations pursuant to the Confidentiality Agreement in respect of "Evaluation Material" (as defined therein) that is included in the Purchased Assets shall terminate. The provisions of this <u>Section 8.5</u> shall survive the Closing. The Parties acknowledge and agree that any disclosures made to the Secured Party by either Party with respect to the Business, the Transactions or the Transaction Documents shall not be in violation of this <u>Section 8.5</u>.

     **8.6.**   **<u>Preservation of Records; Cooperation.</u>**  Sellers and Purchaser shall preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of one (1) year or such longer period as may be required by Applicable Law (<u>provided, however,</u> that in no event shall Sellers be required to preserve such records after the Bankruptcy Cases are closed, converted or dismissed) and shall make such records and information available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Legal Proceedings involving the Purchased Assets, or any governmental investigations of Sellers or Purchaser or any of their respective Affiliates related to the Purchased Assets, or in order to enable Sellers or Purchaser or any of their respective Affiliates to comply with their respective obligations hereunder and each other agreement, document or instrument contemplated hereby or thereby or otherwise, or to allow Sellers to transition and conduct accounting and tax wind down activities by making Purchaser's computer systems and accounting department personnel reasonably available to Sellers without cost; <u>provided, further,</u> that in no event shall either Party be obligated to provide any information the disclosure of which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or that would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound. Purchaser further acknowledges that Sellers shall be entitled to copy any such records, at Sellers' sole cost and expense, and to retain copies of such records. After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records, at least sixty (60) days' prior written notice to such effect shall be given by Purchaser to Sellers or their successors (or a Person designated by Sellers) and Sellers or their successors (or a Person designated by Sellers) shall have the opportunity (but not the obligation), at their sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select. In the event Sellers wish to destroy any records after the Bankruptcy Cases are closed, before Sellers shall dispose of any of such records, at least thirty (30) days' prior written notice to such effect shall be given by Sellers to Purchaser or its successors (or a Person designated by Purchaser) and Purchaser or its successors (or a Person designated by Purchaser) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as it may in its sole discretion select.

     **8.7.**   **<u>Supplements to Schedules.</u>**  Sellers may, by written notice to Purchaser from time to time prior to the Closing Date, and subject to Purchaser's review and prior written approval, which approval shall not be unreasonably withheld, supplement or amend the Schedules provided pursuant to <u>Article 5</u>, including in response to any changes or updates to <u>Schedule 1.1(a)</u> or <u>Schedule 1.1(b)</u> made by Purchaser. All references to Schedules that are supplemented or amended pursuant to this <u>Section 8.7</u> shall be deemed to be a reference to such

Schedule as supplemented or amended. The Parties shall endeavor to provide all such supplements to Secured Party.

**8.8.**   **Gift Cards.** At the Closing, as part of the Purchase Price, Purchaser shall pay to Sellers an amount equal to fifty percent (50%) of the face amount of any gift cards redeemed after the Execution Date. Similarly, at the Closing, Sellers shall reduce the Purchase Price by an amount equal to fifty percent (50%) of the face amount of any gift cards sold after the Execution Date.

**8.9.**   **Name Change.** Within thirty (30) days after the Closing Date to the extent authorized by the Bankruptcy Court, Sellers shall use commercially reasonable efforts to take such corporate and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes. In furtherance of the foregoing sentence, Sellers shall not operate as Life Uniform or Uniform City and shall change all signage and other uses of the names to remove such names.

**ARTICLE 9**

**EMPLOYMENT MATTERS; TAX MATTERS; OTHER AGREEMENTS**

**9.1.**   **Employment Matters.** At or prior to Closing, Sellers will terminate all of their Employees who are to be hired by Purchaser and included in the Employment Notice and Seller will continue in Sellers' employment or terminate all other Employees. The sale contemplated hereunder does not require the retention or assumption by Purchaser of any Employee, employment agreement or Employee Benefit Plan associated with any Employees or any previous employee of Sellers. Nothing contained in this Agreement shall confer upon any Employee any right with respect to continued employment by Purchaser. Notwithstanding the foregoing, Purchaser may, but shall not be obligated to, offer employment to any or all Employees of Sellers. Any such offers shall be at such salary or wage and benefit levels and on such other terms and conditions as Purchaser shall in its sole discretion deem appropriate. Sellers shall not take any action that would impede, hinder, or otherwise interfere with Purchaser's effort to hire or communicate with any employees of the Sellers, provided that Purchaser agrees to coordinate with Sellers in respect of any such discussions with Employees of Sellers prior to the Closing Date and Purchaser shall provide Sellers at least thirty (30) days prior to the Closing Date with a list of the Employees that it will extend offers of employment conditioned on the Closing (such notice, the "Employment Notice"). For those Employees hired by Purchaser, Purchaser will honor accrued vacation, sick leave, personal time and shall make available to such hired Employees benefits as Purchaser currently makes available to its similarly situated employees. Sellers shall be responsible for all requirements and obligations of and for any and all liability under any local, state or federal law, regulation or statute governing the termination of any and all Employees of the Sellers, including, without limitation, the WARN Act. Sellers shall be responsible for offering and providing any COBRA continuation coverage required with respect to any Employee not hired by Purchaser (or qualified beneficiary thereof) who experiences a qualifying event on or before the Closing Date. Purchaser shall hire a sufficient number of Employees of Sellers' headquarters so that fewer than 50 such Employees

DMEAST #16827137

remain employees of Sellers after the Closing. Sellers, within five (5) days of the Execution Date, will deliver to Purchaser a copy of Sellers' 401(k) plan(s), together with all amendments thereto. Purchaser, at Purchaser's expense, will prepare and provide to Sellers no less than 20 days prior to the Closing, an amendment to such plan(s) such that (a) severance from employment and/or plan termination does not result in an automatic 401(k) loan default for any Employees hired by Purchaser to the extent that such Employees receive a distribution of their 401(k) account balances and rollover such balances to Purchaser's 401(k) plan (including any outstanding loans, which will be permitted by Purchaser's 401(k) plan, and (b) 401(k) account balances of Employees hired by Purchaser will automatically vest upon Closing; provided, however, that the adoption of such amendment will not result in any additional Liability by Sellers with respect to their 401(k) plan(s). Sellers will use best efforts to adopt such amendment on or before the Closing Date.

**9.2.** **Service Credits.** For those employees hired by Purchaser to whom the benefits described in <u>Section 9.1</u> will be made available, Purchaser shall take appropriate action to waive any waiting period, pre-existing condition or requirement for evidence of insurability otherwise imposed with respect to such employee. Purchaser shall give credit to such employee and his or her covered dependents for all deductibles, co-pays, and out-of-pocket expense limitations incurred under the Seller's Employee Benefit Plan to the extent that employee can provide documentation of such expenses. For eligibility and vesting purposes under Purchaser's 401(k) plan, such employees shall receive full credit from Purchaser and its ERISA Affiliates for all service credited under Seller's 401(k) plan prior to the Closing Date.

**9.3.** **No Third Party Beneficiaries.** This Agreement shall not confer any rights or remedies upon any Person other than the Parties hereto, Secured Party and their respective successors and permitted assigns.

**9.4.** **Tax Matters.**

(a)    <u>Transfer Taxes</u>. All sales, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar Taxes and fees arising from or associated with the Transactions (collectively, "<u>Transfer Taxes</u>"), whether levied on Purchaser or Sellers, shall be paid one-half by Purchaser and one-half by Sellers. On or before the Closing Date, Purchaser shall prepare at Purchaser's expense, with Sellers' cooperation, any necessary Tax Returns and other documentation with respect to any Transfer Taxes, and the Party required by Law to file such Tax Return shall timely do so.

(b)    <u>Ad Valorem Taxes</u>. Sellers shall be responsible for all ad valorem Taxes on personal property for all Pre-Closing Periods ("<u>Ad Valorem Taxes</u>"). Ad Valorem Taxes with respect to the Purchased Assets for the calendar year in which the Closing occurs shall be prorated between Sellers and Purchaser as of the Closing Date. If the amount of such Taxes with respect to any of the Purchased Assets for the calendar year in which the Closing occurs has not been determined as of the Closing Date, then the Ad Valorem Taxes with respect to such Purchased Assets for the preceding calendar year shall be used to calculate such prorations, with known changes in valuation or millage applied. Sellers shall be responsible for paying the prorated Ad Valorem Taxes allocable to the Pre-Closing Tax Period, and Purchaser shall be responsible for paying the remainder of the prorated Ad Valorem Taxes for such calendar year.

DMEAST #16827137

The Sellers' share of such prorated Ad Valorem Taxes shall be an adjustment to the amount of cash due from Purchaser at the Closing.

(c)     Tax Claims.  Sellers, at their expense, shall have the right, but not the obligation, to control the conduct of the portion of any audit, claim, proceeding, investigation, or other controversy relating solely to Taxes ("Tax Claim") for which Sellers shall remain liable; provided, however, that Sellers will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to adversely affect Purchaser without first obtaining Purchaser's written consent, such consent to not be unreasonably withheld, conditioned or delayed.  Purchaser shall control the conduct of all other Tax Claims; provided, however, that if such Tax Claim, if successful, could reasonably be expected to result in any Tax for which Sellers may be responsible under this Agreement, Purchaser shall (i) promptly notify Sellers in writing of such claim, (ii) notify Sellers of any significant developments regarding such claim, (iii) consider in good faith recommendations of Sellers in connection with such claim, and (iv) not settle any such claim without first obtaining Sellers' written consent, such consent to not be unreasonably withheld, conditioned or delayed.

(d)     Cooperation.  Sellers and Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities.  Any information obtained under this Section 9.4 shall be kept confidential except to the extent disclosure of such information may be necessary or appropriate in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(e)     Effect of Payments.  Sellers and Purchaser agree to treat any payment made between them pursuant to or in connection with, this Agreement as an adjustment to the Purchase Price for Tax purposes to the extent permitted by applicable Tax Law.

(f)     Pre-Closing Periods and Straddle Periods.  Except as otherwise set forth in this Section 9.4, after the Closing, Purchaser shall prepare and file (or cause to be prepared and filed) all Tax Returns required to be filed by the Purchaser under Applicable Law with respect to the Business and the Purchased Assets; provided, however, that if Sellers are responsible for any of the Taxes shown on such Tax Returns, Purchaser shall deliver to Sellers (i) a copy of such Tax Return at least twenty (20) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions) and shall consider in good faith any comments submitted by Sellers at least ten (10) days prior to the due date for filing such Tax Return (after giving effect to any applicable extensions) and (ii) written notice of any material Tax payment obligation of Sellers at least ten (10) Business Days prior to the date on which such payment is required to be made.  Sellers shall be responsible for all Taxes with respect to the Business and the Purchased Assets for all Pre-Closing Periods.  Whenever Taxes are imposed in respect of the Business or Purchased Assets for a Straddle Period, Sellers shall be responsible for paying the portion of such Taxes allocable to the Pre-Closing Tax Period, and Purchaser shall be responsible for paying the remainder of such Taxes.  Whenever it is necessary to determine the liability for

31

Taxes in respect of Sellers or Purchaser for a Straddle Period, the portion of such Tax that relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the end of the date of Closing and the denominator of which is the number of days in the entire Straddle Period; and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount that would be payable on the basis of an interim closing of the books as of the end of the date of Closing.

     **9.5.**    **Obligation of Purchaser to Indemnify.**  Purchaser agrees to indemnify, defend, and hold harmless Sellers (and their directors, officers, stockholders, employees, lenders, Affiliates, successors, assigns, and their respective Representatives) from and against any losses resulting from or arising out of the Assumed Liabilities.

## ARTICLE 10

## CONDITIONS TO CLOSING

     **10.1.**  **Conditions Precedent to Obligations of Purchaser.**    The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its reasonable discretion, in whole or in part to the extent permitted by Applicable Law):

     (a)    the representations and warranties of Sellers set forth in this Agreement shall be true and correct in all material respects (without regard to any materiality or Material Adverse Effect qualifiers contained in such representations and warranties) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date);

     (b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect;

     (c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

     (d)    all material consents (or in lieu thereof waivers) described on Schedule 10.1(d) (i) to the extent that same are required and can be obtained, shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived, and (iv) shall be in full force and effect;

     (e)    all material Permits and licenses that are transferable under Applicable Law to Purchaser prior to the Closing shall have been so transferred, or reasonably satisfactory

alternative arrangements (such as a management agreement) shall have been offered by Sellers in order to make the benefit of such material Permits and licenses reasonably available to Purchaser;

  (f)  Sellers shall have paid in full or otherwise satisfied all Cure Costs with respect to the Assumed Contracts set forth on Schedule 1.1(a) and Schedule 1.1(b);

  (g)  [intentionally deleted];

  (h)  Sellers shall have paid, or shall pay concurrently with the Closing, all salary and hourly salary and wages for all Employees through and including the date of the Closing;

  (i)  this Agreement shall not have previously been terminated pursuant to Section 4.4; and

  (j)  there shall not have occurred any Seller Material Adverse Effect.

  **10.2.** **Conditions Precedent to Obligations of Sellers.**  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers, in their reasonable discretion, in whole or in part to the extent permitted by Applicable Law):

  (a)  the representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date);

  (b)  Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

  (c)  Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 4.3.

  **10.3.** **Conditions Precedent to Obligations of Purchaser and Sellers.**  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by Applicable Law):

  (a)  there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; provided that the Parties shall have used their respective commercially reasonable efforts to cause any such Order to be vacated or lifted in accordance with Section 8.4 hereof; and

DMEAST #16827137

(b)    the Sale Order and the Procedures Order shall have been entered by the Bankruptcy court, shall not have been stayed, vacated, revoked, or withdrawn.

**10.4.  Frustration of Closing Conditions.**  Neither Sellers nor Purchaser may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>Section 10.2</u> or <u>Section 10.3</u>, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE 11

## LIMITATIONS

**11.1.  Purchaser's Review.**

(a)    <u>No Reliance</u>.  Purchaser has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement and to consummate the Transactions.  In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon, and Purchaser expressly waives and releases Sellers from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Sellers or their Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in <u>Article 5</u>.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Sellers or their Affiliates or any of their respective Representatives, other than the express representations and warranties of Sellers set forth in <u>Article 5</u>.  Purchaser acknowledges and agrees that it has not relied upon, and Purchaser expressly waives and releases Secured Party from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Secured Party or its Affiliates.

(b)    <u>Limited Duties</u>.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

**11.2.  No Consequential or Punitive Damages.**  NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION

34

METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

## ARTICLE 12

## MISCELLANEOUS

**12.1.   Survival of Representations, Warranties, Covenants and Agreements.**  The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or upon termination of this Agreement pursuant to Section 4.4, and, following the Closing or the termination of this Agreement, as the case may be, and notwithstanding anything to the contrary contained herein or pursuant to Applicable Law, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives.   Except with respect to covenants or agreements that are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

**12.2.   Remedies.**  Solely with respect to the Parties' respective covenants under this Agreement that survive the Closing, and solely to the extent to be performed after the Closing, (i) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (ii) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants, (iii) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (iv) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of, or to enjoin the violation of, such covenants, and (v) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**12.3.   Expenses.**  Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the Transactions contemplated hereby and thereby.

**12.4.   Non-Recourse.**  The Parties acknowledge and agree that no past, present or future Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Purchaser or Sellers, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

**12.5.   Submission to Jurisdiction.**

(a)      Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of the

Transaction Documents and to decide any claims or disputes among the Parties that may arise or result from, or be connected with, the Transaction Documents, any breach or default thereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 12.10; provided, however, that if the Bankruptcy Cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Missouri.

(b)     The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each of the Parties hereby consents to process being served by any Party in any suit, Action or proceeding by the mailing of a copy thereof in accordance with the provisions of Section 12.10; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

**12.6.  Waiver of Jury Trial.** THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.6.

**12.7.  Time of Essence.** With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**12.8.  Entire Agreement; Amendments and Waivers.** This Agreement (including the Schedules and Exhibits hereto), the other Transaction Documents and the Confidentiality Agreement represent the entire understanding and agreement among the Parties with respect to the subject matter hereof and supersede all prior or contemporaneous discussions and agreements among the Parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by (i) written instrument making specific reference to this Agreement signed by the Party against whom enforcement of

DMEAST #16827137

any such amendment, supplement, modification or waiver is sought and provided that, with respect to Sections 3.1, 3.2, 3.3, 3.4, 3.5, 4.1, 4.4, 4.5, 6.3, 6.6, Article 7, 8.4, 8.7, Article 10, 11.1, 12.10 (only with regard to the last sentence thereof), 12.13 and this Section 12.8 and the definition of "Secured Party" cannot be amended, supplemented or modified without the written consent of Secured Party.    No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such Party of any conditions to Closing not satisfied as of the Closing Date.    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.    No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

**12.9.    Governing Law.**  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

**12.10.    Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section):

If to Sellers:

      Healthcare Uniform Company, Inc.
      2132 Kratky Road
      St. Louis, MO 63114

Attention:  Bryan Graiff

Phone:  314-824-2950
Fax:  314-890-3973
E-mail:  bgraiff@lifeuniform.com

With a copy to:

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Attention: Domenic E. Pacitti, Esq.

Phone:  (302) 426-1189
Fax:  (302) 426-9193
E-mail:  dpacitti@klehr.com

and

Morgan Joseph TriArtisan LLC
600 Fifth Avenue, 19th Floor
New York, NY 10020
Attention: Alex C. Fisch

Phone:  212-218-3807
Fax:  212-218-3719
E-mail:  afisch@mjta.com

If to Purchaser:

Scrubs & Beyond, LLC
823 Hanley Industrial Court
Brentwood, MO 63144
Attention: Karla Bakersmith, President

Phone:  (314) 961-9494
Fax:  (314) 961-9454
E-mail:  kbakersmith@scrubsandbeyond.com

With a copy to:

Ballard Spahr LLP
999 Peachtree Street
Suite 1000
Atlanta, Georgia 30309
Attention: Stephen A. Opler, Esq.

38

Phone:  678-420-9390
Fax:  678-420-9301
E-mail:  oplers@ballardspahr.com

and

Genesis Capital, LLC
3414 Peachtree Road NE
Suite 700
Atlanta, GA  30326
<u>Attention</u>: Jeremy Ellis

Phone:  404-816-7538
Fax:  404-816-7553
Email:  jellis@genesis-capital.com

<u>To Secured Party</u>:

CapitalSource Finance LLC
5404 Wisconsin Avenue, Second Floor
Chevy Chase, Maryland 20815
<u>Attention</u>:  Walter P. Schuppe
Email:  WSchuppe@capitalsource.com

<u>With a copy to</u>:

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Attn:  Jeffrey L. Jonas, Esq.
Email:  jjonas@brownrudnick.com

The parties hereto shall provide a copy of any notice delivered hereunder to the Secured Party; provided that any failure to so deliver such notice as provided herein shall not constitute a material breach hereunder.

**12.11.  <u>Severability</u>.**  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

DMEAST #16827137

**12.12. No Right of Set-Off.** Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith. Each Seller, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Sellers or any of their Affiliates, successors and assigns have or may have with respect to any payments to be made by Sellers pursuant to this Agreement or any other document or instrument delivered by Sellers in connection herewith.

**12.13. Binding Effect; Assignment.** This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person, other than Secured Party, not a Party to this Agreement except to the extent provided in Section 12.4. No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void.

**12.14. Moral and Attribution Rights.** Sellers waive all moral, attribution, and integrity rights in the Purchased Intellectual Property and further agree that Purchaser, its successors and assigns, and any of its direct or indirect licensees shall not be obligated to designate Sellers as an author or co-author of any the Purchased Intellectual Property.

**12.15. Headings.** The Article and Section headings in the Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**12.16. Counterparts.** This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally left blank; signatures begin on following page.]*

40

IN WITNESS WHEREOF, each of the Parties hereto has caused this Asset Purchase Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

SELLERS:

HEALTHCARE UNIFORM COMPANY, INC.

By: _Bryn Graff_
Name: _Bryan Graff_
Title: _CFO_

UNIFORM CITY NATIONAL, INC.

By: _Bryn Graff_
Name: _Bryan Graff_
Title: _CFO_

PURCHASER:

SCRUBS & BEYOND, LLC

By: _____
Name: _____
Title: _____

41

IN WITNESS WHEREOF, each of the Parties hereto has caused this Asset Purchase Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

SELLERS:

**HEALTHCARE UNIFORM COMPANY, INC.**

By: _____
Name: _____
Title: _____

**UNIFORM CITY NATIONAL, INC.**

By: _____
Name: _____
Title: _____

PURCHASER:

**SCRUBS & BEYOND, LLC**

By: _Karla Abercrombie_
Name: _KARLA BAKERSMITH_
Title: _President / CEO_

41