## EXHIBIT A

## DEFINITIONS

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Accounting Referee" has the meaning given to such term in Section 3.5(a)(iv).

"Accounts Receivable" means all accounts, accounts receivable and other rights of the Sellers to payments, of whatever kind or nature, including all current or deferred rights to payment for goods or services rendered and including all in transit customer payments; provided, however, that such term shall not include any Credit Card Receivables.

"Ad Valorem Taxes" has the meaning given to such term in Section 9.4(b).

"Affiliate" (and, with a correlative meaning, "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Agreement" means this Asset Purchase Agreement and all Exhibits and Schedules attached hereto, as amended, restated, consolidated, supplemented, replaced or otherwise modified by the Parties from time to time.

"Alternative Transaction" means one or more agreements to sell, transfer, refinance (other than the financing provided under the DIP Financing Facility) or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions (other than the transactions to be consummated under this Agreement) with one or more Persons, other than Purchaser, whether pursuant to an asset sale, merger, credit bid, stock purchase, a Plan of Reorganization, an alternative bid that actually closes or otherwise.

"Applicable Law" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets, and any Law applicable to any other conduct, transaction, agreement or matter in question. "Applicable Laws" shall refer to all such Laws.

"Asset Acquisition Statement" has the meaning given to such term in Section 3.4(c).

"Assignment and Assumption Agreement" has the meaning given to such term in Section 4.2(c).

"Assignment and Assumption of Leases and Related Agreements" has the meaning given to such term in Section 4.2(g).

A-1

"Assumed Contracts" means all Contracts set forth on Schedules 1.1(a) and 1.1(b) (as may be modified pursuant to Section 2.5).

"Assumed Liabilities" has the meaning given to such term in Section 2.3.

"Auction" has the meaning specified in the Bidding Procedures Order.

"Back-Up Bidder" has the meaning given to such term in the Bid Procedures.

"Bankruptcy Case" has the meaning given to such term in the Background.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and applicable Federal Rules of Bankruptcy Procedure thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bid Procedures" means those procedures, substantially in the form attached hereto as Exhibit B, for the solicitation, qualification, and consideration of competing bids for the Purchased Assets, including the time, place, and manner of any Auction in the event qualified competing bids are obtained by Sellers.

"Bill of Sale" means a bill of sale substantially in the form attached hereto as Exhibit J pursuant to which title to such of the Purchased Assets as constitute personal property is conveyed to Purchaser.

"Break-Up Fee" means $678,750.

"Business" has the meaning given to such term in the Background.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Wilmington, Delaware are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Capital Leases" has the meaning given to such term in Section 5.5(b).

"Cash & Equivalents" means the amount of all cash, cash equivalents, Credit Card Receivables and freely marketable securities held by Sellers determined in accordance with GAAP and the past practices of Sellers and reflected on the historic balance sheets of Sellers (for reference, Cash & Equivalents was $1,195,000 on March 31, 2013); provided that Cash & Cash Equivalents shall be calculated net of issued but uncleared checks that have been written by either Seller that have not been debited to the accounts of such Seller and shall include deposits in transit of Sellers as of the Closing that have not yet been credited to the accounts of Sellers (but in fact are credited) as of the Closing.

"Cash Purchase Price" has the meaning given to such term in Section 3.1.

A-2

"Claims" means any and all claims as defined in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning given to such term in Section 4.1.

"Closing Current Assets Statement" has the meaning given to such term in Section 3.5(a)(ii).

"Closing Date" has the meaning given to such term in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning given to such term in Section 8.5.

"Contract" means any contract, indenture, note, bond, loan, instrument, certificate, deed, bill of sale, license, lease (including without limitation the Real Property Leases and the Personal Property Leases), commitment, understanding (written or oral) or other agreement.

"Credit Card Receivables" means, collectively, (a) all present and future rights of either Seller to payment from any credit card issuer or credit card processor arising from the sale of goods or the rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of either Seller to payment from any credit card issuer or credit card processor in connection with the sale or transfer of accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any credit card issuer or credit card processor under the credit card agreements or otherwise.

"Cure Costs" means the amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, whether by agreement or Order of the Bankruptcy Court, in connection with the assumption and assignment of any Assumed Contract.

"Current Assets" means the current assets of Sellers (other than Cash & Equivalents), determined in good faith, in accordance with GAAP as it has been interpreted and applied consistent and in accordance with the past practices of Sellers as reflected on the historical audited balance sheets of Sellers (for reference, Current Assets was $15,384,000 on March 31, 2013).

"Current Assets Protest Notice" has the meaning given to such term in Section 3.5(a)(iii).

"Current Assets Escrow" has the meaning given to such term in Section 3.3(c).

"Deposit" has the meaning given to such term in Section 3.2(a).

"DIP Financing Facility" means the debtor-in-possession financing facility to be provided by CapitalSource Finance, LLC to Sellers.

"Documents" means all files, documents, instruments, papers, books, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, accounts, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form and that are owned by Sellers.

"Employee" means any employee (or individual classified for tax purposes as an independent contractor) of a Seller who performs work primarily related to the operation of the Business.

"Employee Benefit Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA), all employment or individual compensation agreements, and all other plans, policies, agreements, payroll practices or arrangements providing any bonus, incentive, retention, equity or equity-based compensation, deferred compensation, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, welfare benefit, pension benefit, life insurance, medical insurance, fringe benefits, educational assistance, tax gross up, change in control or other material employee benefit, in each case as to which any Seller or any ERISA Affiliate has any Liability with respect to any current or former officers, employees, independent contractors or directors of such Seller or any ERISA Affiliate.

"Employment Notice" has the meaning given to such term in Section 9.1.

"Environmental Laws" means all Applicable Laws in effect on the date hereof relating to the environment, natural resources, health and safety or the protection thereof, including but not limited to any applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., and the regulations promulgated pursuant thereto, and all analogous state or local statutes.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with the Person or any of its Subsidiaries would be deemed a "single employer" within the meaning of Section 414 of the Code.

"Escrow Agent" has the meaning given to such term in Section 3.2(a).

"Escrow Agreement" has the meaning given to such term in Section 3.2(a).

"Estimated Current Assets" has the meaning given to such term in Section 3.5(a)(i).

A-4

"Estimated Current Assets Statement" has the meaning given to such term in Section 3.5(a)(i).

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Contract" has the meaning given to such term in Section 2.5(b).

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"Execution Date" has the meaning given to such term in the Preamble.

"Final Current Assets Statement" has the meaning given to such term in Section 3.5(a)(iv).

"Final Current Assets" has the meaning given to such term in Section 3.5(b).

"Final Order" means an order, ruling, judgment or the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Bankruptcy Cases or the docket of any other court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

"Funds Flow" has the meaning given to such term in Section 3.3(b).

"GAAP" means generally accepted accounting principles in effect in the United States from time to time.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to the United States or to a foreign, federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"Hazardous Materials" means all substances defined as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws.

"Indebtedness" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such

Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, "keep well" agreements, agreements to maintain or contribute cash or capital to any Person or other similar agreements or arrangements; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all intellectual property and rights of any type throughout the world, arising from or in respect of the following: all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, design marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, other indicia of source of origin, phone numbers, toll free phone numbers, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof; and (iv) Trade Secrets.

"Intellectual Property Licenses" means (i) any Contract that contains any grant by Sellers or either of them, to any third Person of any right to use, publish, perform or exploit any of the Purchased Intellectual Property, and (ii) any Contract that contains any grant by any third Person to Sellers, or either of them, of any right to use, publish, perform or exploit any Intellectual Property of such third Person concerning or relating to the Purchased Intellectual Property.

"Inventory" has the meaning given to such term in Section 2.1(q).

"Investments" means shares of capital stock of any corporation, interests in partnerships or limited liability companies, or other equity or debt instruments issued by any Person, and proceeds from the sale thereof.

"Knowledge of Sellers" and similar phrases means (i) the actual knowledge of James Rudd and Bryan Graiff as of the Execution Date and (ii) any fact or other matter they would reasonably be expected to discover or otherwise become aware of in the course of conducting a reasonable investigation of such fact or matter based on their duties and responsibilities as an officer of Seller.

A-6

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation, governmental guideline or other requirement enacted, promulgated, issued or entered by a Governmental Authority, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of a Governmental Authority.

"Legal Proceeding" means any judicial, administrative, arbitral or mediation actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, levy, right of first offer, easement, servitude, transfer restriction under any stockholder or similar agreement, Tax (including foreign, federal state and local Tax), Order of any Government Authority, or encumbrance or any other restriction or limitation whatsoever of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Purchaser is a successor, transferee or continuation of Sellers or the Business, and (iv) any leasehold interest, license or other right, in favor of a Seller or a third party to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfilled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Liens and Claims" has the meaning given to such term in Section 2.1.

"Material Contracts" has the meaning given to such term in Section 5.7(a).

"Multiemployer Plan" means a "multiemployer plan" (as defined in Section 3(37) of ERISA) to which a Person or any of its ERISA Affiliates is or has been obligated to contribute or otherwise may have any liability.

"Nonassignable Assets" has the meaning given to such term in Section 2.6(c).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Outside Date" has the meaning given to such term in Section 4.4(e).

DMEAST #16827137

"<u>Party or Parties</u>" has the meaning given to such term in Preamble.

"<u>Permits</u>" means any approvals, authorizations, consents, licenses, franchises, permits or certificates.

"<u>Permitted Liens</u>" means:

      (a)    all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all Applicable Laws or under any Permit issued by any Governmental Authority;

      (b)    liens for real property Taxes not yet due and payable;

      (c)    statutory or contractual lien rights of landlords arising in the ordinary course under Real Property Leases listed on <u>Schedule 1.1(a)</u> for the payment of rents or other amounts required thereunder accruing from and after Closing;

      (d)    any defects, exceptions, existing easements, covenants, conditions, rights-of-way, restrictions and other encumbrances (other than monetary liens) and matters currently of record affecting title to the real property which, which taken individually or as a whole, are not material, do not adversely affect the present ownership, use or operations of such properties or assets; and

      (e)    with respect to Real Property Leases, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any governmental body having jurisdiction over such real property.

"<u>Person</u>" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"<u>Personal Property Leases</u>" has the meaning given to such term in <u>Section 5.5(a)</u>.

"<u>Plan of Reorganization</u>" means any plan of reorganization or plan of liquidation that has been confirmed by an Order of the Bankruptcy Court.

"<u>Pre-Closing Tax Period</u>" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to any Straddle Period, the portion of such period up to and including the Closing Date.

"<u>Procedures Order</u>" means an order of the Bankruptcy Court substantially in the form attached hereto as <u>Exhibit C</u>.

"<u>Proposed Allocation</u>" has the meaning given to such term in <u>Section 3.4(a)</u>.

"<u>Purchase Price</u>" has the meaning given to such term in <u>Section 3.1</u>.

DMEAST #16827137

"Purchased Assets" has the meaning given to such term in Section 2.1.

"Purchased Intellectual Property" means all Intellectual Property owned by Sellers.

"Purchaser" has the meaning given to such term in Preamble.

"Purchaser Documents" has the meaning given to such term in Section 6.2.

"Purchaser Material Adverse Effect" means any change, circumstance, fact, condition (financial or otherwise) or event that individually or in the aggregate with any other change, circumstance, fact, condition (financial or otherwise) or event would or would reasonably be expected to materially delay or impair the ability of Purchaser to perform its obligations under this Agreement.

"Real Property Lease or Real Property Leases" means all real property leases or other occupancy agreements, together with any amendments to the same (other than amendments or proposed amendments that have been negotiated on behalf of Sellers by A&G Realty Partners, LLC and previously disclosed to Purchaser in writing (including by deposit in Sellers' electronic data room)).

"Recordable Copyright Assignment" has the meaning given to such term in Section 4.2(d).

"Recordable Trademark Assignment" has the meaning given to such term in Section 4.2(c).

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants, trustees and other agents and representatives.

"Revised Statements" has the meaning given to such term in Section 3.4(c).

"Sale Motion" has the meaning given to such term in Section 7.3.

"Sale Order" means an order of the Bankruptcy Court substantially in the form of Sale Order attached hereto as Exhibit K.

"Sale Procedures Motion" has the meaning given to such term in Section 7.2.

"Secured Party" means CapitalSource Finance, LLC or such other entity designated by CapitalSource Finance, LLC.

"Seller or Sellers" has the meaning given to such term in Preamble.

"Seller Documents" has the meaning given to such term in Section 5.3.

"Seller Material Adverse Effect" means any change, circumstance, fact, condition (financial or otherwise) or event (other than the commencement of the Bankruptcy Cases) that, individually or in the aggregate with any other change, circumstance, fact, condition (financial or otherwise) or event (other than the commencement of the Bankruptcy Cases), that (a) is or would

DMEAST #16827137

reasonably be expected to have a materially adverse effect on (i) the Sellers, the Business, the Purchased Assets, the financial condition, operations, licenses, Permits, rights, privileges, Liabilities, properties, assets or results of operations of Sellers (taken as a whole) or their Business, or (ii) the ability of Sellers to materially perform their respective obligations under this Agreement, or (b) prevents, impairs or materially delays the consummation of the Transactions provided, however, that in determining whether there has been a Seller Material Adverse Effect, any effect to the extent attributable to any of the following shall be disregarded: (i) with respect to Sellers or the Purchased Assets, the occurrence of any event materially adversely affecting the industry in which the Business operates or in which the Purchased Assets are held and not uniquely relating to Sellers, the Business or the Purchased Assets (as applicable), (ii) with respect to Sellers or the Purchased Assets, any change in the general condition of the regional, national or global economy, (iii) the taking of any action required to be taken by a Party under the terms of this Agreement, (iv) the announcement or existence of this Agreement or the Transactions, or (v) the resignation of James Rudd as CEO of Sellers.

"Straddle Period" means any Tax period beginning before, and ending after, the Closing Date.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, at least fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity entitled, under ordinary circumstances, to vote in the election of directors or other governing body of such Person, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient equity interests to elect a majority of the board of directors or similar governing body of such Person.

"Tax" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority, and (ii) any transferee liability in respect of any items described in clause (i) above.

"Tax Claim" has the meaning given to such term in Section 9.4(c).

"Tax Return" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with any Tax, including any schedule or attachment thereto or amendment thereof.

"Taxable Consideration" has the meaning given to such term in Section 3.4.

A-10

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Trade Secrets" mean information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Without limiting the foregoing Trade Secret includes any item of confidential information that constitutes a "trade secret(s)" under any common law or statutory law, including without limitation the Missouri Uniform Trade Secrets Act, as amended, and generally includes all source codes and object codes for Sellers' software, all buyer and seller information and all lists of clients or suppliers. Nothing in this Agreement is intended, or shall be construed, to limit the definitions or protection of Trade Secrets under the Missouri Uniform Trade Secrets Act, as amended, or any other Applicable Laws protecting trade secrets or other confidential information.

"Transaction Documents" means this Agreement, the Confidentiality Agreement, the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Assignment and Assumption of Leases and Related Agreement, the Recordable Trademark Assignment, the Recordable Copyright Assignment and all other Contracts and agreements contemplated by this Agreement or necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" has the meaning given to such term in Section 9.4(a).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar state or local "mass layoff or "plant closing" laws.

A-11

# EXHIBIT B

## Procedures Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIFE UNIFORM HOLDING CORP., *et al.*,[1] | ) | Case No. 13-[    ] (    ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

**ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AND HEARING TO
APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE
DEBTORS, (B) APPROVING THE BID PROCEDURES FOR SUCH ASSETS,
(C) APPROVING BREAK UP FEE (D) APPROVING THE FORM
AND SCOPE OF NOTICE OF THE BID PROCEDURES AND
AUCTION, (E) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (F) APPROVING ASSUMPTION OF ESCROW
AGREEMENT, AND (G) GRANTING RELATED RELIEF**

Upon consideration of the motion ( the "*Motion*")[2] of the above-captioned Debtors and

Debtors in possession (the "*Debtors*"), pursuant to sections 105(a), 363, 365, 503 and 507 of title

11 of the United States Code (the "*Bankruptcy Code*") and Rules 2002, 6004, 6006 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and Rules 2002–1 and

6004–1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware

(the "*Local Rules*"), for entry of an order authorizing and scheduling an auction and hearing to

approve the Sale of substantially all of the assets of the Debtors, approving the Bid Procedures

for Auction and Sale, approving a Break-Up Fee, approving the scope and manner of notice,

establishing procedures relating to assumption and assignment of the Assumed Contracts, and

approving assumption of an Escrow Agreement; and the Court having determined that the relief

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number,
    are:  Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).
[2]  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Bid
    Procedures attached hereto.

provided herein is in the best interest of the Debtors, their estates, their creditors and other parties in interest; and due and adequate notice of the Motion having been given under the circumstances; and upon the record of the hearing on the Motion, and the full record of this case; and after due deliberation thereon; and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS THAT:[3]

A.    This Court has jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, (ii) Rules 2002, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules, and (iii) Rule 6004-1 of the Local Rules.

C.    Notice of the Motion having been provided to the parties listed therein is sufficient in light of the circumstances and nature of the relief requested in the Motion, and no other or further notice is required except as set forth herein with respect to the Bid Procedures, Auction and Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties-in-interest.

D.    The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, including without limitation, (i) approval of the Bid Procedures and the Break-Up Fee, (ii) the scheduling of the Bid Deadline, Auction, and Sale Hearing for the Sale of the Purchased Assets; (iii) the establishment of procedures to fix the Cure

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Amounts to be paid under section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts, (iv) approval and authorization to serve the Sale Notice and the Assumption, Assignment, and Cure Notice, and (v) approval of assumption of the Escrow Agreement.

E.    The Bid Procedures and the Purchase Agreement were negotiated in good faith and at arms' length by the Debtors and the Purchaser, and the Bid Procedures, the Break-Up Fee and the termination provisions of the Purchase Agreement were material inducements to the Purchaser to submit its Bid.

F.    The Debtors have demonstrated that the Break-Up Fee constitutes an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, and is of substantial benefit to the Debtors' estates by inducing the Purchaser's Bid, which has established a bid minimum for other bidders for the Purchased Assets, thereby ensuring that during the Auction, if any, the Debtors receive the highest or best Bid possible for the Purchased Assets.

G.    Accordingly, the Bid Procedures and the Break-Up Fee are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors, their estates, and creditors.

H.    The Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, Sale, Sale Hearing, and Bid Procedures.

I.    The Assumption, Assignment, and Cure Notice is appropriate and reasonably calculated to provide all counterparties to the Assumed Contracts with proper notice of the potential assumption and assignment of the Assumed Contracts and the proposed Cure Amounts with respect thereto.

J.      Assumption by the Debtors of the Escrow Agreement is a proper exercise by the Debtors of their business judgment.

K.      The entry of this Order and the granting of the relief provided herein is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED in all respects to the extent provided herein.

2.      All objections, if any, to the Motion or the relief provided herein that have not been withdrawn, waived, or settled, as announced to the Court at, or prior to, the hearing on the Motion or any adjournment thereof or set forth in a stipulation presented to the Court, and all reservations of rights included therein, are hereby overruled on the merits.

3.      The Bid Procedures, in substantially the form attached hereto as **Schedule 1**, are APPROVED and the terms thereof are incorporated herein as if fully set forth herein and shall apply with respect to the proposed Sale of the Purchased Assets.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bid Procedures.

4.      As further described in the Bid Procedures, the deadline for submitting Bids for the Purchased Assets is _____, 2013 at __:__ _.m. (prevailing Eastern Time) (the "***Bid Deadline***").

5.      Pursuant to Bankruptcy Rule 6004(f)(1), the Debtors are authorized to conduct an Auction in respect of the Purchased Assets pursuant to the terms and conditions set forth herein and in the Bid Procedures.  If Qualified Bids are received by the Debtors in accordance with the Bid Procedures, the Auction shall take place on _____, 2013 at __:__ _.m. (prevailing Eastern Time) at the offices of Klehr, Harrison, Harvey, Branzberg, LLP, 919 Market Street, Suite 1000, Wilmington, DE, 19801, or such other location and time as designated by the

4

Debtors in a notice to all Qualified Bidders.  If, however, no Qualified Bid is received (other than

the Purchase Agreement which, as set forth in the Bid Procedures, shall be deemed a Qualified

Bid), the Auction will not be held and the Debtors shall seek Court approval of the Sale to the

Purchaser pursuant to the Purchase Agreement.

6.    Each Qualified Bidder at the Auction will be required to confirm that it has not

engaged in any collusion with respect to its bidding on the Purchased Assets.

7.    The Auction will be conducted openly and all creditors of the Debtors are

permitted to attend; *provided, however,* that in order to attend the Auction, a creditor must advise

the Debtors and the Purchaser in writing no later than 48 hours prior to the Auction, provided,

further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that

they object to such creditor's attendance

8.    Bidding at the Auction will be transcribed or videotaped.

9.    The Sale Hearing is scheduled to be held on _____, 2013 at __:__ __.m.

(prevailing Eastern Time) before the Honorable _____, United States Bankruptcy

Judge, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd

Flr., Wilmington, DE, 19801. The Debtors will seek the entry of an order of this Court at the

Sale Hearing approving and authorizing the Sale to the Purchaser or such other party who is the

Successful Bidder, on terms and conditions consistent with the Purchase Agreement or Modified

Purchase Agreement, as applicable.

10.    The form and scope of the Sale Notice attached hereto as Exhibit A is reasonable

and appropriate and is hereby APPROVED and incorporated herein as if fully set forth herein.

11.    The Debtors are hereby authorized and directed to serve copies of this Order and

the Sale Notice upon: (a) the Office of the United States Trustee for the District of Delaware (the

"*U.S. Trustee*"), (b) counsel to any Creditors' Committee; (c) counsel to the Secured Lenders,

(d) counsel to CapitalSource Finance LLC ("*CapSource*") as lender under the Debtors' debtor-in-

possession loan facility (the "*DIP Facility*"); (e) parties entitled to receive notice in the

Bankruptcy Cases pursuant to Bankruptcy Rule 2002; (f) all entities known by the Debtors to

have asserted any lien, claim, interest, or encumbrance in or on the Purchased Assets, (g) all

parties on the Debtors' master mailing matrix, including, without limitation, all known creditors

of the Debtors, (h) all counterparties to the Assumed Contracts, (i) the Internal Revenue Service

and all state/local taxing authorities in jurisdictions where the Debtors have or may have any tax

liability; (j) all relevant regulatory authorities, (k) all persons who have expressed an interest in

acquiring the Purchased Assets within the last twelve (12) months, and (l) counsel to the

Purchaser, no later than two (2) days after entry of this Order, by first class mail, postage

prepaid, or other method reasonably calculated to provide notice of the Sale and the Auction, and

such service shall constitute good and sufficient notice of the Sale of the Purchased Assets, this

Order, the Auction, the Sale Hearing and all proceedings to be held thereon.

12.    The Break-Up Fee and the termination provisions of the Purchase Agreement are

APPROVED.

13.    The Debtors are hereby authorized and directed without the need for further order

of this Court to pay the Break-Up Fee in accordance with the terms and conditions of the

Purchase Agreement.

14.    The Break-Up Fee constitutes an allowed administrative expense claim pursuant

to sections 503(b) (1) (A) and 507(a) (2) of the Bankruptcy Code.

15.    No person or entity, other than the Purchaser, shall be entitled to any expense

reimbursement (other than expense reimbursement or other payments or amounts owing to

CapSource under the DIP Facility) or break-up, topping, termination, or other similar fee or payment in the event that the Purchaser is not the Successful Bidder. Any bidder that seeks payment of such fees from Debtors in connection with any Bid shall not be a Qualified Bidder and shall be excluded from the Auction and Sale Hearing.

16.     The form and scope of the Assumption, Assignment, and Cure Notice attached hereto as **Exhibit B** is reasonable and appropriate and is hereby APPROVED and incorporated herein as if fully set forth herein.

17.     No later than twenty (20) days prior to the Sale Hearing, the Debtors shall serve by first class mail or hand delivery an Assumption, Assignment, and Cure Notice on each counterparty to each Assumed Contract subject to the Purchase Agreement. Such Cure Notice is without prejudice to the Purchaser's ability, on or before the date established by this Court for submission of competing Bids pursuant to the this Order and the Bid Procedures, to elect to add or remove any contract, agreement or lease from the list of Assumed Contracts; provided that no such addition or removal shall affect the Purchase Price payable under the Purchase Agreement.

18.     All objections, if any, to the proposed assumption and assignment of the Assumed Contracts to the Purchaser, including but not limited to, objections to the Cure Amounts, must (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) to the extent it challenges a scheduled Cure Amount, set forth the cure amount being claimed by the objecting party and provide appropriate documentation to support such party's objection; (d) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Flr., Wilmington, DE, 19801 by 4:00 p.m. (prevailing Eastern Time) on _____, 2013 (the "*Cure Objection Deadline*"); and (e) be served upon (i) counsel to the Debtors, Klehr, Harrison, Harvey, Branzberg, LLP, 919 Market Street, Suite 1000, Wilmington, DE, 19801, Attn:

Domenic E. Pacitti, Esq.; (ii) counsel to the Purchaser, Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania, 19103, Attn: Vincent J. Marriott, III, Esq.; (iii) the U.S. Trustee, Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE, 19801; (iv) counsel to any Creditors' Committee; and (v) counsel to CapSource, so as to be actually received no later than the Cure Objection Deadline.

19.    If no objection is timely received, the Cure Amount for any Assumed Contract set forth in the Assumption, Assignment, and Cure Notice shall control as of the date of such notice without regard to anything to the contrary in such Assumed Contract or any other document. In the event a party to an Assumed Contract files a timely objection asserting a higher cure amount than the Cure Amount, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Assumed Contract will be determined at the Sale Hearing or such other date and time as may be fixed by this Court. All other objections to the proposed assumption and assignment of the Assumed Contracts will be heard at the Sale Hearing.

20.    Unless otherwise agreed to between the parties to the Assumed Contracts and the Debtors, the Debtors shall pay the Cure Amounts at Closing; provided, that in the event that any Cure Amount shall then be in dispute, the Debtors shall pay to the applicable counterparty the portion thereof, if any, that is not in dispute, and the balance, if any, shall be paid upon resolution of such dispute.

21.    In the event that the Purchaser is not the Successful Bidder for the Purchased Assets, within two (2) business days after the conclusion of the Auction, the Debtors shall serve a notice identifying the Successful Bidder upon each counterparty to an executory contract or unexpired lease to be assumed and assigned to the Successful Bidder under such bidder's

Modified Purchase Agreement. Each counterparty shall have until __:___ __.m. (prevailing

Eastern Time) on the date that is two (2) business days prior to the Sale Hearing (the "*Adequate*

*Assurance Objection Deadline*") to object to the assumption and assignment of such executory

contract or unexpired lease solely on the issue of whether the Successful Bidder can provide

adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

22.    Assumption by the Debtors of the Escrow Agreement is hereby approved in

accordance with 11 U.S.C. §365(a), and the Debtors and the Purchaser shall be fully bound by

the terms and conditions thereof.

23.    Responses or objections, if any, to the relief requested in the Sale Motion,

including, but not limited to, the Debtors' request to approve the Sale of the Purchased Assets,

must be (a) in writing; (b) state with specificity the basis therefore; (c) comply with the

Bankruptcy Rules and the Local Rules; and (d) be filed with the clerk of the Bankruptcy Court

for the District of Delaware, 824 Market Street, 3rd Flr., Wilmington, DE, 19801 by 4:00 p.m.

(prevailing Eastern Time) on _____, 2013 (the "*Objection Deadline*"); and (e) be served

upon (i) counsel to the Debtors, Klehr, Harrison, Harvey, Branzberg, LLP, 919 Market Street,

Suite 1000, Wilmington, DE, 19801, Attn: Domenic E. Pacitti, Esq.; (ii) counsel to the

Purchaser, Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania,

19103, Attn: Vincent J. Marriott, III, Esq.; (iii) U.S. Trustee, Office of the United States Trustee,

844 King Street, Suite 2207, Lockbox 35, Wilmington, DE, 19801; (iv) counsel to any Creditors'

Committee; and (v) counsel to CapSource, so as to be actually received no later than the

Objection Deadline.

24.    Notwithstanding Bankruptcy Rule 6004, 6006(d), 7062 or 9014, if applicable, or

any other Local Rule or otherwise, this Sale Order shall not be stayed for 14-days after the entry

hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h).

25.    Any conflict between the terms and provisions of this Order and the Purchase Agreement shall be resolved in favor of this Order.

26.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

By the Court:


Date:        , 2013        _____
U.S.B.J.

# EXHIBIT C

## **Bid Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIFE UNIFORM HOLDING CORP.,[1] | ) | Case No. 13-[    ] (    ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

### SALE PROCEDURES[2]

The following procedures (the "Sale Procedures") shall govern the bidding on, and the sale at auction (the "Auction") of, the assets (the "Assets") of Healthcare Uniform Company, Inc. and Uniform City National, Inc. (collectively, the "Sellers") (along with its affiliated debtor, Life Uniform Holding Corp., collectively, the "Debtors") in a single sale to a single purchaser or in several sales to more than one purchaser, pursuant to Debtors' Motion for Order:  (A) Approving Sale Procedures and Bidding Protections in Connection with Sale of Certain of the Debtors' Assets Pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of Certain of the Debtors' Assets; (C) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (i) Sale of Assets, and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Other Relief (the "Sale Procedures Motion"), filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on May [__], 2013.  These Sale Procedures have been approved and authorized by an order of the Honorable _____, United States Bankruptcy Judge, dated June [__], 2013 (the "Sale Procedures Order") in the chapter 11 cases of the Debtors (the "Cases"), which Cases were commenced on May [    ], 2013 (the "Petition Date").

The Sellers have entered into an Asset Purchase Agreement (the "Purchase Agreement") dated May [__], 2013 with Scrubs & Beyond, LLC (the "Purchaser"), pursuant to which the Sellers contemplate the sale (the "Sale") of certain of their Assets (the "Purchased Assets") and the assumption by the Purchaser of certain Assumed Liabilities, including under certain Assumed Contracts, free and clear of all liens, claims, encumbrances and interests (collectively, the "Liens and Claims"), except as otherwise provided for in the Purchase Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code, such Liens and Claims to attach to the proceeds of the Sale of the Purchased Assets.  The proposed transaction is subject to the approval of the Bankruptcy Court.  As contemplated by the Purchase Agreement and as set forth in the Sale Procedures Order, the following Sale Procedures shall govern the Sale and any Auction held in connection therewith.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and Uniform City National, Inc. (0392).

[2] Terms capitalized but not defined herein shall have the meanings ascribed to them in the Purchase Agreement or in the Sale Procedures Motion [Docket No. __].

## Assets to be Sold

The Debtors shall consider bids for all of the Assets in a single bid to a single bidder or in multiple bids for parts of the Assets to multiple bidders, as hereinafter provided.

The Purchased Assets to be sold to Purchaser and subject to higher and better bids at Auction include, *inter alia*,

(a)    all Accounts Receivable and other rights to payment (excluding Credit Card Receivables) arising from the conduct of the Business;

(b)    all security and other deposits related to Assumed Contracts;

(c)    all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases that are Assumed Contracts, including merchandise, supplies, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials and consumables relating to or available for sale or use in connection with the Business;

(d)    all right, title and interest of Sellers under each Real Property Lease on Schedule 1.1(a) of the Purchase Agreement, each of which shall be an Assumed Contract, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof; provided that Purchaser may add or remove Real Property Leases listed on Schedule 1.1(a) as set forth in Section 2.5 of the Purchase Agreement;

(e)    all right, title and interest of Sellers under each other Contract on Schedule 1.1(b) of the Purchase Agreement, each of which shall be an Assumed Contract; provided that Purchaser may add or remove other Contracts listed on Schedule 1.1(b) as set forth in Section 2.5;

(f)    all right, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is an Assumed Contract;

(g)    the Purchased Intellectual Property;

(h)    all of the rights and benefits accruing from and after the Closing under any of the Assumed Contracts, including each Real Property Lease, personal property lease and Intellectual Property License that is an Assumed Contract;

(i)    all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, vendor files, financial and other records,

literature and correspondence, whether or not physically located on any of the premises referred to in clause (f) above, but excluding (i) personnel files for Employees who are not hired by Purchaser, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents that Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) Documents relating to an Excluded Asset or Excluded Liability;

(j)    all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(k)    all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(l)    any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(m)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(n)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(o)    all prepaid expenses of Sellers;

(p)    all other assets, properties, rights and claims of Sellers of any kind or nature that relate to the Business, that are used or useful in or held for use in the Business, or that relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in Section 2.1 to the Purchase Agreement, including, but not limited to, all of Sellers' assets related to, located at, or used or useful in connection with the Real Property Leases that are Assumed Contracts; and

(q)    all inventory of any kind and nature, including raw materials, supplies, work-in-process, packaging materials and other materials in the inventory of the Business ("Inventory").

The Assets in addition to the Purchased Assets to be sold at Auction (the "Additional Assets") include, *inter alia*,

(a)    all tangible personal property (other than Inventory) owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases THAT ARE NOT Assumed Contracts under the Purchase Agreement with Buyer, including equipment, televisions, monitors, video players,

computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, and spare parts relating to or available for use in connection with the Business;

(b)     all right, title and interest of Sellers under each Real Property Lease THAT IS NOT on Schedule 1.1(a) of the Purchase Agreement, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof.

### **"As Is, Where Is"**

The Sale of the Assets and Purchased Assets will be on an "as is, where is" basis except as set forth in the Purchase Agreement with respect to the Purchased Assets and without surviving representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates.

### **Free Of Any And All Liens and Claims**

All of the Debtors' right, title, and interest in and to the Assets, the Purchased Assets, or any portion thereof, to be acquired will be sold free and clear of all Liens and Claims, including, without limitation, all pledges, liens, security interests, encumbrances, claims, charges, options, and interests including, but not limited to any recoupment, offset, defenses, debts and obligations thereon and there against, such Liens and Claims to attach to the proceeds of the Sale of the Purchased Assets.

**I.     Access to Non-Public Information**

To obtain access to all material non-public information that has been or will be delivered to the Purchaser and any other bidder concerning the Purchased Assets and Assumed Liabilities, each interested person or entity (an "Interested Party") must deliver (unless previously delivered) to Debtors' advisor, Morgan Joseph TriArtisian LLC ("Morgan Joseph"), 600 Fifth Avenue, 19th Floor, New York, NY 10020, Attn: Alex C. Fisch, (a) an executed confidentiality agreement, in form and substance satisfactory to the Debtors, which may be obtained from Morgan Joseph, and (b) evidence of the Interested Party's source of capital or other financial ability to complete the contemplated transactions.

As soon as practical after delivery of the foregoing, the Debtors, after consultation with Morgan Joseph, the Secured Lenders (defined below) and the professionals of any official committee of unsecured creditors appointed in the Cases, will determine in their reasonable business judgment whether an Interested Party will be reasonably likely to be able to complete and consummate its proposed transaction on terms no less favorable in the aggregate than the terms of the Purchase Agreement, and within the time frame contemplated in the Purchase Agreement, if it were the Successful Bidder. Thereafter, the Debtors will notify an Interested Party if the Debtors will afford such party access to due diligence material.

Each Qualified Bidder (as defined below) will be deemed to have acknowledged and will so represent in any Modified Purchase Agreement (as defined below) that it had the opportunity to conduct any and all due diligence necessary prior to making any offer and that it has relied solely on its own independent review and that it did not rely on any written or oral statements, representations, promises or guaranties of the Debtors regarding the Debtors' business, or the completeness of any information provided by the Debtors in connection with its Bid (as defined below) or the bidding process.

## II.    Determining Qualified Bids and Qualified Bidders

(a)    Qualified Bid Requirements.

Each offer, solicitation or proposal (a "Bid") from any person or entity (each, a "Potential Bidder") must be in writing and satisfy each of the following conditions to be deemed a "Qualified Bid" and for the Potential Bidder (other than the Purchaser) to be deemed a "Qualified Bidder."

1.    Identification of Bidder.

The Bid shall identify the Potential Bidder and the applicable Potential Bidder's Sponsor (as defined below) (if any) and its representatives who are authorized to act on its behalf regarding the contemplated transaction.

2.    Executory Contracts and Unexpired Leases.

The Bid shall identify with particularity each and every executory contract and unexpired lease that is to be assumed and assigned pursuant to such Potential Bidder's Modified Purchase Agreement and demonstrate to the reasonable satisfaction of the Debtors, in consultation with Morgan Joseph, the Secured Lenders and professionals of any official committee of unsecured creditors appointed in the cases, that the Potential Bidder has the financial ability and can otherwise comply with all future obligations under all such executory contracts and unexpired leases.

3.    Nature of Bids for Assets.

The Bid must be a good faith offer to purchase all or part of the Assets or Purchased Assets and provide for the payment and assumption of all or part of the Assumed Liabilities on terms that are no less favorable to the Debtors and their estates than those set forth in the Purchase Agreement. A Bid shall include a clean and duly executed asset purchase agreement (the "Modified Purchase Agreement"), substantially in the form of the Purchase Agreement except as to the Purchase Price and as may be applicable the Assets or Purchased Assets and Assumed Liabilities, and a marked copy of the Modified Purchase Agreement reflecting the variations from the Purchase Agreement executed by the Purchaser. Bids shall not be conditioned on or subject to obtaining financing, shareholder approval or the outcome of due diligence, including environmental due diligence, by the Potential Bidder. Each Potential Bidder

must agree that if it is selected as the Successful Bidder or the Back-Up Bidder (each as defined below), the Bid will remain binding and irrevocable until the Closing of the Sale.

4.    <u>Financial Capability</u>.

The Bid shall state that the Potential Bidder is financially capable of consummating the transactions contemplated by the Modified Purchase Agreement and that such bidder has the financial ability to fund and consummate the acquisition of the Assets, Purchased Assets or portions thereof and Assumed Liabilities at the Closing, and the Bid shall include such financial and other information as will allow the Debtors to make a reasonable determination, following consultation with Morgan Joseph, the Secured Lenders and professionals of any official committee of unsecured creditors appointed in the cases, as to such financial ability.

5.    <u>Corporate Authority</u>.

The Bid shall contain written evidence of the valid and binding approval of the contemplated transaction by the Potential Bidder's Board of Directors (or comparable governing body having authority to bind the Potential Bidder); *provided, however*, that if the Potential Bidder is an entity specially formed for the purpose of acquiring the Purchased Assets, then the Potential Bidder must furnish evidence or other information reasonably acceptable to the Debtors, in consultation with Morgan Joseph, the Secured Lenders and professionals of any official committee of unsecured creditors appointed in the cases, of the approval of the contemplated transactions by the Board of Directors (or comparable governing body having authority to bind the Potential Bidder) of the controlling members or equity holder(s) of the Potential Bidder (the "<u>Potential Bidder's Sponsor</u>").

6.    <u>Minimum Bid</u>.

The consideration proposed by the Bid must be in cash.  If such Bid is for all or substantially all of the Purchased Assets, such Bid must equal or exceed the sum of the following (such sum, the "<u>Minimum Qualified Bid Amount</u>"):

    a.    The Purchase Price; plus,

    b.    The "<u>Minimum Initial Overbid Amount</u>," which shall be $1,000,000. The Minimum Initial Overbid Amount represents:

        (i)    a break-up fee payable to the Purchaser in the amount of $678,750 (the "<u>Break-Up Fee</u>"), and

        (ii)    an initial overbid in the amount of $321,250.

If such Bid includes Purchased Assets, but is for less than all or substantially all of the Purchased Assets (a "<u>Portion Bid</u>"), the consideration proposed by such Bid, together with the consideration proposed by other Portion Bids, if any, must in the aggregate equal or exceed the Minimum Qualified Bid Amount.

7.    No Break-Up Fee, Etc.

The Bid may not request any break-up fee, termination fee, expense reimbursement or similar type of payment, nor shall any Qualified Bidder (other than the Purchaser) be entitled to any break-up fee, termination fee, expense reimbursement or similar type of payment. Any such Bid will automatically not qualify as a Qualified Bid. Moreover, neither the tendering of a Bid nor the determination that a Bid is either a Qualified Bid or the Successful Bid shall in any way entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. For the avoidance of doubt, only the Purchaser shall be entitled to a Break-Up Fee in the event that the Purchaser is not the Successful Bidder.

8.    Good Faith Deposit.

The Bid must be accompanied by a deposit in the amount of 20% of the value of the Bid (each such deposit, a "Good Faith Deposit"). Each Good Faith Deposit shall be in the form of a bank check or wire transfer pursuant to instructions issued by the Debtors, and shall be treated according to the terms specified herein.

9.    Representation Regarding Excluded Assets.

The Bid shall expressly provide that the Assets or Purchased Assets shall not include any Excluded Assets, other than any Additional Assets that the Potential Bidder elects to include in its Bid.

10.    Bid Deadline.

Any person or entity interested in participating in the Auction must submit a Qualified Bid on or before **July [__], 2013 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") in writing, to Morgan Joseph at the address specified above. The Debtors or Morgan Joseph shall deliver all Bids, regardless of whether or not such Bids are Qualified Bids, to the Purchaser, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases no later than 24 hours after receipt of such Bids.

(b)    Qualified Bidders.

The Debtors, following consultation with Morgan Joseph, the Secured Lenders, and professionals of any official committee of unsecured creditors appointed in the cases, shall make a determination regarding whether a Bid is a Qualified Bid and shall notify Potential Bidders whether their Bids have been determined to be Qualified Bids by no later than **4:00 p.m. (prevailing Eastern time) on July [__], 2013**.

In making any such determination, the Debtors, along with Morgan Joseph (and in consultation with the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), may discuss or negotiate with, or seek clarification from, any Potential Bidders submitting Portion Bids, to determine if the consideration proposed

7

by such Portion Bids, in the aggregate, is, or will be modified to be, an amount that equals or exceeds the Minimum Qualified Bid Amount. In the event that such Portion Bids aggregate, or are modified to aggregate, an amount that equals or exceeds the Minimum Qualified Bid Amount, then such Portion Bids, taken together, to the extent they otherwise meet the requirements of Section II(a) hereof, shall be considered a Qualified Bid, and the Potential Bidders submitting such Bids shall be deemed Qualified Bidders; provided, that if such a Qualified Bid (sometimes hereinafter referred to as a "Portion Qualified Bid") becomes the Successful Bid, it shall be a condition of closing any transaction contemplated by such Successful Bid that all transactions contemplated by such Successful Bid close.

**FOR THE AVOIDANCE OF DOUBT, POTENTIAL BIDDERS SHOULD BE AWARE THAT ANY POTENTIAL BIDDER THAT DOES NOT SUBMIT A QUALIFIED BID BY THE BID DEADLINE WILL NOT BE ALLOWED TO (1) PARTICIPATE IN THE AUCTION UNDER ANY CIRCUMSTANCES OR (2) SUBMIT ANY OFFER AFTER THE BID DEADLINE, WHETHER BEFORE, DURING OR AFTER THE AUCTION.**

Notwithstanding anything in these Bid Procedures to the contrary, the Purchaser is deemed a Qualified Bidder, and the Purchaser's Bid pursuant to the Purchase Agreement is deemed a Qualified Bid, for all applicable purposes under these Bid Procedures with respect to the Sale, any Auction, or otherwise.

      (c)    <u>No Qualified Bids</u>.

If no conforming Qualified Bids are received (other than the Purchaser's under the Purchase Agreement), the Debtors shall not hold an Auction and, instead, the Purchaser shall automatically be deemed the Successful Bidder and the Debtors shall request at the Sale Hearing that the Court approve the Purchase Agreement with the Purchaser.

      (d)    <u>Negotiation and Modification of Qualified Bids</u>.

Between the Bid Deadline and the Auction, the Debtors, along with Morgan Joseph (and in consultation with the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. A Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein.

      (e)    <u>Notice of the Auction</u>

If the Debtors receive more than one Qualified Bid, the Auction will be held on **July [__], 2013 at __:00 a.m. (prevailing Eastern Time)** at the offices of counsel to the Debtors, Klehr, Harrison, Harvey, Branzburg, LLP, 919 Market Street, Suite 1000, Wilmington, DE, 19801, or at any such other location or time as designated by the Debtors in a notice to all

Qualified Bidders.  On or before **1:00 p.m. prevailing Eastern Time, on July [__], 2013**, the Debtors or Morgan Joseph shall provide each Qualified Bidder (including the Purchaser):

      1.    written notice of the Auction; and

      2.    a copy of all Qualified Bids, including the Qualified Bid that the Debtors believes constitutes the highest or best offer and with which it intends to commence the Auction (the "Pre-Auction Successful Bid").

(f)     Secured Creditor Credit Bidding

CapitalSource Finance, LLC, and Sun Uniforms Finance, LLC  (the "Secured Lenders") have agreed that so long as the Purchaser is pursuing approval of the Purchase Agreement, neither will be a Qualified Bidder entitled to credit bid its respective secured claims against the Debtors for the Purchased Assets at the Auction.

## III.    The Auction

(a)     Attendance at and Participation in the Auction.

The Auction shall be conducted openly and all creditors of the Debtors' estates shall be permitted to attend; *provided, however,* that in order to attend the Auction, a creditor must advise the Debtors and the Purchaser in writing no later than 48 hours prior to the Auction, provided, further, however, that the Debtors may seek relief from the Bankruptcy Court in the event that they object to such creditor's attendance.  Without limiting the foregoing, the Debtors, the Purchaser, Qualified Bidders, the U.S. Trustee, the Secured Creditors, and their respective representatives shall be entitled to attend the Auction.  The Purchaser and the Qualified Bidders must appear in person at the Auction, or through a duly authorized representative.   The only parties eligible to participate in the Auction shall be Qualified Bidders who have submitted a Qualified Bid to the Debtors prior to the Bid Deadline.

(b)     The Auction Process.

      1.    Morgan Joseph to Conduct the Auction.

Morgan Joseph shall direct and preside over the Auction.   Only the Purchaser and Qualified Bidders shall be entitled to make any subsequent bids at the Auction.  The bidding at the Auction shall start at the purchase price stated in the Pre-Auction Successful Bid and continue, in one or more rounds of bidding, so long as during each round at least one Overbid (as defined below) is submitted.  All Overbids shall be made and received on an open basis, such that all material terms of each Overbid will be fully disclosed to all other Qualified Bidders.  The bidding at the Auction will be transcribed or videotaped and the Debtors shall maintain a transcript of all Bids made and announced at the Auction, including all Overbids and the Successful Bid.

      2.    No Collusion.

Each Qualified Bidder shall be required to acknowledge and agree in writing that it has not engaged (and agrees not to engage) in any collusion with respect to any Bids, the Auction, or the Sale; provided that it shall not be deemed collusion for the Qualified Bidders whose Bids comprise a Portion Qualified Bid to Overbid in concert.

      3.    <u>Terms of Overbids</u>.

An "Overbid" is any bid made at the Auction after the Debtors' announcement of the Pre-Auction Successful Bid, that is an increment of at least $100,000 greater than the immediately preceding Bid, and that otherwise complies with the terms and conditions for a Qualified Bid as set forth herein.

The Auction may include individual negotiations with Qualified Bidders, subject to the foregoing requirement that Overbids be made and received on an open basis.

In the event an Auction is conducted, the Purchaser shall be permitted, but is not required to, submit one or more Overbids.

      4.    <u>Valuation of Overbids</u>.

To the extent that any Overbid includes consideration other than cash, the Debtors shall disclose their valuation of the total consideration offered in such Overbid (and the basis for their determination) in order to confirm that each Overbid meets the requisite bid increment and to provide a floor for further Overbids.

      5.    <u>Additional Terms and Conditions</u>.

The Debtors may adopt additional rules for the Auction at or prior to the Auction that, in their reasonable discretion (following consultation with Morgan Joseph, the Secured Lenders and professionals of any official committee of unsecured creditors appointed in the cases), will better promote the goals of the Auction and the Debtors' duties and obligations as debtors-in-possession.

      6.    <u>Credit for Break-Up Fee</u>.

In the event the Purchaser submits an Overbid at the Auction (a "<u>Purchaser's Overbid</u>") in order to top an Overbid submitted by another Qualified Bidder, the amount of the Break-Up Fee shall be added to the amount of the Purchaser's Overbid for purposes of determining whether the Purchaser's Overbid is the highest or best bid and whether such bid meets the requisite bid increment.

**IV.**    **Identification of the Successful Bidder and Back-Up Bidder; Acceptance of Successful Bid**

    (a)    <u>Identification of the Successful Bidder</u>.

The Auction shall continue until there is only one offer or combination of offers that the Debtors determine is the highest and/or best offer from among the Qualified Bidders (including the Purchaser) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider in the exercise of their reasonable business judgment (and in consultation with Morgan Joseph, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser as are set forth in the applicable Purchase Agreement or Modified Purchase Agreement(s).

The Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their reasonable business judgment at the Auction (and in consultation with Morgan Joseph, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), shall be required to serve as a Back-Up Bidder (the "Back-Up Bidder"). Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors and Back-Up Bidder will be authorized, but not required, to consummate the Sale without further order of the Bankruptcy Court. The obligation to close of the Back-Up Bidder hereunder shall expire on the earlier of the Closing of a Sale to the Successful Bidder or the Outside Date.

Within three (3) Business Days after adjournment of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

In announcing the Successful Bid and the Back-Up Bid, the Debtors shall announce the material terms of each Bid and the basis for determining the total consideration offered. If no Auction is held, then the Bid of the Purchaser as represented by the Purchase Agreement shall be deemed to be the Successful Bid.

(b)    Acceptance of Bid from Successful Bidder.

The Debtors presently intend to sell the Purchased Assets to the Successful Bidder, pursuant to the Purchase Agreement or Modified Purchase Agreement(s), as applicable. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Sale Hearing (as defined below).

Except as otherwise provided in the Purchase Agreement or Modified Purchase Agreement(s), as applicable, and to the fullest extent permitted by the jurisdiction of the Bankruptcy Court, all of the Debtors' right, title and interest in and to the Assets and Purchased

Assets shall be sold free and clear of all Liens and Claims, other than Assumed Liabilities, such Liens and Claims to attach to the proceeds.

If the Debtors sell any or all of the Purchased Assets to a Successful Bidder other than the Purchaser, the Debtors will pay the Break-Up Fee in accordance with the Purchase Agreement at the Closing.

## VI.    Treatment of Good Faith Deposits

Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder (other than the Back-Up Bidder) by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held until the earlier to occur of the Closing of the Sale to the Successful Bidder or the Outside Date, as applicable. The Good Faith Deposit of the Successful Bidder shall be held until the Closing of the Sale and applied in accordance with the Purchase Agreement or Modified Purchase Agreement(s), as applicable. If the Successful Bidder or Back-Up Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder or Back-Up Bidder, as applicable, the Successful Bidder's Good Faith Deposit or Back-Up Bidder's Good Faith Deposit, as applicable, shall be forfeited to the Debtors.

## VII.    The Sale Hearing

The Successful Bid will be subject to approval by the Court. The Sale Hearing will take place on **July [__], 2013 at _____ a.m. (prevailing Eastern Time)** before the Honorable _____, United States Bankruptcy Court for the District of Delaware, 824 Market Street, Courtroom [__], [__] Floor, Wilmington, DE, 19801. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

**EXHIBIT D**

**<u>Escrow Agreement</u>**

## ESCROW AGREEMENT

AGREEMENT (the "Agreement") made as of this 29th day of May, 2013, by and among **Healthcare Uniform Company, Inc.**, a Delaware corporation ("Healthcare Uniform"), **Uniform City National, Inc.**, a Delaware corporation ("Uniform City", and together with Healthcare Uniform, collectively, "Sellers" and each individually, a "Seller"), **Scrubs & Beyond, LLC**, a Delaware limited liability company ("Purchaser"), and **PNC Bank, National Association,** as escrow agent (the "Escrow Agent").

### BACKGROUND

Purchaser and Sellers are parties to an Asset Purchase Agreement, dated as of May 29, 2013 (the "Purchase Agreement").

Pursuant to Section 3.2 of the Purchase Agreement, Purchaser and Sellers have agreed that Purchaser will deposit $4,525,000 in escrow with the Escrow Agent subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Appointment of Escrow Agent.  The Escrow Agent is hereby appointed as escrow agent hereunder and agrees to act on the terms and subject to the conditions hereinafter set forth.

2.    Establishment of Escrow Fund.  Simultaneously with the execution in full hereof, Purchaser shall deposit with Escrow Agent the sum of $4,525,000 which, together with any proceeds, income and reinvestments, is hereinafter referred to as the "Escrow Fund".  Escrow Agent shall hold the Escrow Fund subject to the terms and conditions of this Agreement.

3.    Deposit and Investment of Escrow Fund.

(a)    The Escrow Agent shall have no investment discretion over the Escrow Fund.  The Escrow Agent shall deposit or invest the Escrow Fund in the investments set forth on Appendix A attached hereto, and incorporated herein and as amended from time to time as herein provided.  This deposit and investment direction may be altered only in a writing delivered to the Escrow Agent, jointly signed by Sellers and Purchaser, and agreed to in writing by the Escrow Agent.

(b)    The Escrow Agent shall have the right to make withdrawals from any deposits or liquidate any investments held, in order to provide funds necessary to make required payments under this Escrow Agreement at such time or times as determined by the Escrow Agent in its sole discretion.  The Escrow Agent in its capacity as escrow agent hereunder shall have no liability for any loss sustained as a result of any investment made pursuant to the instructions of the parties hereto or as a result of any liquidation of any investment prior to its maturity, for the failure of said parties to give the Escrow Agent instructions to invest or reinvest the Escrow Fund or any earnings thereon, or for

any investment made by the Escrow Agent in the absence of instructions from said parties.

(c)     The Escrow Fund will be invested in investments, including without limitation, shares of mutual funds, which are not insured by the FDIC, are not deposits of or guaranteed by the Escrow Agent or any of its affiliates and are subject to investment risks, including the loss of principal. In addition, shares of money market mutual funds are neither insured nor guaranteed by the U.S. Government and there can be no assurance that a money market mutual fund will be able to maintain a stable net asset value of $1.00 per share.

(d)     The parties hereto other than the Escrow Agent acknowledge and agree that the Escrow Agent or its affiliate(s) may provide financial or investment advice or other services to, or receive shareholder servicing fees from some or all of the investments permitted hereby and that the Escrow Agent or an affiliate may be a manager, promoter or placement agent for or have underwritten such investments and the Escrow Agent and its affiliate(s) may be separately and additionally compensated for providing such services or for underwriting such investments. The parties hereto other than the Escrow Agent hereby instruct Escrow Agent to vote all proxies in accordance with the proxy policy in effect from time to time for the Escrow Agent unless otherwise specifically instructed jointly by the parties. Each of said parties specifically acknowledges that it understands that this provision may involve the Escrow Agent's voting shares of mutual funds that pay fees to the Escrow Agent or its affiliates and that, in voting such shares, the Escrow Agent may be in a position to vote to change fees paid at the mutual fund level to itself or to an affiliate.

4.     Income. All income, including interest and dividends, earned on the Escrow Fund (hereinafter called the "Income") shall be added to and held in the Escrow Fund.

5.     Disposition of Escrow Fund. The Escrow Agent shall disburse the Escrow Funds in accordance with the provisions of Appendix B attached hereto and incorporated herein.

6.     Statements. During the term of this Agreement, the Escrow Agent shall provide Sellers and Purchaser with monthly statements containing the beginning balance in the escrow account as well as all principal and income transactions for the statement period. Sellers and Purchaser shall be responsible for reconciling such statements. The Escrow Agent shall be forever released and discharged from all liability with respect to the accuracy of such statements and the transactions listed therein, except with respect to any such act or transaction as to which Sellers or Purchaser shall, within 90 days after making the statement available, file written objections with the Escrow Agent. Each of Sellers and Purchaser (for purposes of this paragraph, the "Recipient") is aware that Federal Regulations require the Escrow Agent, without charge and within one business day of its receipt of a broker/dealer confirmation for each security transaction in the Escrow Account to forward to Recipient a written notification which discloses, among other things: the Escrow Agent's name, Recipient's name, the capacity (capacities) in which the Escrow Agent is acting, the date (and time, within a reasonable period, upon written request of Recipient) of execution, the identity, price, number of shares or units or principal amount of debt securities purchased or sold by Recipient, the name of the

2

broker/dealer, the amount of any remuneration received by such broker/dealer from Recipient and the amount of any remuneration received by the Escrow Agent. Recipient is also aware that, under the terms of this Agreement, the Escrow Agent will be providing to Recipient periodic statements that include a listing of all securities transactions, receipts and disbursements during the period, together with a current listing of the assets held in the Escrow Account. Recipient shall accept such periodic statements in satisfaction of the Escrow Agent's obligation to provide written notification as described above; provided, that upon Recipient's request, the Escrow Agent will provide to Recipient within a reasonable time and at no additional cost the information required by Federal Regulations.

7.    Rights and Responsibilities of Escrow Agent.    The acceptance by the Escrow Agent of its duties hereunder is subject to the following terms and conditions, which the parties to this Agreement hereby agree shall govern and control with respect to the Escrow Agent's rights, duties, liabilities and immunities:

(a)    The Escrow Agent shall act hereunder as an escrow agent only, and it shall not be responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any document furnished to the Escrow Agent or any asset deposited with it.

(b)    The Escrow Agent may rely and shall be protected in acting or refraining from acting upon (and shall incur no liability for following the instructions contained therein) any written notice, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document.  The Escrow Agent shall have no duty to solicit any payments which may be due to be paid into the Escrow Fund by any party.

(c)    The Escrow Agent shall not be liable for any action taken or omitted by it unless a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss.  In the administration of the escrow account hereunder, the Escrow Agent may execute any of its powers and perform its duties hereunder directly or through agents or attorneys and may consult with counsel, including in-house counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons, including in-house counsel.

(d)    Sellers and Purchaser agree to jointly and severally indemnify, defend and hold the Escrow Agent and its affiliates and each of their respective directors, officers, agents and employees (collectively, the "Indemnitees") harmless from and against any and all claims, liabilities, losses, damages, fines, penalties, and expenses, including out-of-pocket and incidental expenses and legal fees and expenses ("Losses") that may be imposed on, incurred by, or asserted against, the Indemnitees or any of them (i) for following any instructions or other directions upon which the Escrow Agent is authorized to rely pursuant to the terms of this Escrow Agreement; or (ii) in connection with or arising out of the Escrow Agent's performance under this Escrow Agreement provided,

3

with respect to this clause (ii) only, the Indemnitees have not acted with gross negligence or engaged in willful misconduct. Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect, incidental, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. The provisions of this Section 7(d) shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent for any reason.

(e)    The Escrow Agent shall have no duties except those specifically set forth in this Agreement and shall not be subject to, nor have any liability or responsibility under, nor be required to make any determination under, any other agreement or document the other parties hereto may be parties to or responsible for, including any determination whether any party thereto has complied with its terms or is entitled to payment thereunder, even if same is referenced herein or copies have been given to the Escrow Agent.

(f)    If, at any time, Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Fund or the Escrow Agent's proper actions with respect to its obligations hereunder, or should any dispute arise between the parties hereto and others, or between the parties hereto themselves, it is understood and agreed that the Escrow Agent may petition (by means of an interpleader or any other appropriate measure) any court of competent jurisdiction for instructions with respect to such uncertainty or dispute and the other parties hereto will hold the Escrow Agent harmless and indemnify it against all consequences and expenses that may be incurred by the Escrow Agent in connection therewith, which indemnity shall survive the termination of this Escrow Agreement or the resignation or removal of Escrow Agent.

8.    Compensation. The fee of the Escrow Agent for its services hereunder shall be paid one-half by Sellers and one-half by Purchaser in the amount of $3,900, payable in full on the date hereof. An additional annual escrow fee of $2,000 (payable one-half by Sellers and one-half by Purchaser) shall be paid to Escrow Agent on each twelve (12) month anniversary of this Agreement to the extent that this Agreement is still in effect as of such date. In addition, the Escrow Agent shall be entitled to reimbursement for all reasonable expenses, disbursements or advances made by it in the performance of its duties hereunder, including counsel fees and court costs incurred pursuant to Section 7(f) or otherwise. The parties hereby grant to Escrow Agent a first priority contractual possessory security interest in and a right of setoff against the Escrow Fund in an amount necessary to secure to Escrow Agent payment of Escrow Agent's fees, expenses and any other amounts owed to Escrow Agent under the terms of this Agreement.

9.    Tax Identification Number; Indemnification as to Taxes, Penalties and Interest.

(a)    All Income accrued in the Escrow Fund on or before Closing (as defined in the Purchase Agreement) shall be held for the account of Purchaser and shall be reported by Purchaser under applicable federal regulations using its tax identification number which is #37-1394610. All Income accrued in the Escrow Fund after Closing

4

shall be held for the account of Sellers and shall be reported by Sellers under applicable federal regulations using their tax identification numbers which are #20-5430392 (Uniform City) and #20-1190640 (Healthcare Uniform). The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Account to the Internal Revenue Service. Federal law may require withholding on earned income in the absence of the Escrow Agent's receipt of a completed and executed W-9 or W-8, as applicable that contains the Tax Identification Number or Employee Identification Number for the aforementioned party.

(b)     Without limiting the generality of any provision of this Agreement, Purchaser and Sellers, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent against and in respect of any liability for taxes and for any penalties or interest in respect of taxes attributable to Income earned by the Escrow Fund.

10.     Amendment.  Except as provided in Section 3(a) above, this Agreement may not be amended or supplemented and no provision hereof may be modified or waived, except by an instrument in writing, signed by all of the parties hereto.

11.     Termination.  The purpose of this Agreement and the terms hereof shall terminate when the Escrow Agent in accordance with the terms of this Agreement shall have distributed the entire balance of the Escrow Fund.  Upon the termination of this Agreement and upon the delivery of all of the Escrow Fund by the Escrow Agent, in accordance with the terms hereof, the Escrow Agent shall be relieved of any and all further obligations hereunder.

12.     Resignation; Removal.

(a)     The Escrow Agent may resign at any time by giving thirty (30) days written notice of such resignation to Sellers and Purchaser.  If no successor Escrow Agent has been named at the expiration of the thirty (30) day period, the Escrow Agent shall have no further obligation hereunder except to hold the Escrow Fund as a depository. Upon joint notification by Sellers and Purchaser of the appointment of a successor, the Escrow Agent shall, upon payment of any and all fees and expenses due to Escrow Agent, promptly deliver the Escrow Fund and all materials in its possession relating to the Escrow Fund to such successor, and the duties of the resigning Escrow Agent shall thereupon in all respects terminate, and Escrow Agent shall be released and discharged from all further obligations hereunder.

(b)     The Escrow Agent may be discharged from its duties as Escrow Agent under this Agreement upon thirty (30) days joint written notice from Sellers and Purchaser and upon payment of any and all fees due to Escrow Agent.  In such event, the Escrow Agent shall be entitled to rely on joint instructions from Sellers and Purchaser as to the disposition and delivery of the Escrow Fund.

(c)     In the event of the termination of this Agreement or the resignation or removal of the Escrow Agent, the Escrow Agent shall have the right to retain for itself from the Escrow Fund an amount equal to the compensation due and owing to the Escrow Agent, plus any costs and expenses the Escrow Agent shall reasonably believe

5

may be incurred by the Escrow Agent in connection with the termination of the Escrow Agreement or the transfer of the Escrow Fund.

13.    Execution.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but such counterparts together shall constitute one and the same instrument.

14.    Miscellaneous.  All covenants and agreements contained in this Agreement by or on behalf of the parties hereto shall bind and inure to the benefit of such parties and their respective heirs, administrators, legal representatives, successors and assigns, as the case may be, and all references to such parties herein shall be deemed also to refer to any successors, assigns, heirs, administrators and legal representatives of said parties, as the case may be.  Except as provided in Section 7(d), this Escrow Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.  None of the parties may assign its rights under this Escrow Agreement, or assign or delegate its obligations hereunder, without the other parties' prior written consent.  The headings in this Agreement are for convenience of reference only and shall neither be considered as part of this Agreement, nor limit or otherwise affect the meaning hereof.  This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.  This Agreement represents the entire understanding of the parties hereto with respect to the subject matter contained herein and supersedes any and all other and prior agreements between them.

15.    Notices.  All notices and communications hereunder shall be in writing and shall be deemed to be duly given as of the date sent in the case of registered mail, return receipt requested, or certified mail, postage prepaid, or upon delivery in the case of personal delivery or delivery by overnight courier, or upon successful facsimile transmission as indicated by voice or electronic confirmation to the address below.  Notwithstanding anything to the contrary herein, Escrow Agent shall not be bound by any notice unless actually received by Escrow Agent.

(a)    If to Sellers:

Healthcare Uniform Company, Inc.
2132 Kratky Road
St. Louis, MO 63114
Attention: Bryan Graiff, Senior V.P. Commercial Sales, I.T. and Logistics
Chief Financial Officer

Phone:  (314) 824-2950
Fax:  (314) 890-3973
E-mail:  bgraiff@lifeuniform.com

6

<u>With a copy to</u>:

Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801
<u>Attention</u>: Domenic E. Pacitti, Esq.

Phone:  (302) 426-1189
Fax:  (302) 426-9193
E-mail:  dpacitti@klehr.com

and

Morgan Joseph TriArtisan LLC
600 Fifth Avenue, 19th Floor
New York, NY 10020
<u>Attention</u>: Alex C. Fisch

Phone:  (212) 218-3807
E-mail:  afisch@mjta.com

and

CapitalSource Finance LLC
5404 Wisconsin Avenue, Second Floor
Chevy Chase, Maryland 20815
<u>Attention</u>:  Walter P. Schuppe
Email: WSchuppe@capitalsource.com

and

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Attn:  Jeffrey L. Jonas, Esq.
Email:  jjonas@brownrudnick.com

(b)    <u>If to Purchaser</u>:

Scrubs & Beyond, LLC
823 Hanley Industrial Court
Brentwood, MO 63144
<u>Attention</u>: Karla Bakersmith, President

Phone:  (314) 961-9494
Fax:  (314) 961-9454
E-mail:  kbakersmith@scrubsandbeyond.com

7

<u>With a copy to</u>:

Ballard Spahr LLP
999 Peachtree Street
Suite 1000
Atlanta, Georgia 30309
<u>Attention</u>: Stephen A. Opler, Esq.

Phone: 678-420-9390
Fax: 678-420-9301
E-mail: oplers@ballardspahr.com

and

Genesis Capital, LLC
3414 Peachtree Road NE
Suite 700
Atlanta, GA 30326
<u>Attention</u>: Jeremy Ellis

Phone: 404-816-7538
Fax: 404-795-0849
Email: jellis@genesis-capital.com

(b)    If to Escrow Agent:

PNC Bank, National Association
620 Liberty Avenue, 7th Floor
Pittsburgh, PA 15222
<u>Attention</u>: Rose Provins

Phone: 412-762-4828
Fax: 800-449-7382
Email: rose.provins@pnc.com

<u>With a copy to</u>:

PNC Bank Legal Department
1600 Market Street, 28th Floor
Philadelphia, PA 19103

*The balance of this page is intentionally left blank.*

8

By signing below, Sellers certify under penalty of perjury that:

a.      The numbers shown in this Agreement are Seller' correct taxpayer ID numbers.

b.      Neither Seller is subject to backup withholding because

(i)      _____X_____ is exempt from backup withholding,

(ii)     _____ has not been notified by the Internal Revenue Service ("IRS") that _____ is subject to backup withholding as a result of a failure to report all interest or dividends, or

(iii)    the IRS has notified _____ that _____ is no longer subject to backup withholding.

By signing below, Purchaser certifies under penalty of perjury that:

a.      The number shown in this Agreement is Purchaser's correct taxpayer ID number.

b.      Purchaser is not subject to backup withholding because

(i)      _____X_____ is exempt from backup withholding,

(ii)     _____ has not been notified by the Internal Revenue Service ("IRS") that _____ is subject to backup withholding as a result of a failure to report all interest or dividends, or

(iii)    the IRS has notified _____ that _____ is no longer subject to backup withholding.

[Signature pages follow]

9

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Agreement as of the date first above written.

**Scrubs & Beyond, LLC**

By: _Karla Bakersmith_
    Name: KARLA BAKERSMITH
    Title: President/CEO

823 Hanley Industrial Court
Brentwood, MO 63144

**Healthcare Uniform Company, Inc.**

By: _____
    Name:
    Title:

2132 Kratky Road
St. Louis, MO 63114

**PNC Bank, National Association**

By: _____
    Name:
    Title:

_____
_____

**Uniform City National, Inc.**

By: _____
    Name:
    Title:

2132 Kratky Road
St. Louis, MO 63114

10

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Agreement as of the date first above written.

Scrubs & Beyond, LLC                          Healthcare Uniform Company, Inc.

By: _____                   By: _____
    Name:                                          Name:
    Title:                                         Title:

823 Hanley Industrial Court                    2132 Kratky Road
Brentwood, MO 63144                            St. Louis, MO 63114

PNC Bank, National Association                 Uniform City National, Inc.

By: _____                   By: _____
    Name:                                          Name:
    Title:                                         Title:

_____                        2132 Kratky Road
_____                        St. Louis, MO 63114

10

IN WITNESS WHEREOF, the parties hereto have duly executed this Escrow Agreement as of the date first above written.

**Scrubs & Beyond, LLC**                    **Healthcare Uniform Company, Inc.**

By: _____              By: _____
    Name:                                    Name:
    Title:                                   Title:

823 Hanley Industrial Court                2132 Kratky Road
Brentwood, MO 63144                        St. Louis, MO 63114


**PNC Bank, National Association**          **Uniform City National, Inc.**

    Name:                              By: _____
    Title:                                   Name:
                                                    Title:

PNC                                        2132 Kratky Road
Institutional Investments                  St. Louis, MO 63114
1600 Market Street  F2-F070-31-1
Philadelphia, PA  19103

10

## Appendix A

Section 3.  <u>Investment of Escrow Fund</u>

During the term of this Escrow Agreement, the Escrow Fund shall be invested and reinvested by the Escrow Agent in the following investment:

\_\_X\_\_\_        PNC Advantage Institutional Money Market #433 (PABXX)

_____        PNC Advantage Govt Money Market #435 (PAVXX)

_____        PNC Advantage Treasury Money Market #434 (PAIXX)

11

## Appendix B

Section 5.  Disposition of Escrow Fund

The Escrow Agent shall distribute the Escrow Fund as follows:

(a)     Upon receipt by the Escrow Agent at any time of joint written instructions signed by Purchaser and Sellers directing the Escrow Agent to pay any amount from the Escrow Fund, the Escrow Agent shall, within five (5) business days of receipt, make payment in accordance with those instructions.

(b)     If the Escrow Agent receives an affidavit from an officer of Sellers and an officer of Purchaser stating that the Closing has occurred, the Escrow Agent shall, within five (5) business days of receipt, (i) transfer to Sellers an amount equal to the Escrow Fund (other than any Income earned thereon, which shall be paid to Purchaser), minus an amount equal to $500,000 (the "Current Assets Escrow"), by wire transfer of immediately available funds into an account designated in writing by Sellers, (ii) retain the Current Assets Escrow in accordance with the terms of this Agreement, and (iii) transfer to Purchaser an amount equal to any accrued Income on the Escrow Fund as of such date, by wire transfer of immediately available funds into an account designated in writing by Purchaser.

(c)     If the Escrow Agent receives an affidavit from either an officer of Purchaser or an officer of Sellers stating that the Purchase Agreement has been terminated pursuant to paragraphs (a), (b), (d), (e), (f), (g), (h) or (i) of Section 4.4 of the Purchase Agreement, together with evidence that a copy of the affidavit has been delivered to the other party, subject to the terms of clause "(f)" below, promptly upon the expiration of twenty (20) calendar days after receipt by the Escrow Agent of the affidavit, then the Escrow Agent shall pay the entire Escrow Fund (together with all Income earned thereon) to Purchaser.

(d)     If the Escrow Agent receives an affidavit from either an officer of Purchaser or an officer of Sellers stating that the Purchase Agreement has been terminated pursuant to paragraph (c) of Section 4.4 of the Purchase Agreement, subject to the terms of clause "(f)" below, promptly upon the expiration of twenty (20) calendar days after receipt by the Escrow Agent of the affidavit, then the Escrow Agent shall pay the entire Escrow Fund to Sellers (other than any Income earned thereon, which shall be paid to Purchaser).

(e)     Upon the final determination of Final Closing Current Assets Statement (as defined in the Purchase Agreement), Escrow Agent shall promptly make distribution of the Escrow Fund (which will consist of the Current Asset Escrow and any Income accrued thereon from and after the Closing Date) in accordance with joint written instructions signed by Purchaser and Sellers.

(f)     If within the twenty (20) day period described in clause (c) or (d) above, as applicable, the Escrow Agent receives conflicting instructions in affidavits from an officer of Sellers and an officer of Purchaser, the Escrow Agent shall hold the Escrow

12

Fund until receipt of either (i) an affidavit signed by an officer of Sellers and an officer of Purchaser directing the disposition of the Escrow Fund or (ii) a certified copy of a final, non-appealable order of a court of competent jurisdiction ordering the Escrow Agent to dispose of the Escrow Fund.    Within five (5) business days of receipt of any such affidavit or order, the Escrow Agent shall promptly comply with its terms.

PHIL1 2819719v.5

**EXHIBIT E**

**Assignment and Assumption Agreement**

DMEAST #16827137

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [●], 2013, is entered into by and among **HEALTHCARE UNIFORM COMPANY, INC.,** a Delaware corporation ("Healthcare Uniform"), **UNIFORM CITY NATIONAL, INC.,** a Delaware corporation ("Uniform City"; together with Healthcare Uniform, collectively, "Sellers" and each individually, a "Seller"), and **SCRUBS & BEYOND, LLC,** a Delaware limited liability company ("Purchaser"), pursuant to (i) the Asset Purchase Agreement dated as of May 28, 2013 by and among Purchaser and Sellers (the "Asset Purchase Agreement"), and (ii) the Sale Order (as defined in the Asset Purchase Agreement).   Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings given to them in the Asset Purchase Agreement.

Background:

Subject to the terms and on the conditions set forth in the Asset Purchase Agreement, Sellers have agreed to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser has agreed to purchase and acquire from Sellers, all right, title and interest in and to the Purchased Assets.

Pursuant to Section 2 of the Asset Purchase Agreement, Sellers have agreed to assign, and, with respect to those obligations first arising thereunder on and after the Closing, Purchaser has agreed to assume certain agreements and contracts of Sellers, as more fully set forth in the Asset Purchase Agreement.

Agreement:

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Assignment and Assumption of Liabilities.  Effective as of the Closing, (a) Sellers hereby assign to Purchaser all right, title and interest of Sellers in, to, and under the Assumed Liabilities, and (b) Purchaser hereby assumes the obligations of Sellers in, to and under the Assumed Liabilities first arising on and after the Closing. Nothing herein shall be deemed to render Purchaser liable for any liabilities of Sellers other than the Assumed Liabilities.

2.    Conflict with Asset Purchase Agreement or Sale Order.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Asset Purchase Agreement or the Sale Order, the terms and conditions of the Asset Purchase Agreement or the Sale Order, as the case may be, shall govern, supersede and prevail.  Notwithstanding anything to the contrary, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter the respective

agreements, terms, conditions, limitations, representations, warranties, covenants and obligations contained in the Asset Purchase Agreement and the Sale Order or the survival thereof.

3.    <u>Governing Law</u>.  This Agreement shall be governed by and construed, interpreted and determined in accordance with the internal Laws of the State of Delaware (without regard to any conflict of laws provision that would require the application of the Law of any other jurisdiction).

4.    <u>Execution</u>.  This Agreement may be executed by facsimile or other electronic signature and in counterparts, each of which is deemed an original and all of which taken together constitute one and the same instrument.

5.    <u>Successors and Assigns</u>.  This Agreement is binding upon and inures to the benefit of Purchaser and Sellers and their respective successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer on any person, other than Purchaser and Sellers and their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this instrument.

6.    <u>Further Assurances</u>.  From time to time following the Closing, Sellers and Purchaser shall, at no cost to Sellers, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the Assumed Liabilities assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

7.    <u>Amendment</u>.  None of the provisions of this Agreement may be waived, changed or altered except in a signed writing by the party against whom enforcement of the same is sought.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Assignment and Assumption Agreement to be executed and delivered by their respective duly authorized officers as of the date first written above.

SELLERS:

**HEALTHCARE UNIFORM COMPANY, INC.**

By: _____
Name: _____
Title: _____

**UNIFORM CITY NATIONAL, INC.**

By: _____
Name: _____
Title: _____

PURCHASER:

**SCRUBS & BEYOND, LLC**

By: _____
Name: _____
Title: _____

DMEAST #16841936 v4

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT F**

**Recordable Trademark Assignment**

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (this "Assignment") dated as of [●], 2013, is made and entered into by and among **HEALTHCARE UNIFORM COMPANY, INC.,** a Delaware corporation ("Healthcare Uniform"), and **UNIFORM CITY NATIONAL, INC.,** a Delaware corporation ("Uniform City"; together with Healthcare Uniform, collectively, the "Assignor"), and **SCRUBS & BEYOND, LLC,** a Delaware limited liability company (the "Assignee") (each a "Party", and collectively, the "Parties"). Unless otherwise defined herein, capitalized terms used in this Assignment shall have the meanings given to them in the Asset Purchase Agreement (as defined below).

### Background:

The Assignor and the Assignee are parties to that certain Asset Purchase Agreement, dated as of May 28, 2013 (the "Asset Purchase Agreement"), pursuant to which the Assignor has agreed to sell the Purchased Assets to the Assignee.

As a condition to the Closing, the Parties agreed to enter into this Assignment pursuant to which the Assignor will assign to the Assignee all of the Assignor's right, title and interest in, to and under all of the Assignor's registered and unregistered trademarks, including but not limited to the registered trademarks and trademark applications listed on Schedule A attached hereto (collectively, the "Trademarks").

### Agreement:

**NOW, THEREFORE**, in consideration of the premises and mutual agreements set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Assignment and Transfer.   The Assignor hereby, effective as of the Closing, assigns, sells, conveys and transfers to the Assignee, its legal representatives, successors and assigns, all of the Assignor's right, title and interest, throughout the world, in, to and under the Trademarks, together with the whole of the goodwill of the business pertaining thereto, with the same rights of the Assignor to be held and enjoyed by the Assignee for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, and together with all rights to sue for and collect damages for, and to obtain injunctive or equitable relief for, any past, present or future infringement, misappropriation, dilution, violation or unlawful imitation, whether currently known or unknown, of the foregoing.

2.      Due Authorization.   As applicable, the Assignor hereby authorizes and requests the Commissioner for Trademarks of the United States and any official of any state or foreign country whose duty it is to issue intellectual property registrations to issue all registrations from any applications for registration of the Trademarks to the Assignee.

3.      Further Assurances.   The Assignor covenants and agrees that they will not execute any writing or do any act whatsoever conflicting with this Assignment, and that the

Assignor will, upon the request of the Assignee, execute and deliver, or cause to be executed or delivered, any and all documents and take any and all actions that may be necessary or desirable to perfect the assignment, conveyance and transfer of the Trademarks hereunder, it being understood that the foregoing covenant and agreement shall bind and inure to the benefit of the successors, assigns and legal representatives of the Assignor and the Assignee. In the event the Assignee is unable, after reasonable effort, to secure the Assignor's signature for the purposes of making such filings and recordations and more fully vesting ownership in the Trademarks, for any reason whatsoever, the Assignor hereby irrevocably designates and appoints the Assignee and its duly authorized agents as the Assignor's agent and attorney-in-fact, to act for and in their behalf to execute and file any and all such documents and to do all other lawfully permitted acts to accomplish the complete and exclusive transfer of the Trademarks.

      4.   <u>Governing Law</u>. This Assignment shall be governed by, enforced under and construed in accordance with the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws of such State.

      5.   <u>Amendment; Waiver</u>. None of the provisions of this Assignment may be waived, changed or altered except in a signed writing by the Party against whom enforcement of the same is sought.

      6.   <u>Conflict with Asset Purchase Agreement or Sale Order</u>. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Asset Purchase Agreement or the Sale Order (as defined in the Asset Purchase Agreement), the terms and conditions of the Asset Purchase Agreement or the Sale Order, as the case may be, shall govern, supersede and prevail. Notwithstanding anything to the contrary, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter the respective agreements, terms, conditions, limitations, representations, warranties, covenants and obligations contained in the Asset Purchase Agreement and the Sale Order or the survival thereof.

      7.   <u>Counterparts</u>. This Assignment may be executed in any number of counterparts with the same effect as if the signatures thereto were upon one instrument.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this Trademark Assignment on the date first written above.

ASSIGNOR:

**HEALTHCARE UNIFORM COMPANY, INC.**

By: _____
Name:_____
Title:_____

**UNIFORM CITY NATIONAL, INC.**

By: _____
Name:_____
Title:_____

ASSIGNEE:

**SCRUBS & BEYOND, LLC**

By: _____
Name:_____
Title:_____

[Signature Page to Trademark Assignment]

Schedule A

Trademarks

**Registered Trademarks:**

| TRADEMARK | REGISTRATION NO. | REGISTRANT/ OWNER |
|---|---|---|
| BE THE FIRST | Reg. No. 4,332,937 | Healthcare Uniform Company, Inc. |
| BE THE FIRST LIFE UNIFORM and design | Reg. No. 4,325,936 | Healthcare Uniform Company, Inc. |
| LIFE | Reg. No. 2,571,331 | Healthcare Uniform Company, Inc. |
| LIFE | Reg. No. 1,647,117 | Healthcare Uniform Company, Inc. |
| LIFE and design | Reg. No. 3,769,341 | Healthcare Uniform Company, Inc. |
| LIFE UNIFORM and design | Reg. No. 3,186,315 | Healthcare Uniform Company, Inc. |
| SCRUB ELEMENTS | Reg. No. 3,764,605 | Healthcare Uniform Company, Inc. |
| FASHION WITH A PULSE | Reg. No. 3,312,293 | Healthcare Uniform Company, Inc. |
| FRESH SCRUBS | Reg. No. 3,424,316 | Healthcare Uniform Company, Inc. |
| LIFE UNIFORM | Reg. No. 3,370,424 | Healthcare Uniform Company, Inc. |
| SIERRA SCRUBS | Reg. No. 3,076,400 | Uniform City National, Inc. |
| UNIFORM CITY | Reg. No. 900,819 | Uniform City National, Inc. |
| UNIFORM CITY | Reg. No. 1,654,583 | Uniform City National, Inc. |

**Registered Trademarks (continued):**

| TRADEMARK | REGISTRATION NO. | REGISTRANT/ OWNER |
| --- | --- | --- |
| UNIFORM CITY ONLINE | Reg. No. 2,798,123 | Uniform City National, Inc. |
| UNIFORM CITY U.S.A. | Reg. No. 1,646,003 | Uniform City National, Inc. |

**Pending Application:**

| TRADEMARK | SERIAL NO. | REGISTRANT/ OWNER |
| --- | --- | --- |
| LIFE ESSENTIALS | Serial No. 85/880630 | Healthcare Uniform Company, Inc. |

**EXHIBIT G**

<u>**Recordable Copyright Assignment**</u>

## COPYRIGHT ASSIGNMENT

This COPYRIGHT ASSIGNMENT (this "Assignment") dated as of [●], 2013, is made and entered into by and among **HEALTHCARE UNIFORM COMPANY, INC.**, a Delaware corporation ("Healthcare Uniform"), **UNIFORM CITY NATIONAL, INC.**, a Delaware corporation ("Uniform City"; and together with Healthcare Uniform, collectively, the "Assignor"), and **SCRUBS & BEYOND, LLC**, a Delaware limited liability company (the "Assignee") (each a "Party", and collectively, the "Parties"). Unless otherwise defined herein, capitalized terms used in this Assignment shall have the meanings given to them in the Asset Purchase Agreement (as defined below).

Agreement:

The Assignor and the Assignee are parties to that certain Asset Purchase Agreement, dated as of May 28, 2013 (the "Asset Purchase Agreement"), pursuant to which the Assignor has agreed to sell the Purchased Assets to the Assignee.

As a condition to Closing, the Parties agreed to enter into this Assignment pursuant to which the Assignor will assign to the Assignee all of the Assignor's worldwide right, title and interest in and to all of the Assignor's registered and unregistered copyrights and all applications, registrations and renewals in connection therewith, including without limitation the copyright registrations listed on Schedule A attached hereto (collectively, the "Copyrights").

Agreement:

**NOW, THEREFORE**, in consideration of the premises and mutual agreements set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Assignment and Transfer.   The Assignor hereby, effective as of the Closing, assigns, sells, conveys and transfers to the Assignee, its legal representatives, successors and assigns, all of the Assignor's right, title and interest, throughout the world, in, to and under the Copyrights, with the same rights of the Assignor to be held and enjoyed by the Assignee for its own use and enjoyment, and for the use and enjoyment of its legal representatives, successors and assigns, and together with all rights to sue for and collect damages for, and to obtain injunctive or equitable relief for, any past, present or future infringement, whether currently known or unknown, of the foregoing. This assignment is made without reservation of any rights of any kind now known or hereinafter discovered or granted by law, including electronic, digital, and all other versions in all media now known or hereafter invented, worldwide and forever.

2.    Further Assurances.  The Assignor covenants and agrees that the Assignor will not execute any writing or do any act whatsoever conflicting with this Assignment, and that the Assignor will, upon the request of the Assignee, execute and deliver, or cause to be executed or delivered, any and all documents and take any and all actions that may be necessary or desirable to perfect the assignment, conveyance and transfer of the Copyrights hereunder, it being understood that the foregoing covenant and agreement shall bind and inure to the benefit

1

of the successors, assigns and legal representatives of the Assignor and the Assignee. In the event the Assignee is unable, after reasonable effort, to secure the Assignor's signature for the purposes of making such filings and recordations and more fully vesting ownership in the Copyrights, for any reason whatsoever, the Assignor hereby irrevocably designates and appoints the Assignee and its duly authorized agents as the Assignor's agent and attorney-in-fact, to act for and in their behalf to execute and file any and all such documents and to do all other lawfully permitted acts to accomplish the complete and exclusive transfer of the Copyrights.

3.    <u>Governing Law</u>.  This Assignment shall be governed by, enforced under and construed in accordance with the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws of such State.

4.    <u>Amendment; Waiver</u>.  None of the provisions of this Assignment may be waived, changed or altered except in a signed writing by the Party against whom enforcement of the same is sought.

5.    <u>Conflict with Asset Purchase Agreement or Sale Order</u>.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Asset Purchase Agreement or the Sale Order (as defined in the Asset Purchase Agreement), the terms and conditions of the Asset Purchase Agreement or the Sale Order, as the case may be, shall govern, supersede and prevail.  Notwithstanding anything to the contrary, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter the respective agreements, terms, conditions, limitations, representations, warranties, covenants and obligations contained in the Asset Purchase Agreement and the Sale Order or the survival thereof.

6.    <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts with the same effect as if the signatures thereto were upon one instrument.

**[SIGNATURE PAGE FOLLOWS]**

2

IN WITNESS WHEREOF, the Parties have executed this Copyright Assignment on the date first written above.

ASSIGNOR:

**HEALTHCARE UNIFORM COMPANY, INC.**

By: _____
Name: _____
Title: _____

**UNIFORM CITY NATIONAL, INC.**

By: _____
Name: _____
Title: _____

ASSIGNEE:

**SCRUBS & BEYOND, LLC**

By: _____
Name: _____
Title: _____

## SCHEDULE A

### Copyrights

| Copyright Title | U.S. Reg. No. |
| --- | --- |
| Uniform City Catalog – ed. no. 110, issue: ed. 2200 | TX 6-034-579 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 2300 | TX 6-034-580 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 2400 | TX 6-034-581 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 2600 | TX 6-034-582 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 2700 | TX 6-034-583 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 2800 | TX 6-034-584 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 137 | TX 5-961-668 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 145 | TX 5-961-669 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 147 | TX 6-030-193 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 148 | TX 6-030-194 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 149 | TX 6-011-583 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 149 | TX 6-011-585 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 150 | TX 6-011-584 |
| Edition 162 of Uniform City Catalog | TX 6-227-541 |
| Edition 163 of Uniform City Catalog | TX 6-212-036 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 124 | TX 6-144-423 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 125 | TX 6-144-420 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 126 | TX 6-144-421 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 127 | TX 6-144-422 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 128 | TX 6-144-426 |

| Copyright Title | U.S. Reg. No. |
|---|---|
| Uniform City Catalog – ed. no. 110, issue ed. no. 130 | TX 6-144-424 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 131 | TX 6-144-419 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 133 | TX 6-144-425 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 134 | TX 6-144-418 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 136 | TX 6-144-417 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 138 | TX 6-144-416 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 140 | TX 6-144-415 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 142 | TX 6-144-414 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 144 | TX 6-144-413 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 146 | TX 6-144-412 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 3300 | TX 6-090-856 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 156 | TX 6-082-130 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 158 | TX 6-154-247 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 159 | TX 6-154-243 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 160 | TX 6-154-244 |
| Uniform City Catalog – Ed. 164 | TX 6-305-876 |
| Uniform City Catalog – Ed. 166 | TX 6-305-875 |
| Uniform City Catalog – Ed. 3600 | TX 6-305-874 |
| Uniform City Discount Catalog | TX 6-305-873 |
| Uniform City Catalog – Ed. 155 | TX 6-146-657 |
| Uniform City discount catalog | TX 6-088-030 |
| Uniform City discount catalog: ED no. 157 | TX 6-085-515 |

| Copyright Title | U.S. Reg. No. |
|---|---|
| Uniform City discount catalog | TX 6-090-655 |
| Uniform City discount catalog: ED no. 154 | TX 6-021-986 |
| Uniform City discount catalog: ED no. 152 | TX 6-021-985 |
| Uniform City Catalog: ED no. 153 | TX 6-021-984 |
| Uniform City Catalog: ED no. 117 | TX 6-021-983 |
| Uniform City Catalog-ed no. 110, issue: ed. no. 120 | TX 5-536-926 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 121 | TX 5-536-927 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 95 | TX 5-181-362 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 96 | TX 5-181-363 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 97 | TX 5-181-364 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 110 | TX 5-402-305 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 111 | TX 5-402-304 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 112 | TX 5-402-306 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 113 | TX 5-416-313 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 114 | TX 5-416-312 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 115 | TX 5-416-311 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 116 | TX 5-416-314 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 102 | TX 5-261-626 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 103 | TX 5-261-627 |
| Uniform City Express: clothes for people who are: since | TX 5-261-625 |

| Copyright Title | U.S. Reg. No. |
|---|---|
| 1964 – through ed. no. 109, issue: ed. 104 | |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 105 | TX 5-266-121 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 107 | TX 5-319-606 |
| Uniform City Express: clothes for people who are: since 1964 – through ed. no. 109, issue: ed. 108 | TX 5-319-605 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED88 | TX 5-147-193 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED89 | TX 5-147-196 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED90 | TX 5-147-197 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED91 | TX 5-147-194 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED92 | TX 5-147-192 |
| Uniform City Express: clothes for people who dare: since 1964 – through ed. no. 109, issue: ED93 | TX 5-147-195 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED94 | TX 5-153-195 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED98 | TX 5-181-533 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED99 | TX 5-181-531 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED100 | TX 5-153-193 |
| Uniform City Express: clothes for people who care: since 1964 – through ed. no. 109, issue: ED101 | TX 5-153-194 |
| Uniform City Catalog: ED no. 119 | TX 5-528-091 |

| Copyright Title | U.S. Reg. No. |
|---|---|
| Uniform City Catalog: ED no. 118 | TX 5-528-090 |
| Uniform City Catalog: ED no. 106 | TX 5-340-331 |
| Uniform City Catalog: ED no. 109 | TX 5-340-330 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 58 | TX 4-993-198 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 59 | TX 4-993-199 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 60 | TX 4-992-064 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 61 | TX 4-988-793 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 63 | TX 4-988-027 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 64 | TX 4-988-026 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 65 | TX 4-988-089 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 66 | TX 4-988-028 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 67 | TX 4-993-197 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 68 | TX 4-988-029 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 69 | TX 4-993-190 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 70 | TX 4-993-191 |
| Uniform City Express: clothes for people who care: since | TX 4-993-194 |

| Copyright Title | U.S. Reg. No. |
|---|---|
| 1964.  Issue: ed. no. 71 | |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 72 | TX 4-993-196 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 73 | TX 4-988-790 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 74 | TX 4-988-791 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 75 | TX 4-988-792 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 76 | TX 4-993-186 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 77 | TX 4-993-188 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 78 | TX 4-993-195 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 79 | TX 4-993-192 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 80 | TX 4-993-193 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 81 | TX 4-988-802 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 82 | TX 4-988-803 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 83 | TX 4-988-804 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 84 | TX 4-988-745 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 86 | TX 4-991-524 |

| Copyright Title | U.S. Reg. No. |
|---|---|
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 87 | TX 4-993-189 |
| Uniform City Express: [catalog] | TX 4-988-823 |
| Uniform City Express: [catalog] | TX 4-988-708 |
| Uniform City Express: clothes for people who care: since 1964. Issue: ed. no. 50 | TX 4-060-675 |
| Uniform City Express: clothes for people who care: since 1964. Issue: EDL49 | TX 4-010-023 |
| Edition 170 of Uniform City catalog | TX 6-377-976 |
| Edition 171 of Uniform City catalog | TX 6-377-977 |
| Edition 172 of Uniform City catalog | TX 6-377-978 |
| Edition 2900 of Uniform City catalog | TX 6-159-325 |
| Edition 3000 of Uniform City catalog | TX 6-159-324 |
| Edition 3100 of Uniform City catalog | TX 6-159-326 |
| Edition 3800 of Uniform City catalog | TX 6-380-094 |
| Uniform City Catalog: ED no. 152 | TX 6-021-985 |
| Uniform City Catalog: ED no. 153 | TX 6-021-984 |
| Uniform City Catalog: ED no. 154 | TX 6-021-986 |
| Uniform City Express: ED no. 110 | TX 5-402-305 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 122 | TX 5-900-938 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 123 | TX 5-900-939 |
| Uniform City Catalog-ed. no. 110, issue: ed. no. 135 | TX 5-900-945 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 129 | TX 5-900-940 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 132 | TX 5-900-941 |

| Copyright Title | U.S. Reg. No. |
| --- | --- |
| Uniform City Catalog – ed. no. 110, issue ed. no. 139 | TX 5-900-942 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 141 | TX 5-900-943 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 143 | TX 5-900-944 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 3300 | TX 6-218-116 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 161 | TX 6-218-114 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 3500 | TX 6-218-115 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 167 | TX 6-324-948 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 3700 | TX 6-324-951 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 168 | TX 6-324-949 |
| Uniform City Catalog – ed. no. 110, issue ed. no. 169 | TX 6-324-950 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 51 | TX 4-137-435 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 52 | TX 4-137-434 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 53 | TX 4-241-467 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 55 | TX 4-241-465 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 54 | TX 4-241-464 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 56 | TX 4-334-424 |
| Uniform City Express: clothes for people who care: since 1964.  Issue: ed. no. 57 | TX 4-340-334 |