## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIFE UNIFORM HOLDING CORP.,[1] | Case No. 13-11391 (   ) |
| Debtors. | Joint Administration Requested |

**DEBTORS' MOTION FOR ORDER (A) APPROVING SALE
PROCEDURES AND BIDDING PROTECTIONS IN CONNECTION WITH
SALE OF CERTAIN OF THE DEBTORS' ASSETS PURSUANT TO SECTIONS
363 AND 365 OF THE BANKRUPTCY CODE; (B) SCHEDULING AN AUCTION
AND HEARING TO CONSIDER APPROVAL OF THE SALE OF CERTAIN OF
THE DEBTORS' ASSETS; (C) APPROVING NOTICE OF RESPECTIVE
DATES, TIMES, AND PLACES FOR AUCTION AND FOR HEARING ON
APPROVAL OF (I) SALE OF CERTAIN OF THE DEBTORS' ASSETS, (II)
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (D) APPROVING ASSUMPTION
OF ESCROW AGREEMENT, AND (E) GRANTING OTHER RELIEF**

Life Uniform Holding Corp. ("***Holdings***"), Healthcare Uniform Company, Inc.

("***Life Uniform***") and Uniform City National, Inc. ("***Uniform City***"), the debtors and

debtors-in-possession herein (collectively, the "***Debtors***"), hereby submit this motion (the

"***Sale Procedures Motion***") pursuant to sections 105, 363, and 365 of title 11 of the

United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "***Bankruptcy Code***"), and

rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (each a

"***Bankruptcy Rule***," and collectively, the "***Bankruptcy Rules***") and Rules 2002-1, 6004-

1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), for an order

---

[1]  The Debtors in these cases, along with the last four digits of the federal tax identification number for
each Debtor, are: Life Uniform Holding Corp. (1018), Healthcare Uniform Company, Inc. (0640), and
Uniform City National, Inc. (0392).

(A) approving the proposed sale procedures and bidding protections substantially in the form attached hereto as **Exhibit A** (the "*Sale Procedures*") in connection with the Debtors' proposed sale (the "*Sale*") of certain of their assets (the "*Purchased Assets*," as defined in paragraph [32] below), as a whole to one bidder or in parts to more than one bidder, pursuant to sections 363 and 365 of the Bankruptcy Code, and to sell the "*Additional Assets*" as defined in Paragraph [33] below by Auction; (B) scheduling an auction for the sale of the Purchased Assets and Additional Assets (the "*Auction*") and a hearing to consider approval of the results of such Auction (the "*Sale Hearing*") pursuant to that certain Debtors' Motion for Order (A) Authorizing and Approving Agreement; (B) Approving Sale of Certain of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims and Encumbrances; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (D) Authorizing the Debtors to Consummate Transactions Related to the Above; and (E) Granting Other Relief (the "*Sale Motion*"); (C) approving the Debtors' proposed notice, substantially in the form attached hereto as **Exhibit B** (the "*Sale Notice*"), of the respective date, time and place for the Auction and the Sale Hearing (at which the Debtors will seek approval of their proposed sale of the Purchased Assets and Additional Assets and assumption and assignment of certain executory contracts and unexpired leases; (D) approving assumption of Escrow Agreement (defined herein); and (E) granting such other relief as is fair and equitable (the "*Sale Procedures Order*," a proposed copy of which is annexed hereto as **Exhibit C**). In support hereof, the Debtors respectfully represent as follows:

2

## INTRODUCTION

1.      The Debtors, in consultation with their debtor-in-possession lender ("***DIP***

***Lenders***"), their pre-petition secured lenders and in the exercise of their considered

business judgment, have determined that the best way to maximize value for the benefit

of their estates and creditors is to attempt an expeditious sale of their assets through one

or more transactions.

2.      In this regard, on May 29, 2013 Debtors executed an Asset Purchase

Agreement (the "***Purchase Agreement***") with Scrubs & Beyond, LLC (the "***Purchaser***")

providing for the sale of the Purchased Assets to the Purchaser and the Debtors'

assumption and assignment to the Purchaser of certain executory contracts and unexpired

leases.  The Debtors also seek to expose the Purchase Assets and the Additional Assets

for competitive bidding through an Auction pursuant to Sale Procedures that are subject

of a separate motion filed contemporaneously herewith.

3.      Although Court approval of the proposed sale of the Purchased Assets has

been sought separately by the Sale Motion, the Debtors presently seek certain ancillary

relief in connection with this proposed Sale.  Specifically, the Debtors request that the

Court enter the proposed Sale Procedures Order (attached hereto as **Exhibit C**), which

approves the Bidding Protections, the Sale Procedures and the Auction and Sale Hearing

Notice. The Debtors also request that the Court schedule the Sale Hearing to be

conducted in connection with the Sale Motion.

## BACKGROUND

### A.      The Chapter 11 Filings

4.      On May 29, 2013 (the "***Petition Date***"), the Debtors each filed a voluntary

petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors

continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      No official committee of general unsecured creditors (the "*Committee*") has been appointed in these cases by the Office of the United States Trustee to date.

6.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) (M), (N) and (O).  Venue of the Debtors' chapter 11 cases and this Sale Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 363 and 365 of the Bankruptcy Code. Bankruptcy Rules 6004 and 6006, and Bankruptcy Rules 6004 and 6006 and Local Rules 2002-1, 6004-1 and 9006-1.

**B.      Overview of the Debtors' Corporate Structure and Business**

*1.      Company Background*

7.      Life Uniform was founded in 1965 when Angelica Corporation ("*Angelica*") decided to enter the retail uniform industry, with the goal of developing a 50-store chain.  At the time, Angelica was principally engaged in the manufacture of uniforms, including healthcare uniforms, and the movement of hospitals away from directly providing uniforms to employees prompted Angelica to form Life Uniform.  The first Life Uniform store was opened in 1965 in Clayton, Missouri, followed shortly by stores in Atlanta, Louisville and Memphis.  The chain grew quickly and by the end of 1969 Life Uniform operated 34 stores with a focus on urban locations, major commercial centers or near hospitals.  The 100th Life Uniform store was opened in 1973 and by 1977 Life Uniform had grown to over 150 stores.  Today, the company's expansive national footprint makes it the nation's largest independently owned medical professional supplier.  The Debtors offer a leading selection of popular third party and proprietary

brands of scrubs, shoes, jackets, lab coats, stethoscopes and other medical accessories, the Debtors are the largest customer for many of its vendors in a unique and highly fragmented industry.

8.    A major driver of growth for the company throughout its existence has been acquisitions. The vast majority of the stores operated today by Life Uniform were acquired as opposed to new stores opened by the company. Notable acquisitions included: the 1969 acquisition the Bruck's chain from American Hospital Supply (14 stores); the mid-1980s acquisitions of Robin's in southern Florida (10 stores) and National Uniform Shops (76 stores); the 1994 acquisition of Z & H Uniforms, Inc. (21 stores); and the 2006 acquisition of Uniform City (9 stores).

9.    Over time, Life Uniform's store portfolio had become somewhat eclectic because of the numerous acquisitions (many of which had different store types). In fiscal 2000 (fiscal year ending in January 2000) Life Uniform decided to rationalize its store portfolio by relocating and closing selected stores as their leases expired. The company closed a total of 48 stores during the following three fiscal years.

10.    During FYE January 2001, Life Uniform initiated a catalog distribution and an e-commerce platform, making it the only national medical supplier to offer its customers shopping via four retail channels at that time. The company also developed a growth strategy focused more on opening new stores as opposed to acquiring existing stores. Subsequently, Angelica opted to refocus efforts on its core line of business, medical linen service, and as a result sought to divest non-core businesses.

11.    In July 2004, Life Uniform was acquired by Sun Uniforms LLC. Sun Uniforms LLC continues to own substantially all of the stock of Holdings, the parent of

the other Debtors, Life Uniform and Uniform City. At the time of acquisition, the company operated 196 locations. As part of the acquisition, the company retained the President to continue serving in his capacity and hired a new CFO to assist in implementing a new growth strategy, selectively targeting strategic acquisitions of already existing medical supply businesses. During this time, the company focused its efforts on expanding store operations outside of mall-based locations, and into hospitals and other locations in proximity to larger concentrations of healthcare professionals that would better support a growing outside/direct sales trend.

12.    In 2006, Life Uniform acquired the nine-store chain, Uniform City, which was then one of the company's biggest competitors. As part of the Uniform City acquisition, in addition to the retail locations, the company acquired an existing catalog and direct fulfillment business that had a broad national circulation base and further expanded the company's national retail footprint into the mid-Atlantic and south-eastern regions of the United States. Uniform City remained a completely separate entity with a distinct catalog, aimed at a lower priced market.

13.    Subsequent to the Uniform City acquisition, in 2008, the company replaced the management with the current management team with the intent of focusing on operational issues, the current economic environment, and the changing customer presence.

14.    The Debtors' average store will stock approximately 2,700 stock keeping units ("*SKUs*") including up to 15 colors in nine sizes (ranging from XS to 5XL) and in petite, regular, and tall for both men and women across basic and fashion products. The Debtors e-commerce site stocks more than 6,500 total SKU's (including some

discontinued in stores). New prints are added monthly and generally new products and styles are introduced four to five times a year.

15.     Historically, Life Uniform sold primarily nationally recognized brands such as Cherokee, Barco, Landau, Peaches and Nursemates shoes. In 2001, Life Uniform began a private label program and has subsequently introduced several proprietary brands, including "Life®", "Life Essentials", "Fresh Scrubs", "Scrub Wear", "Sierra Scrubs", "Comfy Cotton", "Scrub Elements" and "Laura Ashley®." In FYE January 2013, approximately 25 percent of all scrubs sold by Life Uniform were proprietary or private label brands.

## 2.     *Healthcare Apparel Industry*

16.     The standard apparel for healthcare professionals is commonly referred to as scrubs. Scrubs are typically sold as two separate pieces of apparel consisting of "tops" and "bottoms" and are separated into two categories, "basic" and "fashion."

17.     The industry of supplying uniforms and accessories is highly fragmented, with no competitor representing a significant percentage of the market, and those with meaningful scale (i.e. more than one percent of the market) representing less than 30 percent of the overall industry. The Debtors are approximately three times the size of the next largest independent supplier, serving as the largest customer for many of its vendors.

18.     Unlike physician worn scrubs that are typically provided by the hospital and discarded or washed after a procedure, non-physician healthcare providers (nurses, orderlies, medical office personnel, dentists, etc.) own and wear their scrubs as a uniform daily. Depending on the healthcare professional's employer and job function, purchases of scrubs can be either the sole responsibility of the employee or employer, or a shared

responsibility. Determination of the scrub color, pattern, style, fit, and personalization can also range from employer mandated to the employee's discretion, but usually lies in between. These unique demands associated with the consistently evolving uniform specifications of the healthcare industry require that suppliers such as the Debtors focus on a multi-channel delivery system.

19.    Over time, the industry has evolved with more healthcare providers mandating uniforms for their professionals. Outside and inbound sales have emerged as a larger compliment to traditional walk-in retail. The Debtors' extensive national footprint has been highly strategic in providing the company with scale and national reach to compete effectively in the Direct and Inbound channels. These locations serve as retailer, service center and warehouse – providing stock for on-site and outbound sales as well as providing a knowledgeable environment for sizing and fittings.

3.    *Sales Channels*

20.    The company supplies products through three supply channels Direct, Inbound, and Retail. For FYE January 2013, approximately 36 percent of the company's sales are derived from Direct, 14 percent from Inbound, and 50 percent are from Retail.

C.    **The Debtors' Capital Structure**

21.    The voting common stock of Holdings is held by Sun Uniforms, LLC. Holdings holds 100% of the stock of Life Uniform, which in turn owns 100% of stock of Uniform City.

22.    Life Uniform and Uniform City are the Borrowers and Holdings is the Guarantor under a credit facility with Capitalsource Finance LLC ("*Capitalsource*") dated October 3, 2006 (as amended pursuant to certain letter agreements dated July 29, 2009, August 7, 2009, and August 28, 2009 and pursuant to the Waiver and First

Amendment dated September 30, 2009 and pursuant to the Consent and Second Amendment dated August 19, 2011) (the "***Prepetition Credit Agreement***"). The Prepetition Credit Agreement consists of a $11.5 million revolver (the "***Prepetition Revolver***") and a $26 million term loan (the "***Prepetition Term Loan,***" together with the Prepetition Revolver, the "***Prepetition First Lien Debt***"). Capitalsource is both the agent and the lender under the Prepetition Credit Agreement. The Prepetition First Lien Debt is secured by a lien on all of the Debtors' real and personal property. The Debtors have fully utilized all of their availability under the First Lien Debt.

23.     The Borrowers issued to Sun Uniforms Finance, LLC ("***Second Lien Lender***") a Senior Subordinated Secured Promissory Note ("***Senior Secured Promissory Note***") dated September 30, 2009 in the original principal amount of $6,108,000 as well as a general guaranty by Holdings. Second Lien Lender was granted a second lien on the collateral held by Capitalsource as a part of this transaction. The use of proceeds from the loan were to provide liquidity to the company via partial revolver paydown, further reduce the total outstanding debt of the company via partial term loan paydown, and fees and expenses to effectuate the transaction. Prior to the completion of the loan, the company was in default of its financial covenants and the maturity date of the loan was coming due. With the additional liquidity and reduction in leverage, Capitalsource extended its loan for an additional 18 months. The Second Lien Lender also holds two additional notes, each in the original principal amount of $1,088,303.56, which were purchased from Jeffrey N. Linn and Craig Linn on August 19, 2011.

24.     Angelica Corporation holds a Junior Subordinated Note issued by Life Uniform, originally dated July 7, 2004 in the original principal amount of $4,074,328 and

reissued and dated July 27, 2005 in the reissued principal amount of $4,018,680, and further reissued and dated September 30, 2009 in the reissued principal amount of $5,482,453.95, and further reissued and dated August 19, 2011 in the reissued principal amount of $6,304,556.77 (the "*Junior Subordinated Note*").

D.     **Events Leading to the Bankruptcy Filing**

25.     Leading up to the Sun acquisition, the Debtors had sagging profitability and overhead issues. The Debtors, under new ownership, quickly drove increases in profitability through a combination of store rationalization and sensible corporate overhead initiatives. The company also looked to expand its operations and footprint through acquisition, and in 2006, the company acquired Uniform City, a nine location competitor with larger footprint locations, servicing a unique demographic than that of Life's traditional customers.

26.     Despite the numerous initiatives enacted by the Debtors, the company's recent performance has been declining in terms of revenue and EBITDA. This has been in large part due to the company's stressed liquidity profile. The liquidity issues prevented the Debtors from furthering certain necessary goals including the completion of a needed e-commerce system upgrade; payment of key vendors on or near terms to encourage better pricing; continuing a highly accretive acquisition strategy; payment of earned bonuses; and maintaining sufficient working capital to fully support organic sales channel growth. The failure to complete the necessary goals as a result of the Debtors lack of liquidity further stressed the Debtors' liquidity and performance, leading to further deterioration and a downward liquidity spiral.

27.     Recognizing this trend and need for an influx of capital to grow the Debtors' business and profitability, the Debtors determined that the best method to

maximize the value of the enterprise was to pursue a sale of the company.  Accordingly, the company has retained Morgan Joseph TriArtisan LLC ("***Morgan Joseph***") to explore a sale of the company.

      28.     The Pre-Petition First Lien Lenders agreed to continue to fund the Debtors on a daily basis while the Debtors attempted to find a potential buyer and/or investor in conjunction with either an out of court restructuring or through a bankruptcy proceeding. The Debtors' continuing liquidity problems forced the Debtors to file for chapter 11 protection.

      29.     As of the Petition Date, the Debtors lack the funds necessary to meet projected short-term cash needs due to a lack of availability under the Pre-Petition Credit Agreement and Pre-Petition Second Lien Credit Agreement and lower than expected cash flow from operations.

## RELIEF REQUESTED

      30.     By this Motion, the Debtors respectfully request, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1 and 9006-1, entry of an order: (A) approving the Sale Procedures in connection with the Debtors' proposed sale of the Purchased Assets and Additional Assets, as a whole to one bidder or in parts to one or more bidders, pursuant to sections 363 and 365 of the Bankruptcy Code; (B) scheduling the Auction; (C) scheduling the Sale Hearing in connection with the Sale Motion; (D) approving the assumption of the Escrow Agreement; (E) approving the Auction and Sale Hearing Notice; and (F) granting such other relief as is fair and equitable.

11

## PROPOSED SALE OF THE ASSETS

### A.    Description of the Purchased Assets and Additional Assets

31.    The Purchased Assets to be sold to Purchaser the "*Purchased Assets*")[2]

and subject to higher and better bids at Auction include, *inter alia*,

(a)    all Accounts Receivable and other rights to payment (excluding Credit Card Receivables) arising from the conduct of the Business;

(b)    all security and other deposits related to Assumed Contracts;

(c)    all tangible personal property owned by Sellers related to, useful in or held for use in the conduct of the Business that are related to, located at or useful in connection with the Real Property Leases that are Assumed Contracts, including merchandise, supplies, samples, equipment, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunication equipment, storeroom contents, spare parts, shipping materials, packaging materials and consumables relating to or available for sale or use in connection with the Business;

(d)    all right, title and interest of Sellers under each Real Property Lease on Schedule 1.1(a) of the Purchase Agreement, each of which shall be an Assumed Contract, together with all of Sellers' right title and interest in and to all improvements, fixtures and other appurtenances thereto and rights in respect thereof; provided that Purchaser may add or remove Real Property Leases listed on Schedule 1.1(a) as set forth in Section 2.5 of the Purchase Agreement;

(e)    all right, title and interest of Sellers under each other Contract on Schedule 1.1(b) of the Purchase Agreement, each of which shall be an Assumed Contract; provided that Purchaser may add or remove other Contracts listed on Schedule 1.1(b) as set forth in Section 2.5;

(f)    all right, title and interest of Sellers in and to any property subject to a personal property lease that is related to, useful in or held for use in the conduct of the Business, to the extent any such personal property lease is an Assumed Contract;

(g)    the Purchased Intellectual Property;

---

[2]    Defined terms used in the paragraph 30 shall have the meaning ascribed to such terms under the Purchase Agreement.  In the event of any inconsistency between the description of the Purchased Assets set forth herein and the description of such assets as set forth in the Purchase Agreement, the Purchase Agreement shall control.

(h)    all of the rights and benefits accruing from and after the Closing under any of the Assumed Contracts, including each Real Property Lease, personal property lease and Intellectual Property License that is an Assumed Contract;

(i)    all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Purchased Intellectual Property, and all files, customer files and documents (including credit information), supplier lists, vendor files, financial and other records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (f) above, but excluding (i) personnel files for Employees who are not hired by Purchaser, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents that Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) Documents relating to an Excluded Asset or Excluded Liability;

(j)    all of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business to the extent assignable, except any such Permit that is an Excluded Contract;

(k)    all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(l)    any rights, demands, claims, causes of action, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation arising out of or relating to any of the Purchased Assets;

(m)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(n)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property;

(o)    all prepaid expenses of Sellers;

(p)    all other assets, properties, rights and claims of Sellers of any kind or nature that relate to the Business, that are used or useful in or held for use in the Business, or that relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in Section 2.1 to the Purchase Agreement, including, but not limited to, all Sellers' assets related to, located at, or used or useful in connection with the Real Property Leases that are Assumed Contracts; and

(q)    all inventory of any kind and nature, including raw materials, supplies, work-in-process, packaging materials and other materials in the inventory of the Business ("*Inventory*").

32.    The Assets in addition to the Purchased Assets to be sold at Auction (the

"*Additional Assets*")[3] include, *inter alia*,

(a)    all tangible personal property (other than Inventory) owned by Sellers
related to, useful in or held for use in the conduct of the Business that are related to,
located at or useful in connection with the Real Property Leases THAT ARE NOT
Assumed Contracts under the Purchase Agreement with Purchaser, including equipment,
televisions, monitors, video players, computers, hardware, electronics, file servers,
scanners, printers, networks, copiers, cash registers, furniture, furnishings, fixtures,
telephone lines, telecopy machines, telecommunication equipment, storeroom contents,
and spare parts relating to or available for use in connection with the Business;

(b)    all right, title and interest of Sellers under each Real Property Lease
THAT IS NOT on Schedule 1.1(a) of the Purchase Agreement, together with all of
Sellers' right title and interest in and to all improvements, fixtures and other
appurtenances thereto and rights in respect thereof.

**B.    The Debtors' Solicitation and Marketing Efforts**

33.    On February 1, 2013, the Debtors retained Morgan Joseph as their

Investment banker to assist the Debtors in exploring certain strategic alternatives in order

to maximize their value, including the potential sale of the Debtors' assets.

34.    Morgan Joseph prepared marketing materials intended for distribution to

prospective buyers of the Debtors' assets including a teaser, confidential investment

memorandum and the aggregation of key company documents and further analysis for an

online dataroom.  Morgan Joseph worked with the Debtors to develop a list of suitable

potential buyers to be contacted on a discreet and confidential basis, after approval by the

Debtors.

35.    Morgan Joseph then contacted approximately 54 potential strategic buyers

and 104 financial buyers, out of which 67 executed confidentiality agreements and

---

[3]    Defined terms used in the paragraph 31 shall have the meaning ascribed to such terms under the
Purchase Agreement.

requested additional information, 7 visited the Debtors' headquarters and met with management and conducted due diligence.

36.    The Debtors received various offers for substantially all of their assets, either in whole or in parts. After consultation with Capitalsource, and in the exercise of their considered business judgment, the Debtors selected the Purchaser pursuant to the Purchase Agreement as the higher and best purchaser of the Purchased Assets, subject to higher and better offers pursuant to the Sale Procedures.

**C.    The Purchase Agreement**

37.    The Debtors propose to sell the Purchased Assets (a) to the Purchaser pursuant to the Purchase Agreement or (b) in whole or part, to the highest and best successful bidder(s) ("*Successful Bidder(s)*") at the Auction, as determined by the Debtors in accordance with the terms of the Sale Procedures Order and the Sale Procedures and in consultation with the debtor-in-possession lenders ("*DIP Lenders*") and Capitalsource and as ultimately approved by the Bankruptcy Court.

38.    As set forth in greater detail in the Purchase Agreement, the Debtors' estates will receive approximately $22.625 million together with adjustments set forth in the Purchase Agreement (being the cash consideration payable by the Purchaser under the Purchase Agreement) for the Assets (the "*Purchase Price*"). Additionally, the Debtors will assume and assign to Purchaser the Assumed Contracts as set forth in the Agreement.

**D.    The Purchaser**

39.    The Purchaser is Scrubs and Beyond LLC, which is a is a privately held company based in Brentwood, Missouri that started with three scrubs stores in 2000. Today the company owns and operates 27 retail scrubs stores in 14 states along with a

mobile scrubs outlet that brings the retail store to larger customers and smaller markets. Scrubs & Beyond also has a catalog operation that complements its retail stores, and delivers scrubs throughout the country. The Purchaser has no connection with the Debtors, its shareholders, officers or directors. Upon information and belief, and based on information provided to or obtained by the Debtors, the Purchaser has the financial wherewithal to fulfill its obligations under the Agreement.

E.      **The Asset Sale Agreement**

40.      The Debtors propose to sell the Assets (a) to the Purchaser pursuant to the Agreement or (b) in whole or part, to the highest and/or best successful bidder(s) ("*Successful Bidder(s)*") at the Auction, as determined by the Debtors in accordance with the terms of the Sale Procedures Order and the Sale Procedures and in consultation with the DIP Lenders, the Pre-Petition First Lien Lenders, the Pre-Petition Second Lien Lenders and as ultimately approved by the Bankruptcy Court. The Debtors shall provide a copy of this Motion to (i) any party, who is identified by the Debtors as a potential purchaser and other parties that are identified by third parties to the Debtor; (ii) the Office of the United States Trustee for Region 3; (iii) the 30 largest unsecured creditors for each Debtor and counsel to the official committee of unsecured creditors (the "*Committee*"), if one is appointed in these cases; (iv) counsel for the DIP Lenders; (v) counsel for the Agent; and (vi) parties-in-interest who have requested notice in these cases pursuant to Bankruptcy Rule 2002. However, prior to the Auction, the Debtors reserve the right to amend or otherwise change the terms of the Agreement in such a manner as the Debtors deem to be in the best interests of the Debtors' estates and as shall be agreed to, in writing, by the Debtors and Purchaser.

41.     As set forth in greater detail in the Agreement, the Debtors' estates will receive approximately $22.625 million for the Assets (the "**_Purchase Price_**"). Additionally, Purchaser shall assume certain liabilities under the Agreement (defined therein as the "**_Assumed Liabilities_**").

F.     **The Sale Procedures**

42.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction. The Debtors believe that good cause exists to expose the Purchased Assets and Additional Assets to sale at auction and to approve the procedures proposed therefor. An auction conducted substantially in accordance with the Sale Procedures will enable the Debtors to obtain the highest and/or best offers for the Purchased Assets and Additional Assets, thereby maximizing the value of the estates.

43.     The Debtors will permit existing interested parties and any new prospective purchasers to perform reasonable due diligence with respect to the Purchased Assets and Additional Assets and will assist them with such efforts, including providing such potential purchasers with reasonable access to the Debtors' books, records, facilities, customers and executives. This process will culminate in an Auction prior to the Sale Hearing, at which time either the Purchaser or the Successful Bidder(s) shall be approved.

44.     While all interested bidders should read the Sale Procedures (attached hereto as **Exhibit "A"**) in their entirety, set forth below is a summary of such procedures, which summary is qualified in its entirety by the Sale Procedures:

    (a)     On a date no later than five (5) days following the entry of the Sale Procedures Order, the Debtors shall cause the Auction and Sale Hearing Notice to be sent by first class mail, postage prepaid, to (a) any party, who

is identified by the Debtors as a potential purchaser and other parties that are identified by third parties to the Debtor; (b) the Office of the United States Trustee for Region 3; (c) the 30 largest unsecured creditors for the Debtors on a consolidated basis; (d) counsel to the Committee, if one is appointed in these cases; (e) counsel for the DIP Lenders; (f) counsel for the Agent; and (g) parties-in-interest who have requested notice in these cases pursuant to Bankruptcy Rule 2002;

(b)     The Purchased Assets may be sold in a single sale to a single bidder or in parts to different bidders, in each case free and clear of all liens, claims and encumbrances. The Sale of the Purchased Assets and Additional Assets will be on an "as is, where is" basis except as set forth in the Purchase Agreement with respect to Purchased Assets and without surviving representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates. All of the Debtors' right, title, and interest in and to the Purchased Assets, the Additional Assets, or any portion thereof, to be acquired will be sold free and clear of all Liens and Claims, including, without limitation, all pledges, liens, security interests, encumbrances, claims, charges, options, and interests including, but not limited to any recoupment, offset, defenses, debts and obligations thereon and there against, such Liens and Claims to attach to the proceeds of the Sale of the Purchased Assets or Additional Assets as applicable;

(c)     To obtain access to all material non-public information that has been or will be delivered to the Purchaser and any other bidder concerning the Purchased Assets and Assumed Liabilities, each interested person or entity (an "***Interested Party***") must deliver (unless previously delivered) to Debtors' advisor, Morgan Joseph TriArtisian LLC ("Morgan Joseph"), 600 Fifth Avenue, 19th Floor, New York, NY 10020, Attn: Alex C. Fisch, (a) an executed confidentiality agreement, in form and substance satisfactory to the Debtors, which may be obtained from Morgan Joseph, and (b) evidence of the Interested Party's source of capital or other financial ability to complete the contemplated transactions. As soon as practical after delivery of the foregoing, the Debtors, after consultation with Morgan Joseph, the Secured Lenders (defined below) and the professionals of any official committee of unsecured creditors appointed in the Cases, will determine in their reasonable business judgment whether an Interested Party will be reasonably likely to be able to complete and consummate its proposed transaction on terms no less favorable in the aggregate than the terms of the Purchase Agreement, and within the time frame contemplated in the Purchase Agreement, if it were the Successful Bidder.

(d)     Each offer, solicitation or proposal (a "***Bid***") from any person or entity (each, a "***Potential Bidder***") must be in writing and satisfy each of the following conditions to be deemed a "***Qualified Bid***" and for the Potential

Bidder (other than the Purchaser) to be deemed a "***Qualified Bidder***": the bid must

(i) identify the Potential Bidder and the applicable Potential Bidder's Sponsor and its representatives authorized to act on its behalf;

(ii) identify with particularity each and every executory contract and unexpired lease that is to be assumed and assigned pursuant to Potential Bidder's Modified Purchase Agreement and demonstrate the financial ability to comply with future obligations under the executory contracts and unexpired leases;

(iii) be a good faith offer to purchase the Assets or Purchased Assets on terms that are no less favorable to the Debtors than the Purchase Agreement, contain a duly executed Modified Purchase Agreement as well as a marked copy indicating changes from the Purchase Agreement, shall not contain contingencies, and must obligate the Potential Bidder to remain bound until the closing of the sale if selected as the Successful Bidder or the Back-Up Bidder;

(iv) demonstrate the financial capability to consummate the transaction;

(v) contain written evidence of the corporate authority to enter into the transaction and evidence of the Potential Bidder's Sponsor's approval of the transaction in the case of a special purpose entity as a Potential Bidder;

(vi) Provide for consideration in cash and if for substantially all of the Purchased Assets, such bid must equal or exceed the sum of:

        (a)     The Purchase Price; plus;
        (b)     A Minimum Initial Overbid amount of $1,000,000; comprised of a break up fee of $678,750 and an initial overbid amount of $321,250

        If such bid is for les than substantially all of the Purchase Assets, the consideration must, in the aggregate equal or exceed the Minimum Qualified Bid Amount;

(vii) not request any break up fee, expense reimbursement or similar type of payment;

(viii) be accompanied by a Good Faith Deposit of 20% of the value of the Bid; and

19

(ix) expressly provide that the Assets or Purchased Assets shall not include any Excluded Assets, other than any Additional Assets that the Potential Bidder elects to include in its Bid;

(x) be submitted on of before July [___], 2013 at 4:00 p.m. (prevailing Eastern Time) to Morgan Joseph at the address indicated above.

(e)     The Debtors, following consultation with Morgan Joseph, the Secured Lenders, and professionals of any official committee of unsecured creditors appointed in the cases, shall make a determination regarding whether a Bid is a Qualified Bid and shall notify Potential Bidders whether their Bids have been determined to be Qualified Bids by no later than **4:00 p.m. (prevailing Eastern time) on July [__], 2013**. Any Potential Bidders that does not submit a Qualified Bid before the Bid Deadline will not be allowed to participate in the Auction or submit any offer after the Bid Deadline.

(f)     If no conforming Qualified Bids are received (other than the Purchaser's under the Purchase Agreement), the Debtors shall not hold an Auction and, instead, the Purchaser shall automatically be deemed the Successful Bidder and the Debtors shall request at the Sale Hearing that the Court approve the Purchase Agreement with the Purchaser.

(g)     Between the Bid Deadline and the Auction, the Debtors, along with Morgan Joseph (and in consultation with the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. A Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein.

(h)     If the Debtors receive more than one Qualified Bid, the Auction will be held on **July [__], 2013 at __:00 a.m. (prevailing Eastern Time)** at the offices of counsel to the Debtors, Klehr, Harrison, Harvey, Branzburg, LLP, 919 Market Street, Suite 1000, Wilmington, DE, 19801, or at any such other location or time as designated by the Debtors in a notice to all Qualified Bidders. On or before **1:00 p.m. prevailing Eastern Time, on July [__], 2013**, the Debtors or Morgan Joseph shall provide each Qualified Bidder (including the Purchaser):

(i) written notice of the Au ction; and

(ii) a copy of all Qualified Bids, including the Qualified Bid that the Debtors believes constitutes the highest or best offer and with which it intends to commence the Auction (the "***Pre-Auction Successful Bid***").

(i)     CapitalSource Finance LLC, and Sun Uniforms Finance, LLC   (the
        "***Secured Lenders***") have agreed that so long as the Purchaser is pursuing
        approval of the Purchase Agreement, neither will be a Qualified Bidder
        entitled to credit bid its respective secured claims against the Debtors for
        the Purchased Assets at the Auction.

(j)     The Auction shall be conducted openly and all creditors of the Debtors'
        estates shall be permitted to attend.  Without limiting the foregoing, the
        Debtors, the Purchaser, Qualified Bidders, the U.S. Trustee, the Secured
        Creditors, and their respective representatives shall be entitled to attend
        the Auction.  The Purchaser and the Qualified Bidders must appear in
        person at the Auction, or through a duly authorized representative.  The
        only parties eligible to participate in the Auction shall be Qualified
        Bidders who have submitted a Qualified Bid to the Debtors prior to the
        Bid Deadline.

(k)     Morgan Joseph shall direct and preside over the Auction.  Only the
        Purchaser and Qualified Bidders shall be entitled to make any subsequent
        bids at the Auction.  The bidding at the Auction shall start at the purchase
        price stated in the Pre-Auction Successful Bid and continue, in one or
        more rounds of bidding, so long as during each round at least one Overbid
        (as defined below) is submitted.  All Overbids shall be made and received
        on an open basis, such that all material terms of each Overbid will be fully
        disclosed to all other Qualified Bidders.  The bidding at the Auction will
        be transcribed or videotaped and the Debtors shall maintain a transcript of
        all Bids made and announced at the Auction, including all Overbids and
        the Successful Bid.

(l)     Each Qualified Bidder shall be required to acknowledge and agree in
        writing that it has not engaged (and agrees not to engage) in any collusion
        with respect to any Bids, the Auction, or the Sale; provided that it shall not
        be deemed collusion for the Qualified Bidders whose Bids comprise a
        Portion Qualified Bid to Overbid in concert.

(m)     An "Overbid" is any bid made at the Auction after the Debtors'
        announcement of the Pre- Auction Successful Bid, that is an increment of
        at least $100,000 greater than the immediately preceding Bid, and that
        otherwise complies with the terms and conditions for a Qualified Bid as
        set forth herein.  The Auction may include individual negotiations with
        Qualified Bidders, subject to the foregoing requirement that Overbids be
        made and received on an open basis.  In the event an Auction is
        conducted, the Purchaser shall be permitted, but is not required to, submit
        one or more Overbids.

(n)     To the extent that any Overbid includes consideration other than cash, the Debtors shall disclose their valuation of the total consideration offered in such Overbid (and the basis for their determination) in order to confirm that each Overbid meets the requisite bid increment and to provide a floor for further Overbids.

(o)     The Debtors may adopt additional rules for the Auction at or prior to the Auction that, in their reasonable discretion (following consultation with Morgan Joseph, the Secured Lenders and professionals of any official committee of unsecured creditors appointed in the cases), will better promote the goals of the Auction and the Debtors' duties and obligations as debtors-in-possession.

(p)     In the event the Purchaser submits an Overbid at the Auction (a "Purchaser's Overbid") in order to top an Overbid submitted by another Qualified Bidder, the amount of the Break-Up Fee shall be added to the amount of the Purchaser's Overbid for purposes of determining whether the Purchaser's Overbid is the highest or best bid and whether such bid meets the requisite bid increment.

(q)     The Auction shall continue until there is only one offer or combination of offers that the Debtors determine is the highest and/or best offer from among the Qualified Bidders (including the Purchaser) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider in the exercise of their reasonable business judgment (and in consultation with Morgan Joseph, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser as are set forth in the applicable Purchase Agreement or Modified Purchase Agreement(s).

(r)     The Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their reasonable business judgment at the Auction (and in consultation with Morgan Joseph, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), shall be required to serve as a Back-Up Bidder (the "Back-Up Bidder"). Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors and Back-Up Bidder will be

authorized, but not required, to consummate the Sale without further order of the Bankruptcy Court. The obligation to close of the Back-Up Bidder hereunder shall expire on the earlier of the Closing of a Sale to the Successful Bidder or the Outside Date.

(s)     Within three (3) Business Days after adjournment of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. In announcing the Successful Bid and the Back-Up Bid, the Debtors shall announce the material terms of each Bid and the basis for determining the total consideration offered. If no Auction is held, then the Bid of the Purchaser as represented by the Purchase Agreement shall be deemed to be the Successful Bid.

(t)     The Debtors presently intend to sell the Purchased Assets to the Successful Bidder, pursuant to the Purchase Agreement or Modified Purchase Agreement(s), as applicable. The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Sale Hearing (as defined below). Except as otherwise provided in the Purchase Agreement or Modified Purchase Agreement(s), as applicable, and to the fullest extent permitted by the jurisdiction of the Bankruptcy Court, all of the Debtors' right, title and interest in and to the Assets and Purchased Assets shall be sold free and clear of all Liens and Claims, other than Assumed Liabilities, such Liens and Claims to attach to the proceeds. If the Debtors sell any or all of the Purchased Assets to a Successful Bidder other than the Purchaser, the Debtors will pay the Break-Up Fee in accordance with the Purchase Agreement at the Closing.

(u)     Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder (other than the Back-Up Bidder) by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held until the earlier to occur of the Closing of the Sale to the Successful Bidder or the Outside Date, as applicable. The Good Faith Deposit of the Successful Bidder shall be held until the Closing of the Sale and applied in accordance with the Purchase Agreement or Modified Purchase Agreement(s), as applicable. If the Successful Bidder or Back-Up Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder or Back-Up Bidder, as applicable, the Successful Bidder's Good Faith Deposit or Back-Up Bidder's Good Faith Deposit, as applicable, shall be forfeited to the Debtors.

(v)     The Successful Bid will be subject to approval by the Court. The Sale Hearing will take place on **July [__], 2013 at _____ a.m. (prevailing Eastern Time)** before the Honorable _____, United States

Bankruptcy Court for the District of Delaware, 824 Market Street, Courtroom [    ], [    ] Floor, Wilmington, DE, 19801. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

45.    The Debtors believe that the foregoing Sale Procedures provide an appropriate framework for selling the Assets in a uniform fashion and will enable the Debtors to review, analyze and compare all bids received to determine which bid is, or bids are, in the best interests of the Debtors' estates and creditors. Therefore, the Debtors respectfully request that this Court approve the Sale Procedures.

**G.    The Auction and Sale Hearing Notice and Notice of Motion**

46.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing any objections thereto. The Auction and Sale Hearing Notice (a copy of the substantial form of which is attached hereto as Exhibit B) contains the type of information required under Bankruptcy Rule 2002(c), and also includes information on the Sale Procedures and the procedures for the submission of bids. This information will enable interested parties to participate in the Auction and at the Sale Hearing if they so chose. The Debtors accordingly request that this Court approve the form and content of the Auction and Sale Hearing Notice.

47.    The Debtors propose to serve the Auction and Sale Hearing Notice, within five (5) days of the entry of the Procedures Order, by first-class mail, postage prepaid, to (a) all potential purchasers identified by the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Committee, if any, (d) counsel to the DIP Lenders, (e) counsel

24

to the Pre-Petition First Lien Agent, (f) counsel to the Pre-Petition Second Lien Agent, (g) the parties-in-interest who have requested notice in these cases pursuant to Bankruptcy Rule 2002, (h) the parties to the Debtors' executory contracts and unexpired leases that may be subject to assumption and assignment or rejection, and (i) all government agencies required to receive notice of proceedings under the Bankruptcy Rules.  The Auction and Hearing Notice provides that any party not on the Motion Service List that wishes to obtain a copy of the Sale Motion, including all exhibits hereto, may make such a request in writing to Klehr Harrison Harvey Branzburg LLP, 919 Market Street, Suite 1000, Wilmington, DE 19801, Attn: Domenic E. Pacitti, Esq.

48.    The Debtors will serve a copy of this Motion, including all exhibits hereto, by first-class United States mail, upon (a) the Office of the United States Trustee, (b) the 30 largest unsecured creditors for each Debtor and counsel to the Committee, if any, (c) counsel to the DIP Lender, (d) counsel to the Pre-Petition First Lien Agent, (e) counsel to the Pre-Petition Second Lien Agent, and (f) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

49.    The Debtors submit that (a) the notice to be provided through the Auction and Sale Hearing Notice and this Motion and (b) the method of service proposed herein constitutes good and adequate notice of the sale of the Assets and the proceedings to be had with respect thereto (including, but not limited to, the Auction and the Sales Hearing).    Therefore, the Debtors respectfully request that this Court approve the foregoing notice procedures.

## H.    Bidding Protections Are Fair And Reasonable

50.    As set forth above, and in other pleadings filed with the Court, the Debtors have been aggressively marketing the Assets and will continue to do so.  While the

Debtors have determined in their reasonable business judgment that an auction sale of certain of the Assets at this time, such an Auction would be of little value absent the Purchaser setting the minimum purchase price for the Acquired Assets under the Agreement. Subject to the terms of the Agreement, the Debtors will continue to negotiate with potential purchasers and will subject the Agreement to higher and better offers.

51.     The Debtors hereby request that the Court approve certain bidding protections to the Purchaser that are customary in similar circumstances (collectively, the "*Bidding Protections*"), including: (a) a Break-Up Fee in the amount of $678,750 (approximately three percent (3%) of the cash consideration received by the Debtors under the Agreement) ("*Break-Up Fee*"); (b) an initial overbid for all or a portion of the assets of the Debtors (or any combination of bids that the Debtors proposes to accept, in the aggregate) have a value, as determined in the reasonable judgment of the Debtors, that is equal to the sum of (i) $22.625 million (being the cash consideration payable by the Purchaser under the Agreement), and (ii) $1,000,000, (the "*Initial Overbid*"); and (c) in the event that an Initial Overbid is made and Purchaser makes subsequent bids at an auction, or otherwise, Purchaser may "credit bid" the Break-Up Fee. Bidding increments for the Assets at the Auction shall be in aggregate minimum monetary increments that would, if accepted by the Debtors, result in the Debtors receiving aggregate consideration for all of the Assets of not less than $100,000 in excess of the consideration provided for in the highest then pending offer or Bid. The Debtors submit that cause exists to approve the Bidding Protections because they are fair and reasonable under the circumstances here. The Break-Up Fee shall be afforded super-priority administrative expense priority under sections 503(b) and 507 of the Bankruptcy Code in the Chapter 11 Cases and shall

be payable from the proceeds of the closing of a sale to a Successful Bidder, other than the Purchaser.

52.     As set forth in the Sale Motion, there are several compelling business justifications for the proposed asset sale pursuant to the Agreement. Most importantly, the Agreement enables the Debtors to preserve the going concern value of most of their Assets. Accordingly, there are compelling reasons to approve the instant Motion.

53.     The Debtors believe that the payment of the Break-Up Fee and the establishment of bidding procedures are both reasonable and necessary to induce the Purchaser to enter into the transactions encompassed by the Purchase Agreement and to obtain the highest price possible for the Assets.

54.     The payment of a Break-Up Fee is normal and customary in transactions of this nature. Such fees have frequently been approved in connection with asset sales in other chapter 11 cases. Moreover, without the agreement to this fee, the Debtors believe that it would have no initial offer for the Assets. Court approval of the Break-Up Fee is, therefor, in the best interests of the Debtors, their estates and their creditors.

55.     Payment of a Break-Up Fee as part of a sale process is a generally accepted practice. Break-Up Fees encourage an initial purchaser to invest the time, effort and money necessary to consummate the purchase of a debtor's assets, despite the possibility that such purchaser may not ultimately acquire the property. As such, it is an important tool to be used to encourage bidding. The determination of whether a Break-Up Fee or expenses should be allowed is made based on whether the fees and expenses are necessary to preserve the value of the estate. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999). The considerations that underlie a debtor's

business judgment to pay the Break-Up Fee are relevant to the Court's determination of the request. Id. Indeed, many courts have evaluated Break-Up Fee arrangements under the business judgment rule standard. *Cottle v. Storer Communications, Inc.,* 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores,* 683 F.Supp. 422 (S.D.N.Y. 1988); *In re Integrated Resources, Inc.,* 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993).

56.    As to the propriety of approval of the Break-Up Fee, it is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Resources, Inc.,* 147 B.R. at 658. In the instant case, the proposed Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and Purchaser. The Break-Up Fee is approximately [3]% of the consideration to the Debtors pursuant to the Agreement. It is the Debtor's business judgment that the Break-Up Fee are fair and reasonable in the perspective of the time, effort, cost and expense that Purchaser has incurred in negotiating the Agreement and the aggregate consideration to be paid by Purchaser. If other offers for the Assets are received, it will be because Purchaser has served as a "stalking horse" for such offers.

57.    The Break-Up Fee of [3]% is in the middle of the spectrum of Break-Up Fees approved by bankruptcy courts in Chapter 11 cases, particularly when compared to sales of a similar magnitude. *See e.g., In re Montgomery Ward Holding Corp., et al.,* Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved Break-Up Fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.,* Case No, 97-1893 (PJW) (Bankr. D. Del., April 28, 1998) (Court approved

Break-Up Fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Ameriserve Food Distributions, Inc., et al.,* Case No. 00-358 (PJW) (Bankr. D. Del., April 3, 2000) (Court approved topping fee of $250,000 in connection with $38,500,000 sale of assets); *In re Anchor Container Corp. et, al.,* Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (Court approved Break-Up Fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.,* Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved Break-Up Fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Brothers Stores. Inc. et al.,* Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved Break-Up Fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re Industrial General Corp.,* Case No. 95-895 (PJW) (Bankr. D. Del.) (Court approved Break-Up Fee of 3.57%, or $500,000, in connection with $14,000,000 sale transaction); *In re Buddy L. Inc.,* Case No. 95-23S (HSB) (Bankr. D. Del.) (Court approved Break-Up Fee of 1.6%, or $800,000, in connection with $50,000,000 sale of debtors' toy division); *In re Continental Airlines, Inc.,* Case No. 90-932 (HSB) (Bankr. D. Del.) (Court approved Break-Up Fee of 2.4%, or $1,500,000, in connection with $61,000,000 sale transaction); *see also Integrated Resources,* 147 B.R. at 648; *In re Crowthers McCall Pattern, Inc.,* 113 B.R. 877, 879 (Bankr. S.D.N.Y. 1990); *In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). In general, Break-Up Fees encourage an interested party, i.e., Purchaser, to expend money, time and effort to negotiate with a debtor, notwithstanding that the transaction is subject to the risks presented by a pending chapter 11 case and uncertainty

as to the approval of the transaction by the Bankruptcy Court. Break-Up Fees are intended to compensate the initial bidder for serving as a "stalking horse" and, thereby, encouraging the participation of other bidders for the assets to be sold.

58.    The Sale of the Purchased Assets is subject to higher and better offers. The Debtors will consider higher and better offers and advise potential buyers of the Assets. If higher and better offers emerge, they will be considered with reference and by comparison to the terms of the Agreement. Thus, there will be no loss or prejudice to the estate or its creditors if this Motion is approved.

## I.    Assumption of the Escrow Agreement is in the Best Interests of the Debtors

59.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del 2003). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F. 2d 36, 39-40 (3d Cir. 1989).

60.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting

scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

61.    As part of the Purchase Agreement, the Debtors, Purchaser and PNC Bank, National Association (the "*Escrow Agent*") executed an Escrow Agreement dated May 29, 2013 (the "*Escrow Agreement*") attached hereto as **Exhibit D**. Pursuant to Section 3.2 of the Purchase Agreement, Purchaser and the Debtors have agreed, and the Purchaser in fact did deposit $4,525,000 in escrow with the Escrow Agent subject to the terms and conditions set forth in the Escrow Agreement.

62.    The Debtors seek to assume the Escrow Agreement in order to effectuate its terms and conditions as part of the Purchase Agreement. The Escrow Agreement affords the Debtor the protection of the good faith deposit under the Purchase Agreement in case of a default by Purchaser thereunder.

63.    The Debtors believe in their business judgment that the assumption of the Escrow Agreement is in its best interests and in the best interests of its creditors and estates.

### NO PRIOR REQUEST

64.    No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

65.    Notice of this Motion has been provided in accordance with the notice procedures set forth above.

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested in this Motion and grant the Debtors such other and further relief as this Court deems just and proper.

Dated: May 30, 2013          */s/ Domenic E. Pacitti*
Wilmington, Delaware         Domenic E. Pacitti (DE Bar No. 3989)
                             Michael W. Yurkewicz (DE Bar No. 4165)
                             **KLEHR HARRISON HARVEY**
                             **BRANZBURG LLP**
                             919 N. Market Street, Suite 1000
                             Wilmington, Delaware 19801
                             Telephone:    (302) 426-1189
                             Facsimile:    (302) 426-9193

                             *Proposed Counsel to the Debtors*
                             *and Debtors in Possession*